—1—

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                       WACO DIVISION

3   WSOU INVESTMENTS, LLC    *
    DBA BRAZOS LICENSING     * February 21, 2023
4   AND DEVELOPMENT          *
                             *
5   VS.                      *    CIVIL ACTION NOS.
                             *
6   DELL TECHNOLOGIES INC.,  * W-20-CV-480/481/486
    DELL INC., EMC CORP      *
7   AND VMWARE INC.          *

8         BEFORE THE HONORABLE ALAN D ALBRIGHT
                JURY TRIAL PROCEEDINGS
9                   Volume 1 of 3

10  APPEARANCES:

11  For the Plaintiff:   Jonathan K. Waldrop, Esq.
                         Marcus A. Barber, Esq.
12                       John W. Downing, Esq.
                         Darcy L. Jones, Esq.
13                       Heather S. Kim, Esq.
                         ThucMinh Nguyen, Esq.
14                       Kasowitz Benson Torres, LLP
                         333 Twin Dolphin Drive, Suite 200
15                       Redwood Shores, CA 94065

16                       Hershy Stern, Esq.
                         Julianne Laporte, Esq.
17                       Kasowitz Benson Torres LLP
                         1633 Broadway
18                       New York, NY 10019

19                       Paul G. Williams, Esq.
                         Kasowitz Benson Torres LLP
20                       1349 West Peachtree Street, NW
                         Suite 1500
21                       Atlanta, GA 30309

22                       Gregory Phillip Love, Esq.
                         Steckler Wayne Cherry & Love PLLC
23                       PO Box 948
                         Henderson, TX 75653
24

25
```

2

```
 1                          Mark D. Siegmund, Esq.
                            Melissa Samano Ruiz, Esq.
 2                          Steckler Wayne Cherry & Love, PLLC
                            8416 Old McGregor Road
 3                          Waco, TX 76712

 4   For the Defendant:     Brian Rosenthal, Esq.
                            Benjamin Hershkowitz, Esq.
 5                          Gibson, Dunn & Crutcher LLP
                            200 Park Ave.
 6                          New York, NY 10166

 7                          Jaysen S. Chung, Esq.
                            Y. Ernest Hsin, Esq.
 8                          Gibson Dunn & Cruthcher LLP
                            555 Mission Street, Suite 3000
 9                          San Francisco, CA 94105

10                          Casey J. McCracken, Esq.
                            Nathaniel R. Scharn, Esq.
11                          Emily M. Whitcher, Esq.
                            Gibson, Dunn & Crutcher LLP
12                          3161 Michelson Drive
                            Irvine, CA 92612
13
                            Veronica Smith Moye, Esq.
14                          Gibson, Dunn & Crutcher LLP
                            2001 Ross Avenue, Suite 2100
15                          Dallas, TX 75201

16                          Barry K. Shelton, Esq.
                            Winston & Strawn LLP
17                          2121 N. Pearl Street, Suite 900
                            Dallas, TX 75201
18
     Court Reporter:        Kristie M. Davis, CRR, RMR
19                          PO Box 20994
                            Waco, Texas 76702-0994
20                          (254) 340-6114

21      Proceedings recorded by mechanical stenography,

22   transcript produced by computer-aided transcription.

23




24




25
```

3

09:01  1                    (Hearing begins.)

09:01  2                    THE BAILIFF:  All rise.

09:01  3                    THE COURT:  Good morning, everyone.

09:01  4    Please be seated.

09:01  5                    Happy to hear whatever issues you have to

09:01  6    take up.

09:02  7                    Good morning, Mr. Siegmund.

09:02  8                    MR. SIEGMUND:  Good morning, Your Honor.

09:02  9    Appreciate your time this morning.  Mark Siegmund on

09:02  10   behalf of Plaintiff.

09:02  11                   There's two issues I believe, Your Honor,

09:02  12   one of them I'm not going to address.  I believe the

09:02  13   defendants raised that, I believe, the Court is in

09:02  14   violation of the Seventh Amendment for the '800 patent.

09:02  15   I'll let them address that.

09:02  16                   The other issue I wanted to address is

09:02  17   the motion they filed this morning on unaccused

09:02  18   products, supposedly.  And these issues have already

09:02  19   been decided by Judge Gilliland.  As Mr. Scott probably

09:02  20   is well aware, there is no motion for summary judgment

09:02  21   on the '360 patent.  And the motion for summary

09:02  22   judgment only affected the '800 patent in terms of

09:02  23   damages.  Which I think we're in agreement we are not

09:02  24   presenting a damages case at this trial.

09:02  25                   So defendants are arguing, Your Honor,

4

| 09:02 | 1 | because we have to show in order to prove infringement |

```
09:02   1   because we have to show in order to prove infringement

09:02   2   that VMware offers for sale software and hardware.

09:02   3   That's what we have to show.  And they're saying that

09:02   4   hardware has to be out of this case.

09:02   5             And it's a bridge too far, Your Honor.

09:03   6   Because from the very beginning in ECF No. 1, our

09:03   7   complaint, we specifically said that we accused VMware

09:03   8   software on hardware, specifically VxRail and Dell

09:03   9   PowerEdge.  And those are the two products that I

09:03   10  believe Defendants say are not in this case.

09:03   11            But what I think Your Honor cares about

09:03   12  is the expert reports.  So what I think Your Honor

09:03   13  cares about is going to be the citations to our expert

09:03   14  reports.  And I have those readily available if you

09:03   15  would like, Judge.

09:03   16            But suffice it to say, they're in our

09:03   17  infringement contentions which is an exhibit to

09:03   18  Dr. McClellan's infringement report.  And then

09:03   19  Mr. Weinstein has also, in his expert report, accused

09:03   20  these exact same products.

09:03   21            And so we really don't think there's any

09:03   22  dispute about this.  These products are fairly in the

09:03   23  case.  They've been in the case since the very

09:03   24  beginning in our complaint.  All the way through

09:03   25  infringement contentions and reports.
```

| | | |
|---|---|---|
| 09:04 | 1 | So I think that's the issue, Judge. |
| 09:04 | 2 | The only other, I think, issue that they |
| 09:04 | 3 | might try to argue is that VMware Cloud is not in this |
| 09:04 | 4 | case.  But that's a marketing term, Judge.  vSphere is |
| 09:04 | 5 | the accused product.  And vSphere is VMware Cloud. |
| 09:04 | 6 | And, Jorge, if you could pull up the |
| 09:04 | 7 | exhibit, 646.  Sorry, 645.  Excuse me. |
| 09:04 | 8 | Okay.  Page 3. |
| 09:04 | 9 | I'm still seeing the first page. |
| 09:04 | 10 | There we go.  Thank you. |
| 09:05 | 11 | And so, Your Honor, this is a VMware |
| 09:05 | 12 | marketing document.  As you can see, it says VMware |
| 09:05 | 13 | Cloud on Dell is a VMware-managed cloud service |
| 09:05 | 14 | offering that brings VMware's enterprise-class |
| 09:05 | 15 | software. |
| 09:05 | 16 | And it specifically says, VMware vSphere |
| 09:05 | 17 | running on Dell VxRail.  So this is in the case.  It's |
| 09:05 | 18 | been in here the whole time. |
| 09:05 | 19 | And unless Your Honor has any questions, |
| 09:05 | 20 | I'm happy to provide the citations, but for right now I |
| 09:05 | 21 | think that's all I have. |
| 09:05 | 22 | THE COURT:  Yes, sir. |
| 09:05 | 23 | MR. ROSENTHAL:  Good morning, Your Honor. |
| 09:05 | 24 | THE COURT:  Good morning. |
| 09:05 | 25 | MR. ROSENTHAL:  Brian Rosenthal on behalf |

09:05    1    of the defendants.  It's good to be here.  We're

09:05    2    looking forward to trial.

09:05    3              We do have a couple of issues.  The first

09:05    4    issue I think Mr. Siegmund did correctly identify.  And

09:05    5    he also identified correctly that Judge Gilliland has

09:05    6    already resolved this issue.

09:05    7              In fact, Judge Gilliland has already

09:05    8    resolved this issue I think four or five times.  This

09:06    9    case, in the complaint, originally identified some Dell

09:06    10   hardware.  It originally identified VxRail.  It

09:06    11   originally identified PowerEdge.  Those are two Dell

09:06    12   hardware servers.

09:06    13             Then came the preliminary infringement

09:06    14   contentions.  And there was no mention of any Dell

09:06    15   hardware.  During discovery they tried to get discovery

09:06    16   about the Dell hardware and we had a hearing in front

09:06    17   of Judge Gilliland.  This was in April of 2022, almost

09:06    18   a year ago.

09:06    19             And Judge Gilliland said, it's not in

09:06    20   your contentions.  You're not getting discovery on

09:06    21   VxRail and PowerEdge.

09:06    22             Then they tried to amend their

09:06    23   infringement contentions way late in the case in August

09:06    24   of 2022.  And we moved to exclude those amended -- or

09:06    25   they moved for leave to amend their contentions.  We

7

09:06  1  had a hearing about that in November.

09:06  2              And again, Judge Gilliland denied the

09:07  3  request and said it's too late.  You can't wait until

09:07  4  the end of the case to add these to your case.  So the

09:07  5  Dell hardware products are out.

09:07  6              Then we moved for summary judgment of no

09:07  7  indirect infringement.  And we moved to strike

09:07  8  Dr. McClellan's expert report that referred to some of

09:07  9  this hardware because that dealt with indirect

09:07  10  infringement.  There's no indirect infringement in this

09:07  11  case at all.  That was dismissed long ago.

09:07  12              And again Judge Gilliland agreed with us

09:07  13  and excluded those portions of Dr. McClellan's report

09:07  14  that Mr. Siegmund wants to cite to.  Those deal with

09:07  15  indirect infringement.

09:07  16              They deal with customers' use of Dell

09:07  17  hardware in their installation sites.  That is not at

09:07  18  issue in this case.  And again Judge Gilliland agreed

09:07  19  with us.

09:07  20              And then as recently as last -- was it

09:08  21  last Friday?  Was it just a few days ago?  The time is

09:08  22  running -- the days are running into each other.  But

09:08  23  literally four days ago we had a hearing about this

09:08  24  very issue.

09:08  25              Because despite all of that history, WSOU

8

09:08   1    tried to amend its expert reports to add VxRail and

09:08   2    PowerEdge and VMware Cloud which just is a service that

09:08   3    uses those pieces of hardware from Dell.  Add them to

09:08   4    the expert reports.  There were supplemental reports

09:08   5    that we got at midnight the night before, on

09:08   6    Valentine's Day.

09:08   7              And Judge Gilliland said no.  You can't

09:08   8    add those to this case.

09:08   9              So I don't know -- I have two problems.

09:08   10   First of all, they should not be allowed to add

09:08   11   something to this case.  And it's all over their

09:08   12   slides.  It's all over their McClellan demonstratives.

09:08   13   I'm sure this is, you know, what their case is going to

09:08   14   be about.

09:08   15             But these patents -- the two patents, by

09:08   16   the way, that this pertains to are just the '360 patent

09:09   17   and the '800 patent.  These patents, they have decided

09:09   18   to assert only an apparatus claim and only direct

09:09   19   infringement, no indirect infringement.  And they have

09:09   20   never accused Dell products of meeting any of these

09:09   21   elements.

09:09   22             So I don't know why we're arguing it

09:09   23   again.  I don't think we should be arguing this every

09:09   24   day.  I think we should move on to the things that are

09:09   25   at issue in this case, not the things that have been

09:09  1    repeatedly excluded from this case.

09:09  2                    Thank you, Your Honor.

09:09  3                    MR. SIEGMUND:  Judge, just to clear it

09:09  4    up, Mark Siegmund on behalf of the plaintiff.

09:09  5                    The '800 patent, Exhibit 4 infringement

09:09  6    contentions, Pages 2, 3, 4 and 52 explicitly say Dell

09:09  7    PowerEdge.  I mean, plain, end of story.  They've been

09:09  8    in there since the entire time.

09:09  9                    Second thing I wanted to address, on the

09:09  10   indirect infringement was stricken.  However, the

09:09  11   following paragraphs of the '800 patent and

09:10  12   Dr. McClellan's report are still there.  And that's the

09:10  13   Paragraph 86, 152, 163, 235, 303, 375 and so on.

09:10  14                    And, Your Honor, an offer for sale of the

09:10  15   software and hardware is an issue of fact that we

09:10  16   intend to prove in hopefully about 20 minutes before

09:10  17   this jury.  That's different than the expert saying

09:10  18   whether or not he's opining on that.

09:10  19                    And we are going to prove it.  And we

09:10  20   should have the chance to do so.  And Judge Gilliland

09:10  21   didn't say anything differently to that.  Because the

09:10  22   products have been here.  That's all I have.

09:10  23                    (Off-the-record bench conference.)

09:11  24                    THE COURT:  Mr. Rosenthal, could I...

09:11  25                    MR. ROSENTHAL:  Yes, Your Honor.

| | | |
|---|---|---|
| 09:11 | 1 | THE COURT:  I'm going to maintain what |
| 09:11 | 2 | Judge Gilliland has done all along.  Will you tell me |
| 09:11 | 3 | exactly on the record what it is you believe is |
| 09:11 | 4 | excluded so I can make sure the plaintiffs hear it and |
| 09:11 | 5 | know what is excluded? |
| 09:11 | 6 | MR. ROSENTHAL:  Yes, Your Honor.  Any |
| 09:11 | 7 | evidence or argument that pertains to the unaccused |
| 09:11 | 8 | products Dell VxRail, Dell PowerEdge or VMware Cloud. |
| 09:11 | 9 | Those are the three buzzwords.  Dell hardware is |
| 09:12 | 10 | another. |
| 09:12 | 11 | THE COURT:  You said... |
| 09:12 | 12 | MR. ROSENTHAL:  Those -- |
| 09:12 | 13 | THE COURT:  And the last, you just -- |
| 09:12 | 14 | MR. ROSENTHAL:  Oh.  VMware Cloud?  Is |
| 09:12 | 15 | that the one? |
| 09:12 | 16 | THE COURT:  I have VMware Cloud. |
| 09:12 | 17 | MR. ROSENTHAL:  So there's three. |
| 09:12 | 18 | There's -- |
| 09:12 | 19 | THE COURT:  I've got it. |
| 09:12 | 20 | MR. ROSENTHAL:  Oh, you got those?  I was |
| 09:12 | 21 | just going to say Dell hardware generally.  No Dell |
| 09:12 | 22 | hardware is at issue. |
| 09:12 | 23 | THE COURT:  Okay. |
| 09:12 | 24 | MR. ROSENTHAL:  Thank you, Your Honor. |
| 09:12 | 25 | THE COURT:  Those are excluded and will |

| 09:12 | 1 | not be included in any slides that the jury sees during |
| 09:12 | 2 | the opening. |
| 09:12 | 3 | What else do we have? |
| 09:12 | 4 | MR. ROSENTHAL:  I do have -- Mr. Shelton |
| 09:12 | 5 | is going to address the '800 damages issue. |
| 09:12 | 6 | THE COURT:  Okay. |
| 09:12 | 7 | MR. ROSENTHAL:  And I think a couple of |
| 09:12 | 8 | housekeeping matters. |
| 09:12 | 9 | THE COURT:  Mr. Shelton? |
| 09:12 | 10 | MR. SHELTON:  Good morning, Your Honor. |
| 09:12 | 11 | Barry Shelton for the defendants. |
| 09:12 | 12 | As Your Honor is aware, Judge Gilliland |
| 09:12 | 13 | granted in part the defendants' Daubert motion on |
| 09:12 | 14 | Mr. Roy Weinstein, and struck all of his damages |
| 09:12 | 15 | opinions on the '800 patent.  As a result of that |
| 09:12 | 16 | ruling, Plaintiff is not permitted to put on an '800 |
| 09:13 | 17 | damages case in this trial. |
| 09:13 | 18 | Whereas defendants' damages expert, |
| 09:13 | 19 | Dr. Becker, will put on damages opinions.  And the |
| 09:13 | 20 | quantum of damages that he'll present to the jury is |
| 09:13 | 21 | around $40,000 for the '800 patent. |
| 09:13 | 22 | As Your Honor suggested in the final |
| 09:13 | 23 | pretrial conference on February 1st -- and this is Page |
| 09:13 | 24 | 58, Line 7 through Page 61, Line 5 -- Your Honor |
| 09:13 | 25 | suggested that -- one of two options. |

09:13  1          One is that the defendants could allow

09:13  2    the plaintiff to rely on Dr. Becker's damages opinions

09:13  3    on the '800 patent, and we made that offer.  We elected

09:13  4    to allow them to do that on February 18th.

09:13  5          We learned on Saturday that the plaintiff

09:13  6    declined that invitation and decided to choose Door

09:13  7    No. 2, which was Your Honor's suggestion that perhaps

09:13  8    you could take up damages post trial if there was, in

09:13  9    fact, a finding by the jury that Claim 16 of the '800

09:14  10   patent was infringed and not invalid.

09:14  11         The problem with that option, Your Honor,

09:14  12   is that it would violate the defendants' right under

09:14  13   the Seventh Amendment to have this jury in this trial

09:14  14   determine damages.  And the defendants have not waived

09:14  15   and do not waive our Seventh Amendment right.  And I

09:14  16   know the Seventh Amendment is something that Your Honor

09:14  17   holds near and dear.

09:14  18         THE COURT:  Well, I don't think we need

09:14  19   to take this up now.  And what I'm saying by that is,

09:14  20   because I don't want to say it doesn't matter, but

09:14  21   until there's a finding for the plaintiff of

09:14  22   infringement and no invalidity, I haven't done

09:14  23   anything.

09:14  24         And so I think your objection will be at

09:14  25   the time I -- if I choose to take Method No. 2.  Which,

09:14  1  I mean, right now I'm not -- all I'm doing now is

09:15  2  allowing the plaintiff to put on an infringement case.

09:15  3  You all are putting on an invalidity case, I think.

09:15  4  But there'll be no mention of damages on the '800

09:15  5  patent.

09:15  6            If I do move forward in the way I

09:15  7  suggested at that time, y'all need to remind me, but

09:15  8  before I do it, and maybe I'll even have briefing on it

09:15  9  to see if that's -- I did that as you -- off the cuff.

09:15  10  I mean, I just was trying to figure out a way -- I've

09:15  11  had this issue come up before where I have stricken the

09:15  12  plaintiff's damages expert.  And what do you do going

09:15  13  forward?  That's why I gave those two options.

09:15  14            I'm not sure you're right, I'm not sure

09:15  15  you're wrong.  But I don't think we need to take it up

09:15  16  now.  I don't think we need to take it up until I

09:15  17  choose to move forward by allowing them to do that.  If

09:15  18  that makes sense.

09:15  19            MR. SHELTON:  Yes, Your Honor.  However,

09:15  20  I just want to point out that if Your Honor does not

09:16  21  submit '800 damages to this jury, it will violate our

09:16  22  constitutional rights.  And it will be too late.  That

09:16  23  bell cannot be unrung.

09:16  24            THE COURT:  Oh, I'm sorry.  I entirely

09:16  25  missed what you were saying.  That's my fault.

```
09:16   1              You're saying that if -- even if the jury
09:16   2   doesn't put on any evidence of damages, because they
09:16   3   have elected not to go with yours, that I still need to
09:16   4   submit a damages question to the jury in this trial
09:16   5   because you believe that the -- this jury ought to
09:16   6   render a verdict on the damages?
09:16   7              MR. SHELTON:  Yes, Your Honor.  In
09:16   8   fact --
09:16   9              THE COURT:  I'm -- I was -- I was
09:16  10   thinking the problem was -- I understand it now.  So
09:16  11   let me hear a response that.
09:16  12              Yes, ma'am.  Good morning.
09:16  13              MS. JONES:  Good morning, Your Honor.
09:16  14   Darcy Jones on behalf of Plaintiff.
09:16  15              As Your Honor knows, courts have wide
09:17  16   discretion to bifurcate trials for -- on liability and
09:17  17   on damages.  There is no violation of a Seventh
09:17  18   Amendment right.
09:17  19              THE COURT:  I think -- and you can help
09:17  20   me answer this question.  I believe that it was the
09:17  21   practice of Judge Robinson in Delaware for her entire
09:17  22   career to submit the issue of infringement and
09:17  23   invalidity and not submit the question of damages.
09:17  24              And then I think she told me -- if this
09:17  25   is wrong, it's my fault and not hers.
```

09:17  1          I think she told me that she never had to
09:17  2  have the second trial, that once there was
09:17  3  infringement, it was -- if there wasn't infringement,
09:17  4  there wasn't a second trial.  And if there was
09:17  5  infringement, people worked things out.
09:17  6          And so clearly she believed that you
09:17  7  could bifurcate and do damages in a second case.
09:17  8          MS. JONES:  Yes, Your Honor.  You're
09:17  9  absolutely correct.  That is the practice in the
09:17 10  district -- was the practice in the District of
09:17 11  Delaware, also the practice by Judge Davis in the
09:17 12  Eastern District of Texas, also practiced in the
09:18 13  Northern District of Texas.
09:18 14          Judge Davis has done it in the past, her
09:18 15  instance in the Intel Corp versus CSIRO case in 2008 --
09:18 16          THE COURT:  Well, again, even now
09:18 17  understanding this, I think this is an issue I can take
09:18 18  up at the jury charge and decide whether or not to
09:18 19  submit something.
09:18 20          So -- but at least -- yes, sir.
09:18 21  Mr. Shelton?
09:18 22          MR. SHELTON:  May I respond, Your Honor?
09:18 23          THE COURT:  Unless -- I don't know that
09:18 24  you need to now.  Is there something we need to take up
09:18 25  now?

09:18  1          MR. SHELTON:  I just wanted to point out

09:18  2  with this discussion of bifurcation that it just pushes

09:18  3  the problem, that they have no evidence to put on of

09:18  4  the '800 damages, to potentially a different jury or

09:18  5  the same jury, which is I believe what Judge Robinson

09:18  6  would have done.

09:18  7          THE COURT:  And that may be the result as

09:18  8  well.  I mean, now the problem we have, as you're

09:18  9  aware, is that under the law a party that proves

09:18  10  infringement is entitled to a reasonable royalty.

09:18  11  That's what the statute says.

09:18  12          And so that's -- this isn't --

09:19  13  unfortunately for all of us, this isn't a diversity

09:19  14  case on a breach of an insurance contract, where if

09:19  15  they don't have damages evidence, they don't have

09:19  16  damages evidence.

09:19  17          The problem I'm having here is trying to

09:19  18  be faithful to the statute that the plaintiff's

09:19  19  entitled to damages and what to do given the situation

09:19  20  we find ourselves in.

09:19  21          But you've made your record that you gave

09:19  22  them an opportunity to put on a damage case by using

09:19  23  your damage expert.  And if they choose not to, then

09:19  24  I'll have to figure out before I charge the jury

09:19  25  whether or not by doing that they've waived their right

09:19  1   to have a second trial.

09:19  2              Because -- and your argument is, there

09:19  3   would be no evidence in the second trial.  I get that.

09:19  4   And I'll have to decide whether or not what could be

09:20  5   deemed -- I'm not saying it is, but it could be deemed

09:20  6   a waiver might compel me to find that there would be no

09:20  7   question asked in this case and there would be no

09:20  8   second trial.

09:20  9              MR. SHELTON:  Your Honor, I have taken

09:20  10  the liberty of providing a case that I would like to

09:20  11  look at.  It's Federal Circuit, Lindemann

09:20  12  Maschinenfabrik v.  American Hoist.  It's 895 F.2d

09:20  13  1403.  And the pages --

09:20  14             THE COURT:  Say that again, 895 --

09:20  15             MR. SHELTON:  It's 895 F.2d 1403.  And

09:20  16  the page that's relevant is 1407.  I have a copy to

09:20  17  hand to Your Honor.

09:20  18             THE COURT:  Okay.

09:20  19             MR. SHELTON:  And this case, Your Honor,

09:20  20  deals with the issue that you just identified.  Namely,

09:20  21  the tension in the statute Section 284 that says that

09:20  22  when damages are available due to infringement, it

09:21  23  shall be no less than a reasonable royalty.

09:21  24             And this case on PDF Page 5, Your Honor,

09:21  25  and I've highlighted for Your Honor and the party --

09:21  1    the parties, I think this nails it.

09:21  2                It says:  "As above indicated, the

09:21  3    statute obviates the need to show the fact of damage

09:21  4    when infringement is admitted or proven, but that does

09:21  5    not mean that a patentee who puts on literal or no

09:21  6    evidence -- satisfactory evidence of a reasonable

09:21  7    royalty can successfully appeal on the ground that the

09:21  8    amount awarded by the Court is not 'reasonable' and

09:21  9    therefore contravene Section 284."

09:21  10               And in this same case, Your Honor, there

09:21  11   is a cite to a Supreme Court case that says that as

09:21  12   between statutory provisions like Section 284 and the

09:21  13   Constitution, obviously, our Seventh Amendment right

09:21  14   controls and trumps the statute.

09:21  15               So I think if Your Honor looks at Page 5

09:22  16   in that case, it will demonstrate that -- that this

09:22  17   jury must take up '800 damages to preserve the

09:22  18   defendants' Seventh Amendment rights.

09:22  19               And, Your Honor, there's two other

09:22  20   matters briefly that I want to address.

09:22  21               The first is a trial sequencing issue.

09:22  22   And I know it's the Court's practice to generally not

09:22  23   take up and hear argument on Rule 50(a) motions that

09:22  24   are made during trials.

09:22  25               However, I think as has already been

09:22  1    previewed for you by Mr. Rosenthal, you're going to see

09:22  2    that there are very significant proof problems in the

09:22  3    plaintiff's infringement case and that the defendants

09:22  4    will file a Rule 50(a) motion shortly after the close

09:22  5    of Plaintiff's case and urge you to hear argument on

09:22  6    it.  And I think that you will find that Your Honor

09:22  7    should take this case away from the jury.

09:22  8              Depending on the evidence that comes in

09:22  9    in Plaintiff's case-in-chief, Defendants may not put on

09:23  10   an invalidity case.  That would dramatically shorten

09:23  11   the trial and, as Your Honor knows, will obviate the

09:23  12   need or the right for Plaintiff to put on a rebuttal

09:23  13   case.

09:23  14             And then, lastly, Your Honor, as you

09:23  15   know, Judge Gilliland took up some 14 motions, I

09:23  16   believe, in his motion hearings on January 27 and

09:23  17   January 30 and issued two reports and recommendations

09:23  18   in each of the cases.

09:23  19             And the parties then filed numerous

09:23  20   objections to those reports and recommendations.  And I

09:23  21   think, as a housekeeping matter, Your Honor should rule

09:23  22   on those objections before the jury comes in so that

09:23  23   those rulings are the law of the case.

09:23  24             And I can read in the docket numbers in

09:23  25   the three cases of the R&Rs and of the objections if

| | | |
|---|---|---|
| 09:23 | 1 | that would assist Your Honor. |
| 09:23 | 2 | THE COURT:  Hold on one second. |
| 09:24 | 3 | (Off-the-record bench conference.) |
| 09:24 | 4 | THE COURT:  I think there was an issue |
| 09:24 | 5 | last week, late last week, about the ripeness of them |
| 09:24 | 6 | being available for me to rule on, but I think that's |
| 09:24 | 7 | been overcome by the passage of time. |
| 09:24 | 8 | And I'm going to overrule all the |
| 09:24 | 9 | objections that were made to Judge Gilliland's reports |
| 09:24 | 10 | and recommendations. |
| 09:24 | 11 | MR. SHELTON:  Okay.  Thank you, Your |
| | 12 | Honor. |
| 09:24 | 13 | And just one more thing that I should |
| 09:24 | 14 | have mentioned, Your Honor, with respect to the '800 |
| 09:24 | 15 | damages issue. |
| 09:24 | 16 | If Your Honor is inclined to submit the |
| 09:24 | 17 | issue of damages not to this jury, which of course I |
| 09:24 | 18 | strenuously argue that you must under the Constitution, |
| 09:24 | 19 | there should be, of course, no opportunity for this |
| 09:24 | 20 | plaintiff who has made all of its strategic and |
| 09:25 | 21 | tactical decisions throughout this case resulting in |
| 09:25 | 22 | its damages expert being struck, they should have no |
| 09:25 | 23 | opportunity to put in new opinions, new evidence -- |
| 09:25 | 24 | THE COURT:  I think we can take that up. |
| 09:25 | 25 | MR. SHELTON:  Thank you, Your Honor. |

09:25   1            MR. SIEGMUND:  Good morning, Your Honor.
09:25   2    Mark Siegmund on behalf of the plaintiff.
09:25   3            Quick point of clarification, because it
09:25   4    might obviate a lot of this, is:  We understand your
09:25   5    ruling that you're excluding any mention of hardware or
09:25   6    software as it pertains to factual evidence.  And we
09:25   7    believe that was an expansion of Judge Gilliland's
09:25   8    ruling because we thought that he said this only
09:25   9    applied to expert opinions.
09:25   10            So I just wanted to clarify that issue.
09:25   11   Because if your ruling does apply to no mention of
09:25   12   hardware along with the sale of software in terms of
09:25   13   factual evidence, then we're going to have to move for
09:25   14   continuance on the '360 and the '800 patents.
09:25   15            THE COURT:  I'm not sure exactly what
09:25   16   you're saying.  I mean --
09:26   17            MR. SIEGMUND:  So I guess what I'm
09:26   18   saying, Your Honor, is --
09:26   19            THE COURT:  Well, I've made my ruling.
09:26   20   In four minutes you all are going to be doing your
09:26   21   opening arguments.
09:26   22            Is there anything else we need to take
09:26   23   up?
09:26   24            MR. SIEGMUND:  Just for the record, Your
09:26   25   Honor, we just have to move for a continuance on the

```
09:26   1    '360.
09:26   2                   THE COURT:  And that's been respectfully
09:26   3    overruled.
09:26   4                   MR. SIEGMUND:  Got it.  Thank you, Your
09:26   5    Honor.
09:26   6                   MR. ROSENTHAL:  I have something that's
09:26   7    actually for the openings.  There are four slides.
09:26   8                   THE COURT:  Just hand them to me and I'll
09:26   9    look at them.
09:26   10                  MR. ROSENTHAL:  I have them right here.
09:26   11              Rather than me playing telephone,
09:26   12   Mr. Scharn knows all the details.  He'll identify which
09:27   13   slides we have a problem with.  It just has to do with
09:27   14   some incorrect facts and a verdict form that hasn't
09:27   15   been agreed.
09:27   16                  MR. SCHARN:  Good morning, Your Honor.
09:27   17   I'll try to be brief here since I know the jury is
09:27   18   waiting on us.
09:27   19              So the first issue is we have -- we've
09:27   20   reached some agreement on some of our objections that
09:27   21   we provided last night as to Plaintiff's opening
09:27   22   demonstrative, but we haven't seen a revised
09:27   23   demonstrative yet where we can check that those
09:27   24   agreements have been satisfied.
09:27   25                  So we'd ask that we get a revised
```

09:27   1   demonstrative before things start up here.

09:27   2                    THE COURT:  Can Plaintiff's counsel

09:27   3   provide them with the updated?

09:27   4                    MR. SCHARN:  So then, as Mr. Rosenthal

09:27   5   mentioned, there are two slides that appear to have the

09:27   6   verdict form.  The problem is that that is not the

09:27   7   actual verdict form.  So there's a risk of confusion

09:27   8   for the jury there.

09:28   9                    We suggested that they just put text

09:28   10  instead of the actual -- what appears to be the jury

09:28   11  verdict form.  And it doesn't seem like they were

09:28   12  taking our suggestion.  We don't know yet because we

09:28   13  haven't seen the revised slides.

09:28   14                   THE COURT:  Let me hear from the

09:28   15  plaintiff.  I don't believe I've had anyone discuss the

09:28   16  verdict form during opening argument.

09:28   17                   MR. WALDROP:  Good morning, Your Honor.

09:28   18                   THE COURT:  Yes, sir.

09:28   19                   MR. WALDROP:  Your Honor, we don't call

09:28   20  it the verdict form.  We say that the jury's going to

09:28   21  be asked two questions.  We do not refer it to as a

09:28   22  verdict form in any way.  It's not labeled a verdict

09:28   23  form.  But those are the questions that they will be

09:28   24  asked.

09:28   25                   And, Your Honor, we're happy to take the

```
09:28   1    slides down, Your Honor.  But I think you're going to
09:28   2    instruct them that they're going to ask these two
09:28   3    questions so --
09:28   4              THE COURT:  I would take the slides down
09:29   5    at this point.  I think it's much -- I think it's
09:29   6    asking a little much during the opening argument for
09:29   7    them to see that.  And you'll get to use those during
09:29   8    closing.
09:29   9              MR. WALDROP:  Thank you, Your Honor.  I
09:29   10   appreciate Your Honor.  Thank you.
09:29   11             THE COURT:  Yes, sir?
09:29   12             MR. SCHARN:  So the next issue is Slide
09:29   13   35 of Plaintiff's opening presentation.  Maybe it's 36.
09:29   14   Sorry about that.
09:29   15             So the problem with this one is
09:29   16   Plaintiffs filed two motions in limine stating that
09:29   17   Defendants cannot compare the specification to the
09:29   18   accused product.  But that's exactly what Plaintiff has
09:29   19   done here.
09:29   20             They were successful in those two
09:29   21   motions.  Your Honor granted those.  So, you know, it's
09:29   22   kind of a sauce for the goose/gander situation.
09:29   23             THE COURT:  A response?
09:29   24             MR. WALDROP:  Your Honor, we accommodated
09:29   25   them by removing the title slide.  And this is the
```

09:29  1    patent on the left side and the figure on the face of

09:30  2    the patent, Your Honor.  And on the right side is what

09:30  3    they call VeloCloud from their documents, Your Honor.

09:30  4              Your Honor, we're not going to say that

09:30  5    we're saying that the figure infringes the patent.

09:30  6    But, Your Honor, but we're showing the jury what on the

09:30  7    left is the '133 patent, which apparently is the only

09:30  8    patent remaining in the case, Your Honor, and

09:30  9    VeloCloud, the product that they said we believe is

09:30  10   covered by it.

09:30  11             We're not going to say this.  The title

09:30  12   will be removed but we think this is fair game, Your

09:30  13   Honor.

09:30  14             THE COURT:  Counsel?  I'm a goose for the

09:30  15   gander if -- if counsel for Plaintiff wants to do this,

09:30  16   then I'm probably going to be pretty liberal in what I

09:30  17   allow the defendant to do in a similar -- I don't care.

09:30  18   I just want it to be fair.

09:30  19             If you'd like to use this, and I

09:30  20   understand why you would, it doesn't offend me.  But I

09:30  21   would probably be pretty generous in what I allow the

09:30  22   defendants to do with the figures as well.

09:30  23             MR. WALDROP:  Thank you, Your Honor.

09:31  24             THE COURT:  Okay.  So I'll overrule that

09:31  25   objection.

| | | |
|---|---|---|
| 09:31 | 1 | Counsel? |
| 09:31 | 2 | MR. SCHARN:  Very well, Your Honor. |
| 09:31 | 3 | For the sake of time, the -- there are |
| 09:31 | 4 | only two more.  These are document objections with |
| 09:31 | 5 | Dr. McClellan.  And the first one is with respect to |
| 09:31 | 6 | PTX -- |
| 09:31 | 7 | (Off-the-record discussion.) |
| 09:31 | 8 | MR. ROSENTHAL:  I'm so sorry, Mr. Scharn. |
| 09:31 | 9 | This will happen in the afternoon.  Can we do that at |
| 09:31 | 10 | lunch so the jury can come in? |
| 09:31 | 11 | THE COURT:  Of course. |
| 09:31 | 12 | MR. ROSENTHAL:  Is that all right? |
| 09:31 | 13 | Thanks. |
| 09:31 | 14 | THE COURT:  Is there anything else we |
| 09:31 | 15 | need to take up? |
| 09:31 | 16 | MR. SIEGMUND:  Not from the plaintiff, |
| 09:31 | 17 | Your Honor. |
| 09:31 | 18 | THE COURT:  Okay.  We'll -- |
| 09:31 | 19 | MR. ROSENTHAL:  Not from us, Your Honor. |
| 09:31 | 20 | THE COURT:  Mr. Rosenthal, will y'all be |
| 09:31 | 21 | doing your openings this morning? |
| 09:31 | 22 | MR. ROSENTHAL:  Oh, yes. |
| | 23 | THE COURT:  Okay. |
| 09:31 | 24 | MR. ROSENTHAL:  Thank you. |
| 09:31 | 25 | THE COURT:  In about two minutes we'll |

—27—

09:31  1    bring the jury in.

09:31  2                    THE BAILIFF:  All rise.

09:31  3                    (Recess taken.)

09:35  4                    THE BAILIFF:  All rise.

09:35  5                    THE COURT:  Please remain standing for

09:35  6    the jury.

09:35  7                    (Jury entered the courtroom.)

09:36  8                    THE COURT:  Thank you.  You may be

09:36  9    seated.

09:36  10                   Ladies and gentlemen of the jury, let me

09:36  11   introduce myself to you.  My name is Alan Albright.

09:36  12   I'm the United States district judge for the Waco

09:36  13   Division of the Western District of Texas.

09:36  14                   COVID must officially be over.  You are

09:36  15   the first jury in three years that's sat next to each

09:36  16   other.  And so it's -- I think it's a good thing for

09:36  17   our nation that we're back, and that we appreciate all

09:36  18   of you being here.

09:36  19                   There's one housekeeping matter I'm going

09:36  20   to take up before I ask these fine gentlemen to give

09:37  21   you their opening arguments.  Unfortunately, and this

09:37  22   has no impact on you, but a very close friend of mine

09:37  23   passed away in his sleep over the weekend and his

09:37  24   funeral is on Friday.  So we will not be having trial

09:37  25   on Friday.

```
09:37   1                    I know that interferes with the lawyers'
09:37   2       schedule.  And I'm sorry for them.  And I know it
09:37   3       interferes with your schedule and being able to get the
09:37   4       case done.  But I'll be in another city on Friday.  And
09:37   5       I apologize for not being here for that.  But I just
09:37   6       wanted you to know why we're not going Friday.
09:37   7                    So you're about to hear the opening
09:37   8       arguments by counsel.  It's important for you to
09:37   9       understand that these are not evidence.  What they're
09:37  10       going to do is try to provide you with a blueprint of
09:37  11       what they anticipate the evidence will show.
09:37  12                    You are blessed to have some of the
09:37  13       finest lawyers in our country arguing on both sides of
09:38  14       this case.  I'm very much looking forward to the trial.
09:38  15       But the opening arguments are just arguments.
09:38  16                    When the plaintiff calls their first
09:38  17       witness, that's when the evidence will begin.
09:38  18                    So that being said, Counsel, would you
09:38  19       like to give the opening argument in the case?
09:38  20       Mr. Waldrop?
09:38  21                    MR. WALDROP:  Yes, Your Honor.  Thank
09:38  22       you, Your Honor.
09:38  23                    THE COURT:  And would you like any
09:38  24       warning before your time is up?
09:38  25                    MR. WALDROP:  Yes, Your Honor.  Five
```

09:38  1    minutes, Your Honor.

09:38  2                    THE COURT:  You'll have it.

09:38  3                    MR. WALDROP:  I hope to be -- never hear

09:38  4    that.

09:38  5                    (Laughter.)

09:38  6                    THE COURT:  Okay.

09:39  7                    MR. WALDROP:  There we are.  There we

09:39  8    are.

09:39  9                    May it please the Court.  Good morning,

09:40  10   ladies and gentlemen of the jury.  My name is Jonathan

09:40  11   Waldrop and I represent Brazos, a company based right

09:40  12   here in Waco, Texas, and this trial against VMware, one

09:40  13   of the largest computer networking companies in the

09:40  14   world, based in California.

09:40  15                   Yesterday was my birthday.  And thank

09:40  16   you.  And I have to say that it is a great honor and

09:40  17   blessing to be with you here today.  And of course with

09:40  18   Judge Albright.

09:40  19                   With me at counsel table are the lawyers

09:40  20   on the Brazos team who will be trying this case with

09:40  21   me.  They include Darcy Jones, Greg Love.  And also at

09:40  22   counsel table is Craig Etchegoyen, the founder and

09:40  23   chairman of Brazos, my client.

09:40  24                   Now, sitting behind counsel table are

09:40  25   other lawyers on the Brazos team who will be

09:40    1    participating in this trial.  They include Mark

09:41    2    Siegmund and Heather Kim.  This is their first trial

09:41    3    and they'll be taking witnesses in their first trial

09:41    4    and I'm very proud of them.  Hershy Stern, Minh Nguyen,

09:41    5    Paul Williams and Julianne Laporte.

09:41    6              Now, ladies and gentlemen, the stars of

09:41    7    this case are U.S. Patent Nos. 7,539,133, 9,164,800,

09:41    8    7,092,360.  Brazos owns these patents and these patents

09:41    9    are Brazos' property.  During the trial I'll call all

09:41    10   three Brazos' property, Brazos' patents.

09:41    11             Each patent covers valuable and important

09:41    12   inventions that improve congestion on computer

09:41    13   networks.  VMware uses Brazos' patents without

09:41    14   permission and without paying Brazos.

09:41    15             In the pandemic almost everyone has used

09:41    16   some kind of video conference software -- software

09:42    17   application or streaming service like FaceTime or

09:42    18   YouTube.  Could you even imagine going through that

09:42    19   challenging time without these technologies?

09:42    20             And everybody has had the experience when

09:42    21   the video is spotty or the sound is out or it's blurry

09:42    22   or it's slow or the sound goes out.  Now, Brazos'

09:42    23   patents solve these problems and allow you to stream

09:42    24   these videos without interruption.

09:42    25             You'll note an example from last Thursday

09:42  1    when Judge Gilliland gave about the traffic light.

09:42  2    Well, the flow of information on the Internet is a lot

09:42  3    like the flow of the traffic on the highway.  And the

09:42  4    information that flows on the Internet flows in the

09:42  5    form of data packets.

09:42  6            And just like the highway can be

09:42  7    overloaded with traffic from cars, the Internet can be

09:42  8    overloaded from traffic from these data packets.  And

09:42  9    just like congestion on the highway, a network can be

09:42  10   congested.  And we all know that congestion is bad.

09:43  11           Now, from the end-user perspective, on

09:43  12   the highway network congestion feels like a network

09:43  13   slow down, feels like things are moving slowly.  And

09:43  14   that happens when the network is overflowed and can't

09:43  15   handle the data traffic that's on the network.

09:43  16           Because of our client's technologies

09:43  17   which reduce network congestion, you can sit at your

09:43  18   home or your mobile computer or your mobile device and

09:43  19   stream services by connecting to the network over the

09:43  20   Internet and use services like FaceTime or YouTube or

09:43  21   e-mail and enjoy that service reliably and quickly.

09:43  22           You know what it's like, and we all do,

09:43  23   to be on the highway and there's construction.  And

09:43  24   there's stop-and-go traffic on the highway.  Where our

09:43  25   technologies, our client's technologies, it's like

09:43  1    driving on the express lane all day, every day.  These

09:44  2    are amazing technologies that many of us, most of us,

09:44  3    have grown accustomed to but 20 years ago were unheard

09:44  4    of.

09:44  5                    You see, ladies and gentlemen, the Brazos

09:44  6    patents in this case were invented by Alcatel-Lucent.

09:44  7    Now, Alcatel-Lucent was formed by a combination of AT&T

09:44  8    Technologies and Bell Labs, among others.

09:44  9                    Now, ladies and gentlemen, Bell Labs is

09:44  10   one of the most innovative companies in U.S. history.

09:44  11   Bell Labs is still innovating and making new inventions

09:44  12   today.  The scientists at Bell Labs have received nine

09:44  13   Nobel Prizes for physics.  Nine.  With their latest in

09:44  14   2018.

09:44  15                   Now, you may have also -- and this is

09:44  16   important too.  One of the inventors of the '800 patent

09:44  17   that we're going to discuss in this case works for Bell

09:44  18   Labs.

09:44  19                   Now, you may have also heard of Nokia.

09:44  20   Nokia introduced the first camera phone and is a leader

09:45  21   in network technology.  Nokia owns tens of thousands of

09:45  22   patents and has invested billions of dollars in

09:45  23   developing that technology.

09:45  24                   Now, Nokia bought Alcatel-Lucent and all

09:45  25   of their patents in 2016.  And all of their patents in

09:45    1    2016.

09:45    2                    Now, in 2017, a year later, when our

09:45    3    client saw the amazing Brazos patents and the amazing

09:45    4    technology that they encountered -- that they had, our

09:45    5    client, Brazos, decided to buy the Brazos patents from

09:45    6    Nokia.  And the Brazos patents became our client's

09:45    7    property.

09:45    8                    And Brazos then decided to license the

09:45    9    Brazos patents to companies like VMware who were using

09:45    10    the Brazos patents without permission and without

09:45    11    paying for them.

09:45    12                    And what I mean by license, license is

09:45    13    permission from the patent owner to use it.  It's like

09:45    14    when you have a lease of a car.  You don't own the car

09:46    15    but you have the right to use the car under certain

09:46    16    conditions.  Like how many miles you can drive, who's

09:46    17    the main driver, when you have to return the car.

09:46    18    That's what a license is.  It's permission.  And our

09:46    19    client got the rights to grant that permission.

09:46    20                    Now, also, our client teamed up with

09:46    21    Nokia and agreed to give Nokia a portion of the revenue

09:46    22    that it received from the companies like VMware who had

09:46    23    agreed to pay for the permission to use those patents.

09:46    24    That was part of the deal.

09:46    25                    In other words, Brazos helps patent

09:46  1    owners get fairly compensated for their inventions,

09:46  2    which encourages other people to make new and important

09:46  3    inventions.

09:46  4              Imagine constantly creating new

09:46  5    inventions only to have corporations like VMware profit

09:46  6    from them without asking, without paying anyone.

09:46  7              It is crucial for the American economy

09:47  8    that we foster innovation and invention and that patent

09:47  9    owners receive fair compensation for the invention.

09:47  10             Now, in fact, Brazos wasn't the only

09:47  11   company that recognized the value of the patented

09:47  12   technologies.  VMware also saw their potential, and

09:47  13   they started using Brazos' patents and Brazos'

09:47  14   technologies in products they called vSphere 6.5 and

09:47  15   VeloCloud.

09:47  16             Now, the network congestion control

09:47  17   technologies that our client Brazos paid for and now

09:47  18   owns, the amazing technologies that our client owns the

09:47  19   patents for, and I'm going to talk about the patents in

09:47  20   a minute, VMware uses these technologies for its

09:47  21   vSphere and VeloCloud products and they call it

09:47  22   VeloCloud SD 1.  And I'll call it VeloCloud for most of

09:47  23   this case.

09:47  24             VMware use these same technologies

09:47  25   without permission, without license from Brazos,

09:48  1    without paying Brazos for anything.

09:48  2                Now, taking something of value without

09:48  3    asking and without paying is stealing.  And that's

09:48  4    precisely what VMware has done in this case.

09:48  5                Like many corporations, VMware has

09:48  6    decided to take a wait-and-see approach.  VMware has

09:48  7    decided, we'll take our chances.  VMware has decided

09:48  8    that it's worth the risk to use Brazos' patents and not

09:48  9    pay Brazos.

09:48  10               So ladies and gentlemen, VMware has

09:48  11   forced my client, forced us to bring them to court

09:48  12   today to resolve this.  That's the reason why we're

09:48  13   here, ladies and gentlemen.  That's the reason why

09:48  14   we're asking you to resolve this.

09:48  15               VMware just out and took our client's

09:48  16   network technologies, put them in their products where

09:48  17   our products are being used by millions of people every

09:49  18   day, and VMware's making a fortune from our

09:49  19   technologies and has not paid our client a single dime.

09:49  20               And VMware's been doing this for years.

09:49  21               Now, I come from a long line of ministers

09:49  22   in Alabama.  My great grandfather was a minister.  And

09:49  23   my grandfather said to me, he told me, he said,

09:49  24   Jonathan, son, you may be small and you may be David

09:49  25   and they may be and are Goliath, but God gave David a

09:49  1    slingshot.

09:49  2              And Brazos' slingshot is our day in court

09:49  3    here in Waco to protect our property rights.  And

09:49  4    that's why we're here, ladies and gentlemen.

09:49  5              Now, last Thursday you remember hearing

09:49  6    from Judge Fogel in the patent video that a patent is a

09:49  7    property right.  A patent is a right to exclude others

09:50  8    from your property, from making, using or selling your

09:50  9    patented technology.

09:50  10             So when you get a patent, the U.S. laws

09:50  11   and even the U.S. Constitution give you the right to

09:50  12   exclude others.

09:50  13             Brazos has the right to exclude VMware or

09:50  14   anyone else from making, using or selling the patented

09:50  15   technology covered by the Brazos' patents.  In other

09:50  16   words, VMware can't use any of Brazos' patents without

09:50  17   Brazos' permission.

09:50  18             And patent infringement is just like

09:50  19   trespassing on somebody's property.  It is not a

09:50  20   defense to patent infringement to say, well, they're

09:50  21   not the owners or they're not making use of it.

09:50  22             Just like somebody can't come on to your

09:50  23   property without asking you and saying that you, you

09:50  24   didn't build a house on it, you're not making use of

09:50  25   it.  It's your property.  You have the right to defend

09:50    1    it.

09:50    2                    And Judge Gilliland told you last

09:51    3    Thursday, he said that if a patent is granted, it's

09:51    4    presumed valid.  And what that means is no one can use

09:51    5    the invention without getting the patent owner's

09:51    6    permission.

09:51    7                    And if you do use it without permission,

09:51    8    you must pay the patent owner.  That's fair.  But

09:51    9    VMware has refused.

09:51    10                   So now let's take a look at the three

09:51    11   Brazos patents at issue in this case, what VMware

09:51    12   stole.

09:51    13                   Ladies and gentlemen, the patents are

09:51    14   very detailed and technical.  But don't worry, Brazos

09:51    15   has a technical expert who's going to come in and walk

09:51    16   you through each of these patents and what they're

09:51    17   about.  But I'm going to try to summarize for you at a

09:51    18   high level so you're familiar with them.

09:51    19                   The first patent is -- Brazos patent is

09:51    20   the patent you'll see on the top.  It's the 7,539,133

09:51    21   patent.  And for purposes of this trial, I'll call it

09:51    22   the '133 patent.  And then you'll see the title, it

09:52    23   says:  Method and apparatus for preventing congestion

09:52    24   in load-balancing networks.

09:52    25                   You'll also see, ladies and gentlemen,

09:52   1    that the assignee is Alcatel-Lucent USA, Inc.  And

09:52   2    that's there just because Alcatel-Lucent owned it at

09:52   3    the time.  You remember Nokia bought Alcatel-Lucent

09:52   4    later.

09:52   5                    And you'll see right under that that it

09:52   6    was filed on March 23, 2006.  And it issued on May 26,

09:52   7    2009.

09:52   8                    Now, you'll see that from the time the

09:52   9    '133 patent application was filed and was ultimately

09:52   10   granted in 2009, it took three years for the experts at

09:52   11   the USPTO to review the application and ultimately

09:52   12   issue.

09:52   13                   Now, what that means is these experts who

09:52   14   specialize in patents, they reviewed it for three

09:52   15   years.  And they ultimately decided to grant 22 claims

09:52   16   in the '133 patent.  Each claim is a different

09:52   17   invention.  So there's 22 inventions in the '133 patent

09:52   18   that are claimed.

09:52   19                   Now, ladies and gentlemen, I'm guessing

09:52   20   you'll breathe a sigh of relief, we're only going to

09:53   21   deal with one of those 22 inventions in this trial.

09:53   22   And that's lucky Claim 13.

09:53   23                   Lucky Claim 13 is an invention that

09:53   24   allows for the processing of those data packets I

09:53   25   talked about on the Internet, on the computer network,

09:53   1   to avoid congestion at the exit points in the network.

09:53   2   And it also routes traffic based on the priority of the

09:53   3   information of the data packets.

09:53   4           One way to think about this in your

09:53   5   everyday life is to -- remember when I talked about how

09:53   6   this technology relates to network congestion and how

09:53   7   that is like highway congestion?

09:53   8           Think of a computer traffic cop who

09:53   9   directs traffic of packets of information to the best

09:53   10   exits on the road when they're congested, and -- but

09:53   11   this is a special computer cop -- traffic cop because

09:53   12   he knows information about the congestions at the exits

09:53   13   ahead.  He sees ahead.

09:53   14           But as we all know, not all traffic is

09:53   15   created equal, right?

09:53   16           So the traffic cop is able to prioritize

09:53   17   different kinds of traffic.  So he knows the difference

09:53   18   between the police, the ambulance, the funeral

09:54   19   procession over regular commuter traffic.

09:54   20           So this traffic cop can prioritize

09:54   21   traffic to the right exit before regular commuter

09:54   22   traffic.

09:54   23           Now, Brazos' technical expert is going to

09:54   24   explain all of this in great technical detail to you,

09:54   25   but you'll understand it.

09:54  1              Now, let's talk about the second Brazos

09:54  2  patent and you'll see that this patent on the top

09:54  3  right-hand corner is the U.S. 9,164,800, and I'll call

09:54  4  it the '800 patent for purposes of this trial.

09:54  5              This is entitled:  Optimizing latencies

09:54  6  in cloud systems by intelligent compute node placement.

09:54  7  You'll see the title of it.

09:54  8              You'll also see here the assignee is

09:54  9  Alcatel-Lucent.  They owned it at the time.  Remember,

09:54  10  Nokia bought Alcatel-Lucent, so did the Brazos.  Brazos

09:54  11  owns it now.

09:54  12             Now, you'll see this was filed

09:54  13  October 25, 2012, and it issued on October 20, 2015.

09:54  14  We'll call this the '800 patent.

09:55  15             Again, the experts at the USPTO who

09:55  16  specialize in patents, they reviewed this for three

09:55  17  years.  And they ultimately decided to issue it with 24

09:55  18  claims.  That's 24 different inventions.  Again, we're

09:55  19  only going to talk about one.

09:55  20             We're going to talk about only one

09:55  21  invention of the '800 patent, and that's Claim 16.  And

09:55  22  it's shown here on the screen.

09:55  23             Now, at the time of the invention of

09:55  24  Claim 16, businesses and governments stored data,

09:55  25  right, in those big physical data centers, those large,

—41—

09:55  1   tall buildings with racks of servers, right, all in a
09:55  2   central location.
09:55  3          And the only way that you could get the
09:55  4   data you wanted was to go to that central location, and
09:55  5   that was the only way you could get it, that particular
09:55  6   location.
09:55  7          Now, the invention of Claim 16, however,
09:55  8   allows virtual machines and servers so that users can
09:55  9   get the data they need from multiple sources, not just
09:55  10  stuck to that central location, and that way you avoid
09:56  11  network congestion.  Multiple places to get
09:56  12  information.
09:56  13         Now, you remember I talked earlier about
09:56  14  the '133 patent and it was an exit traffic cop, the
09:56  15  computer traffic cop.  One way to think of this is to
09:56  16  imagine that you're trying to get to a Whataburger, and
09:56  17  you don't care which one you get to because you want
09:56  18  that burger.  You're hungry.  You just want the burger
09:56  19  and you want to get there the fastest.
09:56  20         Well, this computer traffic cop of the
09:56  21  '800 patent gets you to the Whataburger that's not
09:56  22  crowded, that's not congested.
09:56  23         Now, you're going to hear a lot more
09:56  24  technical details about this from Brazos' technical
09:56  25  expert, but I want to give you a sense of how these

09:56  1   patents avoid congestion and how that relates to you in

09:56  2   your everyday life.

09:56  3            Now, the last patent that we're going to

09:56  4   talk about is the third Brazos patent, which is the

09:56  5   U.S. 7,092,360 patent.  We'll call it the '360 patent

09:56  6   for purposes of this trial.  And the title of it is:

09:56  7   Monitor, system and method for monitoring performance

09:56  8   of a scheduler.

09:56  9            Now, you'll see here the assignee is

09:57  10  labeled Tropic Networks, Inc.  Now, Alcatel-Lucent in

09:57  11  2007 bought Tropic Networks and all of their patents,

09:57  12  including the '360 patent.  But at the time this patent

09:57  13  issued, it was owned by Tropic Networks.  Now, it's

09:57  14  Brazos' property.

09:57  15            Now, ladies and gentlemen, you see on the

09:57  16  date that the application was filed in December 28,

09:57  17  2001, and that it issued on August 15, 2006.

09:57  18            Now, again, after reviewing this patent

09:57  19  for five years, the experts at the United States Patent

09:57  20  Office did their work carefully and granted the '360

09:57  21  patent, which has 49 inventions, 49.  And we're only

09:57  22  going to talk again about only one, and that's Claim 1

09:57  23  of the '360 patent.

09:57  24            Now, this patent also deals with traffic

09:57  25  congestion on the Internet.  This invention allows for

09:57  1    the monitoring of a computer network to make sure that

09:57  2    the data packets are being sent at the right time

09:58  3    without problems.

09:58  4              So one way to think about this in your

09:58  5    everyday life is imagine that you're in a car that's

09:58  6    broken down on the highway.  However, you don't have

09:58  7    any idea what's wrong with the car.  It's smoking.

09:58  8    We've all been there.

09:58  9              However, it won't drive no matter what.

09:58  10   And in this instance, you just got to get the car

09:58  11   towed.

09:58  12             Well, and we know that takes a lot of

09:58  13   time and money.  But without -- with the invention of

09:58  14   the Claim 1 of the '360 patent, the driver gets a

09:58  15   message from your car monitor and it says, hey, your

09:58  16   oil is low.

09:58  17             And with that information, you can go to

09:58  18   the nearest Valvoline and get the oil change you need

09:58  19   instead of waiting there not knowing what's happening

09:58  20   with your car and getting it towed.

09:58  21             It does that for flow of information on

09:58  22   the Internet.  Now, Brazos' technical expert is going

09:58  23   to explain all of this to you in more detail.

09:58  24             Now, I'm still -- I'm thinking that you

09:59  25   may be thinking to yourself, look.  What are all these

—44—

09:59  1    technical terms?  You know, what is a switching node?
09:59  2    What is a load-balancing network?  What's all these
09:59  3    terms in this patent?
09:59  4              Well, thankfully the Court has already
09:59  5    defined some of these terms as having the plain and
09:59  6    ordinary meaning for one of ordinary skill in the art,
09:59  7    and that just means they've been explained to someone
09:59  8    to use the meaning of someone who understands the
09:59  9    invention.
09:59  10             And Brazos' technical expert understands
09:59  11   the inventions.  And he's going to explain them to you
09:59  12   in a way that you can understand.
09:59  13             Now, in the beginning of my opening I
09:59  14   talked a little bit about the plaintiff Brazos, my
09:59  15   client, and how it helps companies license their
09:59  16   patents that are being used without permission.
09:59  17             Brazos also licenses patents that it
09:59  18   owns.  Brazos owns many, many patents from many
09:59  19   innovative companies.  And what I mean by that is that
09:59  20   Brazos will give people permission, if they obtain it,
09:59  21   to use their technology.  They want people to use their
10:00  22   technology, with permission, if they pay for it.
10:00  23             And so people come to Brazos to help them
10:00  24   get compensated when others are using their patents
10:00  25   without permission.

| | |
|---|---|
| 10:00 | 1 |

                    Now, Brazos owns thousands of patents,
like I said before, developed from
Nokia/Alcatel-Lucent, Bell Labs and other companies and
other companies.  And many, many, many companies have
taken licenses from Brazos to use Brazos' technology
which means they can lawfully use Brazos' patents
because they got permission.  So Brazos does that.
They'll give permission if you do it the right way.

                    And these companies that have gotten
permission to use Brazos' patented technologies and
inventions, they include companies like Microsoft, NEC,
Huawei, NXP, many, many others that you heard from.  So
meaning of these companies have paid money to Brazos so
that they can lawfully use the technology owned by
Brazos.  VMware has not.

                    Now, the first witness that you will hear
from in this case will be Mr. Craig Etchegoyen.  This
is Brazos' chairman and founder.  Mr. Etchegoyen is
sitting right here, here today in court.  You'll hear
from him in a few minutes.

                    He's spent most of his life helping
underdogs protect their patent rights.  He's an
inventor himself of over 100 patents.  And he started
several successful companies.  He will testify about
Brazos and why they're here today defending their

10:01  1    property rights.

10:01  2                Now, let's talk a little bit about the

10:01  3    defendant VMware and the accused products in this case.

10:01  4    VMware was founded in 1998.  It's a technology company.

10:01  5    It sells products that have solutions to reduce network

10:01  6    congestion.  Those products include hardware and

10:01  7    software.

10:01  8                And what I mean by hardware, I mean by

10:01  9    the physical machine or device.  And what I mean by

10:01  10   software is the instructions that go in the device to

10:01  11   tell it what to do.

10:01  12               Now, VMware was purchased by a company

10:02  13   called EMC -- you may have heard of it -- in 2004 and

10:02  14   was subsequently bought by Dell in September 2016.

10:02  15   Now, VMware and Dell separated in 2021.  And now VMware

10:02  16   is a standalone company.

10:02  17               Now, ladies and gentlemen, in addition to

10:02  18   Dell having owned VMware, Dell and VMware had a

10:02  19   partnership.  VMware offers to its customers software

10:02  20   and hardware included in their pricing.  It has been a

10:02  21   very lucrative and successful partnership.

10:02  22               Now, on this slide we have the products

10:02  23   that infringe Brazos' patents.  We have the VeloCloud

10:02  24   product and then vSphere 6.5 and later versions,

10:02  25   different models of products that came after

10:02  1    vSphere 6.5.  Throughout the trial I'll call this

10:02  2    VeloCloud and vSphere 6.5.

10:02  3              Now, in 2017, VMware bought a company

10:02  4    called VeloCloud which had been selling the VeloCloud

10:03  5    SD-WAN products.  That's the accused -- one of the

10:03  6    accused products in this case.  And VMware has kept

10:03  7    selling that product today.  And they haven't stopped.

10:03  8              Now, VeloCloud and vSphere 6.5 were

10:03  9    critical to VMware's business.  And the evidence will

10:03  10   show that.

10:03  11             Now, the evidence will also show that

10:03  12   Brazos' patents are critical to reducing network

10:03  13   congestion.  It will show that people didn't want to

10:03  14   buy VMware's products without technology that reduced

10:03  15   network congestion significantly, right, and increase

10:03  16   performance.  And that's what Brazos' patents do.

10:03  17             Now, everyone has heard the saying that a

10:03  18   picture is worth a thousand words.  Now, this is just

10:03  19   some of the evidence that you will see during the

10:03  20   trial.  Here on the left is a Figure 1 from the '133

10:03  21   patent and on the right --

10:03  22             THE COURT:  Mr. Waldrop, you have five

10:03  23   minutes.

10:03  24             MR. WALDROP:  Okay.  And on the right are

10:04  25   technical documents that describe the VeloCloud SD-WAN

10:04  1    product.

10:04  2                    The evidence will show that Claim 1,

10:04  3    Claim 13 of the '133 patent covers Figure 1.  And that

10:04  4    Claim 13 of the '133 patent covers VeloCloud.  Imagine

10:04  5    if those pictures were put side by side on top of each

10:04  6    other.

10:04  7                    The evidence will show that VMware wanted

10:04  8    to provide the best networking technology performance

10:04  9    available.  And the Brazos patents enabled much faster

10:04  10   and better performance.

10:04  11                   Now, the evidence will also show that the

10:04  12   three Brazos patents issued years before VMware started

10:04  13   selling the infringing products.  And that they

10:04  14   continue to infringe today.

10:04  15                   Now, on Slide 39, the first -- the second

10:04  16   witness you will hear from will be -- from

10:04  17   Mr. Etchegoyen will be -- after Mr. Etchegoyen will be

10:04  18   Dr. Stan McClellan.  This is the technical expert who's

10:05  19   going to come in here and explain all of this to you.

10:05  20   He's a professor of electrical engineering and computer

10:05  21   engineering at -- right down the road at Texas State

10:05  22   University.

10:05  23                   He's going to come through -- come in and

10:05  24   walk you through all the technical details of the

10:05  25   patent in which hopefully you can understand.  And he's

```
10:05    1    going to help you answer one and the first most
10:05    2    important question which is whether the accused VMware
10:05    3    products infringe the claims of Brazos' patents.
10:05    4              Now, last Thursday Judge Gilliland told
10:05    5    you that to prove infringement that we had a burden of
10:05    6    proof by a preponderance of the evidence.  At least
10:05    7    50 percent, a little bit more than 50 percent.  We're
10:05    8    going to exceed that.
10:05    9              But that's our burden.  Just a little bit
10:05   10    over 50 percent.  And we're going to show you how
10:05   11    VMware infringes the accused -- how VMware's accused
10:05   12    products infringe Brazos' patents.  And VMware owes
10:05   13    Brazos for that infringement.
10:05   14              Now, you heard some of what VMware's
10:05   15    going to say.  And they said it last Thursday.  They
10:06   16    said this is old technology, right?  Well, ladies and
10:06   17    gentlemen, the '133 patent doesn't expire until 2027 --
10:06   18    2024.  The '800 patent expires in 2033.  And the '360
10:06   19    patent expires in 2024.
10:06   20              So as you can see, ladies and gentlemen
10:06   21    of the jury, we have the right to exclude everyone
10:06   22    until these patents expire.  It doesn't sound like old
10:06   23    technology to me.  These patents are existing today.
10:06   24    And we have almost, in one case, another decade to
10:06   25    exclude others.
```

10:06    1          So we have until 2027 to exclude anyone

10:06    2    from using the '133 patent.  We have until 2033 to

10:06    3    exclude anyone from the '800.  And we have until next

10:06    4    year to exclude people from using the '360.  That's not

10:06    5    old technology.

10:06    6          You also will hear -- you also will hear

10:06    7    VMware's counsel say they're here to clear their name,

10:07    8    that they've been falsely accused.  Well, the evidence

10:07    9    will show that none of that's true.  The evidence will

10:07    10    show even though -- the evidence will show that we're

10:07    11    here for our day in court.

10:07    12          And I'm sure by the time they're done,

10:07    13    they'll want you to believe that they're the victim in

10:07    14    this case.  But this is our property.

10:07    15          They'll also ask you to ignore their

10:07    16    admissions, ignore their documents, ignore the same

10:07    17    words in the claims and in their products.  We sell

10:07    18    software not hardware.  They'll say the patent -- we

10:07    19    infringe maybe, but maybe the patents are invalid.

10:07    20          But all of that's not true.

10:07    21          You may also hear about a $2.5 million

10:07    22    offer to Dell.  Not VMware, but to Dell.  But that

10:07    23    offer was made without all the information that we know

10:07    24    today.

10:07    25          But the real thing is all this is

```
10:07   1   distractions.  The stars of this case are the Brazos
10:07   2   patents.
10:07   3                  Now, the last question that you're going
10:07   4   to be asked, and it's an important one, is how much is
10:07   5   Brazos entitled to for damages in this case?
10:08   6                  Brazos' economist, Roy Weinstein, will
10:08   7   walk you through the calculations that he made to
10:08   8   arrive at a number for damages in this case.  And
10:08   9   hopefully he will do it in a way that you understand
10:08  10   and can relate to.  And he will help you answer that
10:08  11   question.
10:08  12                  But the question is bounded by what you
10:08  13   heard from Judge Gilliland before and what you will be
10:08  14   instructed.  The patent owner is entitled to no less
10:08  15   than a reasonable royalty.  No less than a reasonable
10:08  16   royalty.  That's what we're entitled to.  And
10:08  17   Mr. Weinstein will help you understand how he arrived
10:08  18   at that.  Because we seek full compensation, not
10:08  19   partial, for VMware's infringement.
10:08  20                  And those total damages here are for the
10:08  21   '360 patent and the '133 patent are $81,590,685.
10:08  22                  Now, this is important because you don't
10:08  23   see the '800 patent there, right?  Because that's going
10:08  24   to be handled in a separate proceeding.  We're only
10:08  25   going to deal with infringement for the '800 patent
```

10:09  1    here in this trial.

10:09  2                    So we'll talk about infringement for all

10:09  3    three patents, but you don't have to deal with the

10:09  4    damages for the '800 patent.  The Court's going to deal

10:09  5    with that later.  But as to these two patents, this is

10:09  6    the damage that we're seeking.

10:09  7                    Now, ladies and gentlemen of the jury,

10:09  8    I'm going to come back at the close of evidence in this

10:09  9    case and talk to you about how we met our burden of

10:09  10   showing infringement and damages.  And I'm going to

10:09  11   talk to you about how you should award us and make the

10:09  12   findings that we ask for.

10:09  13                   Now, this is a great honor to be here.

10:09  14   It is a great blessing to be in front of you.  You are

10:09  15   providing the highest service to this country that you

10:09  16   can provide.  And as Judge Albright said, it is a true

10:09  17   honor and a blessing to be with you.  And I thank you

10:09  18   very much for your time.  And I'll see you soon.  Thank

10:09  19   you very much.

10:10  20                   THE COURT:  Would you care for any

10:10  21   warning?

10:10  22                   MR. ROSENTHAL:  I'd love a five-minute

10:10  23   warning, Your Honor.  Thank you very much.

10:10  24                   And I'm sure I'll hear it.

10:10  25                   Okay.  Are you all seeing the

10:10    1    presentation?  Let me just wait till that comes up.

10:10    2                    All right.  Thank you.

10:10    3                    Well, let me just put this microphone up

10:10    4    here for the court reporter.  Otherwise I'm going to

10:10    5    get in trouble.

10:10    6                    Okay.  Good morning.  My name is Brian

10:10    7    Rosenthal.  I'm very, very proud to be here today on

10:10    8    behalf of my clients, the defendants VMware and Dell

10:10    9    and EMC, and talk to you all today.

10:10    10                   The first thing I want to say, and this

10:11    11   is the point that I'm going to make over and over and

10:11    12   over again in this trial, and it's what all the

10:11    13   evidence is going to show, is that VMware just does not

10:11    14   use these patents.  Just doesn't use this technology.

10:11    15                   These patents, I understand they're still

10:11    16   alive, but they were filed a long time ago.  And that's

10:11    17   okay.  But it's old technology.  It's old technology

10:11    18   from a cellular technology company.  It has no

10:11    19   applicability to VMware, which is a software company

10:11    20   making software products to help companies talk to each

10:11    21   other.

10:11    22                   It's not related to what Nokia was

10:11    23   working on, what Alcatel-Lucent was working on.  And

10:11    24   the technology is outdated.  It doesn't have any

10:11    25   applicability.

10:11  1              And what this case is about is the

10:11  2    plaintiff wants us to pay $80 million for technology

10:11  3    that we don't use.  And that's not fair.  That's not

10:11  4    right.

10:11  5              And we'll explain.  I don't want you to

10:12  6    take my word for it.  I don't want you to take

10:12  7    Mr. Waldrop's word for what he's saying either.  We're

10:12  8    lawyers.  We're making arguments.  But I want you to

10:12  9    judge, and the jury -- the judge is going to instruct

10:12  10   you to judge the facts based on the evidence that you

10:12  11   hear.  That's not what I'm saying.

10:12  12             But the first thing I want to do is I

10:12  13   want to thank you.  You heard Judge Gilliland say it

10:12  14   last week and I couldn't agree more.  This really is

10:12  15   one of the most important things about this country.

10:12  16   It's one of the founding principles of this country,

10:12  17   that juries decide civil disputes.  And it's a great

10:12  18   thing.

10:12  19             And you might be asking yourselves, why

10:12  20   are we deciding this issue about technology and patents

10:12  21   and all of this networking stuff?  We don't have

10:12  22   training in that area.

10:12  23             And the reason is that this patent --

10:12  24   this patent case is not just about technology and it's

10:12  25   not just about the law.  It's about what's right and

| | |
|---|---|
| 10:12 | 1 |
| 10:13 | 2 |
| 10:13 | 3 |
| 10:13 | 4 |
| 10:13 | 5 |
| 10:13 | 6 |
| 10:13 | 7 |
| 10:13 | 8 |
| 10:13 | 9 |
| 10:13 | 10 |
| 10:13 | 11 |
| 10:13 | 12 |
| 10:13 | 13 |
| 10:13 | 14 |
| 10:13 | 15 |
| 10:13 | 16 |
| 10:13 | 17 |
| 10:13 | 18 |
| 10:13 | 19 |
| 10:13 | 20 |
| 10:14 | 21 |
| 10:14 | 22 |
| 10:14 | 23 |
| 10:14 | 24 |
| 10:14 | 25 |

what's wrong.  Who's credible and who's not credible?

Who's telling the truth?  Who's being consistent?

And the jury system allows you all to

bring your unique experience, your knowledge, your

moral compass and, most importantly, your common sense

to the evidence that's being shown.

We're going to have witnesses up on the

stand.  And there's nobody in a better position than

you to assess whether those witnesses sound credible.

Are they changing their story from when they testified

earlier in the case?  That's a pretty good indication

that something's awry, right?

That's stuff that you are very, very

perfectly situated to judge.  And that's all I ask of

you in this trial, is listen to all the evidence and

judge what you think is right based on that evidence.

So we thank you.  We -- our clients thank

you.  I'm sure both -- all parties thank you.  It's a

very, very important part of what we do.

I want to take a moment and introduce my

team and my client.  Sitting here at counsel table is

Brooks Beard who's the vice president, a vice

president, at VMware who has responsibility for this

litigation for VMware.

Also Anthony Peterman who has -- also a

```
10:14   1   vice president at Dell and EMC who has responsibility
10:14   2   for this case.
10:14   3               I am not a one-man show.  I have a big
10:14   4   team, as does Plaintiff's counsel.  You're going to be
10:14   5   hearing -- you already know Ms. Moye from Thursday.
10:14   6   You'll be hearing from her, from Barry Shelton who's
10:14   7   based here in Texas.  You're going to hear from
10:14   8   Mr. Hsin, from Mr. Hershkowitz, from Mr. Chung.  And
10:14   9   you may hear from others as well.
10:14  10               But I do want to introduce the most
10:14  11   important person in the room, which is Mr. Eaton.
10:14  12   Mr. Eaton runs the show.  He puts the slides on the
10:14  13   screen.  He makes sure that we all look very good.  If
10:14  14   he doesn't do his job, we don't look good.  I've been
10:14  15   working with him for 20 years and he's the best.
10:14  16               So we are all very proud to be here
10:15  17   representing VMware.
10:15  18               Now, I want to introduce who VMware is.
10:15  19   And I am -- we are -- very proud to be representing a
10:15  20   company that is this innovative.
10:15  21               In fact, VMware is probably the most
10:15  22   innovative and successful company that you've never
10:15  23   heard of.  They're not like Google or Microsoft or
10:15  24   Apple, who we all know because we use their stuff all
10:15  25   the time.
```

10:15  1          VMware makes software for those companies

10:15  2    to use.  VMware makes software for companies to use to

10:15  3    bring their people together.  That's what VMware does.

10:15  4    And they're incredibly innovative.

10:15  5          I'll give you an example.  MD Anderson,

10:15  6    the cancer clinic here in Texas, uses VMware products

10:15  7    to bring their radiologists, their nurses, everybody

10:15  8    together to allow them to exchange diagnoses, to

10:15  9    exchange information, x-rays, et cetera, seamlessly as

10:15  10   though they're all in the same office, right?  That's

10:15  11   what VMware does.  It's an example of the many, many

10:15  12   customers that we have.

10:15  13         VMware, as Mr. Waldrop said, was founded

10:16  14   in 1998 by five people in an apartment.  And since then

10:16  15   they have grown to one of the most innovative and

10:16  16   successful software companies in America.  And it

10:16  17   really is an American innovation story.  This is what

10:16  18   America's all about, is bringing great ideas and

10:16  19   innovations to the market.

10:16  20         And they have grown in every year,

10:16  21   introducing new technologies, new products.  Today they

10:16  22   have over 35,000 employees, including 2,000 in Texas.

10:16  23   They have over 500,000 customers, if you can believe

10:16  24   that.

10:16  25         In fact, the Fortune 500 list, you know,

10:16  1   the top 500 companies in the world, every single one of

10:16  2   them uses VMware.  Every single one of them.  We are a

10:16  3   very, very well-respected company that brings

10:16  4   innovative products to the market.

10:16  5              And this is probably my most important

10:16  6   slide.  VMware has done it the right way through hard

10:17  7   work and innovation.  Not through stealing, not through

10:17  8   taking other people's technology.  We have 12,000 of

10:17  9   our own engineers.  12,000.

10:17  10             We spend a ton every year trying to

10:17  11  innovate and break new ground in these areas.  We have

10:17  12  been awarded thousands of our own patents.  In fact,

10:17  13  our patent portfolio has been ranked the second most

10:17  14  powerful patent portfolio in the world of software,

10:17  15  second only to Microsoft.  So we really value our

10:17  16  culture of innovation.

10:17  17             Now, I do want to say a word about Dell.

10:17  18  I've been talking about VMware.  You might be wondering

10:17  19  what's the role of Dell in all this?  And you heard a

10:17  20  little bit about this.  Dell and its company, EMC,

10:17  21  owned VMware for a brief period of time.  It happens to

10:17  22  be that when WSOU -- when the plaintiffs sued at that

10:18  23  time, Dell and EMC were still owners of VMware.  That's

10:18  24  why they're in this case.

10:18  25             This case is not about Dell products.

```
10:18   1    It's not about EMC products.  It's about VMware
10:18   2    products and only VMware products.
10:18   3                So in case there's any confusion about
10:18   4    that, you're going to be hearing from VMware witnesses.
10:18   5    You're going to be hearing me talking about VMware.
10:18   6    That's what this case is all about.
10:18   7                So the two products that are at issue in
10:18   8    this case, as you heard, are the vSphere product.  And
10:18   9    very importantly, that vSphere product is just
10:18  10    software.  VMware is a software company.  Bits and
10:18  11    bytes.  Information.
10:18  12                With one exception, and that is the other
10:18  13    product which is VeloCloud.  VeloCloud is a bit of an
10:18  14    aberration in VMware.  VeloCloud was a company that
10:18  15    made hardware products, including software products,
10:18  16    that VMware acquired.  That's the only circumstance
10:18  17    that VMware ever sells hardware, is with respect to the
10:19  18    VeloCloud stuff.
10:19  19                These two products are at issue in this
10:19  20    case.  And you're going to hear a ton about what they
10:19  21    do.
10:19  22                But one thing that they do is the vSphere
10:19  23    product does something called virtual machines.  In
10:19  24    fact, the VM in VMware stands for virtual machines.
10:19  25    And ware means software.  We sell virtual machine
```

10:19  1    software.

10:19  2                        Virtual machines are like you have a

10:19  3    single computer, but you have ten different people

10:19  4    using that computer.  And every one of them think that

10:19  5    they have their own computer.  That's what a virtual

10:19  6    machine is.  It sort of makes it look like you're using

10:19  7    your own computer, even though you're not.  That's what

10:19  8    the software is.

10:19  9                        Now, you're going to hear from two very,

10:19 10    very impressive fact witnesses in this case.

10:19 11    Mr. Turner, Paul Turner, and Mr. Craig Connors.

10:19 12                        Paul Turner is the vice president at

10:19 13    VMware who is in charge of vSphere.  He knows

10:19 14    everything about the product, what it does and what it

10:19 15    doesn't do.  He's going to testify a little bit later,

10:20 16    probably tomorrow.

10:20 17                        And then there's Craig Connors.  Craig

10:20 18    Connors is a very impressive guy, former Green Beret in

10:20 19    the Army.  He decided to go into technology and started

10:20 20    one of the very first software-defined wide-area

10:20 21    network companies, which is a brand new technology,

10:20 22    which is now what VMware does in VeloCloud.

10:20 23                        He wrote VeloCloud.  He literally wrote

10:20 24    the code for VeloCloud.  So any questions you have

10:20 25    about how that product works are going to be answered

10:20   1    by Mr. Connors.

10:20   2              Now, who is the plaintiff?

10:20   3              Now, you heard the plaintiff refer to

10:20   4    themselves as Brazos.  That is their name.  Their name

10:20   5    is also WSOU.  That's how they incorporated.

10:20   6              WSOU is an acronym that includes the

10:20   7    first letters of some of the founders.  That's where

10:20   8    that name comes from, in case you're wondering.  I

10:20   9    thought it might be a university or something, but it

10:20   10   turns out that's what it is.

10:20   11             They were started in 2017, five years

10:20   12   ago.  And they had one purpose, to buy 8,000 patents

10:21   13   from Nokia and make money from them.

10:21   14             That's Mr. Etchegoyen's business.  He's

10:21   15   been doing it for 20 years, buying patents and making

10:21   16   money from them.  And that's okay.  That's a business

10:21   17   model, but that's what this case is about.

10:21   18             They bought thousands of patents, and

10:21   19   they tried to find some that they could assert against

10:21   20   VMware and others and are now trying to make money on

10:21   21   those patents.

10:21   22             They make no products.  They make no

10:21   23   inventions.  They sell nothing.  They create nothing.

10:21   24   They're just trying to make money.  Their only business

10:21   25   is patent assertion.

| | | |
|--|--|--|
| 10:21 | 1 | Now, who did make these patents? |
| 10:21 | 2 | These inventions, these patents were |
| 10:21 | 3 | developed by Alcatel-Lucent, which as you just heard |
| 10:21 | 4 | was a company that Nokia bought. |
| 10:21 | 5 | Now, you -- we may have heard of Nokia. |
| 10:21 | 6 | Nokia makes cell phones and that's what their business |
| 10:21 | 7 | is.  Their business is cell phones and cellular |
| 10:21 | 8 | technology that goes into the network, you know, the 3G |
| 10:22 | 9 | network.  All those antennas connect to a bunch of |
| 10:22 | 10 | computers.  Nokia and Alcatel-Lucent make those |
| 10:22 | 11 | computers. |
| 10:22 | 12 | It has nothing to do with what VMware |
| 10:22 | 13 | does.  It's a totally different area of technology.  3G |
| 10:22 | 14 | and 4G and 5G, that's what Nokia's all about.  VMware |
| 10:22 | 15 | is about software that does virtualization. |
| 10:22 | 16 | Now, you also heard that Nokia has tens |
| 10:22 | 17 | and tens of thousands of patents, and that's true. |
| 10:22 | 18 | They're very sophisticated with their patents. |
| 10:22 | 19 | Sometimes they assert them.  Sometimes they license |
| 10:22 | 20 | them.  Sometimes they identify patents that are old |
| 10:22 | 21 | that they don't use that don't have any value and sell |
| 10:22 | 22 | them to someone else. |
| 10:22 | 23 | That's what happened here.  They sold |
| 10:22 | 24 | these patents to WSOU for $2,000 a patent.  That's what |
| 10:22 | 25 | they sold them for, $2,000 a patent. |

10:22  1          They knew what they were selling.
10:22  2  They're one of the most sophisticated patent companies
10:22  3  in the world.  And they sold these patents for that for
10:22  4  good reason.  They're old.
10:23  5          Now, you're going to hear our first
10:23  6  witness, who's going to, I believe, come on tomorrow.
10:23  7  His name is Kit Colbert.  He is the chief technology
10:23  8  officer of VMware.  And that means he's in charge of
10:23  9  the strategic technology vision.  He doesn't know all
10:23  10  the details of every product.  We brought witnesses for
10:23  11  that.
10:23  12          But he's going to talk about why we're
10:23  13  here.  He's been with the company for 20 years.  He's
10:23  14  seen it grow from almost nothing to where it is today.
10:23  15  And he's going to testify about our culture of
10:23  16  innovation.  He's also going to testify about the fact
10:23  17  that we respect IP.
10:23  18          There's no one that respects IP more than
10:23  19  us.  We have our own patents.  We pay for technology
10:23  20  when we use it, lots of examples of that.  He'll talk
10:23  21  about that.
10:23  22          When we don't use it, though, we don't
10:23  23  pay for technology that we don't use.  Any more than it
10:23  24  would be fair for us to pay for rent on an apartment
10:23  25  that we don't use, right?  It's not fair to have

| | | |
|---|---|---|
| 10:23 | 1 | someone pay for something that we don't use. |
| 10:23 | 2 | So why are we here? |
| 10:24 | 3 | Well, the plaintiff's business model is |
| 10:24 | 4 | sue and hope that the company settles because they |
| 10:24 | 5 | don't want to go to court.  That's the model. |
| 10:24 | 6 | Well, that's not what VMware is about. |
| 10:24 | 7 | VMware is here because we have been falsely accused. |
| 10:24 | 8 | I don't know -- I know I've been falsely |
| 10:24 | 9 | accused of things, you know, all kinds of -- I mean, |
| 10:24 | 10 | little things, big things, et cetera.  And it's so |
| 10:24 | 11 | frustrating.  It's so frustrating to get up and defend |
| 10:24 | 12 | yourself, right? |
| 10:24 | 13 | But that's the situation that we're in. |
| 10:24 | 14 | We just don't use these patents.  That's why we're |
| 10:24 | 15 | here, because it's not fair to be accused of something |
| 10:24 | 16 | that we don't do. |
| 10:24 | 17 | I want to say a word about the three |
| 10:24 | 18 | patents that are at issue.  If I were a jury -- if I |
| 10:24 | 19 | were on a jury, I should say, in a patent case, I would |
| 10:24 | 20 | be looking forward to the inventors coming up on the |
| 10:24 | 21 | stand and saying what they invented and their aha |
| 10:24 | 22 | moment, their eureka moment, here's why we changed the |
| 10:24 | 23 | world and made the Internet faster. |
| 10:24 | 24 | That's -- it's not a true story, and |
| 10:24 | 25 | that's why you're not going to have the inventors say |

| | | |
|---|---|---|
| 10:24 | 1 | that.  You're going to hear that from the lawyers and |
| 10:24 | 2 | you're going to hear that from the paid experts that |
| 10:25 | 3 | they brought.  That's it.  That's their only witnesses. |
| 10:25 | 4 | There's no inventors coming to this |
| 10:25 | 5 | trial.  There's no inventors that the plaintiff decided |
| 10:25 | 6 | to depose, take their deposition and play their |
| 10:25 | 7 | testimony so that you could hear it. |
| 10:25 | 8 | Now, if these were really groundbreaking |
| 10:25 | 9 | patents, if these were really breakthrough patents that |
| 10:25 | 10 | changed the world, wouldn't you expect that the |
| 10:25 | 11 | inventors would come, that the plaintiff would bring |
| 10:25 | 12 | the inventors to tell that story?  You're not going to |
| 10:25 | 13 | hear any of that. |
| 10:25 | 14 | So I do want to talk about the three |
| 10:25 | 15 | patents, and I'm going to try to do so briefly.  And |
| 10:25 | 16 | Ms. Moye promised on Thursday that we're going to try |
| 10:25 | 17 | to make this entertaining and engaging, and I'm going |
| 10:25 | 18 | to try to do that as much as I can, even though it's |
| 10:25 | 19 | highly technical. |
| 10:25 | 20 | But let me talk about the three patents. |
| 10:25 | 21 | The first one we call the "monitor patent," the '360. |
| 10:25 | 22 | The monitor patent. |
| 10:25 | 23 | You remember the Valvoline example.  A |
| 10:25 | 24 | monitor is a device that monitors, like a carbon |
| 10:26 | 25 | monoxide monitor, and it sets an alarm if something's |

10:26  1    not right.  That's what a monitor is.

10:26  2                    Now, the monitor patent was filed in

10:26  3    2001.  That's over 20 years ago.  Now, think about what

10:26  4    technology was like.  I mean, we all know how much

10:26  5    technology changes in 20 years.  That's a long time for

10:26  6    technology.

10:26  7                    In 2001, AOL was how people got on the

10:26  8    Internet.  Doesn't exist anymore.

10:26  9                    Remember the flip phones?  There were no

10:26  10   smartphones, right?  Remember the flip phones, you had

10:26  11   to text message people by pressing, like, 5 three times

10:26  12   to get an L or something like that.

10:26  13                   It -- that's what the technology was back

10:26  14   then.  TVs were huge.  I remember I carried one of

10:26  15   these things up three flights to my first apartment.

10:26  16   The iPod just was introduced that carried a few hundred

10:26  17   songs, right?

10:26  18                   That's the state of technology 20 years

10:26  19   ago.  That's not what we see today.  And the same is

10:26  20   true -- in fact, it's even more true in software.

10:26  21   Software changes like this.

10:27  22                   So we're not saying the patents are

10:27  23   expired.  They're not expired.  What we're saying is

10:27  24   when they were invented was a long time ago.  And it

10:27  25   doesn't pertain to what we do now.

10:27    1            So as I said, the monitor patent is about

10:27    2    a monitor, a physical device.

10:27    3            What did I say?  We're a software

10:27    4    company.

10:27    5            The company makes a product called

10:27    6    vSphere.  VSphere is software.  You are not going to

10:27    7    hear any evidence in this case that we sell any

10:27    8    hardware that uses this patent.  That's the end of the

10:27    9    case.

10:27    10           They've said that we sell hardware.  I

10:27    11   mean, that's what they have to say, that we sell

10:27    12   hardware.  But there's no evidence in this case that we

10:27    13   sell a physical monitor.  That's the end of it.

10:27    14           So what do they point to?

10:27    15           They point to our software, but our

10:27    16   software also doesn't have a monitor.  And the reason

10:27    17   is in the old days, 20 years ago, people used to make

10:27    18   these things called schedulers.

10:27    19           Now, a scheduler is just something that

10:28    20   says which traffic goes -- which data goes out first,

10:28    21   right?

10:28    22           They used to make it in hardware.  And so

10:28    23   before you made it in hardware, they modeled it in

10:28    24   software, and then they used a monitor to test it to

10:28    25   make sure it worked.  And then they'd spend all the

| | | |
|---|---|---|
| 10:28 | 1 | money to make it into hardware.  That's what the patent |
| 10:28 | 2 | talks about. |
| 10:28 | 3 | Okay.  We don't do that.  So what the |
| 10:28 | 4 | patent talks about is two things:  You've got a |
| 10:28 | 5 | monitor, and then you've got this scheduler device. |
| 10:28 | 6 | The whole patent is about the monitor, |
| 10:28 | 7 | not the scheduler.  We don't have a monitor.  And |
| 10:28 | 8 | you're not going to hear any testimony that we sell a |
| 10:28 | 9 | monitor.  No evidence. |
| 10:28 | 10 | I don't know why we're here.  I really |
| 10:28 | 11 | don't.  We don't have this. |
| 10:28 | 12 | And, you know, Counsel put up the claims |
| 10:28 | 13 | real quick, but the claims are the star of the show.  I |
| 10:28 | 14 | agree.  This is where the rubber meets the road.  This |
| 10:28 | 15 | is the scope of their invention. |
| 10:28 | 16 | And what is the first word of the claim? |
| 10:28 | 17 | A monitor for monitoring the operation of a scheduler. |
| 10:29 | 18 | It's not just a scheduler.  It's a monitor.  That's |
| 10:29 | 19 | what they have a right to.  We don't have a monitor. |
| 10:29 | 20 | We don't have it.  That's the end of this case. |
| 10:29 | 21 | Now, the next patent we call the '800 |
| 10:29 | 22 | patent because those are the last three numbers.  This |
| 10:29 | 23 | one was filed over ten years ago.  We call this one the |
| 10:29 | 24 | "minimizing network delay" patent. |
| 10:29 | 25 | Now, what was this patent trying to |

10:29  1    solve?

10:29  2                Again, a problem that we don't face.

10:29  3    This patent was trying to solve the problem if you have

10:29  4    in New York a computer that needs data and you have in

10:29  5    Chicago a computer that has the data, what's going to

10:29  6    happen if they try to connect to each other?  Delay,

10:29  7    right?  I mean, that just makes sense.

10:29  8                So this patent is all about matching up

10:29  9    computers that need data with computers that have the

10:29  10   data -- they call it a compute node and a data node --

10:29  11   matching them up to try to minimize the delay between

10:30  12   the two.

10:30  13               So I'd rather match two computers that

10:30  14   are in Chicago than a computer that's in Chicago with a

10:30  15   computer that's in New York, right?  That makes sense.

10:30  16               That's what the patent's about.  Well,

10:30  17   that's fine.  That's an interesting idea.  Nothing to

10:30  18   do with what we do.  Our stuff is all in the same

10:30  19   location, right?  We don't have geographic distance.

10:30  20   We don't worry about that kind of latency.

10:30  21               When I say the word "latency," by the

10:30  22   way, that's just the computer term for delay.  You're

10:30  23   going to hear a lot about the word "latency."  Latency

10:30  24   just means delay.  It's the -- that's what the computer

10:30  25   scientists use.

10:30  1              So the patent is all about the distance

10:30  2  between a compute node and a data node, right, and

10:30  3  trying to minimize the delay that happens.

10:30  4              Our products, we have something called a

10:30  5  virtual machine, software that's inside the computer.

10:30  6  There's no delay between those two things.

10:30  7              That's like saying what's the delay

10:30  8  between me and this courtroom?  I'm already here.

10:30  9  There's no delay.  There's no latency.  I'm already

10:31  10  here.

10:31  11             As a result, we don't try to minimize

10:31  12  that latency.  And you won't hear any evidence that we

10:31  13  do.

10:31  14             So when you look at these claims --

10:31  15  again, they were flashed up on the screen, but what do

10:31  16  they say?  Look at where it says in Claim 16, which is

10:31  17  the claim that's asserted, and we're going to get into

10:31  18  this -- I don't have a lot of time, we're going to get

10:31  19  into this in great detail.

10:31  20             But if you look at Claim 16, it says:

10:31  21  The assignment objective comprises minimizing a total

10:31  22  latency.

10:31  23             Do you see on the right side there, it

10:31  24  says "minimizing a total latency"?

10:31  25             There should be a way for me to touch it,

10:31  1    but I don't know how to do that.  Oh, here it is.

10:31  2                 See where it says "minimize a total

10:31  3    latency"?  That's what this is all about.  We don't do

10:31  4    that.

10:31  5                 We don't even have Edges between the

10:31  6    compute nodes and the data nodes.  Our software's in

10:31  7    the machine.  There's no delay between the two of them.

10:31  8    And so we don't do any of this stuff that's in this

10:31  9    claim.

10:32  10                And what you're going to hear is you have

10:32  11   to do every single thing in the claim, and it's their

10:32  12   burden to show it.  It's not our burden to show we

10:32  13   don't.  They have to show we do every single thing in

10:32  14   this claim, and we don't do most of it.

10:32  15                Let me see if I can clear this.  I did.

10:32  16                All right.  Let me talk about the last

10:32  17   patent.  The last patent was filed 15 years ago.  And I

10:32  18   call this one the "call ahead patent."  And you'll see

10:32  19   why in a minute.

10:32  20                So this is the patent where -- you

10:32  21   remember Counsel put up a picture of -- this picture,

10:32  22   this four-node picture.  And then a picture from our

10:32  23   document.  And did this cool graphic where they go over

10:32  24   each other?

10:32  25                We're not disputing we have a network.

10:32  1   Of course we have a network.  This patent's not about

10:32  2   having a network.  Everybody has a network.  The

10:32  3   question is, how does the network work?  That's the

10:32  4   question.

10:32  5              And the way this patent works, we call it

10:32  6   the "call ahead patent" because when data comes into

10:32  7   the network, you see where I have "entrance" there?

10:32  8   Data comes into the network here.

10:32  9              And what it does is it asks, is the exit

10:33  10  point congested?  Is it busy?  And if it is, it's going

10:33  11  to send the packet slower.  Or it's going to send them

10:33  12  with lower priority.  Or it's going to just drop them.

10:33  13             Because why rush if the exit point is

10:33  14  busy?  Sometimes you'll see this called the egress

10:33  15  node.  Egress node just means exit, right?  That's what

10:33  16  the patent is about.

10:33  17             And that's an interesting idea for what

10:33  18  they were worried about.  They were worried -- when I

10:33  19  say "they" I mean Alcatel-Lucent.  They were worried

10:33  20  about the situation where they couldn't tell whether

10:33  21  the endpoint of the network had too much traffic.  And

10:33  22  if they had too much traffic they would sometimes send

10:33  23  traffic to a place that was already too busy.

10:33  24             We don't have to worry about that because

10:33  25  the year after this patent was filed -- this was in

—73—

10:33  1   2006 -- in 2007, Mr. Connors, who you're going to hear

10:33  2   from, Craig Connors, and a bunch of people invented a

10:33  3   brand new technology called software defined networks.

10:34  4             Software defined is SD-WAN.  Wide area

10:34  5   network.  Software defined wide area network.  They

10:34  6   invented it.

10:34  7             And that solves this problem.  You don't

10:34  8   have to look ahead anymore.  Because they control how

10:34  9   much data gets to the exit node.  They know it's never

10:34  10  going to be congested.  They don't have to worry about

10:34  11  what happens if it's congested.

10:34  12            So what do we do?  What do they say we

10:34  13  do?  What our network does is if data comes into the

10:34  14  network, all we do is we choose the best path.  We

10:34  15  never, ever, ever call ahead to see if the exit node is

10:34  16  congested.  And that -- by the way, that's what the

10:34  17  patent's about.

10:34  18            So we tried to come up with an analogy.

10:34  19  Analogies are interesting because they're never perfect

10:34  20  and we do our best.

10:34  21            But the analogy is, let's say you want to

10:34  22  go to the Olive Garden for dinner, okay?  We've all

10:34  23  experienced, you show up at -- well, if you like Olive

10:34  24  Garden, you've experienced this.  I do.  You show up at

10:34  25  the Olive Garden and there's 55 people waiting in the

—74—

```
10:35    1    lobby and it's going to be an hour-and-a-half wait.
10:35    2              So I just wasted my time driving all the
10:35    3    way out here to the Olive Garden because it's too busy.
10:35    4    That's what congested means, too busy, right?
10:35    5              So what does this patent talk about?
10:35    6    It's not a terribly, you know, interesting idea.  But
10:35    7    the idea is you call ahead.  You call the Olive Garden
10:35    8    and you say, are you busy?  And if you're busy, stay
10:35    9    home and make spaghetti or go somewhere else.  That's
10:35   10    what the patent's about.  You call ahead.
10:35   11              That's not what we do.  What we do --
10:35   12              THE COURT:  Mr. Rosenthal.
10:35   13              MR. ROSENTHAL:  Five minutes?
10:35   14              What we talk about is it's like going to
10:35   15    a Whataburger.  You know you're going to get your
10:35   16    burger quickly, right?  I guess we're all -- we all
10:35   17    have Whataburger on our minds.  We both came up with
10:35   18    the same analogy.
10:35   19              But you're not going to call ahead to a
10:35   20    Whataburger.  And we don't call ahead either.  All we
10:35   21    do is we choose the best path.  We go on I-95 -- I-35
10:35   22    rather than the local road.  That's all we do.  We
10:35   23    never call ahead.  And you're never going to see any
10:35   24    evidence that we call ahead.
10:36   25              And so when you look at the claim of the
```

10:36  1  patent that talks about determining the congestion at

10:36  2  the exit, we never, ever do it.  And you won't hear any

10:36  3  evidence that we do.

10:36  4              You're going to hear from Dr. Kevin

10:36  5  Jeffay who's sitting in the back of the courtroom and

10:36  6  Dr. Tajana Rosing.  They're our technical experts.

10:36  7  These are world-class experts in this field.  They're

10:36  8  professors of computer science.

10:36  9              Dr. Jeffay was, until this year, the

10:36  10  chair of the University of North Carolina.  And they're

10:36  11  going to talk about why it is that we don't infringe.

10:36  12              Now, I want to talk about damages.  And

10:36  13  this is the only thing I want to say about damages.

10:36  14  The amount of damages in this case is zero.  If you

10:36  15  find that they have not carried their burden of showing

10:36  16  that we infringe, that we meet every single one of

10:36  17  those elements, the case is over.  Your work is done.

10:36  18  There are no damages.

10:36  19              But I have to represent my client and

10:36  20  say, well, what happens if you disagree?  Because you

10:36  21  are the only ones who get to decide that question.

10:37  22  What would the damages be?

10:37  23              And the way that damages are measured is

10:37  24  that you look at what would two parties have negotiated

10:37  25  if they just sat down and negotiated a license to these

| | | |
|--|--|--|
| 10:37 | 1 | patents?  And you're going to hear from -- I don't |
| 10:37 | 2 | think she's here yet, but Ms. Julie Gonzalez, who's our |
| 10:37 | 3 | senior vice president of finance.  She's going to talk |
| 10:37 | 4 | about all the costs that go into our products. |
| 10:37 | 5 | You're also going to hear from |
| 10:37 | 6 | Dr. Stephen Becker, who's also in the courtroom. |
| 10:37 | 7 | Dr. Becker's one of the world's most renowned valuation |
| 10:37 | 8 | experts.  He's based in Austin.  He's been there for |
| 10:37 | 9 | 20 years.  He's got a Ph.D.  He's got a computer |
| 10:37 | 10 | science degree. |
| 10:37 | 11 | And he will do what we would all do if we |
| 10:37 | 12 | were trying to figure out what the right value is.  If |
| 10:37 | 13 | you had a house and you wanted to know how much is my |
| 10:37 | 14 | house worth, what would you do?  Look at comps. |
| 10:37 | 15 | Comparables.  Similar houses in the same neighborhood. |
| 10:37 | 16 | How much do those go for?  And that's what Dr. Becker |
| 10:37 | 17 | does.  That's what every good damages expert does, look |
| 10:38 | 18 | at comps. |
| 10:38 | 19 | And in this case, WSOU actually licensed |
| 10:38 | 20 | their entire portfolio of patents several times to tech |
| 10:38 | 21 | companies that are, like VMware, in this business and |
| 10:38 | 22 | actually bigger than VMware.  They licensed to AT&T for |
| 10:38 | 23 | 2 million, Amazon for 1.8, Facebook for 1 million.  And |
| 10:38 | 24 | they made an offer to Dell which included VMware at the |
| 10:38 | 25 | time for 2.5 million. |

10:38    1                    And they say, well, we didn't know what

10:38    2    we had.  Mr. Etchegoyen has been in this business for a

10:38    3    long time.  They knew what they had.  They knew what

10:38    4    the assets were.  And this is the price that they put

10:38    5    on the entire portfolio of patents.

10:38    6                    So if you're asking how much are the two

10:38    7    patents that you're being asked to determine damages

10:38    8    for, how much are those worth?  Well, it should be less

10:38    9    than this.  But that's not what they're asking for.

10:38    10                    They got an expert who works for

10:39    11    plaintiffs all the time to say that the right measure

10:39    12    of damages here is $81 million.  Even though they've

10:39    13    licensed all these other tech companies for 1 to

10:39    14    $2 million.

10:39    15                    And by the way, they licensed the entire

10:39    16    portfolio of 8,000 patents for 1 to $2 million.  And

10:39    17    their damages expert is only talking about two of those

10:39    18    patents and how much those are worth.  That doesn't

10:39    19    make sense.

10:39    20                    Remember I said this case is about common

10:39    21    sense?  That's a perfect example.  Does it make sense

10:39    22    that these patents that they licensed for a million or

10:39    23    two dollars, that the parties would have sat down and

10:39    24    negotiated a license for $81 million?  That doesn't

10:39    25    make sense.

```
10:39   1                        Does it make sense that VMware, a
10:39   2       software company in the area of virtual machines, would
10:39   3       use 20-year-old technology from a cellular technology
10:39   4       company that they've never heard of?  They've never
10:39   5       heard of these patents, VMware.  They've never heard of
10:40   6       the inventors.  You're going to hear all of that.  They
10:40   7       can't say, oh, I'd like to use this technology.  They
10:40   8       did something completely different.
10:40   9                        So that's what this case is about.  And I
10:40   10      would like to ask for your commitment to wait to hear
10:40   11      all of the evidence.  Plaintiff gets to go on first.
10:40   12      That's the nature of these things, right?
10:40   13                       And they've got very good lawyers.  And
10:40   14      they've got very practiced and seasoned witnesses who
10:40   15      are going to get up there and tell you their story that
10:40   16      they've told many times, right?  And so that's fine.
10:40   17                       But I'd like for you to wait to hear our
10:40   18      side of the story before you make your decision.
10:40   19      Because what I submit to you is that when you listen to
10:40   20      these witnesses, you will not see a single piece of
10:40   21      evidence that we do what's in these claims.
10:40   22                       We don't have a monitor.  We don't sell
10:40   23      any hardware with our vSphere product.  We don't look
10:40   24      at latency costs when we're assigning these things in
10:40   25      the way that the claim requires.  And we never call
```

79

10:40  1    ahead.  We never call ahead.  Because we don't have to.
10:40  2               So that's all.  The evidence is going to
10:41  3    go in.  I am going to get a chance to talk to you at
10:41  4    the end of the case.  But I just want to thank you
10:41  5    again for your attention.  I know we all have things
10:41  6    that are very important in our lives, family and jobs
10:41  7    and things that we'd rather be tending to.  But we
10:41  8    really appreciate it.
10:41  9               This case is very important, very
10:41  10   important to us.  And we thank you and I'll talk to you
10:41  11   soon.
10:41  12              THE COURT:  You may call your first
10:41  13   witness.
10:41  14              MR. WALDROP:  Your Honor, we call Craig
10:41  15   Etchegoyen.  As I said before, Ms. Kim is going to be
10:41  16   doing his -- her examination.  This is her first time
10:41  17   in your court doing an examination, Your Honor.
10:41  18              (The witness was sworn.)
10:42  19              MS. KIM:  Good morning.  Thank you for
10:42  20   having me.  It's my first time, so if I'm a little
10:42  21   nervous, that's probably why.
10:42  22                   DIRECT EXAMINATION
10:42  23   BY MS. KIM:
10:42  24      Q.   Good morning, Mr. Etchegoyen.  Could you
10:42  25   please introduce yourself to the ladies and gentlemen

10:42    1    of the jury?

10:42    2        A.    Sure.  Hi.  My name's Craig Etchegoyen.  I'm

10:42    3    the founder and chairman of Brazos.

10:42    4        Q.    Could you please tell the jury where you

10:42    5    currently live?

10:42    6        A.    I split my time between Southern California

10:42    7    and Texas.

10:42    8        Q.    And could you please tell us a little bit

10:42    9    about your family?

10:42   10        A.    Sure.  I have three beautiful children, an

10:43   11    amazing wife that made those beautiful children.  And I

10:43   12    come from a big family.  I have -- there's six of us.

10:43   13    I have four -- I have four sisters and one brother.

10:43   14        Q.    And I think you told us you were a Brazos

10:43   15    chairman and founder.

10:43   16            Could you please tell us what that means, what

10:43   17    your role is?

10:43   18        A.    I handle -- I handle the licensing.  So our

10:43   19    technology portfolio, I handle most of the licensing

10:43   20    for Brazos.

10:43   21        Q.    And please tell us why you're here today.

10:43   22        A.    I'm here to defend our property, our

10:43   23    intellectual property, and stop VMware from stealing

10:43   24    it.

10:43   25        Q.    I'd like to talk a little bit more about you.

| | | |
|---|---|---|
| 10:43 | 1 | I know you've had a pretty interesting life, so I'd |
| 10:43 | 2 | like to talk a little bit about your background and the |
| 10:43 | 3 | events leading us to today. |
| 10:43 | 4 | Could you please tell us about your education |
| 10:44 | 5 | level? |
| 10:44 | 6 | A.    Sure.  Excuse me.  I graduated high school.  I |
| 10:44 | 7 | did a smattering of classes in local college of things |
| 10:44 | 8 | that I was interested in, some computer science |
| 10:44 | 9 | courses, some mathematics courses, things like that, |
| 10:44 | 10 | just a couple. |
| 10:44 | 11 | Q.    What do you mean by "computer science |
| 10:44 | 12 | courses"?  What do those teach? |
| 10:44 | 13 | A.    I was really interested in -- from a young |
| 10:44 | 14 | age, really interested in how computers and software |
| 10:44 | 15 | worked in general.  Started very young with that, and I |
| 10:44 | 16 | was always interested in learning more.  This was a |
| 10:44 | 17 | little while ago, quite sometime ago.  But I was always |
| 10:44 | 18 | interested in how computers and software worked. |
| 10:44 | 19 | Q.    Could you please tell us about your first job? |
| 10:44 | 20 | A.    Sure.  That was -- if you could call it a job, |
| 10:44 | 21 | I started -- when I was 13, about 13 years old, I was |
| 10:45 | 22 | on the -- from 13 till about 18, a small portion of |
| 10:45 | 23 | 19 years old, I was on the professional surfing tour. |
| 10:45 | 24 | And that was my -- that was my first job, if you can |
| 10:45 | 25 | call it that. |

```
10:45    1            I was blessed to travel kind of around the
10:45    2    world surfing and surfing in the competitions.  That
10:45    3    was my first job.
10:45    4        Q.   So I think you just told us you started
10:45    5    professionally surfing on tours at age 13, which I
10:45    6    think I was in school at that time when I was 13.
10:45    7            How did you attend school when you were on
10:45    8    these tours?
10:45    9        A.   I -- my mom, amazing lady, let her 13-year-old
10:45   10    son -- maybe because she had so many kids, let her
10:45   11    13-year-old son kind of travel the world.  And her
10:45   12    prerequisite to that with the sponsors, the companies
10:45   13    that paid for me to go around the world, she made sure
10:45   14    that they were -- that I had tutors.
10:46   15            It was -- she was -- that was her deal killer,
10:46   16    as she said.  So those tutors taught me -- taught me a
10:46   17    bunch.  I'm grateful for that.
10:46   18        Q.   What were some of the subjects that you were
10:46   19    very drawn to by your tutors?
10:46   20        A.   I -- I -- I really -- again, when I was 13 and
10:46   21    on, I was really in love with programming, software
10:46   22    languages.  I got a very, very good one-on-one
10:46   23    education for, you know, even early languages like
10:46   24    COBALT assembler, the C languages.  Just mostly -- I
10:46   25    was mostly into -- I was mostly into the computer
```

10:46  1    languages at that time.

10:46  2           I liked math too.  I wasn't -- I wouldn't say

10:46  3    I was exceptional with that.  I just had a lot of time

10:46  4    on my hands being, you know, 13, 14 and 15 when

10:46  5    everyone else is like 26.  They're all very nice but --

10:47  6    competing against them, but, you know, I had a lot of

10:47  7    time in my -- in various hotel rooms to try and learn

10:47  8    some more things that I was interested in.

10:47  9    Q.    What did you do -- I assume you are no longer

10:47  10   a professional surfer.

10:47  11          What did you do after your professional

10:47  12   surfing ended?

10:47  13   A.    I was a lot lighter back then.

10:47  14          So after that -- my plan was always to --

10:47  15   again, mom again put in my head, hey, you have to get

10:47  16   an education.  This surfing thing is great,

10:47  17   congratulations.  But you have to get educated or

10:47  18   you're going to have problems.

10:47  19          So now I was -- I was afraid of her.

10:47  20          So I went back -- my plan was always to go

10:47  21   back to be kind of a regular kid, go back to high

10:47  22   school.  So I went back about halfway through senior

10:47  23   year in high school to just be normal and start

10:47  24   thinking about colleges.

10:47  25          I got fairly good grades.  So I had -- I was

—84—

10:48   1   fortunate enough to have options with college and what

10:48   2   colleges I could attend.

10:48   3       Q.    Did you end up going to college?

10:48   4       A.    No.  It was a tough one.  So I -- maybe like

10:48   5   my kids sometimes, I didn't know how expensive college

10:48   6   was.  So I had a little bit of money saved from surfing

10:48   7   and I had written -- I'd started writing this product

10:48   8   and I kind of had -- I had a choice to make.

10:48   9           I had enough money to maybe pay for, I don't

10:48   10  know, 80 percent of college the first year and then not

10:48   11  enough to obviously finish.

10:48   12          So I had a choice to either start my company

10:48   13  or take my product that I was -- or that I had worked

10:48   14  on and make a real company out of it.

10:48   15      Q.    You keep referring to "a product."  Can you

10:48   16  tell us what this product was?

10:48   17      A.    Sure.  Sorry.

10:48   18      Q.    That's okay.

10:48   19      A.    I've only done this once before.

10:49   20          So the product was -- so when I was traveling

10:49   21  around, I could -- it was difficult to get ahold of my

10:49   22  family, get ahold of my mom.  Hotel rooms back then,

10:49   23  and now, but hotel rooms, it cost, like, $100 to call

10:49   24  my mom depending on where I was internationally.  So it

10:49   25  was just, like, that was out of my reach at that time.

```
10:49    1              So I figured out, my mom had an old fax
10:49    2    machine, like, with the rolls in her bedroom.  And I
10:49    3    figured out how to send an e-mail to her fax machine at
10:49    4    home so I didn't have to call all the time.  I could
10:49    5    just say, hey, don't worry.  Your son is alive.  This
10:49    6    is where I am.  I'm being taken care of.  I'm in a --
10:49    7    she always was wondering if I was eating.  You know,
10:49    8    I'm eating.  I'm okay.  I'm there.  And this is my plan
10:49    9    for probably the next week.
10:49   10              So that was my first -- that was my first
10:50   11    product.
10:50   12        Q.   And what was that product called?
10:50   13        A.   The company was called Any Fax Solutions.
10:50   14        Q.   Was the product successful, Any Fax?
10:50   15        A.    It was.  Had a lot of smart people that came
10:50   16    in and helped me.  We had hundreds of licensees, like
10:50   17    the large companies, like even as big as maybe VMware
10:50   18    at some point.
10:50   19              Yeah.  It was -- I -- at the time, I mean,
10:50   20    again being young, I thought it was like -- I thought I
10:50   21    was, like, I hit a home run.  It was -- yeah.  It was
10:50   22    very successful.
10:50   23        Q.   And what became of Any Fax Solutions?
10:50   24        A.   Software distributors distributed it.  Back
10:50   25    then, there were like IBM and Cisco.  There were
```

10:50  1   software -- or companies that used to distribute

10:50  2   software to corporate business-to-business they used to

10:50  3   call it.

10:50  4           I also -- they -- my technology would be

10:50  5   embedded, built into products like when -- when you

10:51  6   would -- when you'd get, like, a sandwich, you know, a

10:51  7   coupon for a sandwich delivered to your office, if you

10:51  8   guys ever experience that, they used to send -- they

10:51  9   used to use my technology for that.

10:51  10          And mortgages, like banks used it a lot.  It's

10:51  11  ultimately what became, I think it's called JFax and

10:51  12  eFax now.  They do like $2 billion a year.  They're

10:51  13  giant.

10:51  14  Q.    So after your affiliation with Any Fax ended

10:51  15  or you sold it, what did you do after that?  What was

10:51  16  your next job?

10:51  17  A.    It sounds silly now, but I did -- I did a

10:51  18  company called United Logistics.  Similar technology, I

10:51  19  took -- it was a -- it was called a dialer box.  It was

10:51  20  so hard back then.  Now you could probably do it in a

10:51  21  day, someone smart could.

10:51  22          But my friend, surfing friend told me about

10:51  23  like UPS, FedEx, all the big logistic centers and, you

10:52  24  know, just shipping stations around the world, they

10:52  25  were getting about $250,000 a month long distance.

—87—

10:52  1    Because if a package was going from Waco to Paris, that

10:52  2    bill of lading, the tracking document would be faxed.

10:52  3         Some places still do it.  It's wild.  But

10:52  4    there were these giant tumbler -- they're called

10:52  5    tumbler rooms.  I got to visit them early on.  And they

10:52  6    were, like, these giant fax machines that just faxed

10:52  7    all day long distance.

10:52  8         So they were spending like $250,000 a month

10:52  9    per location on average.  And I figured out if I could

10:52  10   plug my little dialer box in the back of those and then

10:52  11   call a local number -- someone mentioned AOL in their

10:52  12   opening.

10:52  13        I bought -- AOL -- I bought a POP.  So AOL, if

10:52  14   anyone's ever used that with, like, the beep, beep,

10:52  15   beep, that thing, it's -- that was calling a local

10:52  16   number.

10:52  17        So I figured out how to turn that into a local

10:52  18   call and manage the software that way.  And it saved

10:52  19   them, like, about, I think, 80 percent discount to what

10:53  20   they were making.  So they could pay me a fee.  That

10:53  21   was fun.

10:53  22   Q.    And what was that company called again?

10:53  23   A.    United Logistics.

10:53  24   Q.    And what became of United Logistics?

10:53  25   A.    Computer Consortium licensed it.  I think

—88—

```
10:53   1   Computers -- this was quite sometime ago -- Computer
10:53   2   Associates, IBM, they sold the product.
10:53   3         I think Computer Associates now kind of owns
10:53   4   that entire logistics market.  I could be wrong, but I
10:53   5   think so.
10:53   6       Q.    So after Any Fax and then after United
10:53   7   Logistics, what was your next job?  What did you do
10:53   8   next?
10:53   9       A.    Next, I did a company called Senior Explorer,
10:53  10   Explorer Systems.  I wasn't very good with the names.
10:53  11   So Senior Explorer, Explorer Systems.
10:53  12       Q.    And what was Explorer Systems or Senior
10:53  13   Explorer?
10:53  14       A.    So my grandma, who's gone now, but she was the
10:53  15   smartest lady -- smartest person I've ever known.  She
10:54  16   was like -- she was a controller and a CFO forever.
10:54  17   Until a couple of years before she died, she worked
10:54  18   real hard.  But she was one of the first people I knew
10:54  19   that had a computer.
10:54  20         So I started saying, come on, Grammy.  Like,
10:54  21   you got to get on the Internet.  It's really cool.  I
10:54  22   can send you pictures.  It might take 20 minutes to
10:54  23   download, but I can send you pictures.
10:54  24         And I -- so, in essence, I -- she was having a
10:54  25   lot of trouble.  So I ended up designing this software
```

| | | |
|---|---|---|
| 10:54 | 1 | system that was really easy for her to use.  It was |
| 10:54 | 2 | kind of like the original iPad.  Even -- there was even |
| 10:54 | 3 | touchscreen models and PC models, big buttons. |
| 10:54 | 4 | Q.    What's an NPC model? |
| 10:54 | 5 | A.    No.  Sorry.  And PC model. |
| 10:54 | 6 | Q.    And PC.  I'm sorry. |
| 10:54 | 7 | A.    PC model.  So iPad and then a mouse and a |
| 10:54 | 8 | keyboard, but really easy to navigate.  It was -- it |
| 10:54 | 9 | was a wonderful product. |
| 10:54 | 10 | So yeah.  I designed that with help from my |
| 10:55 | 11 | grandma.  She loved it.  She was -- she only started |
| 10:55 | 12 | using that system.  So I was like, wow.  That's really |
| 10:55 | 13 | cool.  Loved it. |
| 10:55 | 14 | That grew into I called -- this is how brave |
| 10:55 | 15 | you are when you're young, I guess.  I cold-called the |
| 10:55 | 16 | CEO of a group called AARP, which at the time was the, |
| 10:55 | 17 | still is I think, the largest kind of consortium of |
| 10:55 | 18 | senior citizens in the country. |
| 10:55 | 19 | I even get those things in the mail sometimes. |
| 10:55 | 20 | So they -- I got ahold of the CEO and I said, hey, I |
| 10:55 | 21 | made this thing for my grandma.  I want to show it to |
| 10:55 | 22 | you.  And that turned into, you know, like, a huge |
| 10:55 | 23 | blessing. |
| 10:55 | 24 | My focus group of one turned into a |
| 10:55 | 25 | significant focus group.  And they let me do these |

| | | |
|---|---|---|
| 10:55 | 1 | groups, and I started designing it for kind of a |
| 10:55 | 2 | broader audience, not just my grandma.  And that turned |
| 10:56 | 3 | into them marketing it. |
| 10:56 | 4 | At the time, again, I didn't really know a lot |
| 10:56 | 5 | of this stuff, but it was like a Super Bowl ad, you |
| 10:56 | 6 | know.  It was really expensive to market to their |
| 10:56 | 7 | group, to the -- I think it was like 50 million |
| 10:56 | 8 | households. |
| 10:56 | 9 | That product turned into millions and millions |
| 10:56 | 10 | of users.  It was the first fully contained |
| 10:56 | 11 | Internet-access, easy-to-use device.  It was awesome. |
| 10:56 | 12 | That was really rewarding. |
| 10:56 | 13 | Q.   And what became of Senior Explorer, Explorer |
| 10:56 | 14 | Systems? |
| 10:56 | 15 | A.   So we licensed Oracle.  Oracle's a big |
| 10:56 | 16 | database company.  Intel.  And I did a bunch of stuff |
| 10:56 | 17 | like -- this is dating me a little, Radio Shack, |
| 10:56 | 18 | Circuit City, Target. |
| 10:56 | 19 | I did, more or less, similar hardware models. |
| 10:56 | 20 | I did something called Junior Explorer that was for |
| 10:56 | 21 | kids.  And it was again an iPad.  There was this thing |
| 10:57 | 22 | called the iToaster that went into your -- similar to |
| 10:57 | 23 | what Facebook/Meta does now where you can, like, video |
| 10:57 | 24 | conference and pull up recipes in your kitchen.  It was |
| 10:57 | 25 | like a little less expensive than an iPad. |

| | | |
|---|---|---|
| 10:57 | 1 | I did -- I went crazy on hardware versions. I |
| 10:57 | 2 | loved it so much I spent -- bad business move on that, |
| 10:57 | 3 | so I ended up spending a ton of money on the hardware |
| 10:57 | 4 | development because I just loved it so much. |
| 10:57 | 5 | But yeah. I ended up licensing it out. I |
| 10:57 | 6 | believe Oracle and Intel still use the management |
| 10:57 | 7 | system and the software to manage their terminal |
| 10:57 | 8 | services. So because it was so easy to use and |
| 10:57 | 9 | probably inexpensive for them, they -- they used it a |
| 10:57 | 10 | lot for businesses like terminals like this. So it |
| 10:57 | 11 | would manage these types of things for banks and other |
| 10:57 | 12 | companies. |
| 10:57 | 13 | Sorry that was long-winded. So... |
| 10:57 | 14 | Q.   That's okay. |
| 10:57 | 15 | There's water and little cough drops, if you |
| 10:57 | 16 | need -- |
| 10:57 | 17 | A.   Oh.  Thanks.  Sorry. |
| 10:57 | 18 | Q.   No problem. |
| 10:57 | 19 | So after you sold off Senior Explorer, what |
| 10:58 | 20 | did you do next? |
| 10:58 | 21 | A.   A friend of mine, again, surf friend, said, |
| 10:58 | 22 | hey, you got to meet this wild Australian guy.  He |
| 10:58 | 23 | surfs.  He's an inventor.  You'll love him.  And his |
| 10:58 | 24 | name's Rick Richardson.  He's older than me. |
| 10:58 | 25 | And I met him and started a company called |

10:58   1    Uniloc, U-n-i-l-o-c.  He came up with the name, not me.
10:58   2    So if you like it, he deserves the credit.
10:58   3        Q.    Could you tell the jury just in a couple of
10:58   4    sentences what is Uniloc?
10:58   5        A.    Uniloc was -- and the company -- it was a
10:58   6    substantial company.  So Rick had come to me with this
10:58   7    idea.  He had partnered with IBM.  And for a while --
10:58   8    he's Australian, so IBM Australia.  And he came to me
10:58   9    with this concept.
10:58   10           And I had been working on -- I'd been working
10:58   11   on security products.  I was really into security,
10:59   12   developing unique identifiers.  So like, if someone
10:59   13   stole your -- if someone stole your identifier -- like
10:59   14   now it's your social security number.
10:59   15           But I was working on identifiers for computing
10:59   16   devices so if you got hacked, you wouldn't be in
10:59   17   trouble because the number string wouldn't mean
10:59   18   anything to anybody.  I was, like, always really
10:59   19   worried about that.
10:59   20           So I took all the security stuff I was working
10:59   21   on and tinkering with -- I've always kind of tinkered
10:59   22   around with ideas.  So I took -- I took those concepts
10:59   23   that I'd been working on and Rick -- and started
10:59   24   talking to Rick about it.  And we were collaborating.
10:59   25           It turned into Uniloc software activation,

| | | |
|---|---|---|
| 10:59 | 1 | Uniloc cybersecurity, so Net Authority and Device |
| 10:59 | 2 | Authority were the names of those companies.  And then |
| 10:59 | 3 | what I just explained was BlueCava was the name.  And |
| 10:59 | 4 | it was -- it was advertising identities. |
| 10:59 | 5 | It was -- so like -- if I like -- I like John |
| 10:59 | 6 | Deere tractors on my phone, it'll deliver, you know, an |
| 11:00 | 7 | ad, a John Deere ad to my TV or my Apple TV. |
| 11:00 | 8 | But what was so cool about it, and it's still |
| 11:00 | 9 | here now.  The companies use it.  Is that that |
| 11:00 | 10 | information, if it gets out, is meaningless.  It's -- |
| 11:00 | 11 | they can't resell it on the dark web.  Like, you can't |
| 11:00 | 12 | do anything with it.  It's just a number string.  So |
| 11:00 | 13 | it's really cool stuff. |
| 11:00 | 14 | Q.    Let's take those one by one.  I think you said |
| 11:00 | 15 | the first of the three sort of broad categories, you |
| 11:00 | 16 | said was software activation. |
| 11:00 | 17 | Could you please tell the jury what that is? |
| 11:00 | 18 | A.    Sure.  We invented -- I've done about 100 -- I |
| 11:00 | 19 | don't know what the exact number is.  I've done about |
| 11:00 | 20 | 100 patents myself.  A lot of them were around device |
| 11:00 | 21 | identity. |
| 11:00 | 22 | So software activation was Microsoft, for |
| 11:00 | 23 | example.  They use it.  So Microsoft, when you have -- |
| 11:00 | 24 | way back when, you used to get Microsoft on a CD -- |
| 11:00 | 25 | Windows or Office on a CD.  And your CD would come with |

11:01    1    an unlock code on it.

11:01    2              So I would load it on my computer or my

11:01    3    computer would come preloaded with it.  And then the

11:01    4    unlock code would unlock it.

11:01    5              The problem that Microsoft was having, they

11:01    6    were losing tens of billions of dollars, because I

11:01    7    could share that CD with you guys with -- or 10,000 of

11:01    8    my closest friends.

11:01    9              So they realized that the way to solve that

11:01    10   problem was our technology.  IBM had made them aware of

11:01    11   it.  And that was the way to solve the problem.

11:01    12             So much so -- so much so that they ended up --

11:01    13   they tried to buy the company or buy that division of

11:01    14   the company.  And we didn't -- we didn't want to sell

11:01    15   it.  I didn't want to sell it.

11:01    16             So that turned into the software activation

11:01    17   group.  It was very -- it was great, but difficult.

11:01    18   That software activation group turned into a

11:02    19   significant -- like this, Microsoft being a huge

11:02    20   company -- turned into a very long, almost a decade of

11:02    21   my life, believe it or not, litigation.  When I

11:02    22   wouldn't sell them my technology, they said they were

11:02    23   going to kill me.

11:02    24             So that turned into ten years of my life.

11:02    25   My -- he had said I've been doing this a long time.

11:02  1   That's when I started I guess, enforcing my inventions.

11:02  2        But they -- it took -- it's about -- it was

11:02  3   about nine and a half years.  My business partner and

11:02  4   until this day one of my best friends, it almost killed

11:02  5   him.  So he ended up retiring.  He couldn't handle it

11:02  6   anymore.

11:02  7        But this story had a -- it has a happy ending.

11:02  8   We did this.  And a jury awarded us almost half a

11:02  9   billion dollars.  Because it was so important, such an

11:02  10  important component in Microsoft's technology.

11:02  11       So Uniloc ended up having a significant

11:03  12  licensing business.  We licensed Microsoft.  My

11:03  13  patent's licensed by Apple.  My technology, it's in

11:03  14  the -- it's in the iPhone.  Lots of products.  Lots of

11:03  15  companies have used and licensed the patents.

11:03  16  Q.    And that's still today.  They currently

11:03  17  license currently today?

11:03  18  A.    Yeah.  I mean, us.  Sorry.  I don't want to

11:03  19  mix it.  But Brazos -- Microsoft -- Microsoft, for

11:03  20  very -- a ton of money, licensed Brazos technology and

11:03  21  our patents as well.  I think they said their --

11:03  22  Microsoft's a customer of theirs.  So yeah, Microsoft

11:03  23  licensed some of that from us.

11:03  24  Q.    As well as the software activation inventions

11:03  25  you --

11:03  1        A.    Yes.

11:03  2        Q.    -- did a long time ago?

11:03  3        A.    Yes, ma'am.

11:03  4        Q.    I think you told the jury a little while ago

11:03  5    about you -- and we heard in opening statements with

11:03  6    Mr. Waldrop as well, that you are a inventor and you

11:03  7    have over 100 patents.

11:03  8              Could you please tell the jury about the

11:03  9    process of getting a patent?

11:03  10       A.    It's, like, almost impossible.  It's so hard.

11:04  11   You spend -- as an inventor, you know, you come up with

11:04  12   this idea.  And you build, you know, a product or a

11:04  13   service around it.  And you spend, you know, five

11:04  14   years, sometimes ten years as an inventor.

11:04  15             It's too expensive.  I mean, I've tried to

11:04  16   help -- I have helped other inventors on that side.

11:04  17   It's like could be 100 -- $150,000.  And you don't even

11:04  18   know if you're going to get it granted.

11:04  19             It's a really long process.  There's this

11:04  20   group of experts at the Patent Office that grill you

11:04  21   constantly.  And you have to have very expensive

11:04  22   attorneys.  No offense to --

11:04  23       Q.    Not me.

11:04  24       A.    You have to have very expensive attorneys to

11:04  25   do all that paperwork.  Or at least I do.  I couldn't

11:04  1    do.  I couldn't do a lot of it.  So it's very expensive
11:04  2    and takes years and years and years and years.
11:04  3         And it also -- and, you know, litigate -- like
11:04  4    having to litigate those.  You go through it all over
11:04  5    again.  Like, even with Microsoft and other cases, you
11:05  6    go through it again.  So you have to make it all the
11:05  7    way through the gauntlet of all of this stuff.
11:05  8         And I feel blessed to be here for sure.  But
11:05  9    it took years.  And you go -- then after you get it
11:05  10   granted and someone steals it, you have to go back to
11:05  11   the Patent Office, pay more money.  You know, sometimes
11:05  12   $500,000, right?  And then just so the defendant can
11:05  13   throw it out, try and throw it out again.
11:05  14        And then, I mean, fortunately you get here.
11:05  15   And we won, you know -- or Microsoft, we won all of
11:05  16   that.  They spent tens of millions of dollars trying to
11:05  17   do that against little old me.  So anyway.
11:05  18        Yeah, that's kind of the process.  It's really
11:05  19   hard.
11:05  20        And then when you talk about international,
11:05  21   protecting your product, it's really important to
11:05  22   protect internationally as well, especially with
11:05  23   software.  Because it -- a lot of like Huawei, like
11:05  24   Chinese companies will come to the U.S., take your
11:06  25   technology and try and sell it worldwide.  So you have

11:06  1    to protect in other countries as well, which is even

11:06  2    more expensive.

11:06  3         Q.    So I want to ask you a couple of things.  So

11:06  4    you talked about Apple and them being licensed as well.

11:06  5    Can you give us an example of some of the inventions

11:06  6    that they're licensing?

11:06  7         A.    Yes.  The other company -- the company that we

11:06  8    incubated in Uniloc was Device Authority and Net

11:06  9    Authority.

11:06  10        Q.    And that's the second sort of branch that you

11:06  11   talked about?

11:06  12        A.    Yeah.  That was the second branch.

11:06  13              So I don't have my phone.  Normally I would

11:06  14   show you on my phone.

11:06  15              So if you guys are familiar with what an

11:06  16   accelerometer does, I'll just give you one example.

11:06  17   There's a lot.  We did a lot in this area.

11:06  18              But an accelerometer is what tracks your

11:06  19   motion of your phone, like when you move it or if you

11:06  20   play a game or if you change your screen, it'll change

11:06  21   your, you know, the -- which is kind of a nightmare

11:06  22   sometimes -- it'll change the orientation of your

11:06  23   screen.  But it counts your footsteps.  That's your

11:06  24   accelerometer on your Apple Watch or your phone.

11:07  25              I figured out how -- the way we move our

11:07  1    phones and the way we walk is unique to us, believe it

11:07  2    or not.  I didn't -- it was amazing.  So I figured out

11:07  3    how to extract the digital DNA of that out of the phone

11:07  4    and more or less have a unique identifier based on the

11:07  5    way your phone moves.

11:07  6            Also did things like, if you notice on the

11:07  7    screens, you can't see them but there's -- it's called

11:07  8    pixel mapping.  You can't see them because there's

11:07  9    burnt pixels that don't, you know, sometimes you can

11:07  10   see them on your screen.  But that's also unique to

11:07  11   your device.  So I figured out how to do -- how to do

11:07  12   that and create a unique identifier for that.

11:07  13           We've done -- that company has done everything

11:07  14   from protecting a -- I don't have one of these, but

11:07  15   protecting, like, smart fridges and, like, home

11:07  16   appliances that are connected so hackers can't get into

11:07  17   your house via those devices.

11:07  18           All the way to the U.S. military, which I --

11:08  19   that was my project.  I loved that.  Ground

11:08  20   communications.  So adversaries, like in Afghanistan,

11:08  21   can't breach into the connection because their computer

11:08  22   ID doesn't match.  It was awesome.  Sorry.

11:08  23      Q.    No.  Don't apologize.

11:08  24           I think a third category you talked about was,

11:08  25   I think you called it BlueCava for advertising.

| | | |
|---|---|---|
| 11:08 | 1 | Could you please tell us about that? |
| 11:08 | 2 | A.    Yes.  I touched on that a little earlier. |
| 11:08 | 3 | That company became -- it's a big company.  It became |
| 11:08 | 4 | Qualia.  They -- that's what they do.  They deliver |
| 11:08 | 5 | predictive ads without taking user information, without |
| 11:08 | 6 | breaching your -- what I think is your God-given |
| 11:08 | 7 | American right not to give up your personal data. |
| 11:08 | 8 | So they deliver ads, really good ads, accurate |
| 11:08 | 9 | ads based on that information. |
| 11:08 | 10 | Q.    That was sort of a John Deere tractor -- |
| 11:08 | 11 | A.    Yes, ma'am. |
| 11:08 | 12 | Q.    -- that you talked about. |
| 11:08 | 13 | I want to go back to something you said |
| 11:08 | 14 | earlier about how long and expensive it is to get a |
| 11:08 | 15 | patent. |
| 11:09 | 16 | Why did you file so many patents? |
| 11:09 | 17 | A.    Well, in 2003, I didn't have any -- all my |
| 11:09 | 18 | other companies that we had talked about, I was just -- |
| 11:09 | 19 | I didn't really know much about patents.  And I was |
| 11:09 | 20 | like, wow.  That's expensive.  I don't know if I want |
| 11:09 | 21 | to do it. |
| 11:09 | 22 | And I just -- I didn't know how important they |
| 11:09 | 23 | were to inventors and to companies in general until |
| 11:09 | 24 | Microsoft stole our code and stole our technology. |
| 11:09 | 25 | I had no idea.  I literally went to -- I went |

| | |
|---|---|
| 11:09 | 1 |
| 11:09 | 2 |
| 11:09 | 3 |
| 11:09 | 4 |
| 11:09 | 5 |
| 11:09 | 6 |
| 11:09 | 7 |
| 11:09 | 8 |
| 11:10 | 9 |

11:09  1  to these law firms and I said, hey, what do I -- what

11:09  2  do I do here?  Like, IBM, who was a great partner, gave

11:09  3  Microsoft our code.  It's in every product.  What do I

11:09  4  do?

11:09  5        And they said, well -- I thought -- I thought

11:09  6  copyright, because I was just naive to it, but I

11:09  7  thought copyright.  Oh, it's my code.  It's

11:09  8  copywritten.  They're like, no.  That will never work.

11:10  9  You will lose.

11:10  10  Q.    About how old were you here in this time

11:10  11  frame?

11:10  12  A.    So that was -- I just had my birthday the

11:10  13  other day, the day before we were here at jury

11:10  14  selection.  So I was -- so I was like 25, 26, something

11:10  15  like that.

11:10  16        And so, anyway, that was the -- that was the

11:10  17  reasoning behind it.  They said, hey -- and we had --

11:10  18  we had a couple of patents in process, one granted.

11:10  19  They're like, look.  This is your only -- like, you

11:10  20  have to go -- you have to go after Microsoft for patent

11:10  21  infringement.

11:10  22              THE COURT:  Ladies and gentlemen, we're

11:10  23  going to take a very short morning recess.  Please do

11:10  24  not discuss the case amongst yourselves.  We'll be back

11:10  25  in about five or ten minutes.

| | | |
|---|---|---|
| 11:10 | 1 | THE BAILIFF:  All rise. |
| 11:10 | 2 | (Jury exited the courtroom.) |
| 11:11 | 3 | THE COURT:  Thank you.  You may be |
| 11:11 | 4 | seated. |
| 11:11 | 5 | Let me make very clear:  We're not going |
| 11:11 | 6 | to hear anything else about Microsoft or theft or |
| 11:11 | 7 | anything that's not relevant to the case, number one. |
| 11:11 | 8 | Number two, if the plaintiff again gets |
| 11:11 | 9 | into the fact that this is a David-versus-Goliath |
| 11:11 | 10 | effort, that the defendant is a big, evil corporation, |
| 11:11 | 11 | it's the little guy against the big company, I will say |
| 11:11 | 12 | something in front of the jury that the plaintiff will |
| 11:11 | 13 | not care for. |
| 11:11 | 14 | I don't know where this gentleman's |
| 11:11 | 15 | going.  I don't know why we've taken the amount of time |
| 11:11 | 16 | we've taken with him.  He's already misrepresented |
| 11:12 | 17 | things.  It's not impossible to get a patent.  He's |
| 11:12 | 18 | given the jury that impression.  We're on ten million |
| 11:12 | 19 | patents right now, maybe higher. |
| 11:12 | 20 | But so if you don't reign in what you're |
| 11:12 | 21 | doing, I will in front of the jury deal with this. |
| 11:12 | 22 | Is that clear? |
| 11:12 | 23 | MS. KIM:  Yes, Your Honor. |
| 11:12 | 24 | THE COURT:  Yes, ma'am. |
| 11:12 | 25 | MS. MOYE:  Your Honor, if I could be |

| | | |
|---|---|---|
| 11:12 | 1 | heard on this.  I think -- |
| 11:12 | 2 | THE COURT:  No.  I don't think I need to |
| 11:12 | 3 | hear anything else. |
| 11:12 | 4 | MS. MOYE:  Okay. |
| 11:12 | 5 | THE COURT:  Thank you very much.  We'll |
| 11:12 | 6 | be back in a few minutes. |
| 11:12 | 7 | (Recess taken.) |
| 11:22 | 8 | THE BAILIFF:  All rise. |
| 11:22 | 9 | THE COURT:  Please remain standing for |
| 11:22 | 10 | the jury. |
| 11:22 | 11 | (Jury entered the courtroom.) |
| 11:23 | 12 | THE COURT:  Thank you.  You may be |
| 11:23 | 13 | seated. |
| 11:23 | 14 | I talked to the jury and they would like |
| 11:23 | 15 | to go for about another hour, so that's what we'll do |
| 11:23 | 16 | before we break for lunch. |
| 11:23 | 17 | THE WITNESS:  Thank you, sir. |
| 11:23 | 18 | BY MS. KIM: |
| 11:23 | 19 | Q.   Hello again, Mr. Etchegoyen. |
| 11:23 | 20 | A.   Hello. |
| 11:23 | 21 | Q.   Is this on? |
| 11:23 | 22 | A.   I can hear you. |
| 11:23 | 23 | Q.   So we talked before the break about several |
| 11:23 | 24 | companies that you started and sold.  Now I want to |
| 11:23 | 25 | talk to you about Brazos and why you started it. |

—104—

11:23   1          Could you please tell us why you started

11:23   2   Brazos?

11:23   3       A.    Sure.  I wanted to take what I'd learned about

11:23   4   kind of incubating technologies at the former company

11:24   5   and -- but start with a -- start with a much -- a much

11:24   6   better kind of patent portfolio and invention catalog.

11:24   7          I always looked up to -- as an inventor, you

11:24   8   end up doing searches and stuff.  And I always looked

11:24   9   up to -- I always looked up to the inventors at

11:24   10  obviously Bell Labs, like, and Alcatel-Lucent.  Most

11:24   11  inventors do.

11:24   12         They -- you know, you see those names, and

11:24   13  it's rare that -- it's rare that any group of humans

11:24   14  have nine Nobel Prizes, you know.  I didn't have

11:24   15  anything like that.  So I was -- I thought that that

11:24   16  would be a good foundation to incubate companies, have

11:24   17  a licensing group and also incubate companies as well

11:24   18  and bring on inventors and new technologies.

11:24   19      Q.    When you say "incubate," what do you mean by

11:24   20  that?

11:24   21      A.    I mean, eventually when we have -- when we

11:25   22  have more money, we can -- we're -- we plan on bringing

11:25   23  in like even local inventors, you know.  We've been

11:25   24  working a little bit with Baylor.  It's early.  But

11:25   25  bringing on young, new -- young, new inventors and

105

11:25  1    create companies like I had done in the past.  It's

11:25  2    exciting.

11:25  3        Q.    And I think you were referring to, as an

11:25  4    inventor, you looked up to the Bell Labs and

11:25  5    Alcatel-Lucent patents.  We were all here when

11:25  6    Mr. Waldrop and Mr. Rosenthal talked about those

11:25  7    patents.

11:25  8            Could you tell us about why those patents were

11:25  9    something noteworthy for you?

11:25  10       A.    Yeah.  It's -- I mean, the patents are kind of

11:25  11   well-known as kind of one of the, you know, most, kind

11:25  12   of, unlicensed portfolios of value in the market.

11:25  13           You know, I think -- I saw a slide, I think it

11:26  14   said 8,000.  I don't think -- I think it's 12,000,

11:26  15   closer to 12,000 worldwide patents.

11:26  16           And it was, you know, it's a significant

11:26  17   patent portfolio, significant provenance of inventors

11:26  18   and invention, and it was a great -- is and was a great

11:26  19   foundation to start.

11:26  20           We've been doing it for, what, six years.  So

11:26  21   it's been -- it's been, you know, gone on for awhile,

11:26  22   but I hope we can continue to grow it.

11:26  23       Q.    I think you just told us about how it's -- the

11:26  24   value of it is -- it's because it's unlicensed.

11:26  25           Can you please tell us what you meant by that?

11:26    1    A.    Sure.    I mean, companies like IBM, Broadcom,

11:26    2    other companies kind of, you know, that, I mean, Nokia

11:26    3    as well is a great -- is a great, great company.    But

11:26    4    IBM and others -- I'm not picking on IBM.    They're a

11:27    5    fantastic company.    They did a lot for me.    I love

11:27    6    them.

11:27    7    But they -- they tend to license out their

11:27    8    entire portfolio to companies, you know, in broad

11:27    9    licensing.    So it's hard to create new products and new

11:27    10    licensing because then you're kind of competing with

11:27    11    yourself because the technology's already been licensed

11:27    12    out.

11:27    13    Bell Labs, Alcatel-Lucent, Nokia are pretty

11:27    14    famous for not -- for not doing that.    They -- and

11:27    15    they -- and they do enforce.    I mean, that was the

11:27    16    other thing.    I mean, Alcatel-Lucent and Nokia were,

11:27    17    you know, strong about enforcing their portfolio and

11:27    18    their inventions and they protect their inventors.

11:27    19    That's unique.

11:27    20    I mean, they pay their inventors very, very

11:27    21    well, which is fantastic.    It was just -- they just --

11:28    22    they just do it -- they do it right in my opinion.

11:28    23    Q.    And the patents we're talking about today

11:28    24    that, I think, both Mr. Waldrop and Mr. Rosenthal had

11:28    25    on slides, the -- I think it's the '133, the '800 and

11:28    1    the '360 patents, were they included as part of the 8

11:28    2    or 12,000 patents we were talking about?

11:28    3        A.    Yes, ma'am.

11:28    4        Q.    And you were here on Thursday when our jury

11:28    5    was selected and also earlier this morning.  I saw you

11:28    6    here with my own eyes.

11:28    7            And I believe counsel for VMware, Ms. Moye and

11:28    8    Mr. Rosenthal, have both said that are -- the

11:28    9    technology's very old, that it's 20 years old.

11:28    10           Do you remember that?

11:28    11       A.    I do.  Yeah.

11:28    12       Q.    Do you agree with that?

11:28    13       A.    No.  No.  In a way, that's -- I mean, cloud

11:28    14   computing is still at its infancy.  I mean, Amazon

11:28    15   licensed this -- our patents.  And Amazon's a leader in

11:28    16   cloud computing.  I mean, they are the cloud.

11:28    17           So I think that's -- I think that's really

11:29    18   false.  I think that's kind of "if you can't convince,

11:29    19   confuse" terminology.

11:29    20           I think that, you know, when, you know,

11:29    21   depending on how great a patent is and how

11:29    22   forward-thinking, I mean, being an inventor is about

11:29    23   being forward-thinking.  It's about coming up with

11:29    24   something sometimes years before anyone else does and

11:29    25   then the market catches up with that.

11:29  1          I mean, the telephone was invented long before

11:29  2   the market adopted it, so even way back then.

11:29  3          So it's -- no.  I mean -- and it's the core.

11:29  4   I mean, cloud -- cloud is really, really important.  So

11:29  5   yeah.  I don't agree with that.  I mean, no offense.  I

11:29  6   don't.

11:29  7      Q.    Sure.

11:29  8          I want to go back and talk about the patents

11:29  9   that you purchased from Nokia, which came from

11:29  10  Alcatel-Lucent and also Bell Labs.

11:29  11         8,000 or 12,000, that sounds like a lot of

11:29  12  patents.  It sounds like a significant amount of

11:29  13  patents to Nokia.  About what percentage of Nokia's

11:30  14  patents did that make up?

11:30  15     A.    I don't know -- I don't know what it is today,

11:30  16  but I think then it was roughly a third of their --

11:30  17  what they call their licensable portfolio.

11:30  18     Q.    So a third is -- that's a big chunk.  If I was

11:30  19  a third shorter, a third taller, I'd be either giant or

11:30  20  really, really small.

11:30  21         Why would -- what's your understanding of why

11:30  22  Nokia would sell a third of their patents to you and

11:30  23  Brazos?

11:30  24     A.    I wish I was a third taller.

11:30  25         So they -- so, again, they enforce -- Nokia

| | | |
|---|---|---|
| 11:30 | 1 | spent billions of dollars upgrading technology and |
| 11:30 | 2 | patents, and they did enforce.  They have -- like I |
| 11:30 | 3 | said before, they have a history of enforcing -- |
| 11:30 | 4 | Q.    When you say "enforce," what does that mean? |
| 11:30 | 5 | A.    Litigating their patent rights for what |
| 11:31 | 6 | they -- for what they invented.  They -- so -- and they |
| 11:31 | 7 | were -- they were going after Apple at that time as |
| 11:31 | 8 | well, right before we acquired the portfolio. |
| 11:31 | 9 | But they tend to, you know, they enforce their |
| 11:31 | 10 | patents.  And, ultimately, they can't do all of it. |
| 11:31 | 11 | So, historically speaking, I mean, Uniloc |
| 11:31 | 12 | was -- that team was -- unfortunately, we had to |
| 11:31 | 13 | litigate a lot to protect my inventions and my |
| 11:31 | 14 | products. |
| 11:31 | 15 | So it -- they -- they kind of sought out the |
| 11:31 | 16 | team to say, hey, you know, would you be willing to, |
| 11:31 | 17 | you know, acquire these assets and partner and help us |
| 11:31 | 18 | license our inventions? |
| 11:31 | 19 | Q.    And you ended up partnering with Nokia? |
| 11:31 | 20 | A.    Yes. |
| 11:31 | 21 | Q.    I want to talk a little bit about that deal. |
| 11:31 | 22 | What did Nokia, other than getting to partner |
| 11:32 | 23 | with you, what did they get out of it? |
| 11:32 | 24 | A.    They -- at that time, they received a |
| 11:32 | 25 | percentage of all the money.  So how it worked is they |

11:32    1    collect -- you know, we pay.  We pay upfront, but we

11:32    2    also collect licensing revenue for companies that pay,

11:32    3    like, you know, like Amazon and Microsoft and others.

11:32    4            And then we -- and then they get a percentage

11:32    5    of that.  And then they distribute that back to their,

11:32    6    you know, to pay their inventors that still work there

11:32    7    and all of that.

11:32    8        Q.    What was that percentage?

11:32    9        A.    I'm sorry.  There were two different ones.

11:32    10   But I think it was 10 -- one was -- one grouping of

11:32    11   patents was 10 percent, and the other was I think

11:32    12   32 percent.  Later it was -- later, because I'm simple,

11:32    13   we blended it to 20 -- I think it was 20 percent after

11:33    14   blending all the portfolios.

11:33    15       Q.    Was VMware or Dell ever provided a chance to

11:33    16   license Brazos' patents?

11:33    17       A.    Yes.

11:33    18       Q.    Why do you believe that?

11:33    19       A.    I found out later that they were.  I don't

11:33    20   know how long after they were offered.  A broker -- we

11:33    21   were -- Brazos was -- we took a stance for several

11:33    22   years to -- to like, you know, we didn't want to

11:33    23   litigate at all.

11:33    24           So we were trying -- we had brokers that did

11:33    25   friendly, you know, friendly non-litigation licensing.

11:33    1    Hey.  Our stuff is great.  You know, please license it.

11:33    2    You know, it's making a difference in the world.

11:33    3    I've -- license it.  And we don't want to litigate.

11:33    4         So we had brokers that did that, that did

11:33    5    non-litigation licensing.

11:33    6         Q.    And you're aware that one of your brokers, I

11:33    7    think Mr. Rosenthal mentioned it a little earlier this

11:34    8    morning, that they had made an offer of the 2.5

11:34    9    million.

11:34   10         Are you aware of that?

11:34   11         A.    Yes.  I found out -- I found out later.  Maybe

11:34   12    years later after the offer was made.

11:34   13         Q.    And you're aware that that was done before you

11:34   14    brought this lawsuit against VMware and Dell?

11:34   15         A.    Yes.  Yes, of course.

11:34   16         Q.    Were you willing to license the patents to

11:34   17    Dell and VMware before you brought this lawsuit?

11:34   18         A.    I'm always -- I've done hundreds of licensing

11:34   19    transactions.  I'm always willing to license.  I would

11:34   20    prefer -- I would prefer not to do lawsuits.

11:34   21         Q.    Had VMware chosen to take a license to Brazos'

11:34   22    patents, would you be here today?

11:34   23         A.    No.

11:34   24         Q.    Thank you, Mr. Etchegoyen.

11:34   25              MS. KIM:  I pass the witness.

112

| | | |
|---|---|---|
| 11:34 | 1 | MS. MOYE:  Your Honor, if we could |
| 11:34 | 2 | approach quickly, I just have a couple of issues before |
| 11:35 | 3 | I start cross-examination. |
| 11:35 | 4 | THE COURT:  Okay. |
| 11:35 | 5 | (Bench conference.) |
| 11:35 | 6 | MS. MOYE:  Just two things I wanted to |
| 11:35 | 7 | explore, Your Honor, to make sure we don't cross any |
| 11:35 | 8 | lines.  One, I know there was motion in limine practice |
| 11:35 | 9 | on Brazos and its Texas presence versus other presence. |
| 11:35 | 10 | And I believe that in the first sentence |
| 11:35 | 11 | of his opening statement that plaintiff's counsel has |
| 11:35 | 12 | opened the door for us to cross-examine this witness |
| 11:35 | 13 | about the fact that it was originally a Delaware |
| 11:35 | 14 | corporation and only became -- had a Texas presence a |
| 11:35 | 15 | few months before the filing of this lawsuit.  The |
| 11:35 | 16 | first words out of his mouth are:  We were a Texas |
| 11:36 | 17 | company. |
| 11:36 | 18 | THE COURT:  I heard. |
| 11:36 | 19 | MS. MOYE:  Okay. |
| 11:36 | 20 | THE COURT:  Counsel? |
| 11:36 | 21 | MS. KIM:  The MIL, I think, was pretty |
| 11:36 | 22 | clear.  Actually, do I have it?  I don't have it here |
| 11:36 | 23 | with me.  But it had to do with the reason for being |
| 11:36 | 24 | here would be not to disparage the other side.  For |
| 11:36 | 25 | example, us opening here because we want a Waco |

11:36  1  presence and things like that.  I think him saying that

11:36  2  we are --

11:36  3              THE COURT:  You made that --

11:36  4              MS. KIM:  -- a Texas company --

11:36  5              THE COURT:  You made them sound like they

11:36  6  were a Texas company.

11:36  7              I'll allow you to get -- to give some

11:36  8  background about the fact that they're from Delaware.

11:36  9              MS. MOYE:  Thank you.

11:36  10             THE COURT:  Anything else?

11:36  11             MS. MOYE:  Yes.  Your Honor, on the

11:36  12  question of other litigation, I know there was a motion

11:36  13  in limine that dealt with patent proceedings.  I don't

11:36  14  think there was anything on other litigation.

11:36  15             But this witness has now testified at

11:36  16  length and repeatedly about other litigation.  And I

11:36  17  think given that, we're entitled to explore his other

11:36  18  litigation related to this patent portfolio.  He's

11:36  19  filed over 140 lawsuits.  Just told the jury that this

11:37  20  is my first time doing this.  Has, in fact, been

11:37  21  deposed 20 times.

11:37  22             THE COURT:  Counsel?

11:37  23             MS. MOYE:  I think this is wide open.

11:37  24             MS. KIM:  I think the number of lawsuits

11:37  25  would be highly prejudicial and not add anything.  He'd

—114—

11:37  1    had about -- he talked about lawsuits before.

11:37  2                    THE COURT:  He talked about having to go

11:37  3    to trial and take on Microsoft.  He's opened the door.

11:37  4    I don't want this to devolve into a bunch of other

11:37  5    stuff.

11:37  6                    But you can get in -- you can -- you can

11:37  7    go into cross to show that he did not get the full

11:37  8    picture of the success that he's had with these patents

11:37  9    in prior litigations.  I don't want you to talk about

11:37  10   how much litigation there's been.  I don't think that's

11:37  11   particularly relevant.

11:37  12                   But he did give the impression -- I got

11:37  13   the impression that there's just been one case against

11:37  14   Microsoft and everyone else has taken a license.  And

11:37  15   you're free to correct that in your cross.

11:37  16                   MS. MOYE:  Thank you, Your Honor.

11:37  17                   MS. KIM:  Your Honor, for clarification,

11:38  18   does that mean just Brazos' lawsuits that have been

11:38  19   filed and settled?  Or is it total?  If we're talking

11:38  20   about how successful he's been --

11:38  21                   THE COURT:  On these patents.

11:38  22                   MS. KIM:  On these patents, these three

11:38  23   patents.  Right.

11:38  24                   MS. MOYE:  That's all I intend to do, is

11:38  25   ask him --

11:38　1　　　　　　　　THE COURT:  It's limited to these three

11:38　2　patents.

11:38　3　　　　　　　　MS. KIM:  These three patents only.

11:38　4　　　　　　　　Thank you, Your Honor.

01:36　5　　　　　　　　(Bench conference concludes.)

11:38　6　　　　　　　　MR. MCCRACKEN:  Your Honor, may I

11:38　7　approach with some binders?

11:38　8　　　　　　　　THE COURT:  Of course.  Thank you for

11:38　9　asking.

11:38　10　　　　　　　　　　CROSS-EXAMINATION

11:38　11　BY MS. MOYE:

11:38　12　　　Q.　　Good morning, Mr. Etchegoyen.

11:38　13　　　A.　　Good morning.

11:38　14　　　Q.　　We have not met before.  I am Veronica Moye.

11:38　15　I represent the defendants.  And I will be doing your

11:38　16　cross-examination today.

11:38　17　　　　　　Can you hear me fine, sir?

11:38　18　　　A.　　I can hear you fine, ma'am.

11:38　19　　　Q.　　Thank you.

11:38　20　　　　　　And I'd like us to get through this

11:39　21　examination as quickly and efficiently as possible.  So

11:39　22　I'd ask that listen to my questions and try to respond

11:39　23　directly to them.

11:39　24　　　　　　Can you do that, sir?

11:39　25　　　A.　　Yes, ma'am.

116

11:39  1        Q.    Thank you.

11:39  2              Now, Mr. Etchegoyen, you explained that you

11:39  3    are currently the chairman and CEO of the plaintiff

11:39  4    WSOU, right?

11:39  5        A.    I think I said chairman and founder.

11:39  6        Q.    Are you not also currently the CEO, sir, of

11:39  7    WSOU?

11:39  8        A.    I haven't seen that title, but that's fine,

11:39  9    yeah.  I can be the CEO.

11:39  10       Q.    You are the CEO.

11:39  11             And you, Mr. Etchegoyen, you personally will

11:39  12   receive a percentage of any money generated by WSOU's

11:39  13   efforts to license its patents, correct?

11:39  14       A.    Yes.  Eventually.

11:39  15       Q.    And if this jury awards WSOU money, you will

11:40  16   receive a percentage of what is collected; isn't that

11:40  17   right, sir?

11:40  18       A.    I don't think if the jury awards $81 million

11:40  19   that I would receive money, no.

11:40  20       Q.    Okay.  Mr. Etchegoyen, do you remember being

11:40  21   deposed in this case?

11:40  22       A.    Yes, ma'am.

11:40  23       Q.    And you were under oath when you were deposed

11:40  24   just as you're under oath now; isn't that correct, sir?

11:40  25       A.    Yes, ma'am.

11:40  1      Q.    And so you told the truth in that deposition,

11:40  2   didn't you?

11:40  3      A.    Yes.

11:40  4      Q.    Okay.  You should have in front of you a copy

11:40  5   of your deposition transcript.  And I refer you to Page

11:40  6   119, Lines 8 through 19.

11:40  7      A.    I'm sorry.  Which tab?  Sorry.

11:40  8              MS. MOYE:  May I approach, Your Honor,

11:41  9   and help the witness?

11:41  10     A.    Oh, I think I got it.  The first tab.  Sorry.

11:41  11             MS. MOYE:  Deposition transcript.

11:41  12     A.    Oh, okay.

11:41  13             (Off-the-record discussion.)

11:41  14             MS. MOYE:  And could I have, Mr. Eaton,

11:41  15   Mr. Etchegoyen's deposition testimony starting at Page

11:41  16   119, Lines 8 through 19?

11:41  17             (Video played.)

11:41  18     Q.    So you understand that in the event that a

11:41  19   jury does award money damages, and that award is upheld

11:41  20   and paid, that that would become revenue of WSOU,

11:41  21   correct?

11:41  22     A.    Yes.  I would agree.  If -- on the moneys

11:41  23   paid, I would receive some calculation based on that.

11:41  24     Q.    And the higher the jury award, the more you

11:42  25   get paid?

—118—

11:42  1      A.    Yeah.  I think that's -- yeah.  I think that's

11:42  2  reasonable to assume.

11:42  3                  (End video.)

11:42  4  BY MS. MOYE:

11:42  5      Q.    Mr. Etchegoyen, is it not true that the higher

11:42  6  the jury award in this case, the more you will get

11:42  7  paid?

11:42  8      A.    I -- eventually I will -- I will get paid when

11:42  9  there's a certain --

11:42  10      Q.    Is that a yes, Mr. Etchegoyen?

11:42  11                  THE COURT:  Counsel, you need to let him

11:42  12  answer the question.  And if I don't think he's

11:42  13  responding directly, I will take care of it.

11:42  14                  MS. MOYE:  Understood, Your Honor.

11:42  15      A.    I think I understood the question.

11:42  16                  THE COURT:  Would you all like to hear

11:42  17  the question again?

11:42  18      A.    I would, please.

11:42  19  BY MS. MOYE:

11:42  20      Q.    I'm happy to repeat it.

11:42  21      A.    Thank you.

11:42  22      Q.    Is it not true, Mr. Etchegoyen, that the more

11:42  23  the jury awards, the more you will ultimately receive?

11:42  24      A.    If the jury awards the 81 million maximum, I

11:43  25  won't -- we've spent -- with the amount we've spent, I

—119—

| | | |
|---|---|---|
| 11:43 | 1 | won't -- I won't receive -- I don't think I receive |
| 11:43 | 2 | anything yet.  Because there's a threshold. |
| 11:43 | 3 | Q.    Mr. Etchegoyen, I didn't ask you about 81 |
| 11:43 | 4 | million. |
| 11:43 | 5 | A.    Okay. |
| 11:43 | 6 | Q.    So let me try again.  Is it not true, sir, |
| 11:43 | 7 | that the more the jury awards, the more you will |
| 11:43 | 8 | receive? |
| 11:43 | 9 | A.    Eventually I will receive financial |
| 11:43 | 10 | remuneration, yes. |
| 11:43 | 11 | Q.    Okay. |
| 11:43 | 12 | MS. MOYE:  Can we just have |
| 11:43 | 13 | Mr. Etchegoyen's sworn deposition testimony again? |
| 11:43 | 14 | This is at 119, 8 through 19. |
| 11:43 | 15 | (Video played.) |
| 11:43 | 16 | Q.    So you understand that in the event that a |
| 11:43 | 17 | jury does award money damages and that award is upheld |
| 11:43 | 18 | and paid, that that would become revenue of WSOU, |
| 11:43 | 19 | correct? |
| 11:43 | 20 | A.    Yes.  I would agree.  On the moneys paid I |
| 11:44 | 21 | would receive some calculation based on that. |
| 11:44 | 22 | Q.    And the higher the jury award, the more you |
| 11:44 | 23 | get paid? |
| 11:44 | 24 | A.    Yeah.  I think that's -- yeah.  I think that's |
| 11:44 | 25 | reasonable to assume. |

11:44  1                    (End video.)

11:44  2   BY MS. MOYE:

11:44  3       Q.    And that's your sworn deposition testimony,

11:44  4   correct, Mr. Etchegoyen?

11:44  5       A.    Yes, ma'am.

11:44  6       Q.    That's you on the video?

11:44  7       A.    Yes.  That's me.

11:44  8       Q.    Now, I've been using WSOU.  During your

11:44  9   testimony you used the term Brazos.  Those are, in

11:44  10  fact, the same companies; is that correct?

11:44  11      A.    Brazos and WSOU are the same company.

11:44  12      Q.    Right.  So WSOU is the company's name.  Brazos

11:44  13  is the DBA, a doing business as; is that correct?

11:44  14      A.    I don't know the legal term, but it's

11:44  15  pronounced Brazos and I believe that's -- I think it's

11:44  16  a DBA, yeah.  It's part of WSOU.

11:44  17      Q.    Now, WSOU is seeking over 80 million in

11:45  18  damages, right?  You've confirmed that?

11:45  19      A.    Yes.

11:45  20      Q.    And that's the award that WSOU is seeking for

11:45  21  claimed infringement of three patents, correct?

11:45  22      A.    No, ma'am.  It's two patents.  The one is --

       23      Q.    Two patents.

11:45  24      A.    -- we're waiting till after.  And then we have

11:45  25  another trial on the damages, I believe.

—121—

11:45   1        Q.    You are correct on that.  Two patents --

11:45   2                THE COURT:  Ladies and gentlemen of the

11:45   3    jury, we're going to take a recess.  We're going to go

11:45   4    ahead and take a recess now for lunch.  It's 11:45.  If

11:45   5    you all would be back at 1:00, that would be great.

11:45   6                THE BAILIFF:  All rise.

11:45   7                (Jury exited the courtroom.)

11:45   8                THE COURT:  You may step down.

        9                THE WITNESS:  Yes, sir.

11:46   10                THE COURT:  I have not decided anything

11:46   11   about another trial.  I didn't say that.  I don't know

11:46   12   how to fix this now with the jury.  I'll think about it

11:46   13   over lunch.

11:46   14                Counsel, if this witness can't answer the

11:46   15   questions directly and injects -- I don't even really

11:46   16   know what to say about what to do right now.  He was

11:46   17   here for the entire discussion this morning.

11:47   18                But I will find -- I'll figure something

11:47   19   out to say to the jury.  If this happens again with any

11:47   20   witness, I will correct it and the witness -- well, I

11:47   21   don't know what to do.  He's on cross.  I can't deny

11:47   22   you your cross.

11:47   23                But advise your fact witnesses that they

11:47   24   are limited to the facts and answer the questions that

11:47   25   are asked.  And if they don't, I won't take another

11:47  1    break with the jury.  I will handle it with the jury in

11:47  2    here.  And whoever witness it is, I guarantee you will

11:47  3    be unhappy about what I have to do to make it fair for

11:47  4    the other side because of what a witness has said.

11:48  5              I don't know how I can be any more clear

11:48  6    than that.  Talk to your witnesses.  Tell them to

11:48  7    answer the questions.  I will see you back at 1:00.

11:48  8              THE BAILIFF:  All rise.

11:48  9              (Recess taken.)

01:01  10              THE BAILIFF:  All rise.

01:01  11              THE COURT:  Thank you.  You may be

01:01  12    seated.

01:01  13              My understanding is there are issues to

01:01  14    be taken up.  And I will remind you, Mr. Shelton and

01:01  15    everyone, that you all are on the clock and the loser

01:01  16    will have the time used to their bank account.

01:02  17              MR. SHELTON:  Thank you, Your Honor.

01:02  18              Your Honor, we spent the lunch break

01:02  19    preparing a proposed curative instruction for the

01:02  20    several references to either a second trial on damages

01:02  21    for the '800 or another proceeding after this trial, of

01:02  22    course, which are incorrect.

01:02  23              And I can either -- I have copies

01:02  24    prepared for Your Honor and for the plaintiff.

01:02  25              THE COURT:  Okay.

01:02  1           MR. SHELTON:  And, Your Honor, of course,

01:02  2  I don't need to explain this to you, but two things

01:02  3  have happened this morning, both of which are quite

01:02  4  troubling.

01:02  5           The first is that there's been an undue

01:02  6  emphasis on damages, putting the damages cart before

01:02  7  the liability horse, which of course is problematic in

01:02  8  front of the jury.

01:02  9           And the second is that there have been

01:02  10  these incorrect references to another proceeding after

01:02  11  this trial in which damages on the '800 patent, if

01:02  12  liability was found, would be determined.

01:02  13           And as Your Honor put it aptly, you have

01:03  14  not made that decision yet.

01:03  15           Would you prefer that I read this

01:03  16  proposed instruction in the record?

01:03  17           THE COURT:  I'll read it, and then you

01:03  18  can just mark it as an exhibit.

01:03  19           MR. SHELTON:  Very good.  Thank you, Your

01:03  20  Honor.

01:03  21           THE COURT:  Okay.  Mr. Shelton, I've read

01:04  22  this.  Let me hear from the plaintiff what they think

01:04  23  of this.

01:04  24           You don't need to argue to me -- let me

01:04  25  start over.  You do not need to argue to me the final

01:04  1    sentence of the second paragraph.  I would not give

01:04  2    that sentence, but if you want to tell me what you feel

01:04  3    about the rest of it.

01:04  4                  MR. WALDROP:  Thank you, Your Honor.  I

01:04  5    appreciate that.  Thank you again, Your Honor.

01:04  6                  I think that the only part, Your Honor --

01:04  7    well, I hate to be in this situation, Your Honor, but

01:04  8    not only the last sentence but the part about "even

01:04  9    though the plaintiff has the burden of proof," Your

01:05  10   Honor, after the '800 patent in the middle of the

01:05  11   second paragraph.

01:05  12                  THE COURT:  I see it.  But that

01:05  13   statement's correct, is it not?

01:05  14                  They're not going to hear evidence --

01:05  15   tell me what's incorrect about this statement:  You

01:05  16   will not hear evidence from the plaintiff in this trial

01:05  17   regarding damages on the '800 patent even though the

01:05  18   plaintiff has the burden of proof, and I would add, on

01:05  19   this issue.

01:05  20                  What is incorrect about that statement?

01:05  21                  MR. WALDROP:  Because the sentence by

01:05  22   itself assumes that we didn't meet the burden.  We

01:05  23   don't have a burden of damages in this case, Your

01:05  24   Honor.

01:05  25                  THE COURT:  Yes, you do.  You have the

01:05   1   burden of proof on the amount of damages.

01:05   2               MR. WALDROP:  But we're not putting on --

01:05   3   there's no damages case -- I understand.  Yeah.  That's

01:05   4   the only thing I'm concerned about.  I mean, the

01:05   5   context of it, Your Honor, you know what I'm saying,

01:05   6   Your Honor.

01:05   7               THE COURT:  No.  I understand.  But I'm

01:05   8   saying, but you -- it's correct your client or witness,

01:05   9   a witness you called, injected this issue.

01:06   10              And -- but it is a fact that the jury

01:06   11  will not hear evidence from the plaintiff in this trial

01:06   12  regarding damages on the '800 patent.  That's correct,

01:06   13  right?

01:06   14              That's so far --

01:06   15              MR. WALDROP:  Yes, Your Honor.  So I'll

01:06   16  state this, Your Honor, before I get in -- Your Honor,

01:06   17  we object to the curative instruction just in general,

01:06   18  Your Honor.  So I would oppose the --

01:06   19              THE COURT:  Okay.  That's fine.

01:06   20              But let me try again:  You will not hear

01:06   21  evidence from the plaintiff in this trial regarding

01:06   22  damages on the '800 patent.

01:06   23              That is a true statement, right?

01:06   24              MR. WALDROP:  Yes.

01:06   25              THE COURT:  And it's the --

01:06    1          MR. WALDROP:  Period.

01:06    2          THE COURT:  And it's the plaintiff that

01:06    3    has the burden of proof on the amount of damages -- of

01:06    4    proving the damages.

01:06    5          MR. WALDROP:  Yes, Your Honor.  But I

01:06    6    don't even know why you have to inject -- Your Honor, I

01:06    7    would object to that.

01:06    8          THE COURT:  I understand, but --

01:06    9          MR. WALDROP:  It doesn't make any sense

01:06   10    because we're not presenting a damages case.  So it

01:06   11    almost suggests that --

01:06   12          THE COURT:  But if I -- if I ask them,

01:07   13    and I very well might, ask them to answer a damages

01:07   14    question, the defendant certainly would have the right

01:07   15    in closing argument, because it's going to be in my

01:07   16    charge to say, ladies and gentlemen of the jury, on all

01:07   17    three patents, the plaintiff has the burden of proving

01:07   18    the appropriate amount of damages.

01:07   19          And there is going to be no evidence.

01:07   20    And they're likely to hear this instruction -- this

01:07   21    part of the instruction now and then because what else

01:07   22    do we do?

01:07   23          You all have made the decision to move

01:07   24    forward with the '800 patent even though you don't have

01:07   25    a damages case.  You don't have any evidence to put on.

01:07    1    That's fine.  It's your choice.

01:07    2                But you're also going to have to reap the

01:07    3    problems that that causes because I have to make sure

01:07    4    the jury understands what is happening.

01:08    5                And it's a fact that there will be -- I'm

01:08    6    deleting what I think -- I'll say it, I think this is

01:08    7    impermissible.  Defendant asked me to say:  I did not

01:08    8    permit the plaintiff to present evidence regarding

01:08    9    damages for the '800 patent because it's not reliable.

01:08   10                I don't think that needs to be in there.

01:08   11    I think -- but everything else is, in my opinion,

01:08   12    exactly what the law is and what the -- what's going to

01:08   13    happen in the trial.

01:08   14                MR. WALDROP:  Your Honor, I understand,

01:08   15    Your Honor.  We object, Your Honor.

01:08   16                But there's one question, Your Honor,

01:08   17    that may circumvent all of this, Your Honor, which you

01:08   18    kind of hinted at, Your Honor, which may lead to a

01:08   19    reduction in time for the entire proceeding, Your

01:08   20    Honor, and I'm mindful of the Court's time and very

01:08   21    thankful for this opportunity, Your Honor.

01:08   22                Look, Your Honor.  We only -- if there's

01:08   23    one question or two questions that we cannot ask based

01:08   24    on the Court's rulings this morning, then we may be in

01:08   25    a situation, Your Honor -- and depending on what the

01:09    1    Court says, that may obviate the need for all of this.

01:09    2                So I wanted to raise that with Your Honor

01:09    3    because that may put all this aside, if I could.

01:09    4                If we can't -- if we cannot ask, Your

01:09    5    Honor, our expert, and this is the particular question,

01:09    6    just this question alone:  Does VMware offer hardware

01:09    7    and software in connection with its vSphere 6.5

01:09    8    product?  Is that question permissible or not?

01:09    9                THE COURT:  What is the defendants'

01:09   10    position?

01:09   11                MR. ROSENTHAL:  Your Honor, our position

01:09   12    is that's exactly what was ruled on today.  There is no

01:09   13    hardware.

01:09   14                THE COURT:  I thought so too.

01:09   15                Yeah.  You are correct, Mr. Waldrop.  I

01:09   16    think that's been the subject of at least four

01:09   17    hearings, maybe five hearings, that have been ruled on

01:09   18    by this Court about that issue.

01:09   19                MR. WALDROP:  So the only reason why I

01:09   20    was asking, Your Honor, because -- and maybe it was

01:09   21    wrong, Your Honor.  I'm doing the very best I can.  Our

01:09   22    understanding was that the rulings applied to -- your

01:09   23    ruling this morning applied to specific Dell hardware,

01:10   24    not the existence of hardware.

01:10   25                If that's the case, Your Honor, I think

01:10   1   we're in a situation, Your Honor, given these rulings,

01:10   2   and we would like to preserve for the record and, Your

01:10   3   Honor, either move to continue or make every

01:10   4   preservation of rights that we can as to the '800 and

01:10   5   '360 patent, make offers of proof.

01:10   6           In an interest of time, we may not be

01:10   7   able to do all of that now, but I would want to ask for

01:10   8   preservation of all rights for appeal, Your Honor.

01:10   9           And then maybe make offers of proof after

01:10  10   the jury leaves or however you want to do that, Your

01:10  11   Honor.  We weren't prepared to do that because we had a

01:10  12   different understanding, but we are where we are, Your

       13   Honor.

01:10  14           And if that's the case, if that's where

01:10  15   we are, Your Honor, because effectively we've been --

01:10  16   effectively the case is over for us on the '360 patent

01:10  17   and the '800 patent by operation of the rulings, Your

01:10  18   Honor, as to almost summary judgment.

01:10  19           And I have no interest in wasting the

01:11  20   Court's time.  We'll just take this up in a different

01:11  21   way, Your Honor.  And we'll just proceed on the '133

01:11  22   patent.

01:11  23           THE COURT:  So what I hear you saying is

01:11  24   you would want me to sever out two of the three patents

01:11  25   and allow you to go up to the Circuit and appeal my

01:11  1    rulings with respect to the Daubert where I struck the

01:11  2    damages and my rulings with respect to what is and is

01:11  3    not admissible with respect to the hardware?

01:11  4                    MR. WALDROP:  They're already separate

01:11  5    cases, Your Honor, I believe, consolidated for trial.

01:11  6                    THE COURT:  So you're asking me to grant

01:11  7    the motion -- you would ask me to grant a motion from

01:11  8    the defendant on those to dismiss them, which would

01:11  9    make them appealable based on my rulings?

01:11  10                   MR. WALDROP:  Your Honor, there's a

01:12  11   couple ways to do it, because we could also

01:12  12   stipulate -- stipulations are also an issue.

01:12  13                   Your Honor, if I could, because like I

01:12  14   said, this was not something -- if I could have one

01:12  15   minute, Your Honor.

01:12  16                   THE COURT:  You can have as much time as

01:12  17   you need.  This is on your clock.

01:12  18                   MR. WALDROP:  Okay.  Well, my case shrank

01:12  19   a lot, Your Honor.  So I want to move fast.

01:12  20                   THE COURT:  Take your time.

01:12  21                   MR. WALDROP:  All right.  Thank you, Your

01:12  22   Honor.  I just need a few seconds, Your Honor, a few

01:12  23   minutes.

01:12  24                   (Pause in proceedings.)

01:18  25                   MR. ROSENTHAL:  Your Honor, it's me.

01:18  1    Mr. Waldrop and I have just discussed how we think

01:18  2    would be the appropriate way to proceed in this

01:18  3    circumstance.  And we think the appropriate way to

01:18  4    proceed is for us to now make a motion and hear

01:18  5    defendants -- or hear Plaintiff's response.

01:18  6                Our motion is under Rule 56 we move for

01:18  7    judgment as a matter of law that there is no direct

01:18  8    infringement of the '800 and '360 patents on the basis

01:18  9    that those -- the only asserted claims of those two

01:18  10   patents are apparatus claims.  The only proffered

01:18  11   evidence in this case that is consistent with the

01:18  12   Court's rulings is that of direct sales of software

01:18  13   alone.  And that there is no proffered evidence under

01:18  14   the Court's rulings of the sale of hardware.  And as a

01:18  15   result, there will be no evidence of infringement.  And

01:19  16   indirect infringement is out of the case.

01:19  17               We also move for the same basis for

01:19  18   judgment as a matter of law that there are no damages

01:19  19   for those two, or at least that the plaintiff cannot

01:19  20   prove any damages for those two patents on the same

01:19  21   basis, because the damages evidence that they have

01:19  22   proffered in this case is tied entirely to the sale of

01:19  23   software which cannot by law infringe apparatus claims.

01:19  24               THE COURT:  And in addition to that, on

01:19  25   the '800 the Daubert that I had already granted.

01:19   1                    MR. ROSENTHAL:  And on that basis as

01:19   2   well, Your Honor.

01:19   3                    THE COURT:  Okay.

01:19   4                    MR. ROSENTHAL:  Thank you.

01:19   5                    THE COURT:  Yes, sir?

01:19   6                    MR. WALDROP:  Your Honor, for the record,

01:19   7   we would oppose that motion, Your Honor.  And we ask

01:19   8   and state that by operation of law, Your Honor, and

01:19   9   your rulings from this morning previously, that we

01:19   10  cannot present a damages case and maybe an infringement

01:19   11  case, Your Honor.  And we ask that you enter in your

01:19   12  findings of fact in this case, Your Honor.

01:19   13                   THE COURT:  A response?

01:20   14                   MR. ROSENTHAL:  Your Honor, I'm not sure

01:20   15  how an opposition plays here.  Either they're going to

01:20   16  present the evidence --

01:20   17                   THE COURT:  That's what I think as well.

01:20   18                   MR. ROSENTHAL:  -- or they're not.

        19                   THE COURT:  Right.

01:20   20                   MR. ROSENTHAL:  And if the answer is that

01:20   21  they're not, then there is no basis to oppose.  So we

01:20   22  think it ought to be dismissed with prejudice.

01:20   23                   THE COURT:  What you have to put on the

01:20   24  record, Counsel -- I understand you're opposing the

01:20   25  motions.  But if there's anything substantive with

01:20  1   which you disagree about what Counsel just said -- and

01:20  2   I understand you blame the Court for it and that's

01:20  3   fine, the rulings of the Court for the situation you're

01:20  4   in.

01:20  5           But what I heard Mr. Rosenthal say, I

01:20  6   think you've articulated very clearly on the record

01:20  7   that given my rulings, both with respect to the

01:20  8   hardware and with respect to the Daubert on just the

01:21  9   '800, that a motion -- if my -- if my rulings were

01:21  10  correct -- which Plaintiff disagrees with on the

01:21  11  record -- but if my rulings were correct, then you are

01:21  12  unable to put on evidence that would support a finding

01:21  13  of infringement or damages on -- and I've already -- my

01:21  14  brain's already gone -- on the '800 and the --

01:21  15           MR. ROSENTHAL:  '360, Your Honor.

01:21  16           THE COURT:  '360 patent.

01:21  17           Do you agree with that?

01:21  18           MR. WALDROP:  Yes, Your Honor.  We

01:21  19  cannot.

01:21  20           THE COURT:  Okay.  Then I'm going to

01:21  21  grant those motions.  Which what I -- now, let me ask

01:21  22  you all this.

01:21  23           And you can start, Mr. Waldrop, just

01:21  24  because you're up.

01:21  25           I doubt the jury was dramatically

01:21  1    impacted by the statement that was made on the '800.

01:21  2    But I'm sitting up here.  I don't have -- I have no

01:21  3    skin in the game.

01:21  4                    But it seems to me that if we were -- if

01:21  5    I were to instruct the jury when they came back in that

01:22  6    we are now only going to hear evidence with respect to

01:22  7    the...

01:22  8                    MR. ROSENTHAL:  '133, Your Honor.

01:22  9                    THE COURT:  133 patent, and they should

01:22  10   disregard anything -- any evidence that they heard with

01:22  11   respect to either the '800 or the '360 patent -- I'm

01:22  12   instructing them to disregard anything they've heard so

01:22  13   far both with respect to in the opening argument, which

01:22  14   is just argument, and any evidence that might have been

01:22  15   put on during the opening for the first witness with

01:22  16   regard to those two patents, and we're only going to

01:22  17   deal with the '133, that's the way I would suggest we

01:22  18   move forward.

01:22  19                    I don't think I need to read a curative

01:22  20   instruction on something that's not in here.

01:22  21                    MR. ROSENTHAL:  We agree, Your Honor.

01:22  22                    THE COURT:  Counsel?

01:22  23                    MR. WALDROP:  That's fine, Your Honor.

01:22  24   Thank you, Your Honor.

01:22  25                    THE COURT:  Okay.  And then the final

01:22  1    thing we have, which makes me very happy, is you now

01:22  2    have ten hours per side since there's only one

01:22  3    patent --

01:22  4                    MR. WALDROP:  Thank you.

01:22  5                    THE COURT:  -- left in the case.

01:22  6                    Now, Mr. Waldrop, you go first and then

01:22  7    I'll hear from opposing counsel.  Is there anything

01:23  8    else we need to take up before I bring in the jury?

01:23  9                    MR. WALDROP:  There was an offer of

01:23  10   proof, Your Honor, on just a -- and I'm not here to

01:23  11   reargue claim construction, Your Honor.  But there was

01:23  12   an offer of proof we wanted to make on claim

01:23  13   construction just to --

01:23  14                    THE COURT:  On claim construction?

01:23  15                    MR. WALDROP:  Yes, Your Honor.  There was

01:23  16   a denial -- we objected to some plain and ordinary

01:23  17   meaning terms they used, Your Honor.  In an effort to

01:23  18   clarify, we offered to define what we meant by plain

01:23  19   and ordinary meaning.  The Court denied that, said it

01:23  20   didn't want to take it up.

01:23  21                    So we were going to state on the record,

01:23  22   if the Court wanted, what Mr. -- Dr. McClellan, our

01:23  23   witness, would say -- what we would say would be the

01:23  24   constructions that the Court should have entered to

01:23  25   resolve any 02 Micro disputes, Your Honor.

01:23  1          THE COURT:  Okay.  What we're going to do

01:23  2  is we're going to get -- who -- what witness comes

01:23  3  after this gentleman?

01:23  4          MR. WALDROP:  Our infringement expert,

01:23  5  Dr. McClellan.

01:23  6          THE COURT:  Let's -- the jury's been

01:23  7  waiting 20 minutes more.  Let's finish this gentleman.

01:23  8  We'll take a break and I'll take up that issue.  And

01:23  9  your expert is prepared to move forward?

01:24  10          MR. WALDROP:  Yes, sir.  Yes, sir.

01:24  11          THE COURT:  Okay.

01:24  12          MR. ROSENTHAL:  And, Your Honor, that's

01:24  13  fine with us.  We do have some demonstrative issues

01:24  14  with his testimony, even on the '133.  But I'm happy to

01:24  15  take those up after this break.

01:24  16          THE COURT:  Okay.  Okay.  I'll -- I'm

01:24  17  just going to go back.  And give me two minutes.  We're

01:24  18  going to round up the jury.  We'll bring them back in.

01:24  19          THE BAILIFF:  All rise.

01:24  20          (Recess taken.)

01:25  21          THE BAILIFF:  All rise.

01:25  22          THE COURT:  Please remain standing for

01:25  23  the jury.

01:25  24          (Jury entered the courtroom.)

01:25  25          THE COURT:  Thank you.  You may be

01:25  1    seated.

01:25  2              Ladies and gentlemen of the jury, the

01:26  3    greatest asset you will have as jurors is patience.

01:26  4    But I wanted you to know that -- so you all are here to

01:26  5    serve as the judges of the facts.  You all are going to

01:26  6    hear the evidence, answer questions at the end and come

01:26  7    back with a verdict.  Because you're the judges of the

01:26  8    facts.

01:26  9              However, there are always issues of law

01:26  10   that have to be dealt with.  And that's why I'm here.

01:26  11   And over the course of the -- while you were all

01:26  12   patiently waiting, the lawyers and I took some things

01:26  13   under consideration and we've determined -- I've

01:27  14   determined that the '800 patent and the '360 patent no

01:27  15   longer need to be in the case.  Meaning we are down to

01:27  16   one patent, the '133 patent.

01:27  17             I got that right, correct?

01:27  18             Very good.

01:27  19             So your time was not wasted by sitting

01:27  20   back there.  We were out here dealing with the law.

01:27  21   The fact that those two patents are no longer in the

01:27  22   case should have no impact on any -- your decision with

01:27  23   the remaining '133 patent.

01:27  24             It has -- all these patents are asserted

01:27  25   individually and separately.  And so you shouldn't

01:27  1    concern yourself with why those patents are not in the

01:27  2    case.  And it should have no impact on any of your

01:27  3    deliberations on the '133.

01:27  4                 But let me wrap up by saying this:  I

01:27  5    didn't hear much testimony that concerned either the

01:28  6    '800 or '360 patent with the first witness.  But if

01:28  7    there was any -- I don't remember much, if any -- you

01:28  8    must disregard it because they're no longer in the

01:28  9    case.  To the extent that the lawyers, during their

01:28  10   opening arguments, discussed those patents, you should

01:28  11   just forget about -- it's no longer relevant.

01:28  12                 So having said all that, Counsel, if you

01:28  13   would ask your witness to get back on the witness

01:28  14   stand, please.

01:28  15   BY MS. MOYE:

01:28  16       Q.    Good afternoon, Mr. Etchegoyen.  Are you ready

01:28  17   to proceed?

01:28  18       A.    Yes, ma'am.

01:28  19       Q.    Now, Mr. Etchegoyen, it is true that you have

01:28  20   already made millions of dollars personally from WSOU's

01:29  21   licensing efforts?  Is that right?

01:29  22       A.    No.

01:29  23       Q.    Okay.  Let's look at your sworn deposition

01:29  24   testimony on this point.  Deposition at Page 115, Line

01:29  25   2 to Line 16.

01:29    1                    (Video played.)

01:29    2        Q.    Have you received $5 million, $10 million,

01:29    3    something less than that?  Can you give me any goal

01:29    4    posts around how much you received?

01:29    5        A.    I'm not comfortable personally speculating

01:29    6    because there's -- like I told you before, there's kind

01:29    7    of ingredients into the calculation.  There's some

01:29    8    carry-forward remuneration and accrual.

01:29    9            So again, anything I say will be wrong.  I

01:29    10    think it's safe to say that my total financial package

01:30    11    would be -- would be in the millions.

01:30    12                    (End video.)

01:30    13    BY MS. MOYE:

01:30    14        Q.    And that's your sworn deposition testimony,

01:30    15    correct, Mr. Etchegoyen?

01:30    16        A.    Yes.  It would be eventually, yeah.  I would

01:30    17    eventually make millions -- eventually, I hope.

01:30    18        Q.    Okay.  And you would admit, wouldn't you, sir,

01:30    19    that when it comes to testimony about WSOU, the

01:30    20    plaintiff in this case, you have a bias; isn't that

01:30    21    right?

01:30    22        A.    Yes.  Yes.  I would have a bias towards the

01:30    23    company.

01:30    24        Q.    Thank you, sir.

01:30    25            Now, let's talk about WSOU doing business as

01:30  1    Brazos.  In opening statements your counsel started by

01:30  2    saying Brazos is based right here in Waco, Texas.

01:30  3            Do you remember that statement, sir?

01:31  4    A.    I do, yes.

01:31  5    Q.    And in fact, sir, isn't it true that WSOU was

01:31  6    formed as a Delaware corporation?

01:31  7    A.    I think that's true, yes.

01:31  8    Q.    And it was formed with the name WSOU; isn't

01:31  9    that correct?

01:31  10   A.    I think that's correct.  Yes.

01:31  11   Q.    And it wasn't until January 7, 2020 that WSOU

01:31  12   registered to do business in the State of Texas; isn't

01:31  13   that right?

01:31  14   A.    I don't handle that sort of thing, but that

01:31  15   sounds right.

01:31  16   Q.    Well, let's be sure.  Let's take a look at

01:31  17   Defendants' Trial Exhibit 0535.  You should have it in

01:31  18   your binder there.

01:31  19   A.    Wait.  Which tab is it, ma'am?  Sorry.

01:32  20            MS. MOYE:  May I approach the witness,

01:32  21   Your Honor?

01:32  22            THE COURT:  Of course.

01:32  23   A.    Sorry to make you get up like that.

01:32  24            Thank you.  Thank you for your help.  I've got

01:32  25   it.

141

01:32   1    BY MS. MOYE:

01:32   2        Q.    Now, this, sir, is your application for

01:32   3    registration in the State of Texas; is that correct?

01:32   4        A.    Yes, ma'am.

01:32   5        Q.    And it was filed January 7, 2020; is that also

01:32   6    correct?

01:32   7        A.    Yes, ma'am.  That's here.

01:32   8        Q.    And if you would turn further in that document

01:32   9    with the page ending number 8, I'll wait for you to get

01:33   10   that page.  You can also see these on your screen if

01:33   11   that's easier for you.

01:33   12       A.    Oh, that's much easier.  Thank you.  I'll use

01:33   13   the screen.  Thank you for that.

01:33   14       Q.    Yeah.  Whichever you prefer.

01:33   15             And do you see there that there's a title

01:33   16   "Assumed Name"?

01:33   17       A.    I do.  Yes.

01:33   18       Q.    And the assumed name that WSOU filed for in

01:33   19   January 2020 is the Brazos name that your client has

01:33   20   been using, correct?

01:33   21       A.    Brazos.  Yes.

01:33   22       Q.    And in June 2020, shortly after filing this

01:33   23   assumed name and registering for business in Texas,

01:33   24   that's when you filed this lawsuit, correct, sir?

01:33   25       A.    Yes.

01:33  1       Q.    Now, let's talk about the patent that is at

01:34  2  issue, the '133 patent, but first I want to be clear on

01:34  3  a couple of things.  You gave extensive testimony about

01:34  4  patents that you invented.

01:34  5            Do you remember that testimony?

01:34  6       A.    Yes, ma'am.

01:34  7       Q.    None of those patents are at issue in this

01:34  8  lawsuit, are they, sir?

01:34  9       A.    No, ma'am.

01:34  10      Q.    You are not an inventor on the '133 patent

01:34  11 that is at issue in this lawsuit, correct?

01:34  12      A.    That's correct.

01:34  13      Q.    You also gave extensive testimony about a

01:34  14 Microsoft lawsuit.

01:34  15           Do you remember that, sir?

01:34  16      A.    Yes.  I remember mentioning Microsoft.

01:34  17           MS. KIM:  Your Honor, may we approach?

01:34  18           THE COURT:  Yes.

01:34  19           (Bench conference.)

01:34  20           MS. KIM:  Your Honor, we are not -- we

01:35  21 stopped asking anything about Microsoft litigation,

01:35  22 prior litigation of any Microsoft.  As soon as we

01:35  23 received Your Honor's instruction, we have stopped

01:35  24 doing that.

01:35  25           And Counsel, I think, is now getting back

01:35  1   into the Microsoft litigation, at which time I should

01:35  2   be able to redirect then.  Otherwise, we would ask

01:35  3   VMware to not to go into Microsoft.

01:35  4               THE COURT:  Well, let me make clear.  I

01:35  5   think it's fair for Defense Counsel to ask questions to

01:35  6   clarify.  But if Defense Counsel -- if Defense Counsel

01:35  7   chooses to, say, ask questions, then she's opened the

01:35  8   door for you to do whatever you want on redirect.

01:35  9               So it's up to you.  I'm not telling

01:35  10  either of you what to do.  But if Defense Counsel wants

01:35  11  to get into this, which I think is totally irrelevant

01:35  12  and is wasting time, you can.  And if because of that

01:35  13  on redirect you want to get into it, which I think is

01:35  14  totally irrelevant and a waste of time, it's you all's

01:35  15  time.

01:35  16              MS. KIM:  Thank you, Your Honor.  I just

01:35  17  wanted to make sure that --

01:35  18              MS. MOYE:  Yeah.  Understood.  And that's

01:35  19  really the only confirmation that I'm seeking from him,

01:36  20  is that had nothing to do with this.

01:36  21              THE COURT:  Y'all do whatever you want to

01:36  22  do.

01:36  23              MS. KIM:  Okay.  Thank you.

01:36  24              (Bench conference concludes.)

01:36  25  BY MS. MOYE:

01:36   1          Q.    Okay.  We are back, Mr. Etchegoyen.

01:36   2                The Microsoft lawsuit, the technology that's

01:36   3    at issue in this case, the '133 patent, did it have

01:36   4    anything at all to do with the Microsoft lawsuit?

01:36   5          A.    I'm sorry.  Are you talking about the -- which

01:36   6    Microsoft lawsuit?

01:36   7          Q.    The one you referred to in your testimony,

01:36   8    sir.

01:36   9          A.    No.  No.

01:36   10         Q.    Had nothing to do with what we're here talking

01:36   11   about today?

01:36   12         A.    No.  That patent -- I wasn't referencing

01:36   13   the -- this patent in that lawsuit.  No.

01:37   14         Q.    Okay.  Now, the patent that's at issue in this

01:37   15   lawsuit, you were not an inventor on that '133 patent,

01:37   16   correct?

01:37   17         A.    That's correct, ma'am.

01:37   18         Q.    And no one affiliated with WSOU had any

01:37   19   involvement in the inventions that are at issue in the

01:37   20   '133 patent, correct, sir?

01:37   21         A.    That's correct.

01:37   22         Q.    You, Mr. Etchegoyen, personally do not have

01:37   23   the expertise to be able to tell us whether the '133

01:37   24   patent in this case is valid; is that correct?

01:37   25         A.    Yeah.  I'm not a lawyer.  I wouldn't be able

145

01:37   1    to do that.

01:37   2        Q.    And you personally also do not have the

01:37   3    expertise to be able to tell us whether any of the --

01:37   4    whether the remaining patent in this lawsuit is

01:37   5    infringed or not; is that correct, sir?

01:37   6        A.    I trust -- no, ma'am.  I'm not an expert

01:38   7    witness.

01:38   8        Q.    Now, the inventors of the '133 patent, none of

01:38   9    them are coming to testify at this trial; is that

01:38   10   right, sir?

01:38   11       A.    I heard that in -- and I forgot his name.  I'm

01:38   12   sorry.  I heard that in the opening.

01:38   13       Q.    To your knowledge, are any of the inventors

01:38   14   coming to testify in this lawsuit?

01:38   15       A.    I don't know.  I don't think so, according to

01:38   16   the opening I heard.

01:38   17       Q.    And your company, WSOU, did not take the

01:38   18   depositions of any of those inventors, did they?

01:38   19       A.    I'm sorry, ma'am.  I don't know that.  I don't

01:38   20   know if they --

01:38   21       Q.    You don't know one way or the other?

01:38   22       A.    I don't know if the attorneys took the

01:38   23   deposition of this particular inventor or not, as I sit

01:38   24   here.

01:38   25       Q.    You haven't seen any testimony from any

146

01:38   1    inventor of the '133 lawsuit --

01:38   2                    MS. KIM:  Objection, Your Honor.

01:38   3                    THE COURT:  I'm sorry.  I didn't hear --

01:38   4    if you would ask the question, and then I'll hear the

01:39   5    objection.

01:39   6    BY MS. MOYE:

01:39   7        Q.    I'll repeat the question.

01:39   8              Have you personally seen any testimony from

01:39   9    any inventor of the '133 patent in this lawsuit?

01:39  10                    MS. KIM:  Your Honor, there was a MIL

01:39  11    that was denied on this about referencing any prior

01:39  12    proceeding or discovery hearings or any other dispute.

01:39  13                    May I approach?

01:39  14                    THE COURT:  I'm going to -- I think he

01:39  15    can answer whether or not he's seen any testimony with

01:39  16    regard to -- from any of the inventors in this case.

01:39  17                    MS. KIM:  Thank you, Your Honor.

01:39  18    BY MS. MOYE:

01:39  19        Q.    Can you answer the question, sir?

01:39  20        A.    I don't think I've seen any testimony from an

01:39  21    inventor.  I don't think I'm allowed to.

01:39  22        Q.    If there is a damages award in this case, will

01:39  23    any inventor of the '133 patent receive any portion of

01:39  24    that award?

01:39  25        A.    I believe the inventor of this patent was

01:40  1   already paid by Nokia.  We paid the money in advance.

01:40  2       Q.    And let me ask my question again.

01:40  3       A.    Yes, ma'am.

01:40  4       Q.    If the jury awards damages in this lawsuit,

01:40  5   would the inventors of the '133 patent receive any

01:40  6   portion of those damages?

01:40  7       A.    I don't think so.

01:40  8       Q.    Thank you.

01:40  9            And, now, WSOU has a total of four employees;

01:40  10  is that correct, Mr. Etchegoyen?

01:40  11      A.    I believe that's correct.  Yes.

01:40  12      Q.    And WSOU's business is licensing and asserting

01:40  13  patents; is that correct?

01:40  14      A.    That is a part of our business.  Yes.

01:40  15      Q.    WSOU does not sell any products, does it?

01:40  16      A.    Not yet.  No, ma'am.

01:40  17      Q.    And WSOU does not actually invent any software

01:41  18  at this point, correct?

01:41  19      A.    I am working on things, but no.  No.  WSOU

01:41  20  wouldn't -- wouldn't -- I wouldn't consider it, invent

01:41  21  anything yet.

01:41  22      Q.    Prior to forming WSOU, you were part of a

01:41  23  company called Uniloc; is that correct, sir?

01:41  24            You mentioned it, I believe, in your direct

01:41  25  testimony.

148

01:41    1       A.    Yes, ma'am.

01:41    2       Q.    And Uniloc also had a patent licensing

01:41    3   business; is that right?

01:41    4       A.    Yes.

01:41    5       Q.    And you, Mr. Etchegoyen, founded Uniloc, in

01:41    6   part, correct?

01:41    7       A.    I was the -- I was the cofounder with my

01:41    8   friend, my friend Rick.  Yes.

01:41    9       Q.    And you founded one of the world's most

01:41    10  experienced and successful patent licensing firms,

01:42    11  Uniloc; is that correct, sir?

01:42    12      A.    I don't know if it was the world's most -- it

01:42    13  was -- it had a large licensing business, yes.  I'm

01:42    14  proud of that work.

01:42    15      Q.    Let's take a look at what WSOU says about that

01:42    16  on your website, sir.

01:42    17      A.    Okay.

01:42    18      Q.    That's Exhibit 11, I believe, in your binder.

01:42    19      A.    I'm going to use the screen, if that's okay.

01:42    20  Can I still use this?

01:42    21      Q.    It's also on the screen.  Yes.

01:42    22            And there is, on Page 4, a blurb about you.

01:42    23            You see the first sentence there?

01:42    24      A.    Yeah.  You're saying --

01:42    25      Q.    Craig Etchegoyen.  Craig founded one of the

01:42    1    world's most experienced and successful patent

01:42    2    licensing firms, Uniloc.

01:42    3        Do you see that?

01:42    4    A.    Yes, ma'am.  I see that.

01:42    5    Q.    And that's a true statement, is it not, sir?

01:42    6    A.    Yes.

01:43    7    Q.    Now, let's talk a little more about the

01:43    8    business of WSOU.  And I'd like to first show you the

01:43    9    operating agreement when that entity was founded.

01:43    10        MS. MOYE:  Can we have DX-21?

01:43    11        And I apologize for going back, Your

01:43    12    Honor, but I do need to offer DTX-0535 -- that's the

01:43    13    registration document -- into evidence.

01:43    14        MS. KIM:  No objection.

01:43    15        THE COURT:  It'll be admitted.

01:43    16    BY MS. MOYE:

01:43    17    Q.    Okay.  Can you take a moment, look at WSOU

01:43    18    Investments LLC Operating Agreement?  You see that?

01:43    19    A.    Yes, ma'am.  I see the title.

01:43    20    Q.    And you see it says "execution version"?

01:43    21    A.    Yes, ma'am.

01:44    22    Q.    And do you see that it says it's entered into

01:44    23    and effective as of August 21, 2017?

01:44    24    A.    Yes, ma'am.  I see that date.

01:44    25    Q.    Is this, Mr. Etchegoyen, a true and correct

01:44  1    copy of WSOU's operating agreement?

01:44  2        A.    I believe you if you tell me it is.  Yeah.

01:44  3            MS. MOYE:  And we'd like to offer DTX-21

01:44  4    into evidence also.

01:44  5            MS. KIM:  No objection.

01:44  6            THE COURT:  It'll be admitted.

01:44  7    BY MS. MOYE:

01:44  8        Q.    Now, let's take a look at Page 1, Section 1.3.

01:44  9            This is the section that says "character of

01:44  10   business."

01:44  11           Do you see that, sir?

01:44  12       A.    Yes, ma'am.

01:44  13       Q.    And it says:  The company shall acquire and

01:44  14   thereafter own, manage, license and/or sell a portfolio

01:44  15   of patents, patent applications and related

01:44  16   intellectual property rights from Alcatel-Lucent, Nokia

01:45  17   Solutions and Networks BV and Nokia Technology Oy.

01:45  18           Do you see that?

01:45  19       A.    Yes, ma'am.  I see that.

01:45  20       Q.    And that is a correct statement of what the

01:45  21   business of WSOU was to be, right?

01:45  22       A.    Yes.  I believe that's part of the business.

01:45  23       Q.    It was created to license and sell patents

01:45  24   acquired from Nokia/Alcatel-Lucent, correct, sir?

01:45  25       A.    Yes.  That's one of the business.

01:45  1       Q.    And there is nothing in this character of

01:45  2   business about incubation of other businesses, the

01:45  3   things that you mentioned in your direct testimony, is

01:45  4   there, sir?

01:45  5       A.    Sorry.  You're talking about 1.3?

01:45  6       Q.    Yes.  I am talking about 1.3.

01:45  7       A.    Yes.  In that one section there's no mention

01:45  8   of that.

01:45  9       Q.    Thank you.

01:45  10           And, now, in about July 2017, WSOU did

01:46  11  actually purchase a number of patents from Nokia,

01:46  12  correct?

01:46  13      A.    Yes.  That date sounds correct.

01:46  14      Q.    And there was an original agreement and a

01:46  15  series of amendments to that agreement; is that right,

01:46  16  sir?

01:46  17      A.    Yes, ma'am.

01:46  18      Q.    And at the end of the day, WSOU obtained about

01:46  19  8,000 patents from Nokia/Alcatel-Lucent; is that

01:46  20  correct, sir?

01:46  21      A.    I believe it was more than one transaction.

01:46  22  So I don't want to be confused here.  I want to answer

01:46  23  your -- I believe it was more than 8,000.  I believe

01:46  24  worldwide it was something closer to 12,000.

01:46  25      Q.    Okay.  There were multiple agreements.  And

01:46  1   you believe WSOU, your company, acquired closer to

01:46  2   12,000 patents from Nokia/Alcatel-Lucent; is that

01:46  3   correct?

01:46  4       A.   Yes, ma'am.  I believe that's not the exact

01:47  5   number, but I believe that's in the realm of the exact

01:47  6   number.

01:47  7       Q.   Okay.  And one of those patents that was

01:47  8   obtained in those series of transactions is the '133

01:47  9   patent that is at issue here, correct, sir?

01:47  10      A.   Yes, ma'am.

01:47  11      Q.   And your company, WSOU, made both a lump-sum

01:47  12  payment to Nokia/Alcatel and some royalty payments to

01:47  13  Nokia/Alcatel in order to get those patents, right?

01:47  14      A.   We paid -- yes.  We paid an upfront payment

01:47  15  and then at that time a royalty.  We talked about that

01:47  16  earlier.  A royalty back to them as well.

01:47  17      Q.   Do you need some water or anything?

01:47  18      A.   No, no.  I'm good.  I think it's actually

01:47  19  getting better, believe it or not.

01:47  20      Q.   Yeah.

01:47  21           And the total of the lump-sum payments, was

01:47  22  that about 17 million, Mr. Etchegoyen?

01:48  23      A.   I believe that was -- it was high 16s.  I

01:48  24  believe that's close to accurate, yes.

01:48  25      Q.   Okay.  And through the series of amendments

153

01:48  1    ultimately you agreed to stop paying any royalty

01:48  2    payments to Nokia/Alcatel, right?

01:48  3        A.    Well, we paid them in advance and bought out

01:48  4    the -- bought out the royalty going forward.

01:48  5        Q.    So at this point, as we sit here,

01:48  6    Nokia/Alcatel would not receive any continuing

01:48  7    royalties from your company as a result of these patent

01:48  8    purchases, correct?

01:48  9        A.    Yes.  We paid them in advance on what we

01:48  10   expect to make in royalties.

01:48  11       Q.    Okay.  Now, about 17 million -- or you said a

01:49  12   little less than 17 million as a lump-sum payment,

01:49  13   correct?

01:49  14       A.    I could be off a little.  I don't have them

01:49  15   all memorized.  But I think that is very, very close.

01:49  16   It's a lot of money.  It's very close.

01:49  17       Q.    And then the royalty payments added a little

01:49  18   bit more to that, correct?

01:49  19       A.    I believe we paid close to 17 million, to use

01:49  20   your words, was the total payment including that lump

01:49  21   sum, I believe.

01:49  22       Q.    Oh.  Okay.

01:49  23       A.    It might be more.  I apologize.

01:49  24       Q.    Yeah.  I just want to make sure I and the jury

01:49  25   hear you clearly.  17 million you believe was a total

01:49  1    of the lump sum plus the royalty payments made to

01:49  2    Nokia/Alcatel-Lucent in order to obtain these patents,

01:49  3    however many there were; is that right?

01:49  4        A.    I believe that's -- I believe that's accurate,

01:50  5    yes.

01:50  6        Q.    And you have testified you believe there are

01:50  7    about 12,000 of the patents that were actually

01:50  8    purchased?

01:50  9        A.    Yes.  If that's worldwide, granted pending

01:50  10   applications.  That would also include expired patents

01:50  11   and pending -- and pending patents.  Patents that

01:50  12   aren't granted yet.

01:50  13       Q.    Now, when you bought the patents from Nokia,

01:50  14   you were not focusing specifically on the patent that's

01:50  15   at issue in this case, the '133 patent, were you, sir?

01:50  16       A.    I'm sorry, ma'am.  Could you explain your

01:50  17   question?

01:50  18       Q.    Let me try it a different way.  Did you

01:50  19   actually purchase -- I'm sorry.  Let me start again.

01:50  20            Did you actually discuss the '133 patent, the

01:50  21   patent that is at issue in this case, with Nokia as

01:50  22   part of making your purchase arrangement?

01:50  23       A.    No.  Nope.

01:50  24       Q.    Now, I'd like to have you identify a few more

01:51  25   documents for us.

155

01:51  1                    If we could take a look at DTX-22.

01:51  2                    Tell me when you're ready, sir.

01:51  3        A.    It's not coming on this screen.

01:51  4                    (Off-the-record discussion.)

01:51  5    BY MS. MOYE:

01:51  6        Q.    Sir, you see that this says patent purchase

01:51  7    agreement made as of July 22, 2017.

01:51  8                    Do you see that?

01:51  9        A.    Yes, ma'am.  I see that date.

01:51  10       Q.    And you see the parties to the agreement are

01:51  11   Alcatel-Lucent, Nokia Solutions, Nokia Technologies.

01:52  12                   Do you see them?

01:52  13       A.    Yes.

01:52  14       Q.    And then the purchaser is Wade and Company.

01:52  15                   Do you see that, sir?

01:52  16       A.    I do.

01:52  17       Q.    And Wade and Company was a predecessor to

01:52  18   WSOU; is that right, sir?

01:52  19       A.    Could -- what do you mean predecessor?  Sorry.

01:52  20       Q.    Did Wade and Company assign its rights to the

01:52  21   Nokia/Alcatel patents to WSOU?

01:52  22       A.    I believe that's correct, yes.

01:52  23       Q.    Okay.  Is this, sir, a copy of one of the

01:52  24   patent purchase agreements that led to WSOU ultimately

01:52  25   owning some patents previously owned by Nokia and

01:52  1    Alcatel-Lucent?

01:52  2        A.    I believe that's correct, yes.

01:52  3        Q.    Okay.

01:52  4              MS. MOYE:  I'd like to offer DTX-22 into

01:52  5    evidence.

01:52  6              MS. KIM:  No objection, Your Honor.

01:52  7              THE COURT:  It'll be admitted.

01:53  8    BY MS. MOYE:

01:53  9        Q.    Okay.  Let's take a look at DTX-79.

01:53  10       A.    I touched the screen and put a red line on it.

01:53  11             (Off-the-record discussion.)

01:53  12       A.    It's there.  Don't worry.  I messed it up too.

01:53  13   I put a line on it.

01:53  14   BY MS. MOYE:

01:53  15       Q.    Okay.  This one says it's an amendment to the

01:53  16   patent purchase agreement.

01:53  17             Do you see that?

01:53  18       A.    Yes, ma'am.  I see that.

01:53  19       Q.    And it has the same parties, correct?  The

01:53  20   document we just saw?

01:53  21       A.    Yes.  I think that's accurate.

01:53  22       Q.    Okay.  And, sir, is this a copy of the first

01:53  23   amendment to the patent purchase agreement that we just

01:54  24   looked at?  The first amendment to DTX-22?

01:54  25       A.    I don't see where it says first, but I believe

01:54    1    you if you tell me.

01:54    2        Q.    You're right.  It does not say first.  It says

01:54    3    amendment.  Probably because it's first, right?

         4        A.    Yeah.  Right, right.

01:54    5        Q.    Okay.  It's an amendment.  Okay?

01:54    6        A.    I couldn't get into Harvard.

01:54    7        Q.    Okay.

01:54    8              MS. MOYE:  I'd like to offer DTX-79 into

01:54    9    evidence, please.

01:54   10              MS. KIM:  No objection, Your Honor.

01:54   11              THE COURT:  It'll be admitted.

01:54   12    BY MS. MOYE:

01:54   13        Q.    Let's take a look at DTX-78.

01:54   14              Do you have that, sir?

01:54   15        A.    Yes, ma'am.  I see it.

01:54   16        Q.    Okay.  And you see that it says it's an

01:54   17    assignment of patent purchase agreement?

01:54   18        A.    Yes, ma'am.  I see that.

01:55   19        Q.    With an effective date of July 22, 2017?

01:55   20        A.    Yes.  I see that.  Yes, ma'am.

01:55   21        Q.    Is this a assignment that WSOU entered into?

01:55   22    You may need to scroll to the bottom of the document to

01:55   23    see that.

01:55   24        A.    I can't -- I can't scroll on this.

01:55   25        Q.    It's on -- before you now.

01:55    1        A.    Oh, okay.

01:55    2        Q.    Do you see that, sir?

01:55    3        A.    I see that, yes.

01:55    4        Q.    This is a document you signed?

01:55    5        A.    I did, yes.

01:55    6              MS. MOYE:  I'd like to introduce this one

01:55    7    into evidence also.  This is DTX-78.

01:55    8              And then if we could please publish it

01:55    9    for the jury.

01:55   10              MS. KIM:  No objection, Your Honor.

01:55   11              THE COURT:  It'll be admitted.

01:55   12    BY MS. MOYE:

01:55   13        Q.    Now, if you look at the paragraph in the

01:55   14    middle below "now, therefore."

01:55   15              Do you see that language, sir?  "Wade and

01:55   16    company hereby assigns"?

01:56   17        A.    Yes, ma'am.  I see that.

01:56   18        Q.    It says:  Wade and Company hereby assigns to

01:56   19    WSOU Investments LLC and WSOU Investments LLC hereby

01:56   20    accepts the whole of the interest of Wade and Company

01:56   21    in the patent purchase agreement.

01:56   22              You see that language?

01:56   23        A.    Yes, ma'am.

01:56   24        Q.    And so by this agreement, is it correct, sir,

01:56   25    that Wade and Company assigned its rights in those

—159—

01:56   1   patent purchase agreements that we looked at earlier?

01:56   2       A.   I believe so, yes.

01:56   3       Q.   Okay.   Thank you, sir.

01:56   4              MS. KIM:   Objection.   That calls for a

01:56   5   legal conclusion, Your Honor.

01:56   6              THE COURT:   I think he answered already.

01:56   7   I'll overrule it.

01:56   8              MS. KIM:   Thank you, Your Honor.

01:56   9   BY MS. MOYE:

01:56   10      Q.   And let's look at DTX-23.

01:56   11             Can you, sir, just take a moment --

01:56   12      A.   I'm sorry.   It's not up again.

01:57   13      Q.   Got to do it each time.   She told me that.

01:57   14             Do you have it now?

01:57   15      A.   It's there now, yes.

01:57   16      Q.   Okay.   And the title here is "Fifth Amendment

01:57   17  To Patent Purchase Agreement."

01:57   18             Do you see that?

01:57   19      A.   I do, yes.

01:57   20             MS. MOYE:   And could you scroll to the

01:57   21  bottom of that document, Mr. Eaton?

01:57   22             To the signature page.   I'm sorry.

01:57   23      A.   There's no signature page on here yet.

01:57   24  BY MS. MOYE:

01:57   25      Q.   Okay.   And do you see this -- on this

01:57  1    signature page the signature of Mr. Shanus, Mr. Stuart

01:57  2    Shanus?

01:57  3         A.    I do, yes.

01:57  4         Q.    And Mr. Shanus is the president of WSOU; is

01:57  5    that correct?

01:57  6         A.    Yes, ma'am.

01:57  7         Q.    Is this, sir, a copy of the fifth amendment --

01:57  8    go back to the top -- to the patent purchase agreements

01:58  9    between Nokia/Alcatel-Lucent on one hand and WSOU on

01:58  10   the other?

01:58  11        A.    I believe so, yes.  I see it there.

01:58  12              MS. MOYE:  So I'd like to introduce that

01:58  13   one into evidence also.

01:58  14              MS. KIM:  No objection, Your Honor.

01:58  15              THE COURT:  It'll be admitted.

01:58  16              MS. MOYE:  Now, if we could publish that

01:58  17   for the jury.

       18   BY MS. MOYE:

01:58  19        Q.    And please look in particular at Section 3.2

01:58  20   of this agreement.

01:58  21              Do you have that, Mr. Etchegoyen?

01:58  22        A.    No, ma'am.  It's somehow blocked out on here.

01:58  23        Q.    Section 3.2 does not appear on your screen?

01:59  24        A.    Oh, now it is.  I see it.  Yes.

01:59  25        Q.    And do you see the language in 3.2 that says:

161

01:59  1    The parties agree that no royalties or reports shall be

01:59  2    due on any proceeds for transactions executed?

01:59  3           Do you see that language?

01:59  4    A.    I do.  Yes.

01:59  5    Q.    And by that language, did WSOU and

01:59  6    Nokia/Alcatel-Lucent agree that there would be no

01:59  7    ongoing royalty payments from WSOU to those

01:59  8    counterparties, Nokia/Alcatel-Lucent?

01:59  9    A.    I believe -- I don't know the number of the

01:59  10   agreement, but I believe this is when -- what I was

01:59  11   referencing earlier where we bought out -- the advanced

01:59  12   royalties.  We bought it out.

01:59  13   Q.    Okay.  Let me turn to another issue.

01:59  14          WSOU has actually licensed the portfolio of

01:59  15   patents that it obtained from Nokia and Alcatel-Lucent;

01:59  16   is that right, sir?

01:59  17   A.    Yes, ma'am.

02:00  18   Q.    And you personally negotiated all of WSOU's

02:00  19   licenses to that portfolio, correct?

02:00  20   A.    No.  I don't think I negotiated all of the

02:00  21   licenses.

02:00  22   Q.    Okay.  Let's take a look at your sworn

02:00  23   deposition testimony again.  Deposition at Page 209,

02:00  24   Line 22 to Line 210, 9.  Page 210, 9.

02:00  25          (Video played.)

162

02:00   1          Q.    Mr. Etchegoyen, you have negotiated all of the

02:00   2    outbound licenses that WSOU has engaged in, correct?

02:00   3          A.    I'm the person that negotiates the business

02:00   4    terms, but I do rely on people without a Holiday Inn

        5    Express (inaudible).

02:00   6                So yeah.  I think Stu is a big part of that

02:00   7    training on -- on the legal perspective, but yeah.  I'm

02:01   8    the business terms negotiator.

02:01   9                (End video.)

02:01  10    BY MS. MOYE:

02:01  11          Q.    Thank you, sir.

02:01  12                And that's your sworn testimony, correct?

02:01  13          A.    Yes.

02:01  14          Q.    Now, all of the licenses for this Nokia

02:01  15    portfolio that you've negotiated have been lump sum; is

02:01  16    that correct, sir?

02:01  17          A.    I believe so.  Yes.  I believe so.

02:01  18          Q.    Let's talk about some of those license

02:01  19    agreements.

02:01  20                MS. MOYE:  Let's take a look -- if the

02:01  21    witness can be shown DTX-60.

       22    BY MS. MOYE:

02:01  23          Q.    Do you have it there?

02:01  24          A.    It's up.  Yes.

02:01  25          Q.    Okay.  And, sir, take a moment and look at

02:01  1   this and tell us:  Is this, in fact, a license

02:01  2   agreement between WSOU and AT&T that covers the patents

02:02  3   WSOU obtained from Nokia?

02:02  4       A.   I can only see that first page, but yes.  AT&T

02:02  5   is on there.  And --

02:02  6                MS. MOYE:  I'd like to offer DTX-60 into

02:02  7   evidence.

02:02  8                MS. KIM:  No objection, Your Honor.

02:02  9                THE COURT:  It'll be admitted.

02:02 10                MS. MOYE:  Can we have it published to

02:02 11   the jury now?

02:02 12                Now, if we could look in particular at

02:02 13   Article 3, which has the license fee.

02:02 14                If you could blow that up, Mr. Eaton.

02:02 15   BY MS. MOYE:

02:02 16       Q.   And it says here:  In consideration, AT&T and

02:02 17   its affiliates agree to pay Licensor -- that's WSOU --

02:02 18   a one-time, lump-sum payment of $2 million.

02:02 19            Do you see that?

02:03 20       A.   Yes, ma'am.

02:03 21       Q.   In exchange for that lump-sum payment, AT&T

02:03 22   obtained a perpetual worldwide license to use the

02:03 23   entire portfolio of patents that WSOU had acquired from

02:03 24   Nokia; is that right, sir?

02:03 25       A.   That's correct.

02:03  1          Q.    Let's take a look at another license

02:03  2     agreement.

02:03  3                  MS. MOYE:  If we could have DTX-91

02:03  4     displayed for the witness.

02:03  5     BY MS. MOYE:

02:03  6          Q.    I think I got this now.  I'm close.

02:03  7          Okay.  Would you take a moment and look at

02:03  8     that and tell us if you can confirm that this is, in

02:03  9     fact, a copy of a license agreement between Amazon and

02:03  10    WSOU, again, for the Nokia portfolio of patents?

02:03  11         Can you confirm that for us, sir?

02:04  12         A.    I see Amazon's name.  Yes.  And WSOU.

02:04  13         Q.    Okay.

02:04  14                  MS. MOYE:  I'd like to admit DTX-91 into

02:04  15    evidence.

02:04  16                  MS. KIM:  No objection, Your Honor.

02:04  17                  THE COURT:  It'll be admitted.

02:04  18                  MS. MOYE:  And if we could display that

02:04  19    one for the jury.

02:04  20    BY MS. MOYE:

02:04  21         Q.    Now, let's look at Article 3, license fee, in

02:04  22    this Amazon agreement.

02:04  23         And here we see a one-time, lump-sum payment

02:04  24    of $1,850,000.

02:04  25         Do you see that?

02:04    1        A.    Yes, ma'am.  I see that.

02:04    2        Q.    And in return for that lump-sum payment of

02:04    3    1.85 million, Amazon also received a license to all of

02:05    4    the patents in that portfolio that WSOU had obtained

02:05    5    from Nokia; is that right?

02:05    6        A.    I believe that's accurate.  Yes.

02:05    7        Q.    And Amazon was able to use those patents, and

02:05    8    its affiliates, for any purpose whatsoever under this

02:05    9    license agreement; isn't that correct, sir?

02:05   10        A.    I don't know.  I don't know if that's a legal

02:05   11    term.  I don't know.

02:05   12        Q.    Let's look at Section 5.01 in the agreement.

02:05   13              Section 5.01 says:  Licensor -- that is again

02:05   14    WSOU -- hereby grants to Amazon a nonexclusive,

02:05   15    worldwide, perpetual, irrevocable, fully paid-up,

02:06   16    royalty-free license, including the right to -- if you

02:06   17    look at Subsection I -- make, use, sell, offer to sell,

02:06   18    import or otherwise dispose of or exploit licensed

02:06   19    products or services.

02:06   20              Do you see that language, sir?

02:06   21        A.    Yes, ma'am.  I see that language.

02:06   22        Q.    Okay.  Now, let's talk about the licenses to

02:06   23    Facebook.  And actually, before I do that, I want to

02:06   24    get the timeline right on this.

02:06   25              MS. MOYE:  If we could look at DTX-60

166

02:06  1    again.  The first page.

02:06  2    BY MS. MOYE:

02:06  3        Q.    What is the effective date of this license

02:06  4    agreement?

02:06  5                MS. MOYE:  We may have to go to the back

02:06  6    page to get that.

02:06  7        A.    Sorry.  I can't see that.

       8    BY MS. MOYE:

02:06  9        Q.    Yeah.  They're going to move it back.

02:06  10       A.    Oh, okay.

02:06  11       Q.    Okay.  Do you see, sir, that Mr. Shanus signed

02:06  12   this agreement on behalf of WSOU in March of 2018,

02:07  13   March 22, 2018?

02:07  14       A.    Yes, ma'am.

02:07  15       Q.    Okay.

02:07  16               MS. MOYE:  And then let's go back to the

02:07  17   Amazon agreement.  That is DTX-91.

       18   BY MS. MOYE:

02:07  19       Q.    And that agreement is dated April 10, 2018; is

02:07  20   that right, Mister?

02:07  21       A.    It says April 10, 2018.  Yes.

02:07  22       Q.    Okay.

02:07  23               MS. MOYE:  And now let's turn to the

02:07  24   Facebook agreements, DTX-63 and DTX-64.

       25   BY MS. MOYE:

167

02:07   1      Q.   Do you have those in front of you now, sir?

02:07   2      A.   Yes, ma'am.

02:07   3      Q.   And can you take a moment and look at those

02:07   4   and confirm for us that these are license agreements

02:07   5   that WSOU entered into with Facebook, they also cover

02:08   6   the full portfolio of patents WSOU had acquired from

02:08   7   Nokia; is that right, sir?

02:08   8      A.   I believe that's accurate.  Yes.

02:08   9      Q.   And both of these are entered on what date?

02:08   10  Could you take a look at that and tell us?

02:08   11     A.   I think it says the 14th of November 2018.

02:08   12     Q.   Okay.

02:08   13          MS. MOYE:  I would like to admit DTX-63

02:08   14  and 64 into evidence.

02:08   15          MS. KIM:  No objections to 63 or 64, Your

02:08   16  Honor.

02:08   17          THE COURT:  They'll be admitted.

02:08   18          MS. MOYE:  Could we publish those for the

02:08   19  jury, please?

02:08   20  BY MS. MOYE:

02:08   21     Q.   Now, I'd like to focus on Section 3.1 in these

02:08   22  agreements.  And I believe we have DTX-63 on the top,

02:09   23  that Article 3.

02:09   24          Do you see that?

02:09   25     A.   I see both Article 3s.  Yes.

168

02:09  1     Q.    Okay.  But let's focus on the one on the top.

02:09  2     The one on the top says the consideration for the

02:09  3     license is $800,000.

02:09  4           Do you see that?

02:09  5     A.    Yes, ma'am.

02:09  6     Q.    Okay.  That's from 63.

02:09  7           And then the one on the bottom, it says the

02:09  8     consideration is $200,000; is that correct, sir?

02:09  9     A.    I see that.  Yes.

02:09  10    Q.    And so Facebook got a license to use the

02:09  11    entire Nokia/Alcatel-Lucent portfolio for $1 million, a

02:09  12    total of $1 million; is that correct, sir?

02:09  13    A.    That's correct.  Yes.

02:09  14    Q.    And Facebook also was -- had the same kind of

02:09  15    grant of rights.  It was able to use these patents in

02:09  16    whatever way it saw fit; is that right, sir?

02:09  17    A.    I don't know if the -- I don't know if the

02:10  18    language says that.

02:10  19    Q.    Well, let's look at Section 5.01.

02:10  20          And do you see that it says:  Licensor -- that

02:10  21    again's WSOU, you're giving Facebook a nonexclusive,

02:10  22    worldwide, perpetual, irrevocable, fully paid-up,

02:10  23    royalty-free license under the licensed patents to

02:10  24    make, have made, use, sell or offer to sell?

02:10  25          Do you see that?

169

02:10    1          A.    Yes, ma'am.  I see that.

02:10    2          Q.    And let's look at the other Facebook license

02:10    3    agreement.

02:10    4                Do you see that same language in Article 5

02:10    5    there?

02:10    6          A.    It looks the same to me.  Yes.

02:10    7          Q.    So Facebook also got a license for a total of

02:11    8    1 million to use the whole patent portfolio, the whole

02:11    9    Nokia/Alcatel-Lucent patent portfolio?

02:11   10          A.    I think that's accurate.  Yes.

02:11   11          Q.    Okay.  And then just one final thing.  You

02:11   12    mentioned that you thought the assertion that this is

02:11   13    old technology was incorrect.

02:11   14                Do you remember saying that in your direct

02:11   15    testimony?

02:11   16          A.    Yes, ma'am.

02:11   17          Q.    I'd just like you to take a look at the front

02:11   18    page of the '133 patent.

02:11   19                     MS. MOYE:  If we could put that up.

02:11   20                     I don't know if this is already in

02:11   21    evidence.

02:11   22                     MS. KIM:  I don't believe it is,

02:11   23    Ms. Moye.

02:11   24                     MS. MOYE:  We'd like to introduce it into

02:11   25    evidence.

02:11  1               MS. KIM:  No objection, Your Honor.

02:11  2               MS. MOYE:  Thank you.

02:11  3               THE COURT:  I couldn't -- no objection?

02:11  4               MS. KIM:  No objection, Your Honor.

02:11  5               THE COURT:  It'll be admitted.

02:12  6               MS. MOYE:  And could you blow up, please,

02:12  7    the file date on this patent?

02:12  8               Are we displaying it for the jury now?

02:12  9    Yes?  Okay.

02:12  10   BY MS. MOYE:

02:12  11       Q.   And do you see this was filed March 23, 2006,

02:12  12   sir?

02:12  13       A.   I see that date, yes.

02:12  14       Q.   And that means that the inventions that are at

02:12  15   issue in the '133 patent had to precede 2006, correct,

02:12  16   sir?

02:12  17       A.   That's correct.

02:12  18       Q.   And we are now in 2023; is that right, sir?

02:12  19       A.   Yes.  We are.

02:12  20       Q.   Okay.  Thank you.  I pass the witness.

02:12  21               MS. KIM:  I'm going to carry these

02:12  22   binders.  I just need a minute.

02:13  23               I would just want to make sure the

02:13  24   jurors' screen -- your screens are working.  I think I

02:13  25   got a comment that maybe they're off.  Are they working

02:13  1   currently?

02:13  2           MS. MOYE:  I'm having difficulty hearing

       3   Counsel.

02:13  4           MS. KIM:  Oh, I'm just making sure the

02:13  5   jurors can see the screens.  I heard they were

02:13  6   sometimes off.  You can see them okay?

02:13  7           (Off-the-record discussion.)

02:13  8           MS. KIM:  Okay.  I'm going to use some of

02:13  9   the ones that are already admitted so I can just call

02:13  10  them out then.  I don't know how to use this thing,

02:13  11  though.

02:13  12          (Off-the-record discussion.)

02:13  13  BY MS. KIM:

02:14  14     Q.    Welcome back, Mr. Etchegoyen.  I just want to

02:14  15  ask you a couple questions, following up with some

02:14  16  things that Ms. Moye had asked you.

02:14  17          Could you confirm for us, who owns the '133

02:14  18  patent?

02:14  19     A.    WSOU, Brazos.

02:14  20     Q.    Is the '133 Brazos' property?

02:14  21     A.    Yes, ma'am.

02:14  22     Q.    Is the '133 a patent that Nokia partnered with

02:14  23  you on?

02:14  24     A.    Yes.

02:14  25     Q.    And I think earlier you said something.  We

—172—

02:14  1    were talking about the inventors and how you're not the

02:14  2    inventor of the '133 patent.  And you had said that

02:14  3    they had been paid in advance.

02:14  4              Can you explain a little bit more in detail

02:14  5    what you meant by that?  About the inventors of the

02:14  6    '133 patent being paid?

02:14  7    A.    We pay -- we paid Nokia in advance, you know,

02:14  8    millions of dollars on the patents.  And it's my

02:14  9    understanding from Nokia, one thing I love about them,

02:15  10   is that they take care of their -- the inventors

02:15  11   directly on the patents that they invent.  They have a

02:15  12   structure, like a bonus structure.

02:15  13             MS. MOYE:  Objection, Your Honor.  No

02:15  14   foundation.

02:15  15             THE COURT:  Overruled.

02:15  16   BY MS. KIM:

02:15  17   Q.    You may continue, Mr. Etchegoyen.

02:15  18   A.    I can go?  Okay.

02:15  19   Q.    Yeah.

02:15  20   A.    That's really it.  I mean, they -- they're

02:15  21   great.  They take care of the inventors really well at

02:15  22   Nokia.  And AT&T and Alcatel-Lucent, Bell Labs.

02:15  23   Q.    I'll go back to them in just a second here.

02:15  24             Ms. Moye also asked you quite a few questions

02:15  25   about the fact that the inventors are not here.  And

02:15  1    you hadn't seen any testimony from them.

02:15  2          Do you remember that?

02:15  3      A.    I do, yes.

02:15  4      Q.    Is it your understanding that there's any

02:15  5    requirement for an inventor to come and testify at a

02:15  6    patent trial?

02:15  7      A.    No.  Most inventors don't.  They do not want

02:16  8    to sit up here.

02:16  9      Q.    It looks kind of fun.  You sure?

02:16  10          MS. MOYE:  Again, objection, foundation.

02:16  11          THE COURT:  Overruled.

02:16  12   BY MS. KIM:

02:16  13     Q.    Do you have anything to add to that,

02:16  14   Mr. Etchegoyen?

02:16  15     A.    No.

02:16  16     Q.    Sorry.  My handwriting's a little messy.  Let

02:16  17   me try to make sure I know what I'm reading here.

02:16  18          MS. KIM:  I'd like to bring up -- I don't

02:16  19   believe this particular -- it was the first exhibit,

02:16  20   but it didn't have an exhibit number.  It was the

02:16  21   Brazos Licensing website.

02:16  22          Do I just hit the button?  I don't see

02:16  23   anything on my screen.  Did we admit the website?  Is

02:16  24   that why it's not on here?

02:17  25          MR. ROSENTHAL:  It's not admitted.

174

02:17    1                   MR. LOVE:  It's not admitted.

02:17    2                   MS. KIM:  Is there a way for your -- I

02:17    3    forget your name, Eagan (sic), Mr. Eaton to bring it up

02:17    4    and then maybe we can add a sticker and get it

02:17    5    admitted?

02:17    6                   (Conference between counsel.)

02:17    7    BY MS. KIM:

02:17    8         Q.    Do you remember seeing -- do you remember

02:17    9    seeing this website?  When Ms. Moye showed you this is

02:17   10    Brazos' website here we're looking at?

02:17   11         A.    Yes.

02:17   12         Q.    And she asked you about how -- there was a

02:17   13    certain portion where she asked you about all the --

02:17   14    about your time at Uniloc and it being one of the -- I

02:17   15    forget the word, something about it being a very

02:18   16    successful licensing company.

02:18   17                   Do you remember that?

02:18   18         A.    Yes.  In the bios I remember that.

02:18   19         Q.    I think when you print a website it just looks

02:18   20    kind of weird.  But I want to take a look at a couple

02:18   21    other portions that are on that same website that has

02:18   22    been printed out.

02:18   23                   I'm going to read just a couple of segments on

02:18   24    what is Page 2 of the printout on the website.  You

02:18   25    probably just have to scroll to see it.

02:18  1          It says here:  Most companies and inventors

02:18  2    spend time and money on R&D -- which I believe is

02:18  3    research and development -- legal, crafting, filing and

02:18  4    other costs associated with building and safeguarding

02:18  5    their technology.

02:18  6          Do you see that?

02:18  7    A.    Yes.

02:18  8    Q.    Do you agree with that?

02:18  9    A.    Absolutely.

02:18  10   Q.    And then it says:  The patent-related costs

02:18  11   are often in vain, as the technology ends up not being

02:18  12   core to the business.

02:18  13         Did I read that correctly?

02:18  14   A.    Yes.

02:18  15   Q.    Do you agree with that?

02:18  16   A.    Yes.  That does happen.

02:19  17   Q.    It goes on to say:  Even when the technology

02:19  18   is core, patents sit idle on a balance sheet.  Worse

02:19  19   yet, they rack up maintenance costs on an annual basis.

02:19  20         Do you see that?

02:19  21   A.    Yes.  I see that.

02:19  22   Q.    What does it mean by maintenance costs?

02:19  23   A.    You have to -- for a portfolio of patents or a

02:19  24   patent you pay -- you pay fees.  Like you pay the U.S.

02:19  25   government, in our case, I don't know, hundreds of

176

02:19  1    thousands of dollars a month.  You pay fees to have the

02:19  2    right to have your patents -- they more or less charge

02:19  3    you rent and maintenance.  They're called maintenance

02:19  4    fees.  Other countries have them as well.

02:19  5         Q.    Thank you, Mr. Etchegoyen.

02:19  6               And then it goes on to say if you owned a

02:19  7    hotel, would you let rooms sit vacant and unoccupied?

02:19  8               Do you see that?

02:19  9         A.    I do, yes.

02:19  10        Q.    And I think common sense would tell us no,

02:20  11   right?

02:20  12        A.    I agree with that, yeah.

02:20  13        Q.    Then it goes on to say:  Instead of dragging

02:20  14   down your balance sheet, it's time to turn your patents

02:20  15   into cash-flowing assets.

02:20  16               Do you see that?

02:20  17        A.    I do, yes.

02:20  18        Q.    And then it says:  If competitors are

02:20  19   infringing on your IP, they should be paying rent.

02:20  20               Do you see that?

02:20  21        A.    I do.

02:20  22        Q.    Do you agree with that?

02:20  23        A.    I do.

02:20  24        Q.    The point of patenting technology is to ensure

02:20  25   that anyone using your intellectual property is paying

02:20  1    for the hard work and upfront costs you incurred when

02:20  2    developing the technology.

02:20  3             Do you see that?

02:20  4    A.    I do, yes.

02:20  5    Q.    Do you agree with that?

02:20  6    A.    I do.

02:20  7    Q.    And I just want to direct your attention to

02:20  8    one other portion of the website which is printed out

02:20  9    here.  It says:  Brazos Licensing & Development,

02:20  10   headquartered in Waco, Texas, leverages its propriety

02:20  11   technology and management experience to help inventors

02:20  12   and patent owners maximize the full potential of their

02:20  13   patents.

02:20  14            Do you see that?

02:20  15   A.    I do, yes.

02:20  16   Q.    Do you agree with that?

02:20  17   A.    I do.

02:21  18   Q.    Mr. Etchegoyen, you were also here when

02:21  19   Ms. Moye had asked you about somewhere between 8- and

02:21  20   12,000 patents that had been purchased.

02:21  21            Do you remember that?

02:21  22   A.    Yes.

02:21  23   Q.    And she had asked you, I think, whether you

02:21  24   had looked at the '133 patent which is the patent we're

02:21  25   asserting here in this case.

178

02:21  1              Do you remember that?

02:21  2        A.    I do.

02:21  3        Q.    And I believe this morning Mr. Rosenthal said,

02:21  4   based on the documents Ms. Moye put up, somewhere in

02:21  5   the ballpark of $17 million was paid for all the

02:21  6   patents, broken down by 8- to 12,000 -- I'm horrible at

02:21  7   math -- it came down to $2,000 a patent or so.

02:21  8              Do you remember that?

02:21  9        A.    I do, yes.

02:21  10       Q.    Are all patents of equal value?

02:22  11       A.    No.  No.

02:22  12       Q.    Are some patents more valuable than others

02:22  13  that were bought from Nokia?

02:22  14       A.    Absolutely.

02:22  15       Q.    Were the network congestion technology

02:22  16  something you thought was valuable in the Nokia patent

02:22  17  portfolio?

02:22  18       A.    I -- yes.

02:22  19       Q.    Does the '133 patent relate to network

02:22  20  congestion technology based on what you've heard so far

02:22  21  today?

02:22  22       A.    Yes.  Very important.

02:22  23       Q.    I want to next talk about Ms. Moye asking you

02:22  24  about a buyout of the royalties.

02:22  25             Do you remember that?

02:22    1        A.    Yes, ma'am.

02:22    2        Q.    You paid Nokia 9.78 million, something like

02:22    3    that, to no longer have to pay them a 20 percent

02:22    4    back-end.

02:22    5              Do you recall?

02:22    6        A.    Yes.

02:22    7        Q.    What is your understanding as to why Nokia was

02:23    8    willing to agree to do that?

02:23    9        A.    I don't know exactly all the reasons.  But I

02:23    10    think we are taking all of the risks as far as paying

02:23    11    them in advance for what, you know, royalties and

02:23    12    getting paid for our invention going forward.  I think

02:23    13    that -- I think that was a big reason.

02:23    14              And also we had started the licensing program.

02:23    15    And I believe that Nokia had licensed Apple for a ton

02:23    16    of money, and others, Samsung and -- for a ton of

02:23    17    money.  And I think that they -- I think billions.  And

02:23    18    they -- I think we ultimately served our purpose,

02:23    19    probably, to them in resetting the market and letting

02:23    20    the market know that they were going to -- you know,

02:23    21    they were going to be vigilant about licensing their

02:23    22    patents.

02:23    23        Q.    And I want to now talk about towards the end

02:23    24    of Ms. Moye's questions to you, we went over a few

02:24    25    licenses.  They included AT&T, Amazon and a two-part

02:24    1    Facebook license.

02:24    2            Do you remember that?

02:24    3        A.    I do, yes.

02:24    4        Q.    And AT&T, I think, as we saw -- I won't put it

02:24    5    back up because I don't know how to work the system --

02:24    6    I think we saw it was $2 million for all 8- to 12,000

02:24    7    patents.

02:24    8            Do you remember that?

02:24    9        A.    I do.

02:24   10        Q.    Was AT&T already licensed to any of those?

02:24   11        A.    AT&T was already licensed to all of the

02:24   12    patents.

02:24   13        Q.    And why is that?

02:24   14        A.    Because they're a Nokia customer.  And the

02:24   15    deal we had with Nokia is that we could not license --

02:24   16    or we could not litigate or license their -- their

02:24   17    customers.

02:24   18        Q.    You mean you couldn't sue AT&T?

02:24   19        A.    We could not sue AT&T at all.

02:24   20        Q.    Mr. Etchegoyen, in your -- I think

02:24   21    Mr. Rosenthal said you've been doing this for the

02:24   22    better part of 20 years.

02:24   23            How many license negotiations do you think

02:24   24    you've done?

02:24   25        A.    Maybe 800 --

02:25    1        Q.    800?

02:25    2        A.    -- 900.

02:25    3        Q.    So somewhere between 750 and 1,000 deals?

02:25    4        A.    I think that's probably right.  I could be off

02:25    5    a little, but yes.  A lot.

02:25    6        Q.    Is there a checklist of what you go through,

02:25    7    or is every one of those unique?

02:25    8        A.    Oh, they're all very, very, very unique,

02:25    9    depends on what the company wants.  You know, it's like

02:25   10    any sort of business transaction.  They, you know, the

02:25   11    company might want -- AT&T in this case, might want --

02:25   12    the fact that we've started buying other patent assets

02:25   13    outside of this Nokia transaction, they might see a ton

02:25   14    of value in our expertise in acquiring new technology

02:25   15    in patents, so they pay us $2 million because they were

02:25   16    already licensed to the rest of the other portfolio.

02:25   17    So they saw value in that as well.

02:25   18            That would be an example of one.

02:25   19        Q.    Did you file a lawsuit against AT&T?

02:26   20        A.    No.

02:26   21        Q.    How did you get them to license?

02:26   22        A.    I believe one of -- I believe a broker brought

02:26   23    them in and they asked us for a license.  They found

02:26   24    value in what we were doing and asked us for a license

02:26   25    instead of litigating.

182

02:26    1          Q.    How about Amazon?

02:26    2          A.    That was similar.  The head of -- the head of

02:26    3    Amazon, not Jeff Bezos, the head of their license --

02:26    4    the IP general counsel, I believe, is his title.  He

02:26    5    and the broker kind of came to us with a -- with an

02:26    6    offer to license.

02:26    7          Q.    And Facebook as well.  Did you sue them, or

02:26    8    how did that Facebook license come about or the

02:26    9    two-parter?

02:26    10         A.    They also came to us directly.  No.  We did

02:26    11   not sue them.

02:26    12         Q.    What impact does whether you have to sue a

02:26    13   company or not have on -- and this is very general.  I

02:27    14   understand you say every license deal is unique and

02:27    15   different.

02:27    16               But generally speaking, what impact does not

02:27    17   having a lawsuit against an entity do to the price that

02:27    18   somebody would be willing to pay?

02:27    19         A.    I mean, not litigating is by far the preferred

02:27    20   method for us.  I mean, we much -- we much rather have

02:27    21   companies pay and -- pay for our intellectual property

02:27    22   and not take it for free.

02:27    23               It's -- it's -- normally, I mean, I would say

02:27    24   99 percent of the time, it would be very significantly

02:27    25   less than licensing that you would get after litigation

02:27   1    because you don't have the costs.

02:27   2              I mean, litigation is by far -- I think we've

02:27   3    spent, you know, $52 million litigating, and we

02:27   4    probably spent less than $100,000 on all -- on all of

02:27   5    those other licenses combined.

02:28   6        Q.    I'm going to ask you a very obvious question.

02:28   7              Did you voluntarily license VMware, or did you

02:28   8    have to sue them?

02:28   9        A.    Well, yeah.  I mean, we've been doing this for

02:28  10    a couple of years.  So yes.  Unfortunately, we've had

02:28  11    to sue them.  Unfortunately.

02:28  12              MS. KIM:  I can pass the witness back.

02:28  13                        RECROSS-EXAMINATION

02:28  14    BY MS. MOYE:

02:28  15        Q.    Just a couple of very quick questions,

02:28  16    Mr. Etchegoyen.

02:28  17        A.    Yes, ma'am.

02:28  18        Q.    You mentioned a broker that assisted with some

02:28  19    of your licensing efforts.

02:28  20              Do you recall that?

02:28  21        A.    I'm sorry.  Excuse me.

02:29  22        Q.    Yes.

02:29  23        A.    Could you repeat it?  I'm sorry.  I was

02:29  24    coughing in the microphone.  I apologize.

02:29  25        Q.    No problem.

```
02:29   1              You mentioned just now in talking with your
02:29   2    counsel that you used a broker in some of your
02:29   3    licensing efforts, someone to help you with that.
02:29   4              Do you recall that?
02:29   5         A.   Yes.  We've had brokers.
02:29   6         Q.   And that -- the name of that broker's -- the
02:29   7    name of the company was AQUA; is that correct, sir?
02:29   8         A.   I believe -- I believe that's correct.  Yes.
02:29   9         Q.   And I'd like to have you take a look at
02:29  10    DTX-27.
02:29  11         A.   I think it's still on that.  Okay.  It's up.
02:29  12         Q.   Yes.  Got it.  Got it.
02:29  13              Take a moment and look at this exhibit and
02:29  14    tell us, can you confirm that this is an agreement that
02:29  15    your company, WSOU, entered into with AQUA?
02:29  16         A.   It looks that way.  Yes.  I see AQUA's name.
02:30  17              MS. MOYE:  I'd like to introduce DTX-27
02:30  18    into evidence.
02:30  19              MS. KIM:  No objection, Your Honor.
02:30  20              THE COURT:  It'll be admitted.
02:30  21              MS. MOYE:  Can we now display it for the
02:30  22    jury?
02:30  23    BY MS. MOYE:
02:30  24         Q.   Mr. Etchegoyen, what is the effective date of
02:30  25    this agreement with AQUA?
```

02:30   1        A.    It looks like September 26, 2017.

02:30   2        Q.    Okay.

02:30   3              MS. MOYE:  And if we could blow up that

02:30   4    first paragraph engagement.

02:30   5              Actually, let's go back.  Can we go back

02:30   6    to the top?  We need to define what SPV means.

        7    BY MS. MOYE:

02:30   8        Q.    So if you look at that language "WSOU

02:30   9    Investments LLC, a Delaware company," you see that

02:30   10   language, sir?

02:30   11       A.    I do.  Yes.

02:30   12       Q.    And it says, "hereafter SPV," do you see that?

02:30   13       A.    I do see that.

02:30   14       Q.    And that means in the remainder of the

02:30   15   document, when they say "SPV," they're referring to

02:31   16   WSOU, your company, correct?

02:31   17       A.    I think that's accurate.  Yes.

02:31   18       Q.    Okay.  Now let's look at the engagement

02:31   19   paragraph.

02:31   20             And it says:  SPV -- that's WSOU -- hereby

02:31   21   engages AQUA as its exclusive representative in

02:31   22   conjunction with the sale or other commercial

02:31   23   disposition of the patents listed in the appendix.

02:31   24             Do you see that?

02:31   25       A.    I see that.  Yes.

02:31    1         Q.    And in this agreement was WSOU engaging AQUA

02:31    2    as its exclusive representative to try to help with

02:31    3    licensing of the Nokia/Alcatel-Lucent patent portfolio?

02:31    4         A.    We hired -- our brokers represented us in the

02:31    5    market to license our patents without litigation.  Yes.

02:31    6         Q.    Okay.  And this license was entered in

02:32    7    September 2017, right?

02:32    8         A.    That's correct.

02:32    9         Q.    Before the AT&T license that we looked at

02:32   10    earlier?  You need to see the date on that again, sir?

02:32   11         A.    No.  I think it is before.  I'm comfortable

02:32   12    saying that.

02:32   13         Q.    And before the Amazon agreement; is that

02:32   14    correct, sir?

02:32   15         A.    I believe that's accurate.  Yes.

02:32   16         Q.    And before the Facebook agreement?

02:32   17         A.    That one's a little faint, but yes.  I believe

02:32   18    so.  I believe those were all after 2017.

02:32   19         Q.    And AQUA actually assisted you with

02:32   20    negotiating those license agreements, correct, sir?

02:32   21         A.    Yes.

02:32   22              MS. MOYE:  And then just one clean-up

02:32   23    item, Your Honor.  Because we have read so much from

02:32   24    this website entry, I would like to introduce it into

02:32   25    evidence.

—187—

02:32   1                    We need to get an evidence number and a

02:32   2    tab to put on it, but I would like to introduce it.

02:33   3                    MS. KIM:  No objection, Ms. Moye.

02:33   4                    THE COURT:  It'll be admitted.

02:33   5                    MS. MOYE:  Nothing else.

02:33   6                    FURTHER REDIRECT EXAMINATION

02:33   7    BY MS. KIM:

02:33   8        Q.    I will be brief.

02:33   9              Mr. Etchegoyen, we just looked at the AQUA

02:33   10   agreement.  It was the 2017 September, and it expired

02:33   11   one year, so 2018 September; is that right?

02:33   12       A.    Yes.

02:33   13       Q.    And you're aware that Mr. McMillan at AQUA,

02:33   14   the company that you entered into that license --

02:33   15   that -- sorry -- monetization agreement, the broker, he

02:33   16   had offered Dell -- are you aware that he had offered

02:33   17   Dell a chance to license for 2 and a half million?

02:33   18       A.    Yes.  I became aware of that.  Yes.

02:33   19       Q.    Are you aware that that was done around

02:33   20   August 2018?

02:33   21       A.    It sounds familiar.

02:33   22       Q.    So almost five years ago?

02:33   23       A.    Yes.

02:34   24       Q.    In August of 2018, were you or your company,

02:34   25   Brazos, aware of the value of the '133 patent?

—188—

02:34    1         A.    No.

02:34    2         Q.    Were you aware of the extent of VMware's use

02:34    3    of the patent?

02:34    4         A.    No.

02:34    5         Q.    Based on what you heard from Ms. Moye, does it

02:34    6    appear to -- I can't read my own writing.

02:34    7              Based on Ms. Moye's question, does it appear

02:34    8    that VMware knew since 2018 that it could have been

02:34    9    using the '133 patent with Brazos' permission?

02:34   10                   MS. MOYE:  Objection.  That's a

02:34   11    mischaracterization of anything that was said.

02:34   12                   THE COURT:  Overruled.

02:34   13    BY MS. KIM:

02:34   14         Q.    Let me make the question a little bit more

02:34   15    clear.  I'm sorry.

02:34   16              I'm asking you, Mr. Etchegoyen, in 2018,

02:34   17    Mr. McMillan as your exclusive broker offered 2 and a

02:35   18    half million license to all patents to Dell, correct?

02:35   19         A.    Correct.

02:35   20         Q.    So since that time Dell and VMware, EMC, all

02:35   21    those companies, they have been using the '133 patent

02:35   22    without Brazos' permission, correct?

02:35   23         A.    Correct.

02:35   24                   MS. KIM:  I can pass the witness.

02:35   25                   MS. MOYE:  Just one final question.

189

02:35   1                    FURTHER RECROSS-EXAMINATION

02:35   2   BY MS. MOYE:

02:35   3        Q.    Counsel just asked you about this Dell

02:35   4   situation, the offer that your exclusive broker made.

02:35   5              Do you remember that?

02:35   6        A.    I do.  Yes.

02:35   7        Q.    Yes.  And is it correct, Mr. Etchegoyen, that

02:35   8   you did not send any type of notice out to Dell or

02:35   9   VMware saying, "I think you infringe my patent" before

02:35   10  filing this lawsuit?

02:35   11       A.    I don't know what he -- I don't know what he

02:36   12  sent, you know, list of patents, explanations.  I don't

02:36   13  know what he sent.

02:36   14       Q.    I'm asking about what you sent, what you

02:36   15  did --

02:36   16       A.    Oh, me personally.

02:36   17       Q.    -- what your company did.

02:36   18             Yes.  Did WSOU send any notice to Dell, EMC or

02:36   19  VMware saying "I believe you are infringing" any patent

02:36   20  that WSOU owned before filing this lawsuit?

02:36   21       A.    I don't think I'm allowed to say infringing.

02:36   22  I personally wouldn't have sent anything like that, me,

02:36   23  personally.

02:36   24       Q.    So the answer's no?

02:36   25       A.    The answer's no.  I wouldn't have done that.

190

02:36  1        Q.    Thank you.

02:36  2                    FURTHER REDIRECT EXAMINATION

02:36  3    BY MS. KIM:

02:36  4        Q.    Hello again.

02:36  5        A.    Hi.

02:36  6        Q.    Mr. Etchegoyen, earlier you testified that you

02:36  7    are not somebody who would look at the patent as an

02:36  8    expert witness and say who infringes and who doesn't --

02:36  9                    MS. MOYE:  Objection, Your Honor.  Beyond

02:36 10    the scope.

02:37 11                    THE COURT:  Beyond the scope of what you

02:37 12    just asked?

02:37 13                    MS. MOYE:  Yes.

02:37 14                    THE COURT:  Sustained.

02:37 15    BY MS. KIM:

02:37 16        Q.    Mr. Etchegoyen, based on Ms. Moye's question,

02:37 17    she asked you about whether you had given notice to

02:37 18    Dell about the '133 patent.

02:37 19                    Do you remember that just now?

02:37 20        A.    I do.

02:37 21        Q.    And you said no?

02:37 22        A.    I personally wouldn't be -- I think that's a

02:37 23    legal term.  I wouldn't be able to give notice.

02:37 24        Q.    Based on what you heard from VMware's counsel

02:37 25    today, does it appear that VMware has known since 2018

| | | |
|---|---|---|
| 02:37 | 1 | that it was using the patent? |
| 02:37 | 2 | MS. MOYE:  Objection.  Foundation. |
| 02:37 | 3 | THE COURT:  Sustained. |
| 02:37 | 4 | BY MS. KIM: |
| 02:37 | 5 | Q.    Mr. Etchegoyen, sitting here today knowing |
| 02:37 | 6 | what you know now, would you have licensed all of |
| 02:37 | 7 | Brazos' 12,000 patents for $2.5 million five years ago? |
| 02:37 | 8 | A.    No way. |
| 02:37 | 9 | MS. KIM:  I pass the witness. |
| 02:37 | 10 | MS. MOYE:  Nothing further, Your Honor. |
| 02:38 | 11 | THE COURT:  Thank you. |
| 02:38 | 12 | Ladies and gentlemen of the jury, we'll |
| 02:38 | 13 | take our afternoon recess. |
| 02:38 | 14 | A couple of things I need to tell you. |
| 02:38 | 15 | One, until you begin deliberating at the end of the |
| 02:38 | 16 | trial, you can't talk about the case amongst |
| 02:38 | 17 | yourselves.  So you can talk about the Dallas Cowboys. |
| 02:38 | 18 | I don't know what y'all talk about when you're not with |
| 02:38 | 19 | me.  But whatever it is, baking shows, whatever it is |
| 02:38 | 20 | you can talk about, but not the case. |
| 02:38 | 21 | Number two, you may do not do any |
| 02:38 | 22 | research about the case.  You've learned who the |
| 02:38 | 23 | plaintiff is.  You know who the defendant is.  We want |
| 02:38 | 24 | you to make your decisions based exclusively on the |
| 02:38 | 25 | evidence you hear here. |

192

02:38    1              Three, I'm told by my two college-age

02:38    2    sons there's something called social media.  I'm not on

02:38    3    it.  I don't really know what it is.  But I'm told it

02:38    4    exists.  And if you all want to be on social media,

02:38    5    that's certainly fine.  But until the trial is over and

02:39    6    you've reached a verdict, you may not post anything,

02:39    7    whatever that means, but you can't put anything up

02:39    8    about this case or what's going on on social media.

02:39    9              Once you've finished with your verdict,

02:39   10    it's America.  You can do whatever you want.  But

02:39   11    during this week you can't post anything about the

02:39   12    trial.

02:39   13              So we'll take a 10- or 15-minute recess.

02:39   14    And then we'll come back and take up the next witness.

02:39   15                    THE BAILIFF:  All rise.

02:39   16                    (Jury exited the courtroom.)

02:39   17                    THE COURT:  You may step down.

02:43   18                    (Off-the-record discussion.)

02:44   19                    THE COURT:  Now, you all had some issues

02:44   20    to take up with respect to the next witness.

02:44   21                    MR. ROSENTHAL:  Yes, Your Honor.  I have

02:44   22    some issues with the demonstratives from Plaintiff's

02:44   23    technical expert, Dr. McClellan, which thankfully there

02:44   24    are a lot fewer of them.  So they're only on the '133

02:44   25    patent.

193

02:44    1          Essentially there's just a ton of

02:44    2    demonstratives that are just outside the scope.  And I

02:44    3    can give some examples.  But this -- for instance,

02:44    4    there's opinions on claim construction.

02:44    5          If we could, as an example, could we go

02:44    6    to Slide 55 of the '133 deck?

02:44    7          So you see here he's got the Court's

02:44    8    claim construction.  And then he's got Dr. McClellan's

02:44    9    plain and ordinary meaning.  That's nowhere in his

02:44   10    report.  That's just brand new.

02:44   11          As another example, if we could put up

02:45   12    Claim No. 27 -- or Slide No. 27.

02:45   13          So this figure, you saw this in the

02:45   14    opening statement.  This is littered throughout

02:45   15    Dr. McClellan's report over and over and over again --

02:45   16    I'm sorry.  In his demonstratives.  It is nowhere in

02:45   17    his report.  He doesn't cite to that page.  It

02:45   18    doesn't -- it's just brand new.

02:45   19          As another example --

02:45   20          THE COURT:  Well, we have an easy

02:45   21    solution.  Before -- the jury won't see this.  You will

02:45   22    see this before the jury does.

02:45   23          MR. ROSENTHAL:  Then I'll stand up.

02:45   24          THE COURT:  And you can stand up and say,

02:45   25    I object.  And then you're going to say it's not in his

02:45  1    report.

02:45  2              And they're going to favor me by saying,

02:45  3    of course it is.  It's on this page at this paragraph.

02:45  4    Because they won't show a demonstrative where they

02:45  5    don't know how they can quickly cite to the report.

02:45  6              MR. ROSENTHAL:  That resolves all of my

02:45  7    questions.

02:45  8              THE COURT:  And if the response to you

02:45  9    saying it's not in the report is them saying, I don't

02:45  10   know where it is in the report, then you win.

02:45  11             MR. ROSENTHAL:  Got it, Your Honor.

02:45  12   Thank you.

02:45  13             THE COURT:  So -- and that's -- that goes

02:46  14   both ways.  I mean, that would be the same way when

02:46  15   you're putting on your evidence.

02:46  16             MR. ROSENTHAL:  We took that very

02:46  17   seriously.  We've cut a lot of stuff from our

02:46  18   testimony.

02:46  19             THE COURT:  Anything else we need to take

02:46  20   up?

02:46  21             MR. ROSENTHAL:  Not from me, Your Honor.

02:46  22             MR. WALDROP:  There was a --

02:46  23             THE COURT:  Yes, sir.

02:46  24             MR. WALDROP:  If that's resolved, Your

02:46  25   Honor, on that --

195

|   |   |
|---|---|
|  | 1 |
| 02:46 | 2 |
| 02:46 | 3 |
| 02:46 | 4 |
| 02:46 | 5 |
| 02:46 | 6 |
| 02:46 | 7 |
| 02:46 | 8 |

THE COURT:  Yes.

MR. WALDROP:  Thank you, Your Honor.

There was one other issue, Your Honor, that I wanted to raise about claim construction, Your Honor.  And --

THE COURT:  What is it you want to do?

MR. WALDROP:  What I want to do, Your Honor, is preserve for the record any -- the plain and ordinary meaning they're going to put on in their case, Your Honor, I think creates scope -- it improperly narrows the scope of the claims such that it creates confusion.

THE COURT:  And when does that come up?

MR. WALDROP:  Well, it's going to come up right with Dr. McClellan because he was going to say -- so he's going to give his plain and ordinary -- if you will allow him to do that, Your Honor, it's fine.

My only point was, Your Honor, that there is confusion about -- you know what, Your Honor, we can wait if you want.  How about that, Your Honor, if you want to wait.

(Off-the-record bench conference.)

THE COURT:  Okay.  So Mr. Waldrop and Mr. Rosenthal, I'll just, again, I'll listen to the testimony on direct and cross.  And if there's an issue

02:47  1    about that, you can either ask to approach the bench or

02:47  2    you can make an objection and I'll rule on it.

02:47  3                    Is there anything else we need to take

02:47  4    up?

02:47  5                    MR. WALDROP:  Your Honor, if I -- could I

02:47  6    preserve it for the record, Your Honor, just these

02:47  7    three here --

02:47  8                    THE COURT:  Well, there's nothing to

02:47  9    preserve right now --

02:47  10                    MR. WALDROP:  Okay, yeah.

02:47  11                    THE COURT:  -- because there's no

02:47  12    evidence.  That's what I'm saying is once we begin what

02:48  13    I'm sure will be a fascinating march through the

02:48  14    infringement testimony of this expert --

02:48  15                    MR. WALDROP:  Yes, sir.

02:48  16                    THE COURT:  -- and the jury is sitting on

02:48  17    the edge of their chairs --

02:48  18                    MR. WALDROP:  Absolutely.

02:48  19                    THE COURT:  -- waiting like I will be, if

02:48  20    you ask something that involves the disputed claim

02:48  21    term, if Mr. Rosenthal's unhappy, he can object or ask

02:48  22    to approach.  And at that time I'll take up whatever it

02:48  23    is and rule on it.

02:48  24                    MR. WALDROP:  Thank you, Your Honor.  I

02:48  25    appreciate it.

02:48  1          THE COURT:  I know that you all think

02:48  2    that right now the jury is back there hoping that

02:48  3    there's going to be an infringement expert and

02:48  4    wondering about what he's going to say and wondering

02:48  5    what his interpretation of each claim term will be.

02:48  6    But I think that's unlikely.

02:48  7          MR. WALDROP:  Thank you, Your Honor.

02:48  8          THE COURT:  So let me say one thing,

02:48  9    because I forgot to and it didn't come up.  But just so

02:48  10   you all know, here's my policy on talking to witnesses,

02:48  11   the lawyers talking to witnesses -- their witnesses.

02:48  12          If your witness is on the stand on

02:49  13   direct, if we take a break, you are free to continue to

02:49  14   talk to your witness.  And I try to not break when --

02:49  15   if it screws us up.

02:49  16          But if the witness is on cross, then the

02:49  17   lawyer who put the witness on may not speak to the

02:49  18   witness because the witness is on cross.  There is one

02:49  19   exception, and I don't know who your -- I couldn't tell

02:49  20   if this gentleman was your client or client

02:49  21   representative or not.  But you get one client per

02:49  22   side.  And because it's a client, I'm not going to tell

02:49  23   you that you can't talk to your client, regardless of

02:49  24   where we're at in the trial.  Because you all need to

02:49  25   be able to talk to your client.

02:49  1                    So but you only get one.  You don't get

02:49  2  to talk to someone and -- but in that rare situation

02:49  3  you can always talk to your client about anything,

02:50  4  whoever that one person is that you need to be

02:50  5  coordinating with and making sure of what's going on.

02:50  6  Regardless of what else is happening in the trial.

02:50  7                    So you all take a short break and we'll

02:50  8  come back.

02:50  9                    MR. WALDROP:  Thank you, Your Honor.

02:50  10                    THE BAILIFF:  All rise.

02:50  11                    (Recess taken.)

03:04  12                    THE BAILIFF:  All rise.

03:05  13                    THE COURT:  Please remain standing for

03:05  14  the jury.

03:05  15                    (Jury entered the courtroom.)

03:05  16                    THE COURT:  Thank you.  You may be

03:05  17  seated.

03:05  18                    Counsel, you may call your next witness.

03:05  19                    MR. WALDROP:  Thank you, Your Honor.

03:05  20  Plaintiff calls Dr. Stan McClellan.

03:05  21                    (The witness was sworn.)

03:05  22                    DIRECT EXAMINATION

03:05  23  BY MR. WALDROP:

03:06  24      Q.    Good afternoon, Dr. McClellan.

03:06  25      A.    Good afternoon.

03:06  1      Q.    Please introduce yourself to the ladies and

03:06  2  gentlemen of the jury.

03:06  3      A.    My name's Stan McClellan.  I'm a professor at

03:06  4  Texas State University.

03:06  5      Q.    Now, Dr. McClellan, have you been retained as

03:06  6  an expert witness in this case on behalf of Brazos?

03:06  7      A.    Yes.

03:06  8      Q.    And you heard me during my opening statement

03:06  9  on behalf of Plaintiff.  I talked about a technical

03:06  10  witness for Brazos?

03:06  11      A.    Yes.

03:06  12      Q.    Was I referring to you?

03:06  13      A.    I believe so.

03:06  14      Q.    Okay.  Thank you.

03:06  15            So are you aware that this is a patent

03:06  16  infringement case, Dr. McClellan, between Brazos and

03:06  17  VMware?

03:06  18      A.    Yes.

03:06  19      Q.    And, Dr. McClellan, please describe to us what

03:07  20  you were asked to do for this case and in this case.

03:07  21      A.    I was asked to review the documents that were

03:07  22  produced in the case, the patents of course, the claims

03:07  23  of the patents, and the technologies that are asserted

03:07  24  as being infringing.

03:07  25      Q.    Now, do you know Mr. Craig Etchegoyen

—200—

03:07  1    personally before taking this matter?

03:07  2        A.    No.  I hadn't met him until a few days ago.

03:07  3        Q.    And just so we're clear, this is an important

03:07  4    question, Dr. McClellan.  Did you reach any opinions

03:07  5    concerning whether VMware's accused products infringe

03:07  6    the '133 patent?

03:07  7        A.    Yes.

03:07  8        Q.    And what are your opinions regarding whether

03:07  9    VMware's VeloCloud Edge or SD-WAN devices infringe

03:07  10   Claim 13 of the '133 patent?

03:07  11       A.    The accused products VeloCloud Edge and

03:07  12   Gateway devices literally infringe Claim 13 of the '133

03:07  13   patent.

03:07  14       Q.    And, Dr. McClellan, have you prepared any

03:07  15   slides to help illustrate your testimony for the jury?

03:08  16       A.    Yes.

03:08  17       Q.    And we'll talk about your opinions in a few

03:08  18   minutes, but right now I'm required by the law, I'm --

03:08  19   required to talk about your qualifications to testify

03:08  20   as an expert in this case.

03:08  21             Can I do that?

03:08  22       A.    Uh-huh.

03:08  23       Q.    Now, let's talk about your background,

03:08  24   qualifications and the like.

03:08  25             Now, where did you grow up, Dr. McClellan?

03:08   1       A.    I was born in Georgetown.  I grew up as a

03:08   2   child in Valley Mills, which is just a few miles from

03:08   3   here.  My family is from the Central Texas area for

03:08   4   over 100 years.  And largely, you know, west of Valley

03:08   5   Mills, over Coleman County and so on.  So I've lived in

03:08   6   Texas most of my life.

03:08   7       Q.    Are you married?

03:08   8       A.    Yes.

03:08   9       Q.    Do you have any kids?

03:08   10      A.    I have four kids.

03:08   11      Q.    Let's talk about your -- let's turn to your

03:08   12  professional and educational background, Dr. McClellan.

03:08   13  I want to turn to Slide --

03:08   14            MR. WALDROP:  -- next -- oh, you got it.

03:08   15  Thank you.

        16  BY MR. WALDROP:

03:08   17      Q.    And this -- what I'm showing -- and I'll move

03:08   18  this into evidence, this is PTX-200.  I'll move this

03:09   19  into evidence.

03:09   20            What is this, Dr. McClellan?

03:09   21      A.    This looks like my resume.

03:09   22      Q.    And, Dr. McClellan -- Dr. McClellan, what do

03:09   23  you do for a living?

03:09   24      A.    I'm a faculty member at the Texas State

03:09   25  University in the Ingram School of Engineering where I

03:09  1    work on a bunch of different types of projects.

03:09  2                    MR. WALDROP:  Can I move PTX-200 into

03:09  3    evidence?

03:09  4                    Thank you.

03:09  5                    MR. ROSENTHAL:  No objection, Your Honor.

03:09  6                    THE COURT:  It'll be admitted.

03:09  7    BY MR. WALDROP:

03:09  8        Q.    Can you provide us a general description of --

03:09  9    regarding what you do in those roles at Texas State

03:09  10   University?

03:09  11       A.    I've served in several different roles there.

03:09  12   I was recruited out of industry to Texas State to help

03:09  13   start the Ingram School of Engineering from scratch.

03:09  14   And I thought that would be an interesting challenge,

03:09  15   particularly since a lot of my encounters with

03:09  16   undergraduate students graduating from larger

03:09  17   universities were substandard for corporate purposes.

03:10  18                    So I helped start the school of engineering

03:10  19   there.  I was director of the school for several

03:10  20   years -- associate director, and then director of the

03:10  21   school.  And my aim has been to help students find

03:10  22   useful employment through the practice of engineering.

03:10  23                    A couple of projects that I work on there that

03:10  24   focus in that -- in that vein are what's called the

03:10  25   JETS program.  It's a program that provides direct

03:10  1  engineering, technology and science support for NASA's

03:10  2  Johnson Space Center in Houston where we engage a lot

03:10  3  of students, get them directly involved in a lot of

03:10  4  really interesting projects that go on at Johnson Space

03:10  5  Center.

03:10  6         You may have heard of recently of the Hayabusa

03:10  7  missions and stuff, where they sent an astroid hunter

03:10  8  into space and shot the astroid with a bullet and then

03:10  9  collected the debris off the astroid.

03:10  10        They brought that debris -- that spaceship

03:10  11  came back to Earth with that debris, and that debris is

03:10  12  now being studied at Johnson Space Center partially

03:11  13  involving some of the students from Texas State

03:11  14  University.  That's one of those programs.

03:11  15        The other program is the Connected

03:11  16  Infrastructure Initiative, and I think -- you want me

03:11  17  to talk about that now or later?

03:11  18    Q.    You can go ahead and talk about that briefly

03:11  19  now while we're here.

03:11  20    A.    So the Connected Infrastructure Initiative is

03:11  21  a state-funded activity for economic development in the

03:11  22  Central Texas area.

03:11  23        The purpose of it is to stimulate new

03:11  24  business, engage with business in different ways,

03:11  25  particularly around really hard, challenging problems

03:11 1  that we face that have to do with resource consumption,

03:11 2  water constraint, electricity provision, so on, as well

03:11 3  as interesting challenges that have to do with how

03:11 4  technology rolls out.

03:11 5       A lot of -- so the consortium is a group of

03:11 6  largely municipalities and non-governmental entities,

03:11 7  but also companies and, you know, places like the YMCA.

03:11 8  The YMCA is a member of the consortium because they're

03:12 9  concerned about how these technologies that they don't

03:12 10 understand are going to impact people's health, how

03:12 11 they're going to impact life going forward and so on.

03:12 12      So the consortium is a state-funded activity

03:12 13 to do economic development as well as education for the

03:12 14 students that are graduating from Texas State.

03:12 15 Q.   Now, Dr. McClellan, please tell us about your

03:12 16 education starting with high school.

03:12 17 A.   I graduated from high school in Clint, Texas,

03:12 18 which is kind of in West Texas, and went from there to

03:12 19 attend undergraduate school at Texas A&M.

03:12 20      After I graduated from Texas A&M with a degree

03:12 21 in electrical and computer engineering, I went to work

03:12 22 for aerospace and defense companies in the Dallas/Fort

03:12 23 Worth area.

03:12 24      After a few years working there, I was

03:12 25 recruited by Texas A&M to come back to school to work

03:12 1    on graduate studies, so I went back to Texas A&M.  I

03:12 2    finished a master's degree and a Ph.D.

03:12 3        Q.    I will say go Aggies, right?

03:12 4        A.    You say gig 'em, Aggies.  There's a couple of

03:13 5    other things that you don't say.  So...

03:13 6        Q.    Yeah.  Yeah.

03:13 7        A.    That's enough.

03:13 8              (Simultaneous conversation.)

03:13 9    BY MR. WALDROP:

03:13 10       Q.    You know, I'll get there.  Roll tide.  Thank

03:13 11   you for that, Dr. McClellan.

03:13 12             Now, I also see from your resume, I see that

03:13 13   you started a company as well, Dr. McClellan, and what

03:13 14   was that company?

03:13 15       A.    Yeah.  In about the 2008 time frame, I became

03:13 16   concerned with electricity consumption and how that was

03:13 17   going to affect our lives going forward and I did some

03:13 18   experiments with communications on the electrical grid.

03:13 19             And those experiments were strangely

03:13 20   successful, so we started a company around that.  We

03:13 21   filed some patents and we started a company.  And my

03:13 22   co-inventor was in Boulder, Colorado.  So that's why

03:13 23   the company is located in Boulder, Colorado.

03:13 24             Company was called Power Tagging Technologies,

03:13 25   and we were funded partially by the U.S. National

03:13  1    Science Foundation for the purpose of commercialization

03:13  2    of this technology, several million dollars.

03:13  3           And we were also funded partially by Dominion

03:13  4    Energy, which is the third or fourth largest energy

03:14  5    services provider in the United States.

03:14  6           And we were funded also by Lockheed Martin

03:14  7    because there were Homeland Security implications of

03:14  8    the technology.  The top technology is still in play

03:14  9    today as it was absorbed into a wholly owned subsidiary

03:14  10   of Dominion.

03:14  11   Q.   I also see from you resume, Dr. McClellan,

03:14  12   that you served in executive roles at large

03:14  13   corporations.  Please discuss that -- please describe

03:14  14   that for us.

03:14  15   A.   Well, I worked for Hewlett-Packard and -- for

03:14  16   several years.  And after I finished my graduate degree

03:14  17   at Texas A&M, I got a job in academia at the University

03:14  18   of Alabama at Birmingham.  That's why I'm not allergic

03:14  19   to roll tide and also Bear Bryant coached at Texas A&M.

03:14  20   So that's all good.

03:14  21   Q.   Absolutely.

03:14  22   A.   So I worked at UAB for awhile.  And because of

03:14  23   the work that I did there, I was recruited out of UAB

03:14  24   by -- at that time was Tandem Computers.  Tandem

03:14  25   Computers is the big computer company that started in

—207—

03:15  1    Austin that pioneered online transaction processing.

03:15  2          Tandem was absorbed by Compaq.  Compaq was

03:15  3    absorbed by HP.  So because that's all very painful to

03:15  4    deal with, I just put HP on there.

03:15  5          I was a distinguished technologist for HP.

03:15  6    And in that role I got involved with a lot of different

03:15  7    projects, product launch, product decommission, how to

03:15  8    price products, competitive posture, intellectual

03:15  9    property, mergers and acquisions, and things of that

03:15  10    nature.

03:15  11    Q.    You mentioned that you were a distinguished

03:15  12    technologist at HP or Hewlett Packard.

03:15  13          What is that?

03:15  14    A.    A distinguished technologist is somebody who

03:15  15    has provided extraordinary value to the company and has

03:15  16    technical -- in a technical way to change the way the

03:15  17    company works, a change in the way the company makes

03:15  18    money and things like that.

03:15  19          I think there was something like a quarter of

03:15  20    a percent of the employees -- overall employees of

03:16  21    Hewlett Packard were distinguished technologists.  It

03:16  22    was less than 100.

03:16  23    Q.    What work did you do at HP that led to you

03:16  24    being selected as a distinguished technologist at HP?

03:16  25    A.    I was involved in a lot of different projects

03:16    1    at HP that contributed to that.  My secondary title was

03:16    2    worldwide solution architect.

03:16    3         So one of the main things I did was I engaged

03:16    4    with large companies, network service providers,

03:16    5    telecommunications equipment manufacturers,

03:16    6    technologies suppliers to help create new products and

03:16    7    new avenues for new products and sales opportunities

03:16    8    for new products.

03:16    9         One of those -- one of those avenues was the

03:16    10   changeover from the telecommunications network, the

03:16    11   wireless telecommunications network from 2G to 3G to 4G

03:16    12   and all that kind of stuff.  That was a huge

03:16    13   undertaking.

03:16    14        And so I spent a lot of time basically in

03:16    15   technical negotiations with various companies to try to

03:17    16   enable some of those technologies and along the way

03:17    17   find places for HP technology to be fit in there so

03:17    18   that we could make money.

03:17    19   Q.    I also see within your resume, Dr. McClellan,

03:17    20   that you worked in the defense industry developing

03:17    21   technology for our military; is that right?

03:17    22   A.    All right.  When I finished my undergraduate

03:17    23   degree, I worked for LTV Aerospace and General Dynamics

03:17    24   in Grand Prairie and Fort Worth, respectively.

03:17    25        I worked on -- in both of those places, I

209

03:17  1   worked on things related to flight simulators, realtime

03:17  2   flight simulators, reconnaissance.

03:17  3          This was back in the '80s.  And back at that

03:17  4   time, we didn't have Google Maps and we didn't have

03:17  5   Google Earth.  So the military had things that were

03:17  6   like that, that were even higher resolution than we

03:17  7   have today, at that time.

03:17  8          And so a lot of those things were for mission

03:17  9   rehearsals for the Navy, Navy pilots, mission

03:17  10  rehearsals for Air Force pilots, and the AFTI/F-16

03:18  11  program was an experimental fighter jet program that

03:18  12  Air Force pilots would fly around and experiment with

03:18  13  new technologies.

03:18  14  Q.    Now, as an electrical engineer, do you have a

03:18  15  specialty within the field of electrical engineering,

03:18  16  Dr. McClellan?

03:18  17  A.    That's really difficult to say.  Typically

03:18  18  what I get specialized in is things that communicate,

03:18  19  whether they communicate wirelessly or by fiber or by

03:18  20  copper, and some cases where they communicate using

03:18  21  power signals.

03:18  22         So anything that happens to communicate.  And

03:18  23  that, you know, fortunately or unfortunately, covers an

03:18  24  extremely broad area.

03:18  25  Q.    Now, Dr. McClellan, I also understand that

03:18    1    you're the named inventor on a number of patents in the

03:18    2    electrical engineering and networking field.

03:18    3              How many patents do you have in this field?

03:18    4    A.    I don't know.  Probably 20.

03:18    5    Q.    And are all of these patents in the electrical

03:19    6    engineering/networking field?

03:19    7    A.    Yeah.  Some of them have to do with

03:19    8    communications systems that deal with medical devices,

03:19    9    you can see on the right at UAB.  Stuff that has to do

03:19    10   with communications systems and networks on the left.

03:19    11   And then other types of communication capabilities and

03:19    12   technologies at the top.

03:19    13   Q.    Now, during -- during your time in your

03:19    14   professional history, Dr. McClellan, had you ever heard

03:19    15   of Bell Labs?

03:19    16   A.    Oh, yeah.

03:19    17   Q.    And what was your -- what was your

03:19    18   understanding of Bell Labs -- what was the significance

03:19    19   of Bell Labs?

03:19    20   A.    Bell Labs was the gold standard for

03:19    21   communications technologies starting early in the

03:19    22   1900s.

03:19    23   Q.    During your professional career did you have

03:19    24   an understanding of Alcatel-Lucent?

03:19    25   A.    Alcatel is the AT&T of France.  Lucent was --

| | | |
|---|---|---|
| 03:19 | 1 | I don't remember exactly where Lucent came from.  I |
| 03:19 | 2 | think it was a spin-off of Bell Labs.  And so Alcatel |
| 03:19 | 3 | and Lucent merged, and that was a merger of two really |
| 03:20 | 4 | inventive and large companies. |
| 03:20 | 5 | Q.    Would you consider them still inventive today? |
| 03:20 | 6 | A.    Absolutely.  Alcatel was prominent in the |
| 03:20 | 7 | introduction of DSL lines which was -- started the |
| 03:20 | 8 | broadband revolution. |
| 03:20 | 9 | Q.    Are you familiar, during your professional |
| 03:20 | 10 | background, with Nokia? |
| 03:20 | 11 | A.    Absolutely. |
| 03:20 | 12 | Q.    And what was your understanding of the |
| 03:20 | 13 | innovativeness of Nokia? |
| 03:20 | 14 | A.    Nokia was very innovative in a lot of |
| 03:20 | 15 | different areas.  They don't just make handsets.  They |
| 03:20 | 16 | make network equipment, they make computers.  They make |
| 03:20 | 17 | all kinds of stuff. |
| 03:20 | 18 | In my role at HP, I negotiated directly with |
| 03:20 | 19 | Nokia and Ericsson and other European companies, |
| 03:20 | 20 | including Alcatel, Siemens and lots of other ones, |
| 03:20 | 21 | around different kinds of computer technologies that |
| 03:20 | 22 | would be introduced into the wireless communications |
| 03:20 | 23 | network as it transitioned forward to 2G, 3G, 4G and so |
| 03:20 | 24 | on. |
| 03:20 | 25 | Q.    And I want to ask you an important question. |

212

03:21  1    You probably heard some of this morning.  As to the
03:21  2    '133 patent that we're talking about, based on your
03:21  3    professional background, would you consider the '133
03:21  4    patent old technology?
03:21  5        A.    No.
03:21  6        Q.    Why not?
03:21  7        A.    It uses -- it uses some inventive approaches
03:21  8    to dealing with problems that are faced by every
03:21  9    network every day, today.  And the -- I mean, one of
03:21  10   the deals with patents is that the inventors of the
03:21  11   patents, your job is to sort of predict the future.
03:21  12        And this is one of those cases where the
03:21  13   inventors of the patents kind of predicted the future.
03:21  14   They knew that congestion was going to be a big deal in
03:21  15   future networks because data traffic's never going to
03:21  16   go away.  And so they came up with approaches to manage
03:21  17   that congestion.
03:21  18        And it worked.  Those were approaches that
03:21  19   hadn't been used up to that point.  And they're just
03:21  20   now starting to be used by various other technologies.
03:21  21        Q.    Now, I know we're about to talk a lot about
03:21  22   electrical engineering.  So for the purposes of
03:22  23   illustrating to the jury, what is electrical
03:22  24   engineering?
03:22  25        A.    I got to start that with a joke.  People are

03:22    1    always shocked when they find out how well I can wire a

03:22    2    circuit.

03:22    3            I'll just let that sink in for a minute.

03:22    4            Electrical engineers deal with electricity and

03:22    5    electronics for the purposes of doing something

03:22    6    positive for humanity.  Electrical engineers deal with

03:22    7    the electrical power system.  That's a very narrow area

03:22    8    of electrical engineering.

03:22    9            Electrical engineers deal with communication

03:22   10    systems, telephone systems, Internet, things like that.

03:22   11    They deal with software, they deal with semiconductors.

03:22   12    They deal with all kinds of technologies that you use

03:22   13    on a daily basis and don't even understand that they're

03:22   14    there.

03:22   15            Electrical engineers designed the monitors

03:22   16    that you're looking at this slide on.  It's a very

03:22   17    broad field and it touches everybody in a lot of

03:22   18    different ways.

03:22   19            MR. WALDROP:  Your Honor, we tender

03:22   20    Dr. Stan McClellan as an expert in the field of

03:23   21    electrical engineering with a specialty in

03:23   22    communication networks.

03:23   23            MR. ROSENTHAL:  We have no objection,

03:23   24    Your Honor.

03:23   25            THE COURT:  He'll be recognized as an

03:23  1   expert in those fields.

03:23  2                   MR. WALDROP:  Thank you, Your Honor.

03:23  3   BY MR. WALDROP:

03:23  4       Q.    Now, Dr. McClellan, are you being paid for

03:23  5   your time in this case?

03:23  6       A.    Yes.

03:23  7       Q.    And what is your hourly rate?

03:23  8       A.    $320 an hour.

03:23  9       Q.    But an important question, Dr. McClellan, is

03:23 10   your compensation for your work in this case based on a

03:23 11   contingent in any way on the outcome of this case?

03:23 12       A.    No.

03:23 13       Q.    Is your compensation for your work in any way

03:23 14   based on a contingent on the opinions you provide today

03:23 15   in this case?

03:23 16       A.    No.

03:23 17       Q.    Now, Dr. McClellan, I want to talk to you

03:23 18   about the accused VMware products, what we call

03:23 19   VeloCloud or VeloCloud SD-WAN, which you found to

03:23 20   infringe Claim 13 of the '133 patent.

03:23 21                   Can we talk about that?

03:23 22       A.    Yes.

03:23 23       Q.    But before we do that, let's discuss the '133

03:23 24   patent first.  So, Dr. McClellan, do you recall in

03:24 25   opening statement how I described the '133 patent?

03:24  1        A.    I believe so, but it would help to refresh a

03:24  2   little bit.  I don't remember exactly what you said.

03:24  3        Q.    This was the exit traffic cop.

03:24  4        Do you remember that, Dr. McClellan?

03:24  5        A.    Yeah, yeah.

03:24  6        Q.    Dr. McClellan, I would bring up that animation

03:24  7   for your recollection.  This is one way I tried to

03:24  8   relate the '133 patent to everyday life.  And do you

03:24  9   recall that I thought of it as a computer traffic cop

03:24  10  that directs traffic or packets of information to the

03:24  11  best exits when the rows were congested?

03:24  12        Do you remember that?

03:24  13        A.    Yeah.

03:24  14        Q.    Can you please explain to the jury your

03:24  15  understanding of the '133 patent?

03:24  16        A.    My understanding of the '133 patent is very

03:24  17  similar to this.  The traffic cop in this case would

03:24  18  live at node $104_A$ on the top left.  And the traffic cop

03:24  19  would have information about the red node on the bottom

03:24  20  right.

03:24  21        And before he would allow traffic into the

03:24  22  network, he would make some determinations about where

03:24  23  that traffic really needed to go and what kind of --

03:24  24  where that traffic was supposed to go and how that

03:25  25  traffic could go a different way.  And then he would

216

03:25  1    enforce those determinations at node 104$_A$.

03:25  2            So at the ingress the traffic cop would manage

03:25  3    the traffic flow on behalf of the egress.  Because the

03:25  4    egress was comprised some way.

03:25  5        Q.   Now, Dr. McClellan, I would like to talk to

03:25  6    you about the '133 patent.  Can you please tell the

03:25  7    jury what the title of the '133 patent is?

03:25  8        A.   The title of the patent is "Method and

03:25  9    Apparatus For Preventing Congestion in Load-Balancing

03:25  10   Networks."

03:25  11       Q.   And when was the '133 patent filed,

03:25  12   Dr. McClellan?

03:25  13       A.   Looks like March 23, 2006.

03:25  14       Q.   And when will the '133 patent expire?

03:25  15       A.   Looks like it expires in November 2027.

03:25  16       Q.   Now, what year is it, Dr. McClellan?

03:25  17       A.   2023.

03:25  18       Q.   Okay.  Thank you, Dr. McClellan.

03:26  19            So, Dr. McClellan, let's take a look at one of

03:26  20   the figures which is Figure 1 of the '133 patent.

03:26  21            MR. ROSENTHAL:  Your Honor, I'm sorry.  I

03:26  22   just want to make sure this slide is not shown to jury.

03:26  23   I'm not sure if it is already.  But we have an

03:26  24   objection.  The objection specifically is what's

03:26  25   written down on the bottom right of the screen violates

03:26   1    the MIL.

03:26   2                    THE COURT:  Correct.  I would sustain

03:26   3    that.

03:26   4                    MR. WALDROP:  So, Your Honor, we'll come

03:26   5    back to this slide.  We'll come back to this.

03:26   6       A.    Are we talking about slide that I'm looking

03:26   7    at?

03:26   8    BY MR. WALDROP:

03:26   9       Q.    Yeah.  We'll take down that slide.  We'll go

03:26  10    back to -- we'll go to the next slide.

       11                    MR. WALDROP:  Yeah.  We'll take that --

03:26  12    if we could -- would you remove the -- we'll just keep

03:26  13    going.

03:26  14                    So if we go back to the previous slide,

03:26  15    Jorge, to Slide 11.

       16    BY MR. WALDROP:

03:27  17       Q.    Dr. McClellan, you'll see that the title talks

03:27  18    about networks, load-balancing networks.

03:27  19       A.    Yes.

03:27  20       Q.    So my question as we turn -- if we move to

03:27  21    Slide 14, please describe to the jury what is a

03:27  22    network?

03:27  23       A.    A network is a connection of nodes.  In a

03:27  24    computer network or a data network the nodes are

03:27  25    computers or devices that interchange data.  You can

03:27  1    have other kinds of networks.  But in this case it's a

03:27  2    group of interconnected nodes that can transmit,

03:27  3    receive and exchange data, voice, video traffic and so

03:27  4    on in the form of packets.

03:27  5         Q.    And what are network communications on the

03:27  6    next slide, Dr. McClellan?

03:27  7         A.    Network -- I think we're all kind of familiar

03:27  8    with network communications because we all probably

03:27  9    have a home network in our house.  And our TV's

03:27  10   connected by WiFi and some sort of thing like that.

03:27  11         Networks exist in a lot of different forms,

03:27  12   local area networks exist in a small geographic area.

03:28  13   Wide area networks exist in a much larger geographic

03:28  14   area and tend to interconnect local area networks or

03:28  15   other kinds of networks.  So depending on the

03:28  16   geographic scope of a network, it's given a different

03:28  17   name typically.

03:28  18         Q.    And what is a node, Dr. McClellan?

03:28  19         A.    A node is a place on that network where

03:28  20   communication paths cross.

03:28  21         Q.    And what is a packet?  You might have heard me

03:28  22   talk -- I talked to the jury in the opening about a

03:28  23   data packet.

03:28  24         What is a packet?

03:28  25         A.    A packet is a chunk of data.  You generate --

219

```
03:28   1   you know, if you're having a Zoom -- a Zoom meeting
03:28   2   with your grandma, then your video's getting -- the
03:28   3   video that's being taken of your face and the audio
03:28   4   that's coming out of your -- off of your voice is
03:28   5   getting chopped up into little pieces and packaged up
03:28   6   to be sent off to your grandma.
03:28   7           It's kind of like putting stuff in a box and
03:28   8   then putting a label on the box so that the box can
03:29   9   ship to grandma.  The stuff that goes in the box is the
03:29  10   data.  The box is the packet and the packet has an
03:29  11   address slapped on the outside of it that tells it how
03:29  12   to get there.
03:29  13       Q.   And what is inside a packet?
03:29  14       A.   The packet -- the stuff that's inside the
03:29  15   packet is whatever the user data is typically.  Could
03:29  16   be voice, could be video, could be e-mail.  That's
03:29  17   typically what's inside of a packet.  Packets can
03:29  18   contain all kinds of stuff though.
03:29  19       Q.   Now, let's dig deeper into what a packet looks
03:29  20   like on the next slide.  Please explain to the jury --
03:29  21   oh.  You want to describe the flow of the packet
03:29  22   information?  Yeah.
03:29  23       A.   This slide shows packets which are the little
03:29  24   purple things transiting from the left-hand side to the
03:29  25   right-hand side with a video conference.
```

03:29  1          So what would be inside the packets is the

03:29  2   video that the two ladies are exchanging.  And the two

03:29  3   blue things in the middle would be some kind of network

03:29  4   node through which the packets pass.  The computers

03:29  5   that the ladies are using on the end would also be a

03:29  6   network.

03:29  7       Q.   Dr. McClellan, hold on one second.

03:30  8            Can the jury see the screens?

03:30  9       A.   Doesn't look like it.  I don't see anything on

03:30  10  their screens.  That's been the case for several

03:30  11  minutes.

03:30  12           MR. WALDROP:  But these are

03:30  13  demonstratives, Your Honor.  There're no exhibits

03:30  14  attached to these.  These are demonstratives.

03:30  15           THE COURT:  Okay.  You need to let -- you

03:30  16  need to show them -- you need to hit the button and

03:30  17  show them what's on your screen even if they're

03:30  18  demonstratives.  That gives the other side an

03:30  19  opportunity to object before the jury sees it.

03:30  20           MR. WALDROP:  Can the jury see -- can

03:30  21  they see it now?

03:30  22           Can you see it now?

03:30  23           (Off-the-record discussion.)

03:30  24  BY MR. WALDROP:

03:30  25      Q.   Okay.  So I'll ask the question again.  If you

221

03:30  1    could describe what's going on in this slide,

03:31  2    Dr. McClellan.

03:31  3         A.    Well, I'll keep an eye on those too.

03:31  4              What's going on in this slide is you got two

03:31  5    ladies that are having a video conference.  And the

03:31  6    animation shows little purple things going from left to

03:31  7    right.  And the little purple things are the packets.

03:31  8    So the packets contain the video and the audio that one

03:31  9    person is generating.  And they're taking -- the

03:31  10   packets are taking that data to the other side.

03:31  11        Q.    Now, you talked about what's inside a packet.

03:31  12   What is inside of a packet, Dr. McClellan?

03:31  13        A.    The packet contains whatever the data is that

03:31  14   needs to be sent to the other side.

03:31  15        Q.    And you can see that slide.  Are you able to

03:31  16   see that slide?  Thank you.

03:31  17              Please continue, Dr. McClellan.

03:31  18        A.    So the data that's inside the packet is

03:31  19   typically called a "payload."  That's the thing you're

03:31  20   trying to send to your grandma.

03:31  21              The packet is the box that you're putting it

03:31  22   in and the headers that are shown here in blue are the

03:31  23   addressing information that helps it get to your

03:31  24   grandma.

03:31  25        Q.    Now, Dr. McClellan, you heard me talk before

222

03:31  1    in the opening about how packets can create traffic.

03:32  2            Please explain to the jury how that happens.

03:32  3    A.    Well, packets transit the network and the

03:32  4    packets come from all different types of places and

03:32  5    they're going to all different types of places.  And so

03:32  6    that creates traffic on the network with all the

03:32  7    packets kind of jumbled together, kind of like cars on

03:32  8    a freeway.

03:32  9            And packets have different sizes, kind of like

03:32  10   cars and trucks on a freeway and motorcycles and stuff

03:32  11   like that.

03:32  12           And so all of that stuff mixed together all at

03:32  13   the same time trying to move across the network is just

03:32  14   like cars, for example, on I-35.  It can get jammed up.

03:32  15   Lots more traffic means lots more load on the network.

03:32  16   And I think we're all familiar with what happens around

03:32  17   here on I-35 around Thanksgiving.

03:32  18           That's congestion.  Too much traffic causes

03:32  19   traffic jams.  And we see that on all freeways, right?

03:32  20   Big networks are no different.

03:32  21   Q.    And what happens if too many packets are

03:33  22   moving across the network?

03:33  23   A.    It causes problems.  You get traffic jams.  It

03:33  24   causes delays.  It reduces the performance of the

03:33  25   network, which in turn reduces the performance of the

223

03:33   1   applications that the people are using for the

03:33   2   purpose -- on the network.  And the network efficiency

03:33   3   goes down, and it's just a problem all the way around.

03:33   4       Q.    And so how do you prevent a network from being

03:33   5   overloaded or congested, Dr. McClellan?

03:33   6       A.    There's a lot of different ways to prevent the

03:33   7   network from being overloaded.  One way is to introduce

03:33   8   a traffic cop, and you can decide where you want to put

03:33   9   the traffic cop.  You can put the traffic cop in a lot

03:33   10  of different places.

03:33   11       The typical approach is to put the traffic cop

03:33   12  near the beginning where the packets are entering the

03:33   13  network, because that's the most logical place to slow

03:33   14  down the flow.

03:33   15       That's called the ingress point.  And there's

03:33   16  lots of different ingress points, so then you have lots

03:33   17  of different traffic cops all around at the different

03:34   18  ingress points trying to slow down the traffic that's

03:34   19  entering the network.

03:34   20       Load-balancing also prevents network overload.

03:34   21  Load-balancing is a form of sort of cooperative

03:34   22  operation of devices in the network to try to equalize

03:34   23  the load and more efficiently allocate the available

03:34   24  space on the network with the packets that are trying

03:34   25  to pass through the network.

03:34    1        It avoids overloading certain places while

03:34    2   other places are not loaded at all, for example.

03:34    3        Q.    Now, Dr. McClellan, I want you -- thank you

03:34    4   for explaining some of those terms regarding

03:34    5   load-balancing.  Let's discuss now some of the

03:34    6   background on load-balancing networks to provide the

03:34    7   jury some context.

03:34    8        Please describe what was going on with

03:34    9   load-balancing networks before the invention of the

03:34   10   '133 patent.

03:34   11        A.    Load-balancing is a really broad term.

03:34   12   Load-balancing networks and subnetworks have been used

03:34   13   in a lot of different types of applications.  Typically

03:35   14   when traffic enters a network, it really doesn't

03:35   15   understand what's going on in the rest of the network

03:35   16   because the traffic doesn't have any way to sense

03:35   17   what's happening inside the network.  The traffic is

03:35   18   just moving through the network.

03:35   19        And so the main way to control that kind of a

03:35   20   thing is to stop the traffic from entering the network

03:35   21   when the network starts to get overloaded.

03:35   22        If the network starts to get overloaded, you

03:35   23   slow the traffic down, the congestion eases and the

03:35   24   network starts to function again, and then you let the

03:35   25   traffic go through again.

03:35    1           So you stop the path -- stop the packets from

03:35    2    ingressing or you slow down the packets from ingressing

03:35    3    regardless of what kind of packets they are.

03:35    4           And you have no concept of what's going on in

03:35    5    the inside of the network and particularly not at the

03:35    6    far side of the network where the packets are trying to

03:35    7    reach.

03:35    8    Q.    Has load-balancing changed over time,

03:35    9    Dr. McClellan?

03:35    10   A.    Yeah.  Load-balancing in modern networks is

03:36    11   usually important.  As more applications come online

03:36    12   that nobody envisioned, you know, TikTok, Facebook,

03:36    13   more data traffic is generated and more congestion

03:36    14   happens.  And the load has to be balanced somehow.

03:36    15          And so load-balancing before the '133 patent

03:36    16   worked in a lot of ways, in many cases, like what you

03:36    17   see on the screen here with an ingress flow -- ingress

03:36    18   flow limiting.

03:36    19          The left-hand side shows the car stopped at

03:36    20   the light.  And the -- and when the light turns green,

03:36    21   a certain number of cars can go.  And when the light

03:36    22   turns red, the cars that are on the on-ramp have to

03:36    23   stop.  That's ingress flow limiting.

03:36    24          And that's one way to deal with -- before the

03:36    25   '133 patent, that's -- or older ways of load-balancing,

03:36  1   that was one way to deal with the ingress flow.

03:36  2       Q.    Now, Dr. McClellan, what are some of the

03:36  3   disadvantages or limitations of these prior

03:37  4   load-balancing networks?

03:37  5       A.    Well, a load-balancing network that doesn't do

03:37  6   an effective job can often create worse problems than

03:37  7   it's trying to solve.

03:37  8             If the load-balancing network does a good job,

03:37  9   then the load is balanced, the network works and

03:37  10  everybody's happy.

03:37  11            But if it doesn't do a good job and that job

03:37  12  is not done well for certain people on the network or

03:37  13  for certain applications on the network, then data can

03:37  14  get lost, application performance can be degraded,

03:37  15  connections can get blocked and that can happen in

03:37  16  different ways at different times.

03:37  17      Q.    Now, Dr. McClellan --

03:38  18                 MR. WALDROP:  Hold on one second, Your

03:38  19  Honor.

03:38  20                 (Conference between counsel.)

03:38  21  BY MR. WALDROP:

03:38  22      Q.    So, Dr. McClellan, before we proceed further,

03:38  23  I wanted to make sure that we talked about a few things

03:38  24  before we kind of jumped into this.  And I want this to

03:38  25  be a moment to give the jury some perspective on the

03:38  1    technology and how it relates to everyday life.

03:38  2        A.    Okay.

03:38  3        Q.    Let's assume, Dr. McClellan, that you are

03:38  4    sitting in your room, as you heard, or in your home and

03:39  5    you have your mobile device or your computer and you

03:39  6    want to interact with one of these video-conferencing

03:39  7    services that I talked about in the opening.

03:39  8            Please explain to the jury how important this

03:39  9    technology is in terms of how they interact with it as

03:39  10   they're sitting at home on their mobile device or their

03:39  11   computer.

03:39  12       A.    I think it's pretty clear to everybody that

03:39  13   today's modern society functions on networks and

03:39  14   interchange of data.

03:39  15           You know, I can't even imagine -- there's kids

03:39  16   growing up today that don't even know what a dial-up

03:39  17   modem is or was because broadband always on has become

03:39  18   so ubiquitous.

03:39  19           And those of us who know what the sound of a

03:39  20   modem dial-up is understand that fat pipes and fast

03:39  21   data is the game.  It's very important to us.

03:39  22           When I get on Amazon with my opposable thumbs

03:39  23   on my little mobile phone, I'm generating enormous

03:40  24   amounts of data and I want that thing to be delivered

03:40  25   tomorrow.  And the only way that thing can be delivered

03:40  1   tomorrow is if I can make that purchase right now.

03:40  2          And so it doesn't matter how fast I move my

03:40  3   little opposable thumbs.  If that network is congested

03:40  4   and that network doesn't work right, I don't get my

03:40  5   toothbrush tomorrow from Amazon.

03:40  6          And that's a problem.  It's a problem for

03:40  7   Amazon because they don't make money.  It's a problem

03:40  8   for me because I didn't get my toothbrush.  It's a

03:40  9   problem for the Amazon driver because he might not get

03:40  10  paid.  It's a problem for the Amazon driver that comes

03:40  11  to my house because I put chips out there for them and

03:40  12  they can pick them up so they make them happy, you

03:40  13  know, and stuff like that.

03:40  14         So if the network doesn't work today, society

03:40  15  basically stops.  So this is important stuff.  And it's

03:40  16  not just entertainment stuff.  It's

03:40  17  business-to-business stuff.  Businesses exchange data

03:40  18  all the time.  And the data that they exchange is worth

03:41  19  more than my Amazon toothbrush.  And if the network

03:41  20  stops for that, that's a real problem.

03:41  21     Q.    Are you familiar with remote surgery,

03:41  22  Dr. McClellan?

03:41  23     A.    Yes.  I am.  I actually designed a remote

03:41  24  interoperative surgical system in the late 1990s.  It

03:41  25  was the first instance of something like that.

03:41  1          Surgeons, when you -- when you have surgery --

03:41  2              MR. ROSENTHAL:  Your Honor, I really do

03:41  3     hate to object.  This is well outside the scope.

03:41  4              MR. WALDROP:  We can take this off, Your

03:41  5     Honor.

03:41  6              THE COURT:  Okay.

03:41  7              MR. WALDROP:  Your Honor, Dr. McClellan's

03:41  8     testifying about the importance of the invention, Your

03:41  9     Honor.

03:41  10             You said sustained, Your Honor?  I

03:41  11    couldn't hear.

03:41  12             THE COURT:  I think he is wandering a

03:41  13    little far afield in that technology.

03:41  14             MR. WALDROP:  Okay.  I was going to just

03:41  15    bring it together, Your Honor.

03:41  16             THE COURT:  Okay.  Why don't you do that?

03:41  17             MR. WALDROP:  If I could just wrap it up

03:42  18    right quick, Your Honor.

03:42  19             THE COURT:  Yes.

03:42  20    BY MR. WALDROP:

03:42  21       Q.   So you've heard about remote surgery, right,

03:42  22    Dr. McClellan?

03:42  23       A.   Absolutely.

03:42  24       Q.   And is that technology provided over networks?

03:42  25       A.   Absolutely.

03:42    1        Q.    What happens if there's a congested node or

03:42    2    congested network in remote surgery as your physician

03:42    3    is working on you remotely?

03:42    4        A.    That can create some serious problems in the

03:42    5    surgery.

03:42    6        Q.    Now, load-balancing networks, which is what

03:42    7    we're talking about, how important that is and the '133

03:42    8    patent.

03:42    9            What is a load-balancing network,

03:42   10    Dr. McClellan?  Does the '133 patent tell you about

03:42   11    that?

03:42   12        A.    Yeah.  The load-balancing network that we see

03:42   13    here is the picture from the '133 patent, where you see

03:42   14    the square with the four squares in the corners.

03:42   15            The four squares in the corners are the nodes

03:42   16    of the load-balancing network, and the load-balancing

03:42   17    network interconnects the sort of cloud-shaped things

03:42   18    that are outside of the load-balancing network, Network

03:42   19    A, B, C, D.

03:43   20            And the load-balancing network's job is to

03:43   21    make sure that traffic that passes between these

03:43   22    external networks is -- passes in an efficient fashion

03:43   23    and it doesn't get all clogged up in one side of the

03:43   24    network while the other side of the network is free so

03:43   25    that all of the networks work more effectively.

```
 1              MR. WALDROP:  So I just want to make sure
 2   we orient --
 3              And, jury, can you see the slide?
 4   BY MR. WALDROP:
 5      Q.   So I want to make sure we orient them,
 6   Dr. McClellan.  So on the left this is a figure, right?
 7   That's a figure from the patent that you annotated,
 8   right, Dr. McClellan?
 9      A.   That's directly from the patent with a little
10   bit of darker lines on there.
11      Q.   And on the right is some language from the
12   patent describing load-balancing networks, right,
13   Dr. McClellan?
14      A.   Right.  Highlighted on the right is language
15   from the patent that says:  Load-balancing networks are
16   generally deployed for exchanging traffic between
17   networks in a manner for handling dynamic traffic
18   loads.
19      Q.   Okay.  So first of all, before we go further,
20   orient the jury in terms of the figure on the left.
21              What are they seeing here?  What's going on in
22   the figure?
23      A.   So traffic is -- on the figure on the left
24   traffic is passing from each cloud network on the
25   corners to all the other cloud networks on the other
```

03:44    1    corners.  So the -- in particular on the top left

03:44    2    corner there's a computer at Network A.  And that

03:44    3    computer may be talking to the computer on the other

03:44    4    corner at Network B.

03:44    5        Q.    And I see --

03:44    6        A.    In that case the traffic from Network A goes

03:44    7    into the ingress node and it passes through the

03:44    8    load-balancing network.  And then it comes out of the

03:44    9    load-balancing node at the egress node so it can get to

03:44   10    the computer on Network D.

03:44   11        Q.    Thank you, Dr. McClellan.

03:44   12            And on the right is the specification for the

03:44   13    '133 describing that, those nodes?

03:44   14        A.    That's right.

03:44   15        Q.    So next, Dr. McClellan, what else does the

03:44   16    '133 patent talk about load-balancing?

03:44   17        A.    In the summary of the invention it talks about

03:44   18    the method that's provided in the -- in the invention.

03:44   19            And the method includes determining an egress

03:44   20    node associated with -- and I'm going to skip some of

03:45   21    the words -- determining an egress node associated with

03:45   22    packets that are coming in the ingress node and

03:45   23    determining for each packet whether a congestion exists

03:45   24    at the egress node.

03:45   25            So if the traffic cop is sitting at the

233

03:45  1    ingress node, and the traffic cop magically has some

03:45  2    concept of what's happening at the egress node, and in

03:45  3    the magic of understanding what's happening at the

03:45  4    egress node he does something different with the

03:45  5    packets that are coming in at the ingress node.

03:45  6         And it's kind of like -- it's kind of like if

03:45  7    you're trying to get on the freeway, you're trying to

03:45  8    go on the on-ramp on the freeway and you were going to

03:45  9    go a few exits down.  But there's a wreck a few exits

03:45  10   down.  If you didn't know there was a wreck a few exits

03:45  11   down, you might get on the freeway and get stuck.  But

03:45  12   if you knew there was a wreck a few exits down, you

03:45  13   might take a different route.  It's the same sort of

03:45  14   idea.

03:45  15   Q.    So just so we're clear, the ingress node,

03:45  16   Dr. McClellan, that's on the top left here, the figure

03:45  17   on the left, right?

03:45  18   A.    Yeah.  The ingress services Network A.

03:46  19   Q.    And that's entrance -- can we call that the

03:46  20   entrance node?  Right?

03:46  21   A.    That's the on-ramp.

03:46  22   Q.    On-ramp node.  Thank you, the on-ramp.

03:46  23         And at the bottom is the egress node, right?

03:46  24   A.    That's the off-ramp.

03:46  25   Q.    Thank you.

234

03:46  1          And, Dr. McClellan, we went over that

03:46  2  load-balancing was like before the '133 patent.  And we

03:46  3  then went over what the '133 patent says about

03:46  4  load-balancing.

03:46  5          What does the '133 invent then?

03:46  6          MR. WALDROP:  And, you know, Your Honor,

03:46  7  we may need to approach here on this issue, Your Honor.

03:46  8  The next slide.  But I'll publish it to -- can we --

03:46  9  next slide.

03:46  10  BY MR. WALDROP:

03:46  11     Q.    Go ahead.

03:46  12     A.    You want me to go ahead?

03:46  13     Q.    Yes.

03:46  14          MR. ROSENTHAL:  Your Honor, we do object.

03:46  15  This shouldn't be shown.  This is -- the objection

03:46  16  specifically is this figure is not discussed in

03:46  17  Dr. McClellan's report.

03:46  18          MR. WALDROP:  It is, Your Honor.

03:46  19          THE COURT:  Where at?

03:46  20          MR. WALDROP:  It's in -- it's on

03:46  21  Paragraph 91, Your Honor.  Page 45 of Dr. McClellan's

03:47  22  report, Paragraph 91.  And it cites to Slides 105 to

03:47  23  126, Your Honor.

03:47  24          And this is a document provided to us --

03:47  25  the flashing part is the document provided to us by

235

| 03:47 | 1 | VMware, Your Honor.  In native and in black and white |

03:47    1    VMware, Your Honor.  In native and in black and white

03:47    2    copy.

03:47    3              If we may approach, Your Honor?

03:47    4              THE COURT:  Do you have a response?

03:47    5              MR. ROSENTHAL:  Yes, Your Honor.  He

03:47    6    never discusses this figure.  He has a citation to a

03:47    7    range of pages.  He doesn't do any analysis of this

03:47    8    figure.

03:47    9              MR. WALDROP:  That's all we need, Your

03:47    10   Honor, is disclosure of this document.

03:47    11             THE COURT:  Sustained.

03:47    12             MR. WALDROP:  Your Honor, he does discuss

03:47    13   the analysis of it, Your Honor.  May we approach, Your

03:47    14   Honor?  This is an important issue.

03:47    15             THE COURT:  Sure.

03:47    16             (Bench conference.)

03:48    17             MR. WALDROP:  Paragraph 91.

03:48    18             THE COURT:  (Indiscernible).

03:48    19             MR. WALDROP:  I have --

03:48    20             THE COURT:  Tell me whose expert this is.

03:48    21             MR. WALDROP:  Infringement report,

03:48    22   Dr. McClellan.

03:48    23             THE COURT:  Okay.  The first infringement

03:48    24   report?

03:48    25             MR. WALDROP:  Yes, sir.  So it's

03:48  1   Paragraph 91.  He cites to the pages of which this is

03:48  2   included and just discussing the DMPO feature which is

03:48  3   the accused feature in this -- in this case, Your

03:48  4   Honor.

03:48  5                  THE COURT:  And the slide that I'm

03:48  6   looking at, Slide 27, is one of the slides that he

03:48  7   uses --

03:48  8                  MR. WALDROP:  Yes, Your Honor.

03:48  9                  MR. ROSENTHAL:  Your Honor, he doesn't

03:48  10  make any analysis.  The figure doesn't appear.  It's

03:48  11  throughout his slide projection and not once does he

03:48  12  address it.

03:48  13                 THE COURT:  Okay.  I got it.  So what

03:48  14  is -- what are you -- assuming he can -- assuming he

03:48  15  can show the slide because it's in here, what do you

03:48  16  intend to ask him?

03:48  17                 MR. WALDROP:  Your Honor, I'm going to

03:48  18  ask him about whether or not this is a VeloCloud

03:48  19  product.  I'm going to ask him about whether it's a

03:49  20  VeloCloud, whether it's an accused product, right?

03:49  21                 THE COURT:  And where's that in here?

03:49  22                 MR. WALDROP:  Huh?  Oh, in the DMPO

03:49  23  feature.  This is an accused feature.  DMPO's an

03:49  24  accused feature, Your Honor, of the patent -- of the

03:49  25  product.

—237—

03:49  1                    THE COURT:  Okay.  This says:  Further,

03:49  2   DMP dynamically --

       3                    MR. WALDROP:  Yes.

03:49  4                    THE COURT:  -- route data.  I think it

03:49  5   should be "routes."  Dynamically routes data based on

03:49  6   type of data and path performance, routing traffic in a

03:49  7   load-balancing network.

03:49  8                    MR. WALDROP:  Yeah.  Yes, sir.  That's

03:49  9   what we're talking about.

03:49  10                   THE COURT:  And so in -- this footnote is

03:49  11  down here, C, so the Paragraph 91 is what you want him

03:49  12  to say?

03:49  13                   MR. WALDROP:  Yes, Your Honor.  We're

03:49  14  talking about load-balancing networks right now, Your

03:49  15  Honor.  That's why this is important.

03:49  16                   THE COURT:  Well --

03:49  17                   MR. WALDROP:  How to route traffic.

03:49  18                   THE COURT:  This doesn't say anything --

03:49  19  this doesn't say anything that I see.  Tell me what

03:49  20  DMPO is.

03:49  21                   MR. WALDROP:  Dynamic multipath

03:50  22  optimization.  Yes, sir.

03:50  23                   THE COURT:  I'm saying that's not a

03:50  24  product.

03:50  25                   MR. WALDROP:  It's an accused feature,

238

```
 1    yes.
 2                    MR. ROSENTHAL:  It's a feature of a
 3    product.
 4                    MR. WALDROP:  That we're accusing.
 5                    THE COURT:  So the feature, DMPO,
 6    dynamically routes data based on type of data and path
 7    performance routing traffic.  And that's what you want
 8    him to say?
 9                    MR. WALDROP:  And things like that.
10                    THE COURT:  No, no, no.  Not things like
11    that.  He can say that.  And that's supported by this.
12                    What else do you want him to say?  Beyond
13    what's here?
14                    MR. WALDROP:  And that the figure -- that
15    this -- that this is one of the accused products in
16    this case.
17                    THE COURT:  This?  I'm looking at on the
18    screen?
19                    MR. WALDROP:  No, not this.  The -- he
20    can bring it up to me.  This figure -- this figure --
21    this figure is an accused product.
22                    THE COURT:  To be perfectly clear, by
23    this figure, you're looking at Page 110 of what
24    VMware -- what is this you're holding right here?
25                    MR. WALDROP:  So Paragraph 91, Your
```

03:50   1    Honor, cites to -- this Paragraph 91 of Dr. McClellan's

03:50   2    report cites to these collection of documents from

03:51   3    one -- Pages 105 to 126.  I am showing you the specific

03:51   4    page that we're referring to that that is cited to.  It

03:51   5    is a VMware document talking about one of the accused

03:51   6    products in this case.

03:51   7                 THE COURT:  Where does he say in the

03:51   8    report what he wants to say about this Slide 110 which

03:51   9    is -- I admit I have Paragraph 91 says DMPO dynamically

03:51   10   routes -- he can say that.

         11                 MR. WALDROP:  Yes.  Yes.

03:51   12                 THE COURT:  And then down here I have

03:51   13   "see" and a range of slides.  And it has this slide.

03:51   14   But now where in the report does it say anything else

03:51   15   that you want him to say about this slide?

03:51   16                 Do you just want him to say what's on the

03:51   17   slide?  Or are you going to ask him for an opinion

03:51   18   about what's on the slide?

03:51   19                 MR. WALDROP:  Yeah.  Your Honor, I want

03:51   20   him -- I want him to say, which is accurate, which is

03:51   21   that this is an accused product.  This is --

03:52   22                 THE COURT:  Well, he doesn't say that in

03:52   23   here.

03:52   24                 MR. WALDROP:  Well, this is VeloCloud.

03:52   25                 THE COURT:  But he doesn't say --

240

03:52    1                    MR. WALDROP:  He just said this is --

03:52    2                    THE COURT:  No.  But he says that's how

03:52    3    this works.

03:52    4                    MR. WALDROP:  But DMPO is VeloCloud.

         5                    THE COURT:  No.  DMPO is --

03:52    6                    MR. WALDROP:  SD-WAN.  That's part of the

03:52    7    accused product.

03:52    8                    THE COURT:  It's a feature of that.  And

03:52    9    he can say this.  He can say that it has this feature

03:52   10    that you have in here.

03:52   11                    What I'm trying to say is, where does he,

03:52   12    in his report, discuss what's on this Page 110 that is

03:52   13    cited in your report on 45?  Where does he say what you

03:52   14    want him to say about what's in the page in his report?

03:52   15    That's what I need.

03:52   16                    MR. WALDROP:  This is the only -- this is

03:52   17    the citation to the --

03:52   18                    Your Honor, this is the only citation in

03:52   19    the report to this figure, Your Honor.

03:52   20                    THE COURT:  Okay.  And he can --

03:52   21                    MR. WALDROP:  So can I put this

03:52   22    document in front of him?

03:52   23                    THE COURT:  He can show the figure.

03:53   24                    MR. WALDROP:  Yeah.  Okay.  Thank you.

03:53   25                    THE COURT:  No.  You can show the figure.

241

03:53    1           MR. ROSENTHAL:  Your Honor, the very next

03:53    2 slide, he goes on to compare the figure to Figure 1 of

03:53    3 the patent.

03:53    4           THE COURT:  Well, he can show the figure,

03:53    5 but he can't compare it to what's in the patent unless

03:53    6 you show me where in the report he does that.  That's

03:53    7 what I'm trying to say.

03:53    8           He has to say in the report where he has

03:53    9 disclosed in the report how what's on Page 110 -- he

03:53   10 has to put his opinion in here.

03:53   11           He can show that slide because he's

03:53   12 disclosed it here and he can testify about what's in

03:53   13 Paragraph 91, but if you can show me where in his

03:53   14 report he explains anything about DMPO and tethers it

03:53   15 to this slide in any way, then he can talk about that.

03:53   16 But I don't see -- show me where in the report he does

03:53   17 that.

03:53   18           MR. WALDROP:  He doesn't, Your Honor.

03:54   19 This is the only citation, Your Honor.  But he --

03:54   20           THE COURT:  Then this is all he gets to

03:54   21 say --

03:54   22           MR. WALDROP:  But he -- it is an accused

03:54   23 product, Your Honor, and it is VeloCloud --

03:54   24           THE COURT:  But he doesn't -- I'm going

03:54   25 to say it the last time.

242

03:54   1              MR. WALDROP:  Okay, Your Honor.  I
03:54   2   understand.
03:54   3              THE COURT:  See, this feature does X in
03:54   4   Paragraph 91.
03:54   5              MR. WALDROP:  Yeah.
03:54   6              THE COURT:  See VMware disclosures below.
03:54   7              MR. WALDROP:  Yeah.
03:54   8              THE COURT:  And it's saying that it
03:54   9   describes this, that it has this feature.
        10              MR. WALDROP:  Okay.
03:54  11              THE COURT:  I get that.
03:54  12              MR. WALDROP:  Yes.
03:54  13              THE COURT:  That's what this says.
03:54  14              MR. WALDROP:  Okay.
03:54  15              THE COURT:  But that's all he gets to
03:54  16   say.
03:54  17              MR. WALDROP:  Okay.  I understand.
03:54  18              THE COURT:  He doesn't anywhere -- unless
03:54  19   you can tell me, he doesn't anywhere in here disclose
03:54  20   the opinion about why what we --
03:54  21              MR. WALDROP:  Okay.  That's fine, Your
03:54  22   Honor.  Thank you, Your Honor.
03:54  23              (Bench conference concludes.)
03:55  24              MR. WALDROP:  Can the jury -- can you see
03:55  25   it now?

243

03:55  1              (Off-the-record discussion.)

03:55  2              MR. WALDROP:  Can the jury now see the

03:55  3    slide?  Can you see it now?  Can you see it now?

03:56  4    BY MR. WALDROP:

03:56  5        Q.    Okay.  Good.

03:56  6              So, Dr. McClellan, on this slide -- I'm going

03:56  7    to reorient everyone, Dr. McClellan, what's on Slide

03:56  8    27.  We had a little break there.

03:56  9              Dr. McClellan, on this slide, what is -- what

03:56  10   is on the left at the bottom?

03:56  11             Is -- there seems to be a device.  What is

03:56  12   that?

03:56  13       A.    At the bottom of the slide, on the left-hand

03:56  14   side, is one of the VeloCloud devices.  It's a network

03:56  15   appliance.

03:56  16       Q.    And is that one of the accused products that

03:56  17   infringe -- that you opine infringes the '133 patent?

03:56  18       A.    Now, that's either Edge or a Gateway device

03:57  19   that infringes.  Yes.

03:57  20       Q.    Now, describe to the jury what is above that

03:57  21   in the figure and off to the right.

03:57  22       A.    So the figure above that -- the square above

03:57  23   that with the squares in the corners is a

03:57  24   load-balancing network as described in the patent.  And

03:57  25   the squares on the corner, the dark black squares on

244

03:57  1    the ingress and egress nodes of the load-balancing
03:57  2    network.
03:57  3         Q.   And what does the patent say regarding what
03:57  4    they're seeing on the left -- on the right of Slide 27,
03:57  5    Dr. McClellan?
03:57  6         A.   Well, the patent says that although this is
03:57  7    described in a certain way, it can have different types
03:57  8    of constructions basically.
03:57  9              And then the rest of the highlighted words of
03:57  10   the patent talk about the fact that the lines that kind
03:57  11   of interconnect to the nodes can have different forms.
03:57  12        Q.   Now, for purposes of what we're about to
03:57  13   continue to do, you understand that when I use the term
03:57  14   "VeloCloud," I'm referring to the VMware Edge and
03:58  15   Gateway devices, right?
03:58  16        A.   Right.  It's the little device on the bottom
03:58  17   left.
03:58  18        Q.   And you concluded that VeloCloud, that device
03:58  19   on the -- down at the bottom, infringes Claim 13 of the
03:58  20   '133 patent, right?
03:58  21        A.   Yes.
03:58  22        Q.   Now, can you provide some real-world examples
03:58  23   to us of how knowing the congestion condition at the
03:58  24   egress node will help efficiently process packets?
03:58  25        A.   Well, the -- previously, you know, the egress

245

03:58  1   node status wasn't directly known by the ingress node.

03:58  2   And so what the patent describes is some information

03:58  3   being passed from the egress node to the ingress node

03:58  4   and the ingress node using that information to make a

03:58  5   determination about what to do with subsequent packets.

03:58  6        In this diagram here, we see that the node on

03:58  7   the bottom right has congestion, whereas the nodes on

03:58  8   the top right and the bottom left have no congestion.

03:58  9        So while the congestion condition exists at

03:58  10  the egress node, packets may be rerouted around that

03:59  11  congestion condition.

03:59  12  Q.   Now, the '133 patent summary indicated that

03:59  13  packets can be dropped at the ingress node or the

03:59  14  on-ramp.

03:59  15        Can you explain how this efficiently processes

03:59  16  packets, Dr. McClellan?

03:59  17  A.   Well, dropping packets just means that they

03:59  18  have to be retransmitted.  They just kind of disappear.

03:59  19  And so it's easier to drop the packet before it gets

03:59  20  into the node -- into the load-balancing network than

03:59  21  once it gets inside.

03:59  22  Q.   And why is that a problem?

03:59  23  A.   Because once you've let the packet inside the

03:59  24  load-balancing network, it contribute -- it may

03:59  25  contribute to the congestion itself.

03:59    1        Q.    Now, Dr. McClellan, we just walked through the

03:59    2    '133 patent generally and the problems that it

03:59    3    addressed -- the technical problems that it resolved

03:59    4    with load-balancing.

03:59    5            Dr. McClellan, now I want to talk to you about

03:59    6    VeloCloud, which is the accused VMware product, which

03:59    7    you concluded infringes Claim 13 of the '133 patent.

03:59    8            Can we do that?

03:59    9        A.    Sure.

03:59   10        Q.    Now, Dr. McClellan, can you describe the

04:00   11    VMware products that Brazos has -- accuses of

04:00   12    infringement of Claim 13 of the '133 patent?

04:00   13        A.    Well, the VeloCloud -- as we saw in the

04:00   14    previous slide, the VeloCloud devices are little

04:00   15    network appliances.  So it's a collection of hardware

04:00   16    and software and applications that are kind of

04:00   17    shrinkwrapped together.

04:00   18            So the VeloCloud, they call it the

04:00   19    cloud-delivered SD-WAN solution.  And it basically

04:00   20    builds an overlay network that consists of tunnels.

04:00   21    And it monitors those tunnels and it adapts to changes

04:00   22    in the network by providing feedback on those tunnels

04:00   23    so that it can basically become the traffic cop.

04:00   24        Q.    Now, Dr. McClellan, you were here for opening,

04:00   25    right, Dr. McClellan?

247

04:00  1          A.    Yes.

04:00  2          Q.    And you heard VMware's counsel say that they

04:00  3     don't make hardware.

04:00  4                Did you hear that?  Did you hear that?

04:00  5          A.    Yes.

04:00  6          Q.    Does the VeloCloud product include hardware?

04:01  7          A.    Yes.

04:01  8          Q.    And software?

04:01  9          A.    Yes.

04:01  10         Q.    And please explain to the jury why does --

04:01  11               THE COURT:  Counsel, why don't you come

04:01  12    up here for just a second?

04:01  13               (Bench conference.)

04:01  14               MR. WALDROP:  Yes, sir.

04:01  15               THE COURT:  I think that you just went

04:01  16    into the area that we spent all morning saying you

04:01  17    would not go into.

04:01  18               MR. WALDROP:  No, no, no, no, Your Honor.

04:01  19    No, Your Honor.  See, this is the point where I think

04:01  20    there's confusion, Your Honor, is that VeloCloud --

04:01  21    this product actually contains hardware and software.

04:01  22               And so I want to make sure that the jury

04:01  23    understands that this includes hardware and software.

04:01  24               MR. ROSENTHAL:  Your Honor, this is

04:01  25    summoning confusion like nothing else.

04:02  1                     MR. WALDROP:  I do --

04:02  2                     MR. ROSENTHAL:  Can I --

04:02  3                     THE COURT:  Let Mr. Rosenthal finish.

04:02  4                     MR. ROSENTHAL:  What I said in opening

04:02  5    was that we do not sell hardware with vSphere and that

04:02  6    those claims require an apparatus.  Those patents have

04:02  7    now been dropped.

04:02  8                     And so now for Counsel to talk about

04:02  9    those statements where I was talking about different

04:02  10   patents couldn't be more confusing.

04:02  11                    THE COURT:  Correct.  That's what I

04:02  12   thought as well.  Those -- I've already told the jury

04:02  13   to disregard anything they heard in opening argument

04:02  14   about those patents.

04:02  15                    These statements are -- you cannot go

04:02  16   into it.  You -- those patents are gone.  Under 401,

04:02  17   it's not admissible.  It's not relevant.

04:02  18                    MR. WALDROP:  Your Honor, Your Honor,

04:02  19   Your Honor, I was trying to make sure, Your Honor,

04:02  20   that -- I'm not bringing up what the -- I'm only saying

04:02  21   that this is --

04:02  22                    THE COURT:  You tethered it to what he

04:02  23   said in opening arguments.

04:02  24                    MR. WALDROP:  Yes, Your Honor.  Because

04:02  25   on Thursday at jury selection, they were saying that

04:02  1    they don't make hardware.  They specifically said to

04:02  2    the jurors that they don't make hardware.  This was a

04:03  3    statement that was said at jury selection.

04:03  4                    MR. ROSENTHAL:  We don't make hardware

04:03  5    with the vSphere products.  It's not in this --

04:03  6                    MR. WALDROP:  That's what I'm saying.  I

       7    think the confusion is --

       8                    (Simultaneous speakers.)

04:03  9                    (Clarification by Reporter.)

04:03  10                   MR. ROSENTHAL:  And I said this morning

04:03  11   the only exception to that is VeloCloud.  We do make

04:03  12   hardware with VeloCloud.  I was very clear about that.

04:03  13                   Now what Counsel's trying to do is make

04:03  14   me look like a liar --

       15                   MR. WALDROP:  No.  I am not, Your Honor.

04:03  16                   MR. ROSENTHAL:  -- when I said something

04:03  17   exactly accurate about products that are not in the

04:03  18   case anymore.

04:03  19                   THE COURT:  Counsel?

04:03  20                   MR. WALDROP:  Your Honor --

04:03  21                   THE COURT:  Here's the problem.  You're

04:03  22   not accurately framing the question for this witness.

04:03  23                   MR. WALDROP:  So can I reframe the

04:03  24   question then, Your Honor, that will make it

04:03  25   acceptable?

250

```
04:03   1                    THE COURT:  You need to stay away from --
04:03   2    I understand for the theater purposes you want to
04:03   3    say -- and I know you well enough to know that you
04:03   4    wouldn't accuse Mr. Rosenthal or anyone of lying, but
04:04   5    the only reason you would say this is what the other
04:04   6    side said and then have this person say he's wrong is
04:04   7    to tell the jury that he's wrong.
04:04   8                    And so if you're going to -- I would,
04:04   9    number one, stay away from it.  But if you're going to
04:04  10    discuss in front of the jury with the witness what
04:04  11    opposing counsel said, you better -- you had better
04:04  12    accurately quote what he said.
04:04  13                    MR. WALDROP:  Yes, sir.  I understand.
04:04  14                    THE COURT:  That's why I looked up when
04:04  15    you said that, because that's not what I heard during
04:04  16    opening argument.
04:04  17                    MR. WALDROP:  Your Honor --
04:04  18                    THE COURT:  What you said he said was not
04:04  19    what he said.  And I'm not going to have the jury have
04:04  20    him -- to do a back and forth of you saying something
04:04  21    and him saying nuh-uh.
04:04  22                    MR. WALDROP:  I understand, sir.  I
04:04  23    understand, Your Honor.  I understand.
04:04  24                    MR. ROSENTHAL:  Thank you, Your Honor.
04:04  25                    (Bench conference concludes.)
```

04:04  1    BY MR. WALDROP:

04:05  2        Q.    We were talking, Dr. McClellan, before we

04:05  3    discussed this, that we have DMPO.

04:05  4            And what is DMPO?

04:05  5        A.    Yeah.  We haven't really talked about DMPO

04:05  6    yet.  DMPO is the algorithm or the protocol that's

04:05  7    implemented inside the VeloCloud devices that performs

04:05  8    all of this network enhancement.  It consists largely

04:05  9    of software and data structures where it collects

04:05  10   information and it uses that information to help make

04:05  11   decisions about what -- what's going to happen.

04:05  12       Q.    Now, let's turn to Slide 33.

04:05  13           What are the key features of DMPO?  What makes

04:05  14   it important in the VeloCloud product?

04:05  15       A.    DMPO -- tunnels existed before DMPO.  DMPO --

04:05  16   the product that implements DMPO was actually pretty

04:05  17   ingenious because it set a bunch of tunnels and then

04:05  18   managed them in a certain way.

04:06  19           And setting up the tunnels between the little

04:06  20   VeloCloud appliance devices is one thing.  But managing

04:06  21   those tunnels and orchestrating the traffic according

04:06  22   to what the tunnel capabilities are is -- is -- is

04:06  23   where we kind of ran into issues with this -- with the

04:06  24   patent.

04:06  25       Q.    And what are tunnels specifically, if you

04:06  1    could describe it again, Dr. McClellan?

04:06  2        A.    Sure.  A tunnel -- a tunnel in an IP network

04:06  3    or in a packet-based network is -- you know, I talked

04:06  4    before about how a packet is stuff in a box with a

04:06  5    label.  Well, a tunnel would be taking that box and

04:06  6    putting it in another box and putting a different label

04:06  7    on the other box.

04:06  8        So the first -- the outer box gets delivered

04:06  9    where it needs to go.  And then the inner box gets

04:06  10   taken out and shipped on to your grandma.

04:06  11       Q.    Now, Dr. McClellan, PTX-204 -- and I --

04:07  12            MR. ROSENTHAL:  Objection, Your Honor.

04:07  13   This demonstrative that's on the screen should be taken

04:07  14   down.  It is outside the scope of the report.

04:07  15            THE COURT:  Can you tell us where in the

04:07  16   report this is, Mr. Waldrop?

04:07  17            MR. WALDROP:  Your Honor, this is

04:07  18   Paragraph 106 of Dr. McClellan's report.  Paragraph

04:07  19   106.

04:07  20            MR. ROSENTHAL:  It's not there, Your

04:07  21   Honor.

04:07  22            THE COURT:  Okay.

04:07  23            Mr. Waldrop and Mr. Rosenthal, if you

04:07  24   would approach the bench.

04:07  25            MR. WALDROP:  Thank you.

253

| | | |
|---|---|---|
| 04:07 | 1 | (Bench conference.) |
| 04:08 | 2 | MR. WALDROP:  It's Paragraph 86.  I'm |
| 04:08 | 3 | sorry, Your Honor.  Paragraph 86.  I'm sorry. |
| 04:08 | 4 | MR. ROSENTHAL:  Oh.  86. |
| 04:08 | 5 | MR. WALDROP:  86, Your Honor. |
| 04:08 | 6 | MR. ROSENTHAL:  You can look at my copy. |
| 04:08 | 7 | It's all marked up. |
| 04:08 | 8 | THE COURT:  Mr. Rosenthal, if you'd put |
| 04:08 | 9 | on the record what your concern is. |
| 04:08 | 10 | MR. ROSENTHAL:  My concern is that the |
| 04:08 | 11 | title of this slide and many others states an opinion |
| 04:08 | 12 | that he never rendered, which is that the VeloCloud |
| 04:08 | 13 | maintains information about the egress node.  I mean, |
| 04:08 | 14 | he testified the opposite.  I'll get into that on |
| 04:08 | 15 | cross.  But there's nothing in his report that ever |
| 04:08 | 16 | says that.  It's a critical limitation of the claim. |
| 04:08 | 17 | He never says it. |
| 04:08 | 18 | THE COURT:  So if -- and, Mr. Waldrop, |
| 04:08 | 19 | I'll give you a chance in just a second. |
| 04:08 | 20 | But it seems to me, looking at what I |
| 04:08 | 21 | have in front of me on the slide, that the first |
| 04:08 | 22 | sentence that's highlighted is just something I might |
| 04:08 | 23 | find in any IEEE book that says how DMPO works. |
| 04:09 | 24 | MR. ROSENTHAL:  Yes.  That's not a |
| 04:09 | 25 | problem. |

04:09   1                    THE COURT:  That's not a problem.

04:09   2                    MR. ROSENTHAL:  My problem is the title

04:09   3   of the slide.

04:09   4                    THE COURT:  Okay.

04:09   5                    MR. ROSENTHAL:  It's not the document.

04:09   6   It's the title of the slide.

04:09   7                    THE COURT:  I got you.

04:09   8                    MR. ROSENTHAL:  What they've done is

04:09   9   they've taken a lot of documents, and then they have

04:09  10   these opinions on the top that aren't in his report.

04:09  11                    THE COURT:  Okay.

04:09  12                    Where, Mr. Waldrop, do you have a

04:09  13   statement in the report that says VeloCloud maintains

04:09  14   information regarding congestion at an egress node?

04:09  15                    MR. WALDROP:  Well, we're mapping it to

04:09  16   it.  It doesn't use exactly that same language.  It

04:09  17   uses Edges and Gateways.  It's mapping it to the

04:09  18   language in the claim, Your Honor.  He's explaining it

04:09  19   for the jury.

04:09  20                    THE COURT:  Okay.  But it can't be on --

04:09  21   it can't be on -- unless it's in the report, it can't

04:09  22   be on the demonstrative.

04:09  23                    MR. WALDROP:  So, Your Honor, if we take

04:09  24   it off the slide -- if we take the title off the

04:09  25   slide --

04:09  1                    THE COURT:  If you can take the title off

04:09  2  the slide, I think Mr. Rosenthal will be happy.  And I

04:09  3  will miss getting to see you up here.  But I will be

04:09  4  happy.

04:09  5                    MR. ROSENTHAL:  As long as he doesn't

04:09  6  just say the same thing.

04:09  7                    THE COURT:  Well, you can --

04:09  8                    MR. ROSENTHAL:  I'll make that objection

04:10  9  when the time comes.  Thank you, Your Honor.

04:10  10                   (Bench conference concludes.)

04:10  11  BY MR. WALDROP:

04:10  12     Q.    Okay.  They can see it now.  Can you see it

04:11  13  now?

04:11  14          So as we were talking about before,

04:11  15  Dr. McClellan, we were talking about the DMPO which is

04:11  16  an accused functionality in the VeloCloud's product,

04:11  17  Dr. McClellan?

04:11  18     A.    Yes.

04:11  19     Q.    Please describe what this Document PTX-204 is

04:11  20  discussing regarding the DMPO.

04:11  21     A.    Well, this document is a VMware document

04:11  22  that's entitled "VeloCloud Dynamic Multipath

04:11  23  Optimization."  So it describes the technology in some

04:11  24  detail.

04:11  25          And one of the characteristics of the

256

04:11  1    technology is called continuous path monitoring.  And

04:12  2    the highlighted portion you see here is that DMPO

04:12  3    performs continuous measurements of performance metrics

04:12  4    for every packet on every tunnel between any two of

04:12  5    those little devices.

04:12  6            And the performance metrics that it measures

04:12  7    are loss, latency and jitter.

04:12  8    Q.    Please explain to the jury what is jitter

04:12  9    packet loss and latency.

04:12  10   A.    Packet loss is kind of obvious, right?  The

04:12  11   packets go into the network and then they get lost and

04:12  12   they never show up at the other side.  That's a problem

04:12  13   because those packets have to be retransmitted.  Or

04:12  14   typically have to be retransmitted.

04:12  15           Latency is some sort of delay in how the

04:12  16   packet is being sent from one end to the other.  So

04:12  17   latency is some measure of time difference or time

04:12  18   error.

04:12  19           Jitter is a form -- is a calculation that's

04:12  20   made using all of those time measurements that gives an

04:12  21   idea of the variability of those time measurements.  So

04:13  22   if jitter is really high, that means that packets are

04:13  23   getting delayed weird amounts.  Sometimes they're slow,

04:13  24   sometimes they're fast.  That creates really high

04:13  25   jitter.

04:13  1      Q.    And why is VeloCloud measuring these metrics

04:13  2  related to jitter latency and packet loss,

04:13  3  Dr. McClellan?

04:13  4      A.    Because these measurements give an indication

04:13  5  of the health of the paths, right?  Or the health of

04:13  6  the tunnels.  It's measuring those -- it's measuring

04:13  7  those -- it's taking those -- that telemetry data from

04:13  8  each direction in the path, right?  Going to the left

04:13  9  or going to the right.  And it's -- and it's measuring

04:13  10 it on every tunnel between every two endpoints.

04:13  11      And the reason for that is because it wants to

04:13  12 find out what the health is of those different tunnels.

04:13  13     Q.    Is it measuring congestion?

04:13  14     A.    It makes a decision based on those loss,

04:13  15 latency and jitter as to whether or not a congestion

04:13  16 exists for various egress nodes.

04:14  17              MR. ROSENTHAL:  Objection, Your Honor.

04:14  18 That is not in his report.

04:14  19              THE COURT:  Counsel, can you tell me --

04:14  20              MR. ROSENTHAL:  That's just what we

04:14  21 talked about.

04:14  22              MR. WALDROP:  No, it's not, Your Honor.

04:14  23 It is in his report, Your Honor.  He has a whole

04:14  24 section, Your Honor, regarding the egress node, Your

04:14  25 Honor.

04:14  1                    THE COURT:  Okay.  Well, if you can just

04:14  2    cite the paragraph and the page, please.

04:14  3                    MR. WALDROP:  Paragraph 106, Your Honor.

04:14  4                    MR. ROSENTHAL:  Did you say 106?

04:14  5                    MR. WALDROP:  140.  I'm sorry.  140, Your

04:14  6    Honor.

04:14  7                    (Bench conference.)

04:14  8                    MR. ROSENTHAL:  Paragraph 140 just

04:14  9    recites the claim language and says the claim --

04:15  10                    MR. WALDROP:  When he gets the evidence

04:15  11   up here.

04:15  12                    THE COURT:  Well, this -- remind me

04:15  13   exactly how you asked it.

04:15  14                    MR. WALDROP:  Your Honor?

04:15  15                    THE COURT:  How you asked the question.

04:15  16   Remind me.

04:15  17                    MR. WALDROP:  I don't even remember, Your

04:15  18   Honor.  I don't think he -- I think he -- I don't think

04:15  19   it was actually a response to the question.  It's

04:15  20   something he said, so I don't know.

04:15  21                    MR. ROSENTHAL:  I can clarify what the --

04:15  22   what the specific testimony is that we have a problem

04:15  23   with.  Eliciting it or offering it.  And that is there

04:15  24   is nowhere in this report or in any of this evidence

04:15  25   that's cited in which he says here's the thing where

04:15   1    the ingress node keeps track of information about

04:15   2    what's happening at the egress node.

04:15   3                    The only thing he ever talks about is

04:15   4    paths.  He never says anything that it represents

04:15   5    what's happened at the egress node.  And that's the

04:15   6    problem.

04:15   7                    THE COURT:  So jumping ahead,

04:16   8    Mr. Waldrop, where does he discuss how the ingress --

04:16   9                    MR. WALDROP:  I haven't gotten into the

04:16   10   examination, Your Honor.  But I can tell you later.

04:16   11   We're just doing a background now, Your Honor.  But I

04:16   12   can -- this is the actual discussion of --

04:16   13                    THE COURT:  My sense is your problem is

04:16   14   with his answer more than --

04:16   15                    MR. ROSENTHAL:  Yes.  Yes.

        16                    MR. WALDROP:  That's what I'm saying,

        17   Your Honor --

        18                    MR. ROSENTHAL:  I think we should strike

04:16   19   the answer --

04:16   20                    (Simultaneous conversation.)

04:16   21                    MR. WALDROP:  And Your Honor, I have to

04:16   22   be -- I have to just say, Your Honor, maybe we should

04:16   23   stop, Your Honor.  Because I felt like all of this

04:16   24   was -- if it's going to be like this throughout the

04:16   25   whole examination, Your Honor, we thought we gave them

04:16   1   these exhibits.  We discussed it over time, Your Honor.

04:16   2   We could have dealt with these objections, Your Honor.

04:16   3   I feel like if he's going to interrupt the entire

04:16   4   presentation, Your Honor, that's extremely prejudicial.

04:16   5               THE COURT:  No, it's not.  Here's the

04:16   6   problem.

04:16   7               MR. WALDROP:  Yeah.

04:16   8               THE COURT:  Here's the problem.

04:16   9               MR. WALDROP:  Yes, sir.

04:16  10               THE COURT:  And this has never happened

04:16  11   before -- is you should have a question -- I mean,

04:16  12   let's face it, there's nothing you're asking that you

04:16  13   haven't asked -- and he should have an answer.

        14               MR. WALDROP:  Yeah.  Yeah.

04:17  15               THE COURT:  Your question should elicit

04:17  16   an answer that's somewhere in the report, as in you can

04:17  17   say -- the question might be, is there any element --

04:17  18   claim element not literally present?

04:17  19               And you go from there.

04:17  20               And the answer, you say, yes.  It's 141.

04:17  21   That's the way you do things.

04:17  22               MR. WALDROP:  Yes, sir.  Yes, sir.

04:17  23               THE COURT:  And if -- and the problem

04:17  24   is -- I don't know if it's a disconnect between the way

04:17  25   he's answering on direct, which is usually more

04:17  1    trained, more -- I usually -- I always felt like I knew

04:17  2    what my witness was going to say when I was on direct.

04:17  3    And I don't necessarily get that sense here, but that's

04:17  4    not my problem.

04:17  5              But if you elicit an answer, you should

04:17  6    be able to come up and say, here is where it is in the

04:18  7    report.

04:18  8              MR. WALDROP:  Right, Your Honor.  We

04:18  9    haven't -- we had -- that's what I'm saying, Your

04:18  10   Honor.  We haven't even gotten to that part.  We're

04:18  11   just actually getting to the product now.

04:18  12             THE COURT:  Everything you ask him,

04:18  13   when -- if you had said, you know, where did you go to

04:18  14   school?  I mean, any opinion you ask -- either lawyer

04:18  15   asks of any expert, you have to convince me that you

04:18  16   disclosed it to opposing counsel before the jury hears

04:18  17   it.

04:18  18             MR. WALDROP:  Yes, sir.

04:18  19             MR. ROSENTHAL:  And, Your Honor, I just

04:18  20   wanted to say one thing, we raised every one of these

04:18  21   objections last night.  And for every slide --

       22             (Simultaneous speakers.)

04:18  23             MR. ROSENTHAL:  -- we asked them, where

04:18  24   is it located in the report?

04:18  25             THE COURT:  I'm saying it shouldn't be

04:18    1    this hard.  Your direct should be robotic, ask him a

04:18    2    question and he gives an answer that's found in here.

04:18    3                    MR. WALDROP:  I understand.  Yes, sir.  I

04:18    4    understand.  I understand.

04:18    5                    MR. ROSENTHAL:  Can we have the last

04:18    6    answer stricken, please?

04:18    7                    THE COURT:  I will ask him to repeat --

04:18    8                    MR. WALDROP:  Repeat the question.  I'll

04:19    9    repeat the question.

04:19    10                   THE COURT:  (inaudible) -- or strike.

04:19    11   And I have a feeling at this point no one will remember

04:19    12   it.  And I will instruct you not to --

04:19    13                   MR. ROSENTHAL:  I don't --

04:19    14                   THE COURT:  I'm not going to -- and you

04:19    15   cannot -- do not raise what he said on that answer in

04:19    16   closing argument.

04:19    17                   MR. WALDROP:  Okay.  Yes, sir.

04:19    18                   MR. ROSENTHAL:  Or in any response to a

04:19    19   motion.

04:19    20                   (Bench conference concludes.)

04:19    21                   MR. WALDROP:  Does the jury still see the

04:19    22   slides?  Are you still able to see the slides?

04:19    23                   Thank you.  Thank you.  Thank you very

04:19    24   much.

04:19    25                   So, Your Honor, I was going to move on,

04:19  1    Your Honor?

04:19  2                    THE COURT:  Okay.

04:19  3                    MR. WALDROP:  Thank you.  And, Your

       4    Honor...

       5    BY MR. WALDROP:

04:19  6       Q.    So, Dr. McClellan, we were talking about this

04:19  7    document that was measuring loss, latency and jitter.

04:19  8    I now want to turn to the next slide, which talks about

04:19  9    the VeloCloud document.

04:20  10                    Could we move there?

04:20  11                    Please describe to the jury what we're seeing

04:20  12    on Slide 35.

04:20  13       A.    So on the left hand of this slide at the top

04:20  14    is the VeloCloud appliance device, Edge device or

04:20  15    Gateway device.

04:20  16                    In the middle -- and the bottom of the

04:20  17    left-hand side kind of shows an example of how it

04:20  18    manages traffic on the network.

04:20  19                    And on the right-hand side, these are all

04:20  20    things from the same document.  And I can't see the

04:20  21    document number because there's a menu that's laid over

04:20  22    it.  So if I don't call out --

       23      Q.    It's PTX-126.

04:20  24      A.    -- the number, that's why.

04:20  25                    On the right-hand side is -- it is a flowchart

04:20  1    of how packets get dealt with in the side the software

04:20  2    of the device.

04:20  3          Packets enter at the top and then kind of get

04:20  4    analyzed, and they get put in different types of

04:20  5    buckets and then based on what the traffic requirements

04:20  6    are of the packet.

04:20  7          And they get -- the packets get put in

04:21  8    different types of buckets, and then things kind of

04:21  9    percolate down.

04:21  10         And then the sort of blue and the green stuff

04:21  11   in the middle shows that it says path selection.  And

04:21  12   then it goes past the path selection into -- so the top

04:21  13   part is the network scheduler and the bottom part is

04:21  14   the link scheduler.

04:21  15         It passes through the path selection into the

04:21  16   bottom part called the link scheduler.  And then at

04:21  17   that point, the packet exits from the VeloCloud device

04:21  18   into the load-balancing network.

04:21  19   Q.    Now, Dr. McClellan, I want to make sure that I

04:21  20   understand here.

04:21  21         Are we seeing in the document on the left, do

04:21  22   we see the VeloCloud product that's accused in this

04:21  23   case, right?

04:21  24   A.    Yes.

04:21  25   Q.    Yes or no?

04:21  1        A.    Yes.

04:21  2        Q.    And then on the right, we see the flowchart

04:21  3   for the VeloCloud product?

04:21  4        A.    Yes.

04:21  5        Q.    And this is a process showing how process --

04:21  6   how packets are processed by the VeloCloud product?

04:21  7        A.    Yeah.   It shows how the VeloCloud product

04:21  8   thinks about the packets that come into it.

04:21  9        Q.    And so what is the high-level takeaway that

04:22  10  the jury should take from PTX-126 about how packets are

04:22  11  routed?

04:22  12       A.    One of the things -- I think one of the

04:22  13  high-level takeaways is on the Figure 2 on the

04:22  14  left-hand side at the bottom.   It shows the two

04:22  15  VeloCloud devices communicating with each other, and it

04:22  16  shows different types of traffic that's color-coded.

04:22  17            You got red traffic, yellow traffic and, looks

04:22  18  like, blue traffic.   And different packets of different

04:22  19  types are being sent on different links, different

04:22  20  paths from one device to the other.

04:22  21       Q.    Now, Dr. McClellan, I'm going to move to Slide

04:22  22  36.

04:22  23            MR. WALDROP:   And I want to move Exhibit

04:22  24  126 into evidence as well Exhibit 204.

04:22  25            MR. ROSENTHAL:   No objection, Your Honor.

04:22   1                      THE COURT:  Be admitted.

04:22   2                      MR. WALDROP:  As well as Exhibit 125 and

04:22   3    Exhibit 211.  PTX-211, Slide 110.

        4    BY MR. WALDROP:

04:23   5        Q.    Now, turning back to this flow chart --

04:23   6                      MR. ROSENTHAL:  No objection, Your Honor.

04:23   7                      THE COURT:  They'll be admitted.

04:23   8    BY MR. WALDROP:

04:23   9        Q.    On Slide 36, Dr. McClellan, I want to go a

04:23  10    little further.

04:23  11              At Level 1, do we see that packets are

04:23  12    entering the system?  Is that right?

04:23  13        A.    Yes.  Packets enter from the top of the

04:23  14    diagram, and then they kind of percolate downwards.

04:23  15        Q.    Please walk the jury through this flowchart so

04:23  16    that they understand how VeloCloud processes packets.

04:23  17        A.    All right.  So the packets enter up here --

       18    oh, I thought I could -- let me touch that.

04:23  19              The packets enter up here and they go in that

04:23  20    direction.  And they first go through the network

04:23  21    scheduler, which is at the top, and then they go

04:23  22    through the link scheduler, which is at the bottom.

04:23  23              And you see here this kind of zoom-in of the

04:23  24    red box on the left-hand side on the -- that's shown on

04:23  25    the right-hand side over here shows that the traffic --

04:24    1    that multiple packets are being separated into

04:24    2    different buckets and those different buckets are how

04:24    3    to treat -- how to deal with that traffic.

04:24    4          What kind of traffic is it?  How do I need to

04:24    5    deal with it in the future?  Does it need certain types

04:24    6    of guarantees?  Is it just generic traffic that I can

04:24    7    just kind of throw away if I need to?

04:24    8          And then the bottom box down here shows the

04:24    9    path selection.  So after the -- after the link network

04:24   10    scheduler processes the packets and organizes them in

04:24   11    some respect, then it uses information that's been

04:24   12    gathered over time to make a selection of the path to

04:24   13    put the packets in.

04:24   14    Q.    Now, Dr. McClellan, how specifically are

04:24   15    packets prioritized by DMPO or Dynamic Multi-Path

04:24   16    Optimization?

04:24   17    A.    Well, the prioritization of packets is kind of

04:24   18    a -- is kind of an application-specific problem.  And

04:24   19    so what DMPO has is kind of a nicely generic way of

04:25   20    doing this.

04:25   21          You can see on the bottom right over here,

04:25   22    there's a matrix.  And on the top of the matrix, you

04:25   23    see there's high, normal and low.  Those are

04:25   24    priorities.  And on the side of the matrix, you see how

04:25   25    the traffic needs to be treated:  Realtime,

04:25  1  transactional and bulk.

04:25  2          So if you were, for example, sending -- if

04:25  3  there were two video streams on the network and one of

04:25  4  them was -- if you were at your house and one video

04:25  5  stream was you talking to grandma and another video

04:25  6  stream was your kid talking to another kid, you know,

04:25  7  you talking to grandma might have a higher priority

04:25  8  than the kid talking to their buddy.

04:25  9          And so both of those pieces of traffic might

04:25  10  be realtime traffic because they're video, but one of

04:25  11  them might have a higher priority than the other one.

04:25  12          And so that's what happens in the traffic

04:25  13  classification part of the network scheduler.

04:26  14  Q.    Now, Dr. McClellan, we see here on PTX-125, it

04:26  15  shows that the packets are prioritized high, normal and

04:26  16  low.

04:26  17          Do you see that?

04:26  18  A.    Right.

04:26  19  Q.    Please explain to the jury what's going on

04:26  20  with that.

04:26  21  A.    Well, the high, normal and low is different

04:26  22  types of traffic and how they need to be treated.  And

04:26  23  those are priority levels.

04:26  24          And the realtime, transactional and bulk is

04:26  25  kind of classifications of traffic that fit into those

269

04:26    1    different buckets.  And you can see examples in the

04:26    2    blue, green and red squares of different types of

04:26    3    traffic that fit into those different buckets.

04:26    4        Q.    What does PTX-125 say when there's no

04:26    5    congestion?  What does it say about that?

04:26    6        A.    You can see above -- above the matrix, you can

04:26    7    see the two underlined areas that talks about during

04:26    8    congestion and when there is no congestion.

04:26    9            So during congestion over here and when

04:26   10    there's no congestion.

04:26   11            So the device at the ingress side is aware of

04:27   12    congestion on the network and it's making decisions

04:27   13    that are different based on the determination of

04:27   14    congestion.  And those decisions are how to handle the

04:27   15    traffic.

04:27   16        Q.    What happens when congestion is detected?

04:27   17        A.    Well, it says, during periods of congestion,

04:27   18    it makes decisions based on scheduler weight or it will

04:27   19    have a minimum guaranteed aggregate bandwidth based on

04:27   20    scheduler weight.

04:27   21            And then during periods -- --

04:27   22                MR. ROSENTHAL:  Objection, Your Honor.

       23        A.    -- of no congestion --

04:27   24                MR. ROSENTHAL:  Objection.

04:27   25        A.    -- the decisions are different.

04:27  1            THE COURT:  Doctor.

04:27  2            MR. ROSENTHAL:  I'm so sorry.  The slide

04:27  3  that is currently on the screen has the same problem as

04:27  4  the ones that we talked about.

04:27  5            MR. WALDROP:  This is a different slide.

04:27  6  We should have moved off this slide.

04:27  7            We should move off this slide.  Stay on

04:27  8  the slide here.  We'll stay here.

04:27  9            Thank you.

04:27  10           MR. ROSENTHAL:  I'm sorry -- so sorry to

04:27  11  interrupt.

04:27  12           MR. WALDROP:  Okay.

04:27  13  BY MR. WALDROP:

04:27  14      Q.   So staying on Slide 37.

04:27  15      A.   Okay.  So it says, during periods of

04:27  16  congestion, it will treat the packets according to the

04:27  17  scheduler weight.  And during periods of no congestion,

04:27  18  the applications will be allowed to burst up to their

04:27  19  maximum aggregate bandwidth.  So it's a different way

04:27  20  of treating the traffic whether congestion is detected

04:28  21  or not.

04:28  22      Q.   Now, I want to direct you to slide -- this

04:28  23  understanding as to how the packets and the paths are

04:28  24  selected, did you review deposition testimony,

04:28  25  Dr. McClellan, to confirm your understanding?

04:28  1    A.    Yes.

04:28  2    Q.    And I would like to turn to Slide 39.

04:28  3          Please explain to the jury how this deposition

04:28  4    testimony from Mr. Connors, who's a VP at VMware,

04:28  5    confirmed your understanding of how VeloCloud works

04:28  6    with respect to selecting the path.

04:28  7    A.    You can see the highlighted places from the

04:28  8    deposition testimony.  It says:  When a packet comes

04:28  9    in -- so at ingress -- the device thinks about the

04:28  10   packet.

04:28  11         And this part over here is the part of the

04:28  12   device that thinks about the packet.  And --

04:28  13   Q.    So if you could read the actual language to --

04:28  14   A.    So the highlighted topic, the part at the top,

04:28  15   says when a packet comes in, link select load balance

04:28  16   chooses.

04:29  17         A link select load balance is part of the

04:29  18   software.  And the choice it makes is to choose

04:29  19   potentially the lowest latency path that meets

04:29  20   acceptable quality for the application.

04:29  21         And so the -- there's a context-sensitive

04:29  22   decision being made by the device as to what to do with

04:29  23   the traffic.

04:29  24   Q.    Now, I'd like to direct you to Slide 40,

04:29  25   Dr. McClellan.  After the path is selected, which we

04:29  1    saw here in PTX-126, what does it show about what DMPO

04:29  2    looks again at congestion?

04:29  3        A.    So after a path selection it falls into the

04:29  4    link scheduler part of the diagram which is at the

04:29  5    bottom.  And these are blown-up parts of the link

04:29  6    scheduler.

04:29  7            You can see in the blue on the left it talks

04:29  8    about two different types of links that get to the

04:29  9    Internet.  And the blue on the right corresponds with

04:29  10   the blue on the left, right?  And these are local

04:29  11   links.

04:29  12       Q.    And what does VeloCloud do with this

04:29  13   information, Dr. McClellan?

04:29  14       A.    It uses that information to try to -- to try

04:30  15   to define where, when the traffic comes in this

04:30  16   direction from the left to the right, which in the

04:30  17   other picture is from the top to the bottom, where it's

04:30  18   going to go and how it's going to get there.

04:30  19           You can see in the -- in the green box on the

04:30  20   right-hand side over here, you can see where it talks

04:30  21   about remote site WAN links, and those two WAN links

04:30  22   there at the top are both kind of pink.  So that's the

04:30  23   end of a path.  And there's a bunch of different ways

04:30  24   to get to that end of the path.

04:30  25               MR. ROSENTHAL:  I'm sorry.  Objection.

04:30    1    That opinion is not in his report.

04:30    2                    MR. WALDROP:  He's referring to the

04:30    3    document, Your Honor.  And he's discussing -- on Slide

04:30    4    40, Your Honor, he's discussing here on Paragraph 100

04:31    5    and 101, Your Honor, and 102, Your Honor.

04:31    6                    If we may approach, Your Honor.

04:31    7                    THE COURT:  Sure.

04:31    8                    (Bench conference.)

04:31    9                    MR. ROSENTHAL:  Your Honor, my objection

04:31    10    specifically -- I don't have any problem with his

04:31    11    discussing this picture.  The problem is he never

04:31    12    connects this picture to the end of path, the

04:31    13    egress node anywhere in his report.

04:31    14                    MR. WALDROP:  He never said egress node.

04:31    15                    THE COURT:  I'll wait until I hear

04:31    16    Mr. Waldrop ask him for that opinion.

04:31    17                    MR. ROSENTHAL:  Okay.

04:31    18                    THE COURT:  If he has that opinion, I'm

04:31    19    ready for it.

04:31    20                    MR. ROSENTHAL:  Okay.  I heard him say

04:31    21    it, but that's my problem.

04:31    22                    THE COURT:  Okay.  That's not what I

04:31    23    heard him say.  I mean, that's not the way I took it.

04:31    24    But maybe I wasn't listening carefully enough.

04:32    25                    MR. WALDROP:  Your Honor, Your Honor, I

04:32    1    appreciate you, Your Honor.  Thank you for the -- Your

04:32    2    Honor, this is -- we're talking about one of their

04:32    3    documents.  He's describing the flow of their

04:32    4    documents.  He is not mentioning --

04:32    5              THE COURT:  I think -- and he can speak

04:32    6    for himself.  But, again, I'm just a gatekeeper.

         7              MR. WALDROP:  Yes, sir.  I understand.

04:32    8              THE COURT:  If you have somewhere in his

04:32    9    report he makes the statement that you want him to

04:32   10    say -- what statement -- okay.  Let's try it backwards.

04:32   11              MR. ROSENTHAL:  What do I have a problem

04:32   12    with?  Yeah.  What I have a problem with, so he cites

04:32   13    this document, of course.  But what I have problem

04:32   14    is --

04:32   15              MR. WALDROP:  It's not this document.

04:32   16    It's this document.  This is the document --

04:32   17              MR. ROSENTHAL:  This is the one that I'm

04:32   18    actually talking about.

04:32   19              MR. WALDROP:  See, that's what I'm

04:32   20    saying, Your Honor --

        21              MR. ROSENTHAL:  That's what's on the

04:32   22    slide, right there.

04:32   23              MR. WALDROP:  No.

04:32   24              MR. ROSENTHAL:  He's talking about these

        25    two.

```
         1                    MR. WALDROP:  No.  No.

04:32    2                    MR. ROSENTHAL:  Maybe I can just finish

04:32    3    describing it.

04:32    4                    THE COURT:  Let me just stop you.  Tell

04:32    5    me what --

04:32    6                    MR. ROSENTHAL:  So this is Paragraph 100,

04:32    7    Page 52 of his report.

04:32    8                    THE COURT:  And you're saying that the

04:32    9    slide we're looking at, Slide 40, that's where the

04:32   10    figure on the slide that the jury is --

04:32   11                    MR. ROSENTHAL:  That is correct.

        12                    MR. WALDROP:  That is --

04:33   13                    MR. ROSENTHAL:  On the right side of the

04:33   14    screen you can see it's on the screen right now he's

04:33   15    talking about these links right here, okay?  And he's

04:33   16    saying these pink ones -- he just said it.  I think

04:33   17    it's in the transcript.  He said this corresponds to --

04:33   18                    THE COURT:  I heard him say it.  Are

04:33   19    those the --

04:33   20                    MR. ROSENTHAL:  That's what he just said.

04:33   21    He doesn't say that in his report.  He says that's the

04:33   22    end of the path.

04:33   23                    THE COURT:  Okay.

04:33   24                    So yes, sir, Mr. Waldrop.

04:33   25                    MR. WALDROP:  I was not talking about
```

04:33    1    that, Your Honor.  And I don't think that's what he

04:33    2    said, Your Honor.  Your Honor, we had not even -- this

04:33    3    is not even -- what he's showing you described is not

04:33    4    what the jury's actually even seeing, Your Honor.

04:33    5                THE COURT:  Well, it is what the jury is

04:33    6    seeing.  I'm looking at it.

04:33    7                MR. ROSENTHAL:  That's what I thought.

04:33    8                THE COURT:  That is what he's seeing.

04:33    9                MR. WALDROP:  This is not the full

04:33   10    document.  But I'm saying it's not the full document.

04:33   11    They're seeing him writing through the flow through the

04:33   12    whole thing there.

04:33   13                THE COURT:  But what they're seeing

04:33   14    is what Mr. Rosenthal just circled and that he's

04:33   15    concerned about.

04:33   16                MR. WALDROP:  Yes, sir.  Yes, sir.

04:33   17                THE COURT:  So I'm not following what

04:33   18    you're saying.

04:33   19                MR. WALDROP:  We haven't even got there.

04:33   20    We're talking about something that's about to happen.

04:34   21                THE COURT:  But he just talked about it.

04:34   22                MR. WALDROP:  I don't think he did, Your

04:34   23    Honor.

04:34   24                MR. ROSENTHAL:  Well, the transcript will

04:34   25    say what he said.  What he said was -- and I'm

```
04:34   1    listening very carefully because I know for a fact that
04:34   2    there's no opinion in here about the egress node having
04:34   3    any information stored in the ingress node.  So
04:34   4    whenever he says --
04:34   5                    MR. WALDROP:  That's not true, Your
04:34   6    Honor.
04:34   7                    MR. ROSENTHAL:  So whenever he says --
04:34   8                    THE COURT:  Let's try this.  I'm going
04:34   9    to --
04:34   10                   MR. WALDROP:  You see the problem, Your
04:34   11   Honor, is that we're having an argument about the
04:34   12   sufficiency of his opinion, Your Honor, at trial.
04:34   13                   THE COURT:  It's not sufficiency, it's
04:34   14   whether or not they're in the report.
04:34   15                   MR. WALDROP:  But we had -- Your Honor,
04:34   16   but we had this argument at --
04:34   17                   THE COURT:  I'm going to --
04:34   18                   MR. WALDROP:  -- at the pretrial
04:34   19   conference, Your Honor.
04:34   20                   THE COURT:  I'm going to ask y'all to
04:34   21   step back.
        22                   MR. WALDROP:  Okay.
04:34   23                   THE COURT:  I'm going to strike the
04:34   24   answer.  You can ask a new question.
04:34   25                   Do you have an extra copy of his report?
```

278

04:34  1              MR. WALDROP:  Oh, yes, sir.

04:34  2              THE COURT:  If you would -- next time you

04:34  3  come up, bring me an extra copy --

      4              MR. WALDROP:  Okay.  I'm sure we'll do

      5  that.

04:34  6              THE COURT:  -- and just leave it up here.

04:34  7              MR. WALDROP:  I'm sure we will, Your

04:34  8  Honor.

04:34  9              (Bench conference concludes.)

04:35 10              THE COURT:  Ladies and gentlemen, I

04:35 11  wasn't sure I exactly heard the last answer this

04:35 12  gentleman gave correctly.  So I'm going to strike it

04:35 13  and ask Mr. Waldrop to ask the question again so I can

04:35 14  make sure that I'm following what he's saying.

04:35 15  BY MR. WALDROP:

04:35 16     Q.   Now, we were talking about this.  And when I

04:35 17  talk to you about this figure, Dr. McClellan, I want to

04:35 18  make sure that we're using just only the language that

04:35 19  is found in the VMware document.

04:35 20     A.   Okay.

04:35 21     Q.   So no language regarding the patent or

04:35 22  anything like that.

04:35 23     A.   Okay.

04:35 24     Q.   Please describe to them the flow using only

04:36 25  the language that is --

279

04:36  1        A.    In the figure.

04:36  2        Q.    -- in the figure that VMware uses to describe

04:36  3   the product.  We'll talk about the links later.

04:36  4        A.    Okay.  I'm going to focus on the right-hand

04:36  5   side.  Is that right?

04:36  6        Q.    Yes.

04:36  7        A.    Is that okay?

04:36  8              This side says local links.  This side says

04:36  9   remote links.  This part says remote site X.  This one

04:36  10  says remote site Y.

04:36  11             Obviously the pink ones and the yellow ones

04:36  12  are at two different locations.  So when packets come

04:36  13  in, the device on the local side has to make a decision

04:36  14  about how it's going to get to the remote side.

04:36  15             And as we discussed previously, the local side

04:36  16  and the remote side are connected by tunnels.  And the

04:37  17  tunnels are called paths.

04:37  18       Q.    Now, moving on to Slide 41, Dr. McClellan,

04:37  19  what else does PTX-126 say about this congestion?

04:37  20  Using the language that VMware uses regarding how it

04:37  21  deals with processing packets to alleviate congestion.

04:37  22       A.    Yeah.  This is the -- this is the VMware

04:37  23  document that talks about handling packets inside that

04:37  24  last part of the -- of the device.  And it talks about

04:37  25  it doesn't want to do things that cause congestion.

04:37  1        And with this improvement -- with this feature

04:37  2   improvement which it's talking about some aspect of the

04:37  3   product, the link scheduler will prioritize higher

04:37  4   priority traffic differently, or will handle higher

04:37  5   priority traffic differently in the presence of issues

04:37  6   on the network.

04:37  7        Q.   Now, looking at Slide -- at PTX-126,

04:38  8   Dr. McClellan, what does it say about the link

04:38  9   scheduler in terms of what it does?

04:38  10       A.   Well, the link scheduler is the thing that we

04:38  11  saw previously, which is the last stage in the

04:38  12  processing of the packets.

04:38  13       And so it makes sort of the final decision as

04:38  14  to how that packet is going to get to the other side.

04:38  15  And it may have a couple of different options to

04:38  16  make -- to find a way for that packet to get to the

04:38  17  other side.

04:38  18       And so it's choosing links that are inside of

04:38  19  a path and the links may have slightly different

04:38  20  characteristics.

04:38  21       And so the link scheduler is sensitive to the

04:38  22  priority of the packets.  And under issues of -- when

04:38  23  there's network issues, the link scheduler handles

04:38  24  those different priority packets in a different way.

04:38  25       Q.   Did you review any deposition testimony or

281

04:39  1    statements from VMware regarding what the link

04:39  2    scheduler does to confirm your understanding of what

04:39  3    the link scheduler does?

04:39  4        A.    Yes.  This is the deposition again from

04:39  5    Mr. Connors that talks about the link controller

04:39  6    that's -- you can see where he talks about high

04:39  7    priority and low priority, differentiating --

04:39  8    differentiated service between different flows of

04:39  9    traffic.

04:39  10       Q.    Now, was there other statements that further

04:39  11   confirmed your understanding about how the link

04:39  12   scheduler looks at priority, Dr. McClellan?

04:39  13       A.    This is further in Mr. Connors' deposition.

04:39  14   And you can see the highlighted part here that says:

04:39  15   When packets are in queue to the link scheduler, they

04:39  16   have a priority associated with them from the flow.

04:39  17           This is Mr. Connors saying this.  And he's

04:39  18   pointing to this particular part of the code called the

04:39  19   link scheduler.  And the link scheduler's sensitive to

04:39  20   the priorities of the packets that are in its queue.

04:39  21       Q.    Now, when it says "code" on the -- when it

04:39  22   says "code" there, what does that mean in that

04:40  23   statement there?

04:40  24       A.    It's talking about the software that runs on

04:40  25   the little appliance device.

282

04:40  1       Q.    Now, did you review this code in connection

04:40  2    with how to understand how the accused products work,

04:40  3    Dr. McClellan?

04:40  4       A.    Yes.

04:40  5       Q.    And we'll get into a little bit later.

04:40  6             What is your understanding of VMware DMPO or

04:40  7    Dynamic Multi-Path Optimization?

04:40  8       A.    Well, my understanding is that it functions as

04:40  9    we've described, and some of those functions are pretty

04:40  10   important.

04:40  11            This is a qualitative slide from some VMware

04:40  12   documents.  And, again, I can't tell what document it

04:40  13   is, because on this screen there's an annotation menu.

04:40  14      Q.    It's PTX-114.

04:40  15      A.    Okay.  On the left-hand side, you see from

04:40  16   their marketing document, it talks about the

04:40  17   performance of a video -- whoa.  It went away.

04:40  18            Did I do that?

04:41  19      Q.    Okay.  We're back now.  Thank you so much.

04:41  20            MR. WALDROP:  Thank you so much.

04:41  21            Can you see -- y'all see now?  I just

04:41  22   need to --

04:41  23            DEPUTY CLERK:  It's not admitted.

04:41  24            MR. WALDROP:  Oh, it's not admitted.

04:41  25   Well, let me go ahead and try to move it in now.

|  |  |  |
|---|---|---|
|  | 1 | BY MR. WALDROP: |
| 04:41 | 2 | Q.    Dr. McClellan, are you familiar with the |
| 04:41 | 3 | benefits of VeloCloud, 114 -- the benefits of |
| 04:41 | 4 | VeloCloud? |
| 04:41 | 5 | A.    Yes. |
| 04:41 | 6 | Q.    And I'm going to show you now what's been |
| 04:41 | 7 | previously marked as PTX-114. |
| 04:41 | 8 | Is it showing now? |
| 04:41 | 9 | A.    I can see it, but they can't. |
|  | 10 | MR. WALDROP:  Should I go ahead and press |
| 04:41 | 11 | the button?  I can press the button? |
| 04:41 | 12 | DEPUTY CLERK:  It's not admitted, so only |
| 04:41 | 13 | he can see it. |
| 04:41 | 14 | MR. WALDROP:  Okay.  Then we'll just show |
| 04:41 | 15 | the Slide 44 then.  Thank you. |
| 04:41 | 16 | If you can put Slide 44 back onto the |
| 04:41 | 17 | slide. |
| 04:41 | 18 | Is it published to the jury? |
| 04:41 | 19 | I can't even show the slide deck? |
| 04:41 | 20 | DEPUTY CLERK:  If it's not admitted, it |
| 04:41 | 21 | can't be viewed. |
|  | 22 | BY MR. WALDROP: |
| 04:42 | 23 | Q.    Now, Dr. McClellan, did you rely on VeloCloud |
| 04:42 | 24 | documents PTX-114 to describe the benefits of |
| 04:42 | 25 | VeloCloud? |

04:42    1        A.    Yes.

04:42    2        Q.    And you've reviewed this document in

04:42    3   formulating your opinions?

04:42    4        A.    Yes.

04:42    5             MR. WALDROP:  I move this document into

04:42    6   evidence.

04:42    7             MR. ROSENTHAL:  No objection, Your Honor.

04:42    8             THE COURT:  It'll be admitted.

04:42    9             MR. WALDROP:  Can the jury see it now?

        10   BY MR. WALDROP:

04:42   11        Q.    Please describe the significance of this

04:42   12   document, Dr. McClellan.

04:42   13        A.    So this is a document from one of the VMware

04:42   14   marketing presentations that shows on the left-hand

04:42   15   side -- it shows a video conference, and it's the same

04:42   16   video conference under two different network

04:42   17   conditions.

04:42   18             On the left-hand side with the red stripe

04:42   19   underneath it, it says "without VMware SD-WAN" or

04:42   20   "without VeloCloud."

04:42   21             And on the right-hand side with the green

04:42   22   stripe underneath it, it says "with VMware SD-WAN" or

04:43   23   "with VeloCloud."

04:43   24             Obviously -- and you see the green up at the

04:43   25   top where it talks about a link with 2 percent packet

04:43  1    loss.  So that's some degradation in a network, there's

04:43  2    a problem in the network.

04:43  3              Obviously, the picture on the right is useful.

04:43  4    You can tell that the guy is there.  He's got a picture

04:43  5    of something and he's pointing to it.

04:43  6              And on the left, it looks like something out

04:43  7    of a horror movie or something.  It looks like a

04:43  8    monster.  You can't tell anything.  You can't tell that

04:43  9    it's a guy with a picture or anything.

04:43  10             So the benefits of the technology are very

04:43  11   clear from this particular slide.

04:43  12        Q.    Now, comparing the figure on the left or the

04:43  13   picture on the left with the picture on the right, is

04:43  14   this a significant improvement, Dr. McClellan?

04:43  15        A.    I think we leave that to the jury's eyeballs

04:43  16   to see that.  I mean, it's pretty obvious to me that

04:43  17   it's a significant improvement.

04:43  18        Q.    Are you aware of any statistics that show that

04:43  19   VeloCloud or VeloCloud SD-WAN DMPO actually reduces

04:44  20   congestion, Dr. McClellan?

04:44  21        A.    Yes.

04:44  22        Q.    And what is that next slide?

04:44  23        A.    So this is another slide from a marketing

04:44  24   document that talks about a period of traffic

04:44  25   between -- during the month of November of 2020 where

04:44  1    they apparently were doing some side-by-side testing of

04:44  2    the -- of the network with and without, again, the

04:44  3    VeloCloud technology.

04:44  4         The light blue stripes are without the

04:44  5    VeloCloud technology, and the dark blue stripes that

04:44  6    are very small are with the VeloCloud technology.

04:44  7         And you can see from the title at the top that

04:44  8    it says "VMware WAN mitigated 86 percent of total

04:44  9    brownout duration."

04:44  10        So what this slide is talking about is that

04:44  11   the blue stripes are without the VeloCloud, and it's

04:44  12   showing the duration of network problems that occurred

04:44  13   and how VeloCloud mitigates them with the dark blue

04:45  14   stripes down at the bottom.

04:45  15        And the brownout -- amount of time for the

04:45  16   brownout was just, you know, brownout is the network

04:45  17   doesn't perform as it's supposed to, which can include

04:45  18   a lot of different factors such as congestion.

04:45  19        And so the mitigation of those brownouts

04:45  20   really adds to a lot of efficiency in the people that

04:45  21   are using the network.

04:45  22   Q.   Now, Dr. McClellan, 86 percent is significant?

04:45  23   A.   86 percent is significant, but the percentage,

04:45  24   I think, is not as important as this hour figure down

04:45  25   here.  That's eight hours of brownout time per month.

04:45   1   That's eight hours of efficient network use that your

04:45   2   business just got back.  That's real money.

04:45   3       Q.   Now, Dr. McClellan, I want to now direct you

04:45   4   to the '133 patent in this case.

04:45   5            Dr. McClellan, we talked about before, do you

04:46   6   have --

04:46   7               MR. ROSENTHAL:  Your Honor, I'm sorry.

04:46   8   You've ruled on this already.  I object to this

04:46   9   comparison.

04:46   10              Can we take it down, please?

04:46   11              MR. WALDROP:  It's the patent, Your

04:46   12   Honor.

04:46   13              THE COURT:  Well, it's not just the

04:46   14   patent.  So you can show the patent.

04:46   15              MR. WALDROP:  Okay.  Yes, Your Honor.

04:46   16              You can take the slide down.

04:46   17              If we go to Slide 47.

        18   BY MR. WALDROP:

04:46   19       Q.   We're at a summary of your opinions,

04:46   20   Dr. McClellan.

04:46   21            Do you believe that VMware Edge/Gateway

04:46   22   devices, what we call VeloCloud with DMPO, infringe

04:46   23   Claim 13 of the '133 patent?

04:46   24       A.   Yes.

04:46   25       Q.   Now, Dr. McClellan, I also want to ask you

04:46  1    regarding -- what is your technical apportionment value

04:46  2    of what the value of the VMware Edge/Gateway products

04:46  3    with SD-WAN contribute to the accused functionality in

04:46  4    the product?

04:47  5        A.    In my assessment, the '133 patent accounts for

04:47  6    some 72 percent of the value of the VeloCloud products.

04:47  7        Q.    Can you further explain what you mean by that,

04:47  8    Dr. McClellan, to the jury?

04:47  9        A.    Well, the -- to come up with this number what

04:47  10   we did was analyze the product, analyze the

04:47  11   characteristics of the product, group the

04:47  12   characteristics of the product in groupings that made

04:47  13   sense to each other and then evaluated how much those

04:47  14   groupings contributed to the function of the product.

04:47  15        And then in addition to that, we compared that

04:47  16   function of the -- those different functions of the

04:47  17   product to the functionality that's described by the

04:47  18   patent.

04:47  19        And so that -- at the end of that process, you

04:47  20   know, you end up with 72 percent.

04:47  21        MR. WALDROP:  Now, I would like to show

04:47  22   the witness PTX-211, Your Honor.  And may I approach so

04:48  23   I can just make sure, Your Honor, that he's able to at

04:48  24   least see this picture, Your Honor?

04:48  25        THE COURT:  Sure.

04:48   1               (Bench conference.)

04:48   2               MR. WALDROP:  I'm going to put that on

04:48   3  the ELMO, Your Honor.

04:48   4               THE COURT:  Is this what was in the page

04:48   5  that --

04:48   6               MR. ROSENTHAL:  It is.  I have no problem

04:48   7  with him asking him what it says.

04:48   8               MR. WALDROP:  And I'll be very clear,

04:48   9  Your Honor, about my questions, Your Honor.

04:48  10               THE COURT:  Do whatever you need to do.

04:48  11               MR. WALDROP:  I appreciate you, sir.

04:48  12  Thank you.

04:48  13               (Bench conference concludes.)

04:48  14  BY MR. WALDROP:

04:49  15    Q.   Now, I'm going to ask you some very specific

04:49  16  questions, Dr. McClellan, which are important.

04:49  17          Dr. McClellan, you see this figure here.  And

04:49  18  I'll be very specific.  You see the figure provided

04:49  19  here, Dr. McClellan?

04:49  20               MR. WALDROP:  Can the jury see it yet?

04:49  21  I'm showing them what is PTX-211.

04:49  22              (Off-the-record discussion.)

04:50  23               MR. WALDROP:  Can they see it now?

04:50  24              (Off-the-record discussion.)

04:50  25               MR. WALDROP:  So 211 has been admitted.

04:50   1    So can we put 211 up there on the screen?

04:50   2                You can see it now?

04:50   3                Okay.  Thank you very much.

        4    BY MR. WALDROP:

04:50   5        Q.    So I'm going to ask you some specific

04:50   6    questions, Dr. McClellan.

04:50   7                This figure here with the colors, is this an

04:50   8    example of VeloCloud with DMPO?

04:50   9        A.    Yes.

04:50   10       Q.    And is this one of the accused products in

04:50   11   this case?

04:50   12       A.    Yes.

04:50   13       Q.    And does this figure show that -- and for the

04:50   14   purposes of the jury, I would like for you to discuss

04:51   15   what's on the right using only the language that you

04:51   16   see that VMware uses.  And we'll talk about the patent

04:51   17   language later, but now use only the language that the

04:51   18   document used and explain to the jury what is happening

04:51   19   here respect to VeloCloud DMPO.

04:51   20       A.    Okay.  So these green things here are those

04:51   21   little devices that we saw before.  And they're placed

04:51   22   at each one of the corners.  And they're called -- the

04:51   23   hubs are configured in the orchestrator, and the hubs

04:51   24   are these devices up here.  And all of the devices

04:51   25   communicate with each other.

04:51  1        You can see here in the middle that it says:

04:51  2  VMware SD-WAN Edges build static multipath tunnels to

04:51  3  the hub.

04:51  4        These are the multipath tunnels.  And you can

04:51  5  see that the multipath tunnels exist between all pairs

04:52  6  of the little devices.

04:52  7        And so the Edges -- the third thing doesn't

04:52  8  really matter that much.  They use VMware SD-WAN

04:52  9  Gateway to distribute routes.  End-to-end traffic gets

04:52  10  sent to the hub and all that stuff.

04:52  11        But the whole purpose here of this figure is

04:52  12  to show that there are tunnels built between each pairs

04:52  13  of the little devices.

04:52  14    Q.    Now, I also want to talk to you a little bit

04:52  15  about some of the detail about what you've talked about

04:52  16  before.  Do you see in the tunnels that there are

04:52  17  different colors of green and yellow on the document?

04:52  18  You see that on the tunnels?

04:52  19    A.    Yes.

04:52  20    Q.    Please understand what those colors represent

04:52  21  with respect to this document.

04:52  22            MR. ROSENTHAL:  Objection, Your Honor.

04:52  23  That's outside the scope of his report.

04:52  24            THE COURT:  Mr. Waldrop, he can discuss

04:52  25  what is shown on that page.

292

| | | |
|---|---|---|
| 04:52 | 1 | MR. WALDROP: Okay. Yes. So go ahead. |
| 04:53 | 2 | THE COURT: I mean, he can articulate |
| 04:53 | 3 | what's written on that page. |
| 04:53 | 4 | MR. WALDROP: Exactly. |
| 04:53 | 5 | THE COURT: Beyond that -- and if that's |
| 04:53 | 6 | what you're asking him to do, then I'll overrule the |
| 04:53 | 7 | objection. |
| 04:53 | 8 | MR. WALDROP: Okay. Thank you, Your |
| 04:53 | 9 | Honor. And that's what I'm asking, Your Honor. |
| 04:53 | 10 | THE COURT: Okay. |
| 04:53 | 11 | BY MR. WALDROP: |
| 04:53 | 12 | Q.    You'll see here with respect to the paths that |
| 04:53 | 13 | are here. And I'll start on the left, Dr. McClellan. |
| 04:53 | 14 | If you'll see here on the far left, between Hub 1 and |
| 04:53 | 15 | Hub 2, or the top hub and the bottom hub, you'll see |
| 04:53 | 16 | the three -- the three lines. |
| 04:53 | 17 | Are those the tunnels, Dr. McClellan? |
| 04:53 | 18 | A.    Yeah. Those are the tunnels. |
| 04:53 | 19 | Q.    And is that the paths that's discussed between |
| 04:53 | 20 | the hubs? |
| 04:53 | 21 | A.    Yeah. Those may be multiple paths or multiple |
| 04:53 | 22 | tunnels that are between the two hubs. And the |
| 04:53 | 23 | different colors in there indicate something that's |
| 04:53 | 24 | different about the traffic -- |
| 04:53 | 25 | MR. ROSENTHAL: Objection. That's -- |

293

```
04:53   1    that's outside the scope of his report, that last part
04:53   2    of his answer.
04:53   3                    MR. WALDROP:  I'll re-ask the question,
04:53   4    Your Honor.
04:53   5                    THE COURT:  Okay.  The jury will
04:53   6    disregard the answer that he just gave.
04:53   7    BY MR. WALDROP:
04:53   8        Q.   So only keeping it to the language,
04:54   9    Dr. McClellan, that you see here on the figure.  And
04:54   10   the figure, I'll start marking it.  So if you just tell
04:54   11   me as -- only using the language here, is this the hub
04:54   12   here, Dr. McClellan, that's talked about on the far
04:54   13   right here?
04:54   14       A.   Yeah.  That says it's a hub.
04:54   15       Q.   And this says it's configured with VMware
04:54   16   SD-WAN orchestrator, right?
04:54   17       A.   Yes.  The orchestrator is the blue thing up in
04:54   18   the top.
04:54   19       Q.   And you said notifies all SD-WAN Edges about
04:54   20   hubs.
04:54   21            Do you see that?
04:54   22       A.   Right.
04:54   23       Q.   And you'll see here in the middle,
04:54   24   Dr. McClellan, that it says the VMware SD-WAN Edges
04:54   25   build static multipath tunnels to hubs?
```

04:54   1          A.    That's right.

04:54   2          Q.    And these are the paths here -- the tunnels?

04:54   3     I'm sorry.

04:54   4          A.    Right.

04:54   5          Q.    And you also see on the third where it says

04:54   6     VMware SD-WAN Edges still use VMware SD-WAN gateway to

04:54   7     distribute route?

04:54   8          A.    Right.

04:54   9          Q.    And is -- where is the route?

04:54   10         A.    That's not really shown on here.

04:54   11         Q.    Now, it also says EZE ETE traffic is first

04:55   12    sent to the hub based on the routing table.

04:55   13               Do you see that, Dr. McClellan?

04:55   14         A.    Yes.

04:55   15         Q.    What does that mean?

04:55   16         A.    That part really isn't germane to the picture

04:55   17    either.  I think the second -- the second --

04:55   18         Q.    This sentence here?

04:55   19         A.    Yeah.

04:55   20         Q.    And I'll read it --

04:55   21         A.    It says the Edges establish direct tunnels.

04:55   22         Q.    So it says the dynamic ETE, and that's, I

04:55   23    guess, edge to edge is configured VMware SD-WAN

04:55   24    establish direct tunnels.

04:55   25               Do you see that?

295

```
04:55   1        A.      Right.

04:55   2        Q.      Is that it?  Okay.  Thank you, Dr. McClellan.

04:55   3             And it says here edge to edge -- here edge to

04:55   4    edge VPN with tunnel.

04:55   5             Do you see that, Dr. McClellan?

04:55   6        A.      Yeah.  This is talking about a specific use

04:55   7    case where you have a VPN with hubs.

04:55   8        Q.      All right.  Thank you, Dr. McClellan.

04:55   9             So now, Dr. McClellan, I want to return to --

04:55  10    and this is a very important question because I want to

04:55  11    make sure that this -- the jury understands exactly

04:55  12    what they're seeing.  Is this one of the accused

04:55  13    products that is accused of infringement of Claim 13 of

04:56  14    the -- hold on.  Let me back up.

04:56  15             Is this a VeloCloud product?

04:56  16        A.      Yes.

04:56  17        Q.      Great.  Thank you.

04:56  18                MR. WALDROP:  I'd like to return back, if

04:56  19    I can, to the -- thank you.  Thank you.

04:56  20             So I just press the button?

04:56  21             (Off-the-record discussion.)

04:56  22    BY MR. WALDROP:

04:56  23        Q.      So we'll go to Slide 49.  Now -- and this is

04:56  24    an important question, Dr. McClellan.  This is the one

04:56  25    that we started out with respect to this case.  Does
```

296

04:56  1    each claim element in Claim 13, is it present in the

04:56  2    VMware Edge and Gateway DMPO products, what I've been

04:56  3    calling VeloCloud?

04:56  4        A.    I don't have a display.

04:56  5                MR. WALDROP:  Can they see it now?

04:56  6                You have it now?

04:57  7                Okay.  Good.  We're back on now.

       8    BY MR. WALDROP:

04:57  9        Q.    Okay.  So I'll restate the question.  So each

04:57  10   claim element of Claim 13 is present in the VMware

04:57  11   Edge, what I call VeloCloud products, Dr. McClellan?

04:57  12       A.    Yes.

04:57  13       Q.    Now, I want to talk to you about the process

04:57  14   by which you went through to arrive at this opinion,

04:57  15   Dr. McClellan.

04:57  16             What was the process by which you went through

04:57  17   to arrive at this analysis, Dr. McClellan?

04:57  18       A.    Well, this slide shows three steps that are

04:57  19   kind of common to this kind of process.  The Court's

04:57  20   claim construction, which we've had some discussion

04:57  21   about that already today.  There's the patent and the

04:57  22   claims of the patent and then there's the product.  And

04:57  23   you have to compare the patent claims to the product.

04:57  24       Q.    And then what did you -- what else did you do

04:57  25   to -- in terms of reviewing materials?

—297—

04:57   1       A.    Well, there are a lot of other materials that

04:57   2    are provided in cases like this, where in addition to

04:58   3    the claim construction order, the claims and the

04:58   4    comparison to the product, there's the deposition

04:58   5    testimony.  We've already seen some deposition

04:58   6    testimony here.  And then there's discovery responses

04:58   7    which are generally the documents that we've been

04:58   8    showing pieces of were often discovery responses

04:58   9    documents.  And then also there's a source code that's

04:58  10    provided.

04:58  11       Q.    Now, Dr. McClellan, you relied on a number of

04:58  12    documents that you reviewed in arriving at your

04:58  13    opinion, right, Dr. McClellan?

04:58  14       A.    Yes.

04:58  15       Q.    And is that shown on Slide 52?

04:58  16       A.    That's the list.

04:58  17       Q.    And I know this may take a while, but it may

04:58  18    save us some time later on.  Could you read that into

04:58  19    the record?

04:58  20            And I know this is laborious, but this will be

04:58  21    helpful to you.  If you could just read off the

04:58  22    materials that you relied upon in terms of reaching

04:58  23    your infringement analysis, Dr. McClellan.

04:58  24       A.    Well, there's the Court's claim construction

04:58  25    order.  There's the '133 patent itself.  There's

298

| | | |
|---|---|---|
| 04:58 | 1 | various deposition testimonies.  There's VMware's |
| 04:58 | 2 | discovery responses; other VMware documents; VMware |
| 04:59 | 3 | source code; VMware expert reports.  And then these |
| 04:59 | 4 | other documents that we've kind of taken pieces out of: |
| 04:59 | 5 | PTX-5, 7, 200, 125, 211, 126, 204, 82, 209, 124, 79, |
| 04:59 | 6 | 625, 197, 114, 613, 507, 85, 213, 333, 311, 336, 313, |
| 04:59 | 7 | and 607. |
| 04:59 | 8 | And I think that's all of them.  But I can't |
| 04:59 | 9 | see the very bottom of the screen, again, because of |
| 04:59 | 10 | the menu.  If there's any ones that are under that |
| 04:59 | 11 | No. 15, then I can't see them. |
| 04:59 | 12 | Q.    No.  I appreciate it, Dr. McClellan. |
| 04:59 | 13 | And you can't see -- what are you -- what's |
| 04:59 | 14 | the last PTX you can see, Dr. McClellan? |
| 04:59 | 15 | A.    82 and 607. |
| 04:59 | 16 | Q.    That's -- and can you see what's on the right |
| 05:00 | 17 | side? |
| 05:00 | 18 | A.    According to that monitor over there, that's |
| 05:00 | 19 | the last ones. |
| 05:00 | 20 | Q.    Okay. |
| 05:00 | 21 | A.    I'm just concerned because there's this |
| 05:00 | 22 | annotation menu that shows up on the bottom of the |
| 05:00 | 23 | screen that I can't get rid of. |
| 05:00 | 24 | Q.    We'll deal with PTX-209, 124, 79, PTX-625, |
| 05:00 | 25 | which is showing up on my version, if they can see it. |

05:00    1              Can y'all see it?  Can the jury see it?

05:00    2        A.    Yeah, I did -- I got all those.

05:00    3        Q.    Okay.  Good.  So if you got all those, then

05:00    4    we're good, Dr. McClellan.

05:00    5              So, Dr. McClellan, you also heard -- you're

05:00    6    familiar with the term "person of ordinary skill in the

05:00    7    art"?

05:00    8        A.    Yes.

05:00    9        Q.    And please explain to the jury what that means

05:00    10   in the context of -- first what it means, and then

05:00    11   what's the context in terms of your testimony.

05:00    12       A.    So a person of ordinary skill in the art is

05:00    13   somebody who understands -- who can understand what's

05:00    14   going on with the technology and with the patent.  And

05:00    15   can analyze it effectively.

05:00    16              In this case I think the joint determination

05:00    17   of a person of ordinary skill in the art is somebody

05:00    18   with a bachelor's degree in a technical field like

05:01    19   computer science, computer engineering, electrical

05:01    20   engineering and so on.  And a couple of years of work

05:01    21   experience where some networking experience,

05:01    22   particularly network design analysis, load-balancing

05:01    23   and optimization, that just seems appropriate for the

05:01    24   stuff that we've been discussing, right?

05:01    25              So that's a person of ordinary skill.

05:01  1       Q.    Do you meet or exceed this definition of

05:01  2  person of ordinary skill in the art?

05:01  3       A.    Yes.

05:01  4       Q.    And that's kind of like just somebody who

05:01  5  knows that invention.  He understands it, right?

05:01  6       A.    Well, I mean, you wouldn't want to subject

05:01  7  somebody who didn't have these -- some concept of this,

05:01  8  to this technology.

05:01  9       Q.    Now --

05:01  10      A.    It would be awful.

05:01  11      Q.    Now, you had mentioned earlier that the claim

05:01  12  terms in the '133 patent, as stated by Judge Albright,

05:01  13  you had used some of those to interpret some of those,

05:01  14  right?

05:01  15      A.    Yes.

05:01  16      Q.    Please explain what you mean by that.

05:01  17      A.    Is there another slide for that?

05:01  18      Q.    Slide 55.  Slide 55.

05:01  19            MR. ROSENTHAL:  Your Honor, I object.

05:02  20            Can we take it down, please?  This is not

05:02  21  from his report.

05:02  22            MR. WALDROP:  So this may be the point in

05:02  23  which we make a proffer, Your Honor.

05:02  24            THE COURT:  Well, now's not the time to

05:02  25  make a proffer.

05:02  1                    MR. WALDROP:  Okay.

05:02  2                    MR. ROSENTHAL:  And it's the right

05:02  3   column, Your Honor, that we have a problem with.

05:03  4                    (Conference between counsel.)

05:03  5   BY MR. WALDROP:

05:03  6       Q.    So we'll come back to that, Dr. McClellan.

05:03  7             So, Dr. McClellan, we'll now move to Slide 56.

05:03  8             Dr. McClellan, is this Claim 13 of the '133

05:03  9   patent?

05:03  10      A.    Yes.

05:03  11      Q.    And is this the patent that's being

05:03  12  asserted -- is this a claim term -- this is the claim

05:03  13  being asserted in this case?

05:03  14      A.    Yes.

05:03  15      Q.    And, Dr. McClellan, before we move on, in

05:03  16  terms of your infringement analysis, did you apply the

05:03  17  Court's claim construction of plain and ordinary

05:03  18  meaning with respect to the terms in this case?

05:03  19      A.    Yes.

05:03  20      Q.    And I'm going to read them into the record.

05:03  21  The claim term is whether a congestion -- well, we'll

05:03  22  stop there.

05:04  23             There are three claim terms here for the '133

05:04  24  patent, right?

05:04  25             And whether a congestion -- one of the terms

05:04  1    is "whether a congestion condition exists for the

05:04  2    egress node."

05:04  3            Are you familiar with that term, Doctor?

05:04  4    A.    Yes.

05:04  5    Q.    And the Court's claim construction was plain

05:04  6    and ordinary meaning?

05:04  7    A.    Yes.

05:04  8    Q.    And did you apply that plain and ordinary

05:04  9    meaning?

05:04  10   A.    Yes.

05:04  11   Q.    The second term, and we'll get to it, is

05:04  12   "processing the packets."

05:04  13           Are you familiar that term of Claim 13,

05:04  14   Dr. McClellan?

05:04  15   A.    Yes.

05:04  16   Q.    And did you apply the Court's construction of

05:04  17   plain and ordinary meaning to that term?

05:04  18   A.    Yes.

05:04  19   Q.    And the last term, which is longer, but it

05:04  20   says "such that packets associated with egress nodes

05:04  21   from which the congestion condition does not exist have

05:04  22   a different queueing priority within the load-balancing

05:04  23   network than packets associated with egress nodes to

05:04  24   which the congestions node exists."

05:04  25           Are you familiar with that term,

05:04    1    Dr. McClellan?

05:04    2        A.    Yes.

05:04    3        Q.    Did you apply the Court's claim construction

05:04    4    of plain and ordinary meaning to that term?

05:04    5        A.    Yes.

05:04    6        Q.    Now, in front of us are all three of these

05:04    7    terms that I just discussed found in this Claim 13?

05:04    8        A.    I believe so.

05:04    9        Q.    And are we going to address each of those in

05:05   10    detail as we go through?

05:05   11        A.    Yeah.  We're going to address each claim term

05:05   12    individually.

05:05   13        Q.    Okay.  So we're going to go on a little ride

05:05   14    that's going to repeat -- that's going to repeat some

05:05   15    of the evidence that you've already discussed,

05:05   16    Dr. McClellan.  But we have to do this to satisfy our

05:05   17    burden of showing infringement in this case.

05:05   18              You understand that, right, Dr. McClellan?

05:05   19        A.    Yes.

05:05   20        Q.    So now, what we're going to do is we're going

05:05   21    to split this up into elements.

05:05   22              MR. WALDROP:  And if we go to the next

05:05   23    slide.

        24    BY MR. WALDROP:

05:05   25        Q.    If you could tell the jury what we're about to

05:05  1    do in terms of your infringement analysis.

05:05  2        A.    So on the left-hand side is just the elements

05:05  3    of the claim broken out into sort of a chart format.

05:05  4    And on the right-hand side is another column, and we're

05:05  5    going to go row by row through this chart and we're

05:05  6    going to show the first row of the chart and we're

05:05  7    going to show the evidence that's associated with the

05:05  8    first row of the chart.

05:05  9            And when we finish showing that evidence, then

05:05  10   we will say that infringement has been shown for that

05:06  11   claim term.  And then we'll put a little checkmark on

05:06  12   the right-hand side so you can kind of follow along.

05:06  13       Q.    And so as we go through, we're just going to

05:06  14   check it off and we're going to get to the end --

05:06  15       A.    Check it off and get to the end.

05:06  16       Q.    Okay.  Let's go.

05:06  17            MR. WALDROP:  So let's move to the next

05:06  18   slide, the first element, which is Slide 58.

       19   BY MR. WALDROP:

05:06  20       Q.    So this is the first element of the claim.

05:06  21   And I'll read it into the record.  It's:  An apparatus

05:06  22   for routing traffic in a load-balancing network

05:06  23   comprising a plurality of nodes, comprising...

05:06  24            Do you see that, Dr. McClellan?

05:06  25       A.    Yes.

05:06  1        Q.    Now, it has this term "comprising."

05:06  2              Do you see that there, Dr. McClellan, with the

05:06  3    green box on it?

05:06  4        A.    Yes.

05:06  5        Q.    Can you explain to the jury in the next slide,

05:06  6    what does that mean?

05:06  7        A.    Comprising means that it has at least that.

05:06  8    So the example here is that Old MacDonald has a farm

05:06  9    and he has a patent on his farm.  And on his farm, he's

05:06  10   got a pig, a cow and a duck.

05:06  11             And somebody else has a farm and they have a

05:07  12   pig, a cow and a duck and they add a horse.  But the

05:07  13   fact that they had a pig and a cow and a duck means

05:07  14   that they infringed Old MacDonald.

05:07  15       Q.    And why is the "comprising" term in Claim 13

05:07  16   important to this case?

05:07  17       A.    Because they have to have at least that.  They

05:07  18   can have more.  They can have other things, but they

05:07  19   have to have at least that.

05:07  20       Q.    So, Dr. McClellan, I'd like to show the jury

05:07  21   where the elements of each claim of Claim 13, so the

05:07  22   elements of Claim 13, each one where they're present in

05:07  23   VeloCloud.

05:07  24             Can I do that?

05:07  25       A.    Yep.

05:07  1        Q.    And do you show us a slide that shows how this

05:07  2  element is met?

05:07  3        A.    Yeah.  So this slide -- this slide takes the

05:07  4  first element of Claim 13 and it looks for an

05:07  5  apparatus.  And the apparatus needs to function in a

05:07  6  load-balancing network with a plurality of nodes.  I

05:07  7  think we've shown plenty of evidence that the VeloCloud

05:08  8  devices are an apparatus.

05:08  9        And those apparatus -- those -- I don't even

05:08  10  know what the plural of apparatus is, but those

05:08  11  apparatuses are supposed to be deployed in a

05:08  12  load-balancing network with several nodes.

05:08  13            MR. WALDROP:  And can I have PTX-211?

05:08  14  BY MR. WALDROP:

05:08  15        Q.    PTX-211 that we discussed before, which was

05:08  16  that VeloCloud product.  This is the same thing that I

05:08  17  showed you earlier on the document -- on the camera.

05:08  18  Yeah.

05:09  19        A.    So this is the same as the document from the

05:09  20  document camera.

05:09  21        Q.    And so this is a piece of evidence that you

05:09  22  relied upon to show that it meets that first element of

05:09  23  Claim 13?

05:09  24        A.    Yes.  It implements a load-balancing network

05:09  25  with a plurality of nodes.

—307—

05:09  1            MR. WALDROP:  So if we could return back

05:09  2   to the slide deck of Slide 61.

05:09  3            And so then we'll go to the next slide,

05:09  4   Slide 62.

       5   BY MR. WALDROP:

05:09  6       Q.   Can we check that off, Dr. McClellan?

05:09  7       A.   Let's check that one off.

05:09  8       Q.   So we've showed that we've met the first

05:09  9   element of Claim 13.

05:09  10           Now we'll go to the second element of Claim

05:09  11  13.

05:09  12           MR. WALDROP:  Slide 63.

       13  BY MR. WALDROP:

05:09  14      Q.   And I'll read this into the record, which is:

05:09  15  A processor for -- a processor module for receiving a

05:09  16  traffic flow comprising a plurality of packets; and...

05:09  17           Do you have evidence showing of how this

05:09  18  element is met by the VeloCloud product, Dr. McClellan?

05:10  19      A.   Yes.

05:10  20      Q.   Please describe that to the jury.

05:10  21      A.   We showed this picture before --

05:10  22           MR. ROSENTHAL:  I'm sorry.  I need to

05:10  23  interrupt again.

05:10  24           I object to the slide.  Please take it

05:10  25  down.  This is an opinion that is not in his report

05:10  1    with respect to processor module.

05:10  2                    MR. WALDROP:  This?  Do you want me to

05:10  3    approach, Your Honor?

05:10  4                    THE COURT:  Sure.

05:10  5                    (Bench conference.)

05:11  6                    MR. ROSENTHAL:  Which number?

05:11  7                    MR. WALDROP:  Hold on a second.

05:11  8                    So, Your Honor, we have annotated here,

05:11  9    Your Honor, 129, 130, 132.

05:11  10                   THE COURT:  I just need a page.  83?

05:11  11                   MR. WALDROP:  Yes, sir.  So I'll get you

05:11  12   the page, Your Honor.  Thank you.

05:11  13                   THE COURT:  Okay.  Now, do you have a

05:11  14   copy of the slide you want to show?

05:11  15                   MR. WALDROP:  I didn't bring the slide

05:11  16   up, Your Honor.

05:11  17                   THE COURT:  So what is it you want to

05:11  18   say?  What is it you're going to ask him?

05:11  19                   MR. WALDROP:  Well, this was previously

05:11  20   shown about whether or not the path is met, Your Honor.

05:12  21   This is a previous document.  This is the same document

05:12  22   we already showed him.  He's showing how that document

05:12  23   meets the limitation of the claims, Your Honor.

05:12  24                   129, 130.  130, you'll see he references

05:12  25   this document that Mr. -- so 130, you'll see it there.

05:12  1   Paragraph 130, 131.  Paragraph 133, Paragraph 135,

05:12  2   Paragraph 145, Your Honor.

05:12  3              And so you'll see here both sections,

05:12  4   Your Honor, we're talking about the very document we've

05:12  5   already shown the witness when we're talking about DMPO

05:12  6   and how it processes packets.

05:12  7              So he's going back here to talk about

05:12  8   that language as it relates to the claim element.  So

05:12  9   now we're talking about the claim element.  So we don't

05:12 10   have the same issues, I would think, where we have the

05:12 11   claim element on the left, figure on the right and he's

      12   talking about respect to his report.

05:12 13              Those are the pages and the paragraph

05:12 14   numbers, Your Honor.

05:13 15              MR. ROSENTHAL:  My problem, Your Honor,

05:13 16   is that, first of all, all of these paragraphs are in a

05:13 17   different claim element.  This is the next claim

05:13 18   element.

05:13 19              There's nothing in this report that ever

05:13 20   identifies what the claimed processor module is in the

05:13 21   claim, and it's certainly never puts a box around part

05:13 22   of that figure.  Nothing in the report says that, and

05:13 23   that's the problem.

05:13 24              MR. WALDROP:  Do we -- it's there, Your

05:13 25   Honor.  Do we need to take a break, Your Honor?

```
05:13   1    Because, Your Honor, this is -- Your Honor, it's like
05:13   2    we're having an argument when we've already --
05:13   3                    THE COURT:  Let me ask you this,
05:13   4    Mr. Rosenthal.  Is this your primary noninfringement
05:13   5    argument?
05:13   6                    MR. ROSENTHAL:  Well, this is one of
05:13   7    them.  The problem is that his report misses three or
05:13   8    four elements, just doesn't address them, and this is
05:13   9    one of them.
05:13   10                   So it's one of the things that I will be
05:13   11   focusing on in my motion.
05:13   12                   THE COURT:  Why don't I let the jury go
05:13   13   and I'll take these slides -- are there, I guess, three
05:14   14   or four?
05:14   15                   MR. ROSENTHAL:  There's others.  Yeah.
05:14   16   What I would --
05:14   17                   THE COURT:  What you can do is, for
05:14   18   example here, the claim requirement is a process module
05:14   19   for receiving a traffic flow -- well, what you're going
05:14   20   to have to show me, Mr. Waldrop, is where he, you know,
05:14   21   what -- where he says what you want him to say in the
05:14   22   report.
05:14   23                   If you can do that, then you can use the
05:14   24   slides.
05:14   25                   MR. WALDROP:  Okay.
```

05:14    1                    THE COURT:  We'll do that outside the

05:14    2    jury's presence.

05:14    3                    MR. WALDROP:  Thank you very much, Your

05:14    4    Honor.

05:14    5                    (Bench conference concludes.)

05:14    6                    THE COURT:  Ladies and gentlemen of the

05:14    7    jury, we've decided that you all might have a better

05:14    8    way of spending your time not being here than being

05:14    9    here and watching us chat, so -- but the chatting is

05:14    10   necessary.

05:14    11                   Like I said, if it weren't for the

05:14    12   chatting, then I wouldn't need to be here.  We wouldn't

05:14    13   want that.  So we are going to recess for the evening.

05:15    14                   If you all would be back by -- can I have

05:15    15   the lawyers back up for just one second?

05:15    16                   (Bench conference.)

05:15    17                   THE COURT:  I leave it up to you all.

05:15    18   I've -- I can invite them and they can come here for

05:15    19   the sentencing and attend it.  And then we can get

05:15    20   started right away.  But I don't -- you know, if you

05:15    21   all don't want them to attend the sentencing, that's

05:15    22   y'all's call.  It's not very -- I don't see how it

05:15    23   would impact your case, but it's -- y'all are the trial

05:15    24   lawyers, not me.

05:15    25                   MR. ROSENTHAL:  I don't have a problem

| | | |
|---|---|---|
| 05:15 | 1 | with that.  As long as there's a sort of idea of when |
| 05:15 | 2 | we will start, that's all. |
| 05:15 | 3 | THE COURT:  Well, I only -- I have -- if |
| 05:15 | 4 | I start at -- |
| 05:15 | 5 | DEPUTY CLERK:  11 total. |
| 05:15 | 6 | THE COURT:  Yeah.  And I start at 9:00? |
| | 7 | I start at 9:00 tomorrow? |
| | 8 | DEPUTY CLERK:  Yes, sir. |
| 05:16 | 9 | THE COURT:  I'll be done, I think, by |
| 05:16 | 10 | 10:30. |
| 05:16 | 11 | MR. ROSENTHAL:  Okay. |
| 05:16 | 12 | THE COURT:  10:30.  11:00 probably be the |
| 05:16 | 13 | latest.  And if they're here and we get it going.  And |
| 05:16 | 14 | if not, I'll tell them to be here at 10:30.  I'll tell |
| 05:16 | 15 | them to come at 9:00 and they can sit and watch or they |
| 05:16 | 16 | can be here at 10:30 and we'll start as soon as I'm |
| 05:16 | 17 | done. |
| 05:16 | 18 | Work for you? |
| 05:16 | 19 | MR. WALDROP:  Yes, sir. |
| 05:16 | 20 | (End of bench conference.) |
| 05:16 | 21 | THE COURT:  So ladies and gentlemen of |
| 05:16 | 22 | the jury, as I told you earlier, tomorrow I'll be |
| 05:16 | 23 | sentencing people.  You may find that very interesting. |
| 05:16 | 24 | I have had jurors tell me it was very interesting.  But |
| 05:16 | 25 | you might not want to attend. |

313

05:16  1          So I will begin tomorrow morning at 9:00

05:16  2   sentencing people.  If you'd like to be here, you're

05:16  3   welcome to come and sit in the back of the courtroom

05:16  4   and watch and see how that side of -- I think you'd

05:16  5   find it very fascinating.  When you watch news and hear

05:16  6   everything that's going on in the world, you would see

05:16  7   it from a different perspective.

05:17  8          But if you don't want to do that, that's

05:17  9   absolutely fine.  It's your choice.  But I'd ask you to

05:17  10  be here at 10:30.  Hopefully I'll be wrapped up with my

05:17  11  sentencings by then.  And either at 10:30 or as soon as

05:17  12  I finish with the sentencings, we'll start with the

05:17  13  trial.

05:17  14         So those are your choices.  Come at 9:00

05:17  15  or any time between 9:00 and 10:30 and watch the

05:17  16  sentencings.  Or be here at 10:30 and one of these

05:17  17  gentlemen will take you back to the jury room.  And

05:17  18  you're welcome to do either one.

05:17  19         You can't discuss the case amongst

05:17  20  yourselves.  You can't do any research outside of the

05:17  21  court.  And you can't post anything on social media

05:17  22  about the case.

05:17  23         Other than that, I hope you have a

05:17  24  wonderful evening with your family.  And we will see

05:17  25  you tomorrow morning no later than 10:30.

05:17    1                    THE BAILIFF:  All rise.

05:17    2                    (Jury exited the courtroom.)

05:18    3                    THE COURT:  You may be seated.

05:18    4                    You may step down.

05:18    5                    For what it's worth, and I love having

05:18    6    everyone who's here, but if there are those of you who

05:18    7    don't need to be here because you have things to do

05:18    8    tomorrow, you certainly don't need to -- you are -- the

05:18    9    only people that need to stay here are the ones who

05:18   10    want to stay here while we work this out.

05:18   11                    I know the rest of you all have things to

05:18   12    do in trial.  And you're certainly welcome to go do

05:18   13    those.  You're certainly welcome to stay.

05:18   14                    So Mr. Waldrop, if you would put that --

05:18   15    excuse me -- slide back up that you were dealing with

05:19   16    which is Slide 64 of your demonstratives.

05:19   17                    MR. WALDROP:  Yes, Your Honor.

05:19   18                    THE COURT:  Okay.  Now, what I need for

05:19   19    you to do -- it's pretty clear that what you have is a

05:19   20    page from the patent.  You've blown up traffic flow

05:19   21    sorted into traffic classes.

05:19   22                    MR. WALDROP:  Yes, sir.

05:19   23                    THE COURT:  And you've blown up claim

05:19   24    requirement.  So all those things by themselves are not

05:19   25    objectionable.  Because I can find them in the patent.

05:19    1                    MR. WALDROP:  Yes, Your Honor.

05:19    2                    THE COURT:  Now, what I think

05:19    3    Mr. Rosenthal cares about is what you intend to have

05:19    4    your witness say that this -- you -- the title is

05:19    5    VeloCloud infringes Element 2.  Which tells me he's

05:19    6    going to explain how the traffic flow sorted into

05:19    7    traffic classes in the manner that is shown there --

05:19    8    actually I guess -- let me ask you this:  Is what's at

05:20    9    the top, is that from something that was produced by

05:20    10   defendant?  Or is that --

05:20    11                   MR. WALDROP:  Yes, Your Honor.  Yes, Your

05:20    12   Honor.

05:20    13                   THE COURT:  Okay.  Okay.  So let me -- so

05:20    14   I figured -- okay.  So what you want your expert to say

05:20    15   is he has blown up the spec.  He has something from

05:20    16   Dell there and he wants to be able to say this is what

05:20    17   the claim requires and this is how Dell meets it by

05:20    18   showing the traffic flow.

05:20    19                   MR. WALDROP:  Yes, sir.  VMware.  Yes,

05:20    20   sir.

05:20    21                   THE COURT:  Now, where in his report does

05:20    22   he tell Dell what he intends to tell the jury tomorrow?

05:20    23                   MR. WALDROP:  So on Slide 64, Your Honor,

05:20    24   we just talked about that.  We have Paragraphs 129 --

05:20    25                   THE COURT:  Okay.  Let me get there.

| | | |
|---|---|---|
| 05:20 | 1 | MR. WALDROP:  There are multiple |
| 05:20 | 2 | paragraphs, Your Honor. |
| 05:20 | 3 | THE COURT:  Okay.  Let me get to 129. |
| 05:21 | 4 | Okay.  129 is just him quoting from Mr. Craig Connors. |
| 05:21 | 5 | And obviously anything he wants to tell the jury that |
| 05:21 | 6 | Mr. Connors said, he can do. |
| 05:21 | 7 | What's in 130 that you care about? |
| 05:21 | 8 | MR. WALDROP:  Hold on one second.  Let me |
| 05:21 | 9 | see, Your Honor.  I thought -- let me just be -- so |
| 05:21 | 10 | because we're doing it -- we're doing it |
| 05:21 | 11 | element-by-element, if you want to do that, Your Honor, |
| 05:21 | 12 | because of where we are, the first element that we |
| 05:21 | 13 | mentioned this in starts with 100 which references the |
| 05:21 | 14 | document.  So 100, 101 and 102. |
| 05:21 | 15 | THE COURT:  Okay.  Hold on. |
| 05:21 | 16 | MR. WALDROP:  So just because I want to |
| 05:22 | 17 | make sure we're talking with the first element.  We're |
| 05:22 | 18 | only with the first element, "a processor for..." |
| 05:22 | 19 | MR. STERN:  Your Honor, if I may, Your |
| 05:22 | 20 | Honor, explain this a little bit more -- |
| | 21 | (Clarification by Reporter.) |
| 05:22 | 22 | MR. STERN:  Mr. Stern for plaintiff |
| 05:22 | 23 | Brazos, Your Honor. |
| 05:22 | 24 | The elements are very intertwined.  There |
| 05:22 | 25 | are multiple references to this specific picture in |

05:22    1    almost each of the elements here, with an explanation

05:22    2    of how the packets move through.  So there's a picture

05:22    3    of the larger -- of the larger -- of the larger flow,

05:22    4    right?  With an explanation of what's going on in that

05:22    5    larger flow.

05:22    6                THE COURT:  Well, is the good doctor

05:22    7    going to say anything about how the flow goes through,

05:22    8    other than what -- it appears to me, quick scan, that

05:22    9    what he's done is he's quoted from witnesses or he's

05:23   10    quoted from documents.  And he's saying this is how

05:23   11    they say it works.

05:23   12                And I don't think there's an objection --

05:23   13    my guess is there's not an objection to that.

05:23   14                MR. ROSENTHAL:  No objection to that,

05:23   15    Your Honor.

05:23   16                THE COURT:  And if there were, I would

05:23   17    overrule it.  Because it's in the report.

05:23   18                What I'm looking for is that's probably

05:23   19    not going to get you all where you want with this jury.

05:23   20    What I'm anticipating is that he is at some point going

05:23   21    to say, look at what's on the left.  Now, look at -- it

05:23   22    says traffic flow sorted into traffic classes.  And he

05:23   23    has that.  And that meets the claim requirement of a

05:23   24    processor module for receiving a traffic flow

05:23   25    comprising a plurality of packets.

05:23  1              Now, where does he explain, in his own

05:23  2    opinion, why that happens?

05:23  3              MR. WALDROP:  In my opinion -- in

05:23  4    Paragraph 109 he says, in my opinion, the accused

05:23  5    products comprise -- comprises of a processor module

05:23  6    for receiving a traffic flow comprising a plurality of

05:24  7    packets.

05:24  8              And he also cites to an infringement

05:24  9    chart, Your Honor, and --

05:24  10             THE COURT:  Well, no.  That's just --

05:24  11   he's just summarizing there.  He's -- at 109 he's just

05:24  12   summarizing, in my opinion, the accused product -- I

05:24  13   could -- here's the standard you have to meet.  You

05:24  14   have -- he has to say something that I couldn't have

05:24  15   written.

05:24  16             I could have written, in my opinion, the

05:24  17   accused product comprises -- comprises of a processor

05:24  18   module for receiving a traffic flow comprising a

05:24  19   plurality... because that's just reciting what the

05:24  20   claim element says.  So I could have done that.

05:24  21             I need to see where he explains why --

05:24  22   where he explains why 109 is correct.  Where is his

05:24  23   opinion that says I just told you in 109 what my -- a

05:24  24   summary of my opinion.  And here's where I explain why

05:24  25   that's right.

```
05:24   1              MR. WALDROP:  He goes through -- he goes
05:24   2   through, sir, and explains where -- and connects the
05:25   3   documents with the claim language of nodes throughout
05:25   4   the entire report, Your Honor.
05:25   5              For example, I'll give you an example --
05:25   6              THE COURT:  Well, no.  He skips right --
05:25   7   from 109, he skips right to any claim element not
05:25   8   literally present is found by a Doctrine of
05:25   9   Equivalents.
05:25  10              And he -- what I need to know -- and then
05:25  11   he has a bunch of products.  I get that too.  And then
05:25  12   he goes on 113, 114, he summarizes what people say.
05:25  13              I'm going to try one more time.  Where
05:25  14   does he explain why, in his opinion, the fact that
05:25  15   traffic flow is sorted into traffic classes, in his
05:25  16   opinion, in the Dell products meets the claim
05:25  17   requirement of it having a processor module for
05:26  18   receiving a traffic flow comprising.
05:26  19              Or are you just -- is he simply just
05:26  20   going to say it has this, therefore, that's the extent,
05:26  21   in my opinion?  My opinion is summarized in -- it has a
05:26  22   traffic flow sorted in traffic classes and that meets
05:26  23   the claim requirement.  And that is all he's going to
05:26  24   say?
05:26  25              MR. WALDROP:  Your Honor, in Paragraph --
```

05:26  1    so, Your Honor, he does connect that.  On Paragraph 115

05:26  2    he talks about how it implements two sets of

05:26  3    schedulers, right?  He says an example of VMware

05:26  4    documents explains the network and link scheduler is

05:26  5    functions of using QRS to adjust packet scheduling and

05:26  6    manage traffic and congestion for condition of

05:26  7    subscription as discussed.  VeloCloud implements two

05:26  8    sets of schedulers.  Networks scheduling that

05:26  9    implements, among other things, QRS hierarchy, e.g.,

05:26  10   priority queueing into link scheduler, among other

05:26  11   things, identifies and addresses, among other things,

05:26  12   over-subscription of local and remote --

05:26  13              THE COURT:  And then there's -- where's

05:26  14   the paragraph that says, for example, based on what I

05:27  15   wrote in 115, my opinion is it infringes and here's

05:27  16   why?

05:27  17              MR. WALDROP:  The opening paragraph, Your

05:27  18   Honor, 109.  He says --

05:27  19              THE COURT:  Well, no, no.  109 doesn't

05:27  20   get it.  109 just says -- just says:  In my opinion,

05:27  21   the accused products comprise what is in the claim

05:27  22   requirement.

05:27  23              That doesn't explain why what is in

05:27  24   Paragraph 115 shows that there's infringement, because

05:27  25   he has to do that so that the defendant, if they put on

05:27  1    a noninfringement case, can say, you heard this expert

05:27  2    say X and here's why he's wrong.

05:27  3                    All he's saying right now is, it has this

05:27  4    stuff and, therefore, I think it infringes.

05:27  5                    That's not an opinion.  That's not -- it

05:27  6    doesn't explain why it meets the claim element.  It --

05:27  7    you know, it has -- it's not -- and I'm not good at

05:28  8    analogies.  There's an electric car and it has the

05:28  9    battery and the battery saves power, which is what the

05:28  10   claim element requires.

05:28  11                   How does it say the -- how does it do it?

05:28  12   How does it infringe?  How does it infringe?

05:28  13                   MR. WALDROP:  Your Honor, Your Honor,

05:28  14   like I said before, Your Honor, this -- we've explained

05:28  15   this in multiple briefs, Your Honor.  I'm shocked that

05:28  16   we're here -- actually shocked you're here, Your Honor,

05:28  17   to be having this discussion with you since --

05:28  18                   THE COURT:  Well, so am I, but we're --

05:28  19   probably for different reasons.

05:28  20                   So I don't think this -- I don't think

05:28  21   this is that challenging.  And, again, when I did --

05:28  22   actually, they -- some people let me put on technical

05:28  23   experts.  They probably hadn't met me.

05:28  24                   But when I was doing the damages, I --

05:28  25   and I had my expert say why it was X, that was

05:29  1   explained in his report why it was X.  The jury didn't

05:29  2   hear anything really that wasn't in the report.

05:29  3           That's the way it works, is you put it in

05:29  4   a report.  They get to ask you at the depositions to

05:29  5   explain what's in the report, and then they have

05:29  6   someone really smart come in and say, no.  That's

05:29  7   wrong.  And the jury hears both of them, and they say

05:29  8   one or the other is right.

05:29  9           But he only -- here's what we're going to

05:29  10  do.  Because I -- you know, we can't go on forever like

05:29  11  this.

05:29  12          MR. WALDROP:  Yep.

05:29  13          THE COURT:  Here's the standard.  And I'm

05:29  14  going to say this one more time.

05:29  15          MR. WALDROP:  Yes, sir.

05:29  16          THE COURT:  As you're doing your outline

05:29  17  for your expert --

05:29  18          MR. WALDROP:  Yes, sir.

05:29  19          THE COURT:  -- when you ask him a

05:29  20  question, you need to go backwards and you need to say

05:29  21  what -- the answer needs to be in the report or close

05:29  22  enough to it that you'll convince me that it says that.

05:30  23  It doesn't need to be word for word, but -- it would be

05:30  24  easier for me if it were, but it needs to be in here.

05:30  25          And then ask him:  How do I ask this

05:30  1    question so I get this answer?

05:30  2              Because that way tomorrow if there is an

05:30  3    objection, you can say, Judge, it's in Paragraph 111.

05:30  4    And it's right there.  That's the answer you're going

05:30  5    to hear, is what's in the report in the same way it's

05:30  6    in the report.

05:30  7              However -- whatever you need to do to

05:30  8    accomplish that, that's what it's going to take for

05:30  9    this expert -- and we're not going to keep going

05:30  10   through the exercise that we've been doing coming to

05:30  11   the bench.

05:30  12             I'm just going to say to you,

05:30  13   Mr. Waldrop, tell me where in the report it is.  And

05:30  14   I'm going to have it up here, and I'm going to expect

05:30  15   what he says to be in the report in the format it's in

05:30  16   the report.

05:30  17             MR. WALDROP:  Thank you, Your Honor.

05:30  18   Yes, Your Honor.  Thank you very much.

05:30  19             THE COURT:  Hopefully that helps.

05:31  20             MR. WALDROP:  That is very helpful, Your

05:31  21   Honor.  Thank you very much.

05:31  22             THE COURT:  So anything else we need to

05:31  23   take up tonight?

05:31  24             MR. ROSENTHAL:  Not for Defendants.

05:31  25             THE COURT:  Let me ask you this,

```
05:31   1    Mr. Waldrop.  So when we finish with your expert, and
05:31   2    that will take awhile with cross, so I'm anticipating
05:31   3    we won't finish with him in the morning is my guess.
05:31   4                    MR. ROSENTHAL:  It'll be after lunch.
05:31   5                    THE COURT:  I'm pretty sure Mr. Rosenthal
05:31   6    has some time he intends to spend with him.
05:31   7                    And so -- but we finish with your expert,
05:31   8    who comes next?
05:31   9                    MR. WALDROP:  Our damages expert, Your
05:31  10    Honor.
05:31  11                    THE COURT:  Okay.  And after the damages
05:31  12    expert?
05:31  13                    MR. WALDROP:  We're done for rebuttal.
05:31  14                    THE COURT:  Okay.  I should remember this
05:31  15    by now.  Who's your damages expert?
05:31  16                    MR. WALDROP:  Roy Weinstein, sir.
05:31  17                    THE COURT:  Okay.  He's here?
       18                    MR. WALDROP:  Yes, sir.
05:31  19                    THE COURT:  Okay.  Very good.  And so you
05:31  20    will be finished tomorrow?
05:31  21                    MR. WALDROP:  Yes.  Yes, Your Honor.
05:31  22                    THE COURT:  Okay.  Now, what -- so that
05:31  23    means the defendant will be filing motions.  You can
05:31  24    make them orally and then supplement, you know, file
05:31  25    whatever you need to file.
```

05:31  1                    Who will the defendants' witnesses be

05:32  2   tomorrow?

05:32  3                    MR. ROSENTHAL:  Our first witness is

05:32  4   going to be Kit Colbert, the CTO.  So he'll go -- and,

05:32  5   by the way, we have an agreement with the other side

05:32  6   that they can ask questions outside the scope of the

05:32  7   examination and have it as part of their case so they

05:32  8   don't officially rest until the conclusion.

05:32  9                    THE COURT:  I got it.

05:32  10                   MR. ROSENTHAL:  We took him out of turn,

05:32  11  so that he only had to go once.

05:32  12                   THE COURT:  Thank you for letting me know

05:32  13  that.

05:32  14                   MR. WALDROP:  Thank you.

05:32  15                   MR. ROSENTHAL:  So just so you know.  And

05:32  16  that's the point at which we will make our oral motion,

05:32  17  is after Mr. Colbert sits down.

05:32  18                   THE COURT:  And you're good with that,

05:32  19  Mr. Waldrop?

05:32  20                   MR. WALDROP:  Yes, Your Honor.

05:32  21                   MR. ROSENTHAL:  And then thereafter, we

05:32  22  had a little shakeup because of the removal of a couple

05:32  23  of patents, so we're just coordinating --

05:32  24                   THE COURT:  They can put them back in.

05:32  25  Do you really want those?

```
05:32   1                   MR. ROSENTHAL:  Let me think.

05:32   2                   (Laughter.)

05:32   3                   THE COURT:  I don't want to hurt anyone's

05:32   4   feelings by not getting to be here.

05:32   5                   MR. ROSENTHAL:  But as a result,

05:32   6   Mr. Turner, Paul Turner is not going to show up.

05:32   7                   But what we would like to do, with the

05:32   8   Court's indulgence, is Mr. Connors, who I mentioned was

05:32   9   on this sort of last trip with his friend, he has made

05:32   10  himself available on Thursday to do a Zoom testimony if

05:33   11  that works for the Court.

05:33   12                  THE COURT:  It works.  Well, it does.

05:33   13  What I would suggest we do is you coordinate through

05:33   14  Mark.  And if you haven't met our technical person, it

05:33   15  would be a good time to do it.  And if you have -- but

05:33   16  I would make sure that -- he's shaking his head yes.

05:33   17                  So just make sure our technical person is

05:33   18  available then.  It'd be best to have him.  We've done

05:33   19  Zoom, and I'm happy to do that.

05:33   20                  What I'll do, so you all know, is I will

05:33   21  instruct the jury -- when you go to introduce him, I

05:33   22  will instruct the jury that witnesses are -- since

05:33   23  COVID have been allowed to appear remotely and that

05:33   24  he'll be sworn in in the same manner as witnesses who

05:33   25  are present and that he is to receive -- his testimony
```

| | | |
|---|---|---|
| 05:33 | 1 | is to receive the equal dignity that any person who's |
| 05:33 | 2 | shown up will get, which means they're free to accept |
| 05:33 | 3 | it or not accept it or whatever, but it shouldn't |
| 05:34 | 4 | matter to them that it will be by Zoom. |
| 05:34 | 5 | So I'll give that little instruction. |
| 05:34 | 6 | MR. ROSENTHAL:  We appreciate that.  And |
| 05:34 | 7 | after Mr. Connors, who is going to be the first part of |
| 05:34 | 8 | Thursday, we may play a deposition -- we'll play a |
| 05:34 | 9 | deposition at some point, a very short one.  And then |
| 05:34 | 10 | we're going to have Dr. Rosing, who's our technical |
| 05:34 | 11 | expert. |
| 05:34 | 12 | THE COURT:  And so we're into Thursday? |
| 05:34 | 13 | MR. ROSENTHAL:  We're into late Thursday |
| 05:34 | 14 | at this time.  And then -- and then we're going to have |
| 05:34 | 15 | Ms. Gonzalez, a short piece of testimony from her about |
| 05:34 | 16 | damages-related stuff, and then we're going to have |
| 05:34 | 17 | Ms. -- Dr. Becker, our damages expert. |
| 05:34 | 18 | THE COURT:  Sounds to me like we might |
| 05:34 | 19 | finish on Friday, but I would -- but we won't do |
| 05:34 | 20 | closing arguments on -- now, if we can get this in, |
| 05:34 | 21 | we'll do it.  Let's plan at some point -- we'll have to |
| 05:34 | 22 | go over the -- you all have given us your proposed |
| 05:34 | 23 | charges, correct? |
| 05:34 | 24 | MR. ROSENTHAL:  We have, Your Honor.  And |
| 05:34 | 25 | Mr. Shelton and, I believe, Mr. Williams or |

| 05:35 | 1 | Mr. Siegmund have been doing yeoman's work cutting down |
| 05:35 | 2 | the objections.  So we're going to be very narrow. |
| 05:35 | 3 | THE COURT:  Well, let me also explain how |
| 05:35 | 4 | it works at this point.  I don't -- if this isn't my |
| 05:35 | 5 | 20th patent trial, it's getting close.  If one of you |
| 05:35 | 6 | wants something and one of you doesn't want something, |
| 05:35 | 7 | the one who says, "This is the way you've done it in |
| 05:35 | 8 | all the others" is going to win. |
| 05:35 | 9 | Now -- but there may be something in this |
| 05:35 | 10 | case that wasn't in those.  And that's when you say, |
| 05:35 | 11 | this is different and this is why it's here. |
| 05:35 | 12 | And so -- so -- but so the way I do my -- |
| 05:35 | 13 | I'm sure your local counsel's told you this.  At some |
| 05:35 | 14 | point we'll take -- I'll take it up.  In fact, if we |
| 05:35 | 15 | really motor through and are in good shape, maybe what |
| 05:35 | 16 | we'll do Friday instead of bringing the jury in is come |
| 05:35 | 17 | in and get the jury charge done or have them here for |
| 05:35 | 18 | an hour and then work on the jury charge or whatever. |
| 05:35 | 19 | But what will happen is it will be |
| 05:36 | 20 | informal, and anyone can attend but no one has to.  And |
| 05:36 | 21 | I'll go through and let everyone know how I'm going to |
| 05:36 | 22 | rule on everything.  And then when you close your |
| 05:36 | 23 | case -- when the case is closed, you'll make your |
| 05:36 | 24 | formal objections on the record to preserve them. |
| 05:36 | 25 | It takes me an hour to read the jury |

05:36    1    charge.  So whatever you're thinking about when you're

05:36    2    going to get to closing arguments, you have to factor

05:36    3    in it will take me an hour to get that done.  So

05:36    4    there's no way around that.

05:36    5                    MR. ROSENTHAL:  Very helpful.  Thank you.

05:36    6                    THE COURT:  Is there anything else we

05:36    7    need to take up?

05:36    8                    MR. WALDROP:  No.  Thank you for your

05:36    9    time, Your Honor.  We appreciate you.

05:36    10                   THE COURT:  None of you all need to be

05:36    11   here before 10:30 tomorrow.  I'll be otherwise

05:36    12   occupied.

05:36    13                   (Hearing adjourned.)

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS     )

3

4

5              I, Kristie M. Davis, Official Court

6  Reporter for the United States District Court, Western

7  District of Texas, do certify that the foregoing is a

8  correct transcript from the record of proceedings in

9  the above-entitled matter.

10             I certify that the transcript fees and

11  format comply with those prescribed by the Court and

12  Judicial Conference of the United States.

13             Certified to by me this 26th day of

14  February 2023.

15

                              */s/ Kristie M. Davis*
16                            KRISTIE M. DAVIS
                              Official Court Reporter
17                            800 Franklin Avenue
                              Waco, Texas 76701
18                            (254) 340-6114
                              kmdaviscsr@yahoo.com
19

20

21

22

23

24

25