—608—

07:34   1                IN THE UNITED STATES DISTRICT COURT
                       FOR THE WESTERN DISTRICT OF TEXAS
       2                          WACO DIVISION

       3   WSOU INVESTMENTS, LLC    *
           DBA BRAZOS LICENSING     * February 23, 2023
       4   AND DEVELOPMENT          *
                                    *
       5   VS.                      *    CIVIL ACTION NOS.
                                    *
       6   DELL TECHNOLOGIES INC., * W-20-CV-480/481/486
           DELL INC., EMC CORP      *
       7   AND VMWARE INC.          *

       8            BEFORE THE HONORABLE ALAN D ALBRIGHT
                         JURY TRIAL PROCEEDINGS
       9                     Volume 3 of 3

      10   APPEARANCES:

      11   For the Plaintiff:    Jonathan K. Waldrop, Esq.
                                 Marcus A. Barber, Esq.
      12                         John W. Downing, Esq.
                                 Darcy L. Jones, Esq.
      13                         Heather S. Kim, Esq.
                                 ThucMinh Nguyen, Esq.
      14                         Kasowitz Benson Torres, LLP
                                 333 Twin Dolphin Drive, Suite 200
      15                         Redwood Shores, CA 94065

      16                         Hershy Stern, Esq.
                                 Julianne Laporte, Esq.
      17                         Kasowitz Benson Torres LLP
                                 1633 Broadway
      18                         New York, NY 10019

      19                         Paul G. Williams, Esq.
                                 Kasowitz Benson Torres LLP
      20                         1349 West Peachtree Street, NW
                                 Suite 1500
      21                         Atlanta, GA 30309

      22                         Gregory Phillip Love, Esq.
                                 Steckler Wayne Cherry & Love PLLC
      23                         PO Box 948
                                 Henderson, TX 75653

      24

      25

```
 1                            Mark D. Siegmund, Esq.
                              Melissa Samano Ruiz, Esq.
 2                            Steckler Wayne Cherry & Love, PLLC
                              8416 Old McGregor Road
 3                            Waco, TX 76712

 4    For the Defendant:      Brian Rosenthal, Esq.
                              Benjamin Hershkowitz, Esq.
 5                            Gibson, Dunn & Crutcher LLP
                              200 Park Ave.
 6                            New York, NY 10166

 7                            Jaysen S. Chung, Esq.
                              Y. Ernest Hsin, Esq.
 8                            Gibson Dunn & Cruthcher LLP
                              555 Mission Street, Suite 3000
 9                            San Francisco, CA 94105

10                            Casey J. McCracken, Esq.
                              Nathaniel R. Scharn, Esq.
11                            Emily M. Whitcher, Esq.
                              Gibson, Dunn & Crutcher LLP
12                            3161 Michelson Drive
                              Irvine, CA 92612
13
                              Veronica Smith Moye, Esq.
14                            Gibson, Dunn & Crutcher LLP
                              2001 Ross Avenue, Suite 2100
15                            Dallas, TX 75201

16                            Barry K. Shelton, Esq.
                              Winston & Strawn LLP
17                            2121 N. Pearl Street, Suite 900
                              Dallas, TX 75201
18
      Court Reporter:         Kristie M. Davis, CRR, RMR
19                            PO Box 20994
                              Waco, Texas 76702-0994
20                            (254) 340-6114

21       Proceedings recorded by mechanical stenography,

22    transcript produced by computer-aided transcription.

23

24

25
```

| | | |
|---|---|---|
| 07:36 | 1 | (Hearing begins.) |
| 08:47 | 2 | THE BAILIFF:  All rise. |
| 08:47 | 3 | THE COURT:  Thank you.  You may be |
| 08:47 | 4 | seated. |
| 08:47 | 5 | I'm happy to take up any issues we have. |
| 08:47 | 6 | MR. ROSENTHAL:  Good morning, Your Honor. |
| | 7 | (Audio disruption.) |
| 08:47 | 8 | MR. ROSENTHAL:  How's this?  There we go. |
| 08:47 | 9 | Good morning, Your Honor. |
| 08:47 | 10 | THE COURT:  Good morning. |
| 08:47 | 11 | MR. ROSENTHAL:  That'll wake you up. |
| 08:47 | 12 | We just have a housekeeping matter and |
| 08:47 | 13 | then some objection issues. |
| 08:47 | 14 | We'll start with the housekeeping. |
| 08:47 | 15 | Ms. Nebuchina's going to address that real quick. |
| 08:47 | 16 | THE COURT:  Yes, ma'am? |
| 08:47 | 17 | MS. NEBUCHINA:  Good morning, Your Honor. |
| 08:47 | 18 | Yana Nebuchina for the defendants. |
| 08:47 | 19 | We had a small clerical matter that we |
| 08:47 | 20 | wanted to take care of from yesterday's testimony of |
| 08:47 | 21 | Dr. McClellan.  We'd like to seal one of the exhibits |
| 08:48 | 22 | and its subparts, the source code modules. |
| 08:48 | 23 | It's Plaintiff's Exhibit No. 625, and |
| 08:48 | 24 | it's subparts A through I.  So that's 625A, B, C, D, E, |
| 08:48 | 25 | F, G, H and I. |

| | |
|---|---|
| 08:48 | 1 |

THE COURT:  I'm not sure what you mean by
seal.  We cannot do things -- we can make it
confidential and -- and -- but it has to be electronic.
Because that's the only way we get things to the jury.
And so -- but we can make sure that it's not made
public, if that's what you're asking.

MS. NEBUCHINA:  Yes, Your Honor.

THE COURT:  And I assume that the
plaintiff has no objection to that?

MR. SIEGMUND:  No objection, Your Honor.

THE COURT:  Okay.  We'll take -- Jen will
take care of that.

MS. NEBUCHINA:  Thank you, Your Honor.

MR. ROSENTHAL:  And, Your Honor, one of
the things that we need to figure out is that the
source code itself, the modules, are not supposed to be
made electronic.  Is there a way that we can handle it
like a physical exhibit that the jury can see without
putting it on the system?

THE COURT:  I don't know.  Let me see.

(Off-the-record bench conference.)

THE COURT:  I'm told what will have to
happen is you'll have to scan it and we can send it
back that way.

MR. ROSENTHAL:  Okay.  We'll figure out

08:49  1   with our client the right way to do that and take care

08:49  2   of that.

08:49  3                THE COURT:  Okay.  The jury has to have

08:49  4   it because it's an exhibit.  And we can't -- we have no

08:49  5   other way of getting it to them.  Because that's the

08:49  6   way the system works now on getting them the evidence.

08:49  7                MR. ROSENTHAL:  Okay.  So what we'll do

08:49  8   is we'll talk with opposing counsel and see what we can

08:49  9   do to make this work in a manner that still protects

08:49  10  the source code.

08:49  11               THE COURT:  Sure.

08:49  12               MR. ROSENTHAL:  And we have one other

08:50  13  issue which Mr. Hsin is going to handle.

08:50  14               MR. HSIN:  Good morning, Your Honor.

08:50  15  Ernie Hsin on behalf of defendants.

08:50  16               Our technical expert, Dr. Rosing, is

08:50  17  going to be testifying later today.  And we received

08:50  18  objections last night from the plaintiff.  It turned

08:50  19  out that they objected to virtually every one of

08:50  20  Dr. Rosing's noninfringement slides.

08:50  21               THE COURT:  Okay.

08:50  22               MR. HSIN:  We're not sure what the

08:50  23  plaintiff is planning.  But what we'd like to do is

08:50  24  avoid any unnecessary interruptions to Dr. Rosing's

08:50  25  direct, if possible.  So we looked at the objections

613

| | | |
|---|---|---|
| 08:50 | 1 | and it turns out that there are a couple of slides that |
| 08:50 | 2 | we think are sort of representative of larger swaths of |
| 08:50 | 3 | slides, that if we could resolve ahead of time I think |
| 08:50 | 4 | would give clarity. |
| 08:50 | 5 | So with Your Honor's permission we'd like |
| 08:50 | 6 | to address those. |
| 08:51 | 7 | THE COURT:  If you'll just hand the |
| 08:51 | 8 | slides to me, I'll take care of it. |
| 08:51 | 9 | MR. HSIN:  Okay.  You want them on the |
| 08:51 | 10 | screen or would you like them -- |
| 08:51 | 11 | THE COURT:  If you'll just physically |
| 08:51 | 12 | hand me the ones that the plaintiff is unhappy about, |
| 08:51 | 13 | I'll look through them. |
| 08:51 | 14 | MR. HSIN:  Okay. |
| 08:51 | 15 | Your Honor, we don't have the hard copies |
| 08:51 | 16 | with us right now. |
| 08:51 | 17 | Oh, yes, we do. |
| 08:51 | 18 | Oh, I'm sorry.  We do not.  They're on |
| 08:51 | 19 | their way. |
| 08:51 | 20 | We could show them on the screen if Your |
| 08:51 | 21 | Honor would like, or we could wait until the hard |
| 08:52 | 22 | copies arrive. |
| 08:52 | 23 | THE COURT:  Let me hear from the |
| 08:52 | 24 | plaintiff what the objections are. |
| 08:52 | 25 | MR. STERN:  Sure, Your Honor.  Hershy |

08:52  1   Stern for plaintiff Brazos, Your Honor.

08:52  2                    The issue is, Your Honor, the statement

08:52  3   on the right on the screen, it's condition of network

08:52  4   scheduler or link scheduler.  There is no condition on

08:52  5   the network scheduler or link scheduler.  Those are the

08:52  6   source code entities that detect congestion.

08:52  7                    We believe that it's confusing.  It's not

08:52  8   in -- it's not in Dr. Rosing's report.  I asked for the

08:52  9   paragraph number for which is the basis of these

08:52 10   slides.  It was Paragraph 95, I was told, of

08:52 11   Dr. Rosing's report.  I do not believe it supports

08:52 12   these types of slides.

08:52 13                    Thank you, Your Honor.

08:52 14                    THE COURT:  Yeah.  I think the -- as a

08:52 15   condition for something being on the slide, it would

08:52 16   have to be something that was -- had a foundation in

08:53 17   the report.

08:53 18                    So let me hear from you on that, please.

08:53 19                    MR. HSIN:  Yes, Your Honor.  May I

08:53 20   approach with the copy of the report?

08:53 21                    THE COURT:  Okay.  I've got 95.

08:53 22                    MR. HSIN:  All right.  Your Honor, 95 --

08:53 23   the title of 95 is "Network Scheduler and Link

08:53 24   Scheduler."  And this slide is Dr. Rosing identifying

08:53 25   an argument --

615

08:53  1                  THE COURT:  Yes, sir.

08:53  2                  MR. HSIN:  -- an argument of

08:53  3  Dr. McClellan where he is pointing to satisfy the

08:53  4  condition -- congestion for an egress node.  He's

08:53  5  pointing to congestion on the network scheduler and the

08:53  6  link scheduler.

08:53  7                  And that's exactly what 95 addresses.

08:53  8  First sentence says:  Dr. McClellan also refers to

08:53  9  Mr. Connors' descriptions of VeloCloud's network

08:53  10  scheduler.  There's a parenthetical that describes what

08:54  11  he is referring to and link scheduler.  And there's a

08:54  12  parenthetical describing what he's --

08:54  13                  THE COURT:  He -- he -- he --

08:54  14                  MR. HSIN:  Yes, Your Honor?

08:54  15                  THE COURT:  Is it Dr. Rosing?  Am I

08:54  16  pronouncing --

08:54  17                  MR. HSIN:  Yes.

08:54  18                  THE COURT:  Dr. Rosing has in here:

08:54  19  Neither description -- in Paragraph 95 -- demonstrates

08:54  20  that either the network scheduler or link scheduler --

08:54  21  then, in quotes, "determines for each patent whether a

08:54  22  congestion condition" -- and that's the condition

08:54  23  you're talking about on this?

08:54  24                  MR. HSIN:  That's exactly right, Your

08:54  25  Honor.  And then the --

—616—

08:54  1                    THE COURT:  I'll overrule the objection.

08:54  2                    What's the next slide?

08:54  3                    MR. HSIN:  Thank you, Your Honor.

08:54  4                    The next slide is Slide 322, Your Honor.

08:54  5                    THE COURT:  Okay.  If you'll put that up.

08:54  6                    MR. HSIN:  Their objection, Your Honor,

08:54  7    is to the title and the text as beyond the scope of her

08:54  8    report.

08:54  9                    MR. SIEGMUND:  Your Honor, if I may, just

08:54  10   to shortcut this, that was our only objection.  We

08:54  11   don't have any remaining objections.

08:54  12                    THE COURT:  Okay.  Very good.

08:54  13                    MR. HSIN:  Thank you, Your Honor.

08:55  14                    THE COURT:  You bet.

08:55  15                    Okay.  Is there anything else we need to

08:55  16   take up?

08:55  17                    MR. ROSENTHAL:  Not from us, Your Honor.

08:55  18                    MR. SIEGMUND:  No, Your Honor.

08:55  19                    THE COURT:  Very good.

08:55  20                    Is the jury all here?

08:55  21                    (Off-the-record discussion.)

08:55  22                    THE COURT:  We're a little early, but --

08:55  23   that clock's wrong.  I thought we were a little bit

08:55  24   further along.  I just noticed that.  It's been so

08:55  25   riveting.

617

|        |    |                                              |
|--------|----|----------------------------------------------|
|        | 1  | (Laughter.)                                  |
| 08:55  | 2  | THE COURT:  And so we'll get started at     |
| 08:55  | 3  | 9:00.                                        |
| 08:55  | 4  | THE BAILIFF:  All rise.                      |
| 08:55  | 5  | (Recess taken.)                              |
| 09:01  | 6  | THE BAILIFF:  All rise.                      |
| 09:01  | 7  | THE COURT:  Please remain standing for      |
| 09:01  | 8  | the jury.                                    |
| 09:01  | 9  | (Jury entered the courtroom.)                |
| 09:01  | 10 | THE COURT:  Thank you very much for being   |
| 09:01  | 11 | here.  You may be seated.                    |
| 09:01  | 12 | Plaintiff, you may call your next           |
| 09:01  | 13 | witness.                                     |
| 09:01  | 14 | MS. MOYE:  Your Honor, the defendants       |
| 09:02  | 15 | call as their first witness --              |
| 09:02  | 16 | THE COURT:  Well, the plaintiff hasn't      |
| 09:02  | 17 | rested yet.  That's why I asked them --      |
| 09:02  | 18 | MR. LOVE:  Yes, Your Honor.  Due to the     |
| 09:02  | 19 | nature of the order of the witnesses, we call Kit |
| 09:02  | 20 | Colbert in our case-in-chief.  But I believe the Court |
| 09:02  | 21 | has given permission for defendant to put the witness |
| 09:02  | 22 | on first.                                    |
| 09:02  | 23 | THE COURT:  I have.  Yes, sir.              |
| 09:02  | 24 | (The witness was sworn.)                     |
| 09:02  | 25 | DIRECT EXAMINATION                           |

618

09:02  1    BY MS. MOYE:

09:02  2        Q.    Good morning, Mr. Colbert.

09:02  3        A.    Good morning.

09:02  4        Q.    Please start by telling the jury your full

09:03  5    name and where you are currently employed.

09:03  6        A.    My name is Osten Kit Colbert.  I go by Kit.

09:03  7    And I'm currently employed at VMware.

09:03  8        Q.    And what is your title at VMware?

09:03  9        A.    CTO.

09:03  10       Q.    What does CTO stand for, Mr. Colbert?

09:03  11       A.    Chief technology officer.

09:03  12       Q.    And you just heard plaintiff's counsel said

09:03  13   you were being called as a plaintiff witness.

09:03  14             Did you hear that?

09:03  15       A.    I heard that.

09:03  16       Q.    And are you also appearing here as a witness

09:03  17   for the defendants?

09:03  18       A.    I am.

09:03  19       Q.    Why don't you start, Mr. Colbert, by telling

09:03  20   us why are you here today?

09:03  21       A.    Well, I'm here to represent VMware.  I'm here

09:03  22   to share what VMware's all about, our continued focus

09:03  23   on innovation.  And also how we operate with integrity,

09:03  24   that we are absolutely not the type of company that

09:03  25   would infringe another company's patents.

619

09:03  1    Q.   And why did you, Mr. Colbert, feel it was

09:04  2  important for you personally to appear before this

09:04  3  jury?

09:04  4    A.   So I've been at VMware for about 20 years now.

09:04  5  I've very much grown up there.  In fact, it's the only

09:04  6  place I've worked full-time.  And I've had the benefit

09:04  7  of growing there, learning from the culture and,

09:04  8  hopefully, positively influencing the culture as well.

09:04  9        So to me, it's personally very important for

09:04  10  me to share that experience and my perspective on

09:04  11  VMware with you today.

09:04  12    Q.   And you said your current position is CTO,

09:04  13  chief technology officer; is that right?

09:04  14    A.   That's correct.

09:04  15    Q.   We'll come back and discuss your duties and

09:04  16  responsibilities in a little more detail, but I do

09:04  17  first want to give you an opportunity to introduce

09:04  18  yourself to the jury a little more.

09:04  19        Tell us, where do you currently reside?

09:04  20    A.   I live in the San Francisco Bay area.

09:04  21    Q.   Do you have family there, Mr. Colbert?

09:05  22    A.   I do.

09:05  23    Q.   And tell us a little bit about your family.

09:05  24    A.   Sure.  I have a fiance and I have two kids

09:05  25  from a previous marriage.

620

```
09:05   1        Q.    How old are your children?
09:05   2        A.    12 and 9.
09:05   3        Q.    Boys and girls?  Some of both?
09:05   4        A.    Older girl, younger boy.
09:05   5        Q.    So a 12-year-old girl?
09:05   6        A.    Yes.
09:05   7        Q.    On the brink of a lot of drama, I can tell you
09:05   8   from personal experience.
09:05   9        A.    That's what I hear, yes.
09:05  10        Q.    Are you involved in the local community
09:05  11   outside of your business activities?
09:05  12        A.    I am.
09:05  13        Q.    Tell us what you do.
09:05  14        A.    Well, one of the things I'm particularly
09:05  15   passionate about is education, and I'm the president of
09:05  16   the board for my children's school.
09:05  17        Q.    And why did you decide to take on that
09:05  18   responsibility?
09:05  19        A.    Well, the school's very special for us.  My
09:05  20   daughter was actually in the inaugural class.  And the
09:05  21   school really focuses on not just educating the
09:05  22   children but really building the whole child.
09:05  23              And they're going through, you know, a lot of
09:05  24   growth and sort of evolution, and I felt that in the
09:06  25   lessons that I've learned as a leader at VMware can be
```

621

```
09:06    1    helpful to help grow the school.
09:06    2        Q.    That's admirable.
09:06    3             I want to get a little more about your
09:06    4    background.
09:06    5             Where were you born and where did you grow up?
09:06    6        A.    So I was born outside of Austin, but I grew up
09:06    7    primarily in Oklahoma.
09:06    8        Q.    Where in Oklahoma, sir?
09:06    9        A.    A few different places.  Tulsa, Norman and, if
09:06   10    you know Oklahoma, there's a small town called
09:06   11    Tecumseh, which is kind of near Shawnee.
09:06   12        Q.    And did you graduate from high school in
09:06   13    Oklahoma?
09:06   14        A.    I did.
09:06   15        Q.    Did you attend college after graduating from
09:06   16    high school?
09:06   17        A.    I did.
09:06   18        Q.    Where did you go to college?
09:06   19        A.    I went to Brown University in Providence,
09:06   20    Rhode Island.
09:06   21        Q.    Did you get a degree from Brown?
09:06   22        A.    I did.
09:06   23        Q.    What degree?
09:06   24        A.    A bachelor of science in computer science.
09:06   25        Q.    So computer science from Tecumseh, Oklahoma.
```

622

09:06    1              Tell us, how did you become interested in that

09:06    2      field?

09:06    3         A.    I think I started with video games.  Then my

09:07    4      dad bought a PC and I started playing with it a lot.

09:07    5         Q.    And did you -- tell us a little more about

09:07    6      that experience.  What kind of playing did you do with

09:07    7      that PC?

09:07    8         A.    Well, unfortunately, it was a lot of breaking.

09:07    9      And so eventually my dad got me to do an internship at

09:07   10      the computer company that built that computer for us,

09:07   11      and that was really eye-opening for me.  It helped me

09:07   12      get a better understanding of how computers work and,

09:07   13      really, the possibility with what you can do with

09:07   14      computers.

09:07   15         Q.    When did you graduate from Brown?

09:07   16         A.    That would be in 2003.

09:07   17         Q.    And what was your first job after you

09:07   18      graduated from Brown?

09:07   19         A.    VMware.

09:07   20         Q.    What was your first position at VMware?

09:07   21         A.    I was an entry-level engineer.

09:07   22         Q.    Was that your first job at VMware?

09:07   23         A.    No, actually.  I'd done an internship at

09:07   24      VMware the previous summer in 2002.

09:07   25         Q.    And what did you do as a summer intern at

623

09:07  1    VMware?  What did you work on?

09:07  2        A.    So I worked on our core product ESX, now

09:08  3    called vSphere.  I don't want to get too technical, but

09:08  4    at the operating system level is what I focused on.

09:08  5        Q.    Did you do summer internships at any other

09:08  6    companies while you were in college?

09:08  7        A.    I did.

09:08  8        Q.    Can you tell us about some of those

09:08  9    opportunities?

09:08  10        A.    Sure.  I interned twice at IBM, once here in

09:08  11    Austin -- or over in Austin, actually, and then also

09:08  12    once at Microsoft.

09:08  13        Q.    Did you have the opportunity to join those

09:08  14    other companies, IBM and Microsoft, after you graduated

09:08  15    from college?

09:08  16        A.    After I graduated?

09:08  17        Q.    Yes.

09:08  18        A.    Yes.

09:08  19        Q.    And what made you decide to choose VMware

09:08  20    rather than the Microsofts and IBMs of the world?

09:08  21        A.    I had a great internship at VMware and, you

09:08  22    know, three things really stuck with me.  So, number

09:08  23    one, the technology.  It was so cool.  I loved, you

09:08  24    know, geeking out about it, learning so much.

09:08  25            Number two was the people.  Super, super smart

624

09:09  1    people.  I felt I could learn so much from them.

09:09  2            And Number 3 was really the culture, people

09:09  3    truly caring about one another, supporting one another,

09:09  4    you know, strong integrity, doing the right thing.

09:09  5        Q.    Is there a phrase called "culture of

09:09  6    innovation" that's used at VMware?

09:09  7        A.    Yeah.

09:09  8        Q.    Please explain what that means to the jury.

09:09  9        A.    Sure.  So when VMware started, some of the

09:09  10   technologies we were working on, virtualization for

09:09  11   instance, no one knew if those were really possible to

09:09  12   do.  It was kind of a bit of a science experiment.

09:09  13           The thing is, we did it and, you know, really

09:09  14   pushed the envelope on what was possible.  And so I

09:09  15   think that really is pretty foundational to how we

09:09  16   operate as a company and, you know, what we as

09:09  17   engineers sort of embody.  And so that -- we use that

09:09  18   phrase "culture of innovation."

09:09  19       Q.    And was that culture present when you joined

09:09  20   VMware?

09:09  21       A.    It was.

09:09  22       Q.    Is it still present today?

09:09  23       A.    Yes.

09:09  24       Q.    Do you recall, just a ballpark number, how

09:10  25   many employees were there at VMware when you joined in

625

09:10  1    2003?

09:10  2        A.    Yeah, it was about 300 people at the company.

09:10  3        Q.    And tell us a little bit about your first

09:10  4    full-time position at VMware, what did you do?

09:10  5        A.    Well, essentially, I continued the work that I

09:10  6    had done as an intern.  I was laughing because, matter

09:10  7    of fact, they had filed some bugs, some work against me

09:10  8    because they knew I was coming back.

09:10  9             So really working on that sort of core

09:10 10    operating system level of our ESX, now vSphere product.

09:10 11        Q.    You said, "filed some bugs against you."

09:10 12    Explain what that means.

09:10 13        A.    A bug is a term that we use when there's a

09:10 14    problem or a defect.  You -- there's a bug-tracking

09:10 15    system.  So you say, hey.  Here's the problem.  And

09:10 16    list it out.

09:10 17             And so even though I wasn't an employee at the

09:10 18    company, people knew I was coming back, so they filed

09:10 19    this work against me, these defects for me to work on.

09:10 20        Q.    I see.

09:10 21             So it was work they asked you to do, not

09:11 22    something against you?

09:11 23        A.    No.  Yes.  Thank you for that.  Yes.

09:11 24        Q.    Sure.  Now, you say you have spent 20 years at

09:11 25    VMware.

09:11  1          Can you give us just a high-level overview of
09:11  2   the different positions that you've had?
09:11  3   A.    Uh-huh.  Yeah.  I've been really fortunate to
09:11  4   have tremendous opportunities for growth and to really
09:11  5   step up there.  So I've -- you know, I was fortunate to
09:11  6   work through -- work up, you could say, the engineering
09:11  7   ladder and -- before eventually moving over to a
09:11  8   management position, CTO, for one of our business
09:11  9   groups.
09:11  10          I was a general manager for a short period of
09:11  11  time for one of our BUs and then, most recently, became
09:11  12  our corporate CTO about 18 months ago.
09:11  13  Q.    Now, tell us what exactly is your role as the
09:11  14  company-wide chief technology officer?
09:11  15  A.    Sure.  So what I really focus on is
09:11  16  innovation.  And I look at that through kind of three
09:11  17  different lenses, if you will.
09:11  18          The first is around technical strategy.  Are
09:12  19  we making sure that we're going the right direction?
09:12  20  Where is the industry going?  What do customers need?
09:12  21  How do we stay ahead of that?
09:12  22          The second one is research and incubation,
09:12  23  projects that are a few years out that we need to sort
09:12  24  of test out the technologies for, make sure they can
09:12  25  work.

627

09:12  1           And then the third one is platforms and

09:12  2  systems, common tooling.  How do we support all the

09:12  3  different product teams and what they do so that they

09:12  4  can innovate?

09:12  5     Q.    Okay.  I'd like to explain a little more about

09:12  6  your role as CTO and how it fits in the organization.

09:12  7  We prepared some demonstratives to help the jury follow

09:12  8  that testimony.

09:12  9           MS. MOYE:  So, Mr. Eaton, could you put

09:12  10  up our first slide, please?

09:12  11           Next page.

09:12  12  BY MS. MOYE:

09:12  13     Q.    Now, you see here an org chart with the CEO at

09:12  14  the top and you, OCTO, right below that?

09:12  15     A.    I do.

09:12  16     Q.    Does OCTO stand for "office of chief

09:13  17  technology officer"?

09:13  18     A.    It does.

09:13  19     Q.    Do you report directly to the CEO of VMware?

09:13  20     A.    I do.

09:13  21           MS. MOYE:  Now, Mr. Eaton, if you could

09:13  22  move forward.

09:13  23  BY MS. MOYE:

09:13  24     Q.    Are you the only person who reports directly

09:13  25  to the CEO?

628

09:13  1        A.    No.

09:13  2        Q.    I see a number of boxes here with the initials

09:13  3   "BU" and the denomination "product teams."

09:13  4        A.    Uh-huh.

09:13  5        Q.    What does that mean?  Explain to the jury what

09:13  6   that means.

09:13  7        A.    Sure.  So what we're looking at here on the

09:13  8   screen is essentially a very high-level org chart for

09:13  9   our engineering organization.

09:13  10            So BU stands for business unit, and these are

09:13  11  our lines of business, different product teams.  And as

09:13  12  you can see, we have five of these business units.

09:13  13            And then the office of the CTO kind of sits

09:13  14  next to them, so to speak.  And as I mentioned, our job

09:13  15  is really to support them and what they do.

09:13  16       Q.    Going back to your role as CTO, I see three

09:13  17  boxes below you.

09:13  18       A.    Uh-huh.

09:13  19       Q.    And I want to walk through those and have the

09:14  20  jury understand what those represent.

09:14  21       A.    Sure.

09:14  22       Q.    Are those teams that report to you?

09:14  23       A.    They are.

09:14  24       Q.    Okay.  Let's start first with strategy,

09:14  25  planning and operations.

09:14  1          What happens there on that team?

09:14  2      A.    Yeah.  So as I mentioned, technical strategy

09:14  3  is a big part of what we do within my organization.  As

09:14  4  you can imagine, each of the BUs, they're very excited

09:14  5  to do their own thing, and they're pushing the

09:14  6  envelope.

09:14  7          But how do we make sure that what they're

09:14  8  doing is aligned and that we're all rowing the boat in

09:14  9  the same direction, so to speak?

09:14  10         So that team on the left there, on the bottom

09:14  11 left, is really focused on and showing that we've got a

09:14  12 vision that we're all moving toward together.

09:14  13     Q.    What about research and innovation, what does

09:14  14 that team do?

09:14  15     A.    So this team's really looking at a few years

09:14  16 out, and it comprises a couple different parts.

09:14  17         Actually, let me adjust this.  There we go.

09:14  18         So research, economic research.  We work

09:14  19 closely with universities.  We have some researchers

09:15  20 internally.  They're looking at technologies that may

09:15  21 not see the light of day for five years, that we're not

09:15  22 sure are even possible.

09:15  23         We have other folks that are incubating

09:15  24 projects that are maybe more like two years out.

09:15  25         The point is that the business units, you

630

09:15  1    know, they don't have needs for these technologies

09:15  2    right now.  But we as a company have to be investing in

09:15  3    them early to make sure that they're ready for prime

09:15  4    time once the market is ready.

09:15  5        Q.    And then, finally, the VMware platform

09:15  6    services team, what does that group do?

09:15  7        A.    Yeah.  So that team provides all of the common

09:15  8    platforms, common services, common tooling to all of

09:15  9    our business units.  The reality is that as you build

09:15  10   software, there's just a lot of kind of basic, I would

09:15  11   say, nondifferentiated things that you've got to do.

09:15  12           And rather than having each of our business

09:15  13   units individually do it, replicate, duplicate, do all

09:15  14   this unnecessary work, this one team here can

09:15  15   centralize all that and take care of it for everyone.

09:15  16       Q.    How many people are you responsible for

09:16  17   managing in your role as CTO?

09:16  18       A.    Today, the overall size of the office of the

09:16  19   CTO is about 2,300 people.

09:16  20       Q.    Are all 2,300 of those people engineers?

09:16  21       A.    No.

09:16  22       Q.    Do all the engineers at VMware report to you?

09:16  23       A.    No.

09:16  24       Q.    Are there engineers that also work in the

09:16  25   product teams that we see here?

631

09:16   1        A.    Oh, absolutely.  Many.  Many of them.
09:16   2        Q.    Now, your title is chief technology officer.
09:16   3    Does that mean you're responsible for the development
09:16   4    of all technology at the company?
09:16   5        A.    No.
09:16   6        Q.    Do the product teams get involved in that as
09:16   7    well?
09:16   8        A.    Oh, absolutely.  Very much so.
09:16   9        Q.    In your role as CTO, do you personally get
09:16   10   involved in the technical design of VMware products?
09:16   11       A.    No.
09:16   12       Q.    Are you able to describe in detail the
09:16   13   technical functionality of all the company's products?
09:17   14       A.    No.
09:17   15       Q.    If you had a question, Mr. Colbert, about the
09:17   16   technical functionality of VMware's products, how would
09:17   17   you go about getting answers?
09:17   18       A.    Well, I would talk to the technical leader of
09:17   19   the appropriate product team.  And in some cases that
09:17   20   may be actually someone within my own organization.
09:17   21       Q.    Now, are you aware, sir, that the plaintiff,
09:17   22   WSOU, has accused the VMware product VeloCloud of
09:17   23   infringement in this case?
09:17   24       A.    I'm aware.
09:17   25             MS. MOYE:  If we could have that slide up

| | | |
|---|---|---|
| 09:17 | 1 | still, please. |
| 09:17 | 2 | BY MS. MOYE: |
| 09:17 | 3 | Q.    Where does VeloCloud reside in these product |
| 09:17 | 4 | teams? |
| 09:17 | 5 | A.    Yeah.  So VeloCloud is in the service provider |
| 09:17 | 6 | and Edge business -- excuse me.  Service provider and |
| 09:17 | 7 | Edge business unit on the right-hand side there. |
| 09:17 | 8 | Q.    If you had questions about the detailed |
| 09:17 | 9 | functionality of VeloCloud, who at the company would |
| 09:17 | 10 | you ask? |
| 09:17 | 11 | A.    Well, the first person I would reach out to |
| 09:18 | 12 | would be Craig Connors, who is the general manager and |
| 09:18 | 13 | former CTO for VeloCloud. |
| 09:18 | 14 | Q.    And do you know whether Mr. Connors will be |
| 09:18 | 15 | testifying in this case? |
| 09:18 | 16 | A.    I do. |
| 09:18 | 17 | Q.    And will he? |
| 09:18 | 18 | A.    He will.  Yes. |
| 09:18 | 19 | Q.    Okay.  I'd like to step back and talk a little |
| 09:18 | 20 | more about the company and its history. |
| 09:18 | 21 | A.    Sure. |
| 09:18 | 22 | MS. MOYE:  If we could have the next |
| 09:18 | 23 | slide, please, Mr. Eaton. |
| 09:18 | 24 | BY MS. MOYE: |
| 09:18 | 25 | Q.    When was VMware founded? |

633

09:18  1          Next bullets, please.

09:18  2      A.    In February of 1998.

09:18  3      Q.    And who founded the company?

09:18  4      A.    So we had five founders.  One Stanford

09:18  5  professor and three of his graduate students, and then

09:18  6  the Stanford professor's wife, who is an accomplished

09:18  7  Silicon Valley executive.

09:18  8      Q.    And what line of business is VMware in?  Can

09:18  9  you give us a high-line description?

09:18  10     A.    Sure.  I mean, generally speaking, obviously

09:18  11 we're in the IT space.  But more specifically, we're in

09:18  12 the cloud computing space within that.

09:18  13     Q.    And what does that mean?  The cloud computing

09:19  14 space.

09:19  15     A.    Sure.  You know, the big focus for us is

09:19  16 really on digital transformation.  And this notion that

09:19  17 every company today, irrespective of what its line of

09:19  18 business is, is a software company to some degree,

09:19  19 right?  This is what we, as consumers, expect.  We want

09:19  20 the app on our phone and get it done and, you know,

09:19  21 order things online.

09:19  22          And so what you see is companies struggling to

09:19  23 figure out how to do that, how to get this sort of

09:19  24 digital experience going.

09:19  25          And from a cloud computing perspective, our

634

09:19  1    focus is really to help provide the foundation of that

09:19  2    digital experience for those customers, to help them on

09:19  3    that transformation.

09:19  4        Q.    Are your customers consumers or other

09:19  5    businesses?

09:19  6        A.    We have a very small business that goes

09:19  7    directly to consumers.  The vast majority of our

09:19  8    business is to other businesses.

09:19  9        Q.    Now, I'd like to ask about VMware's patent

09:19  10   portfolio.

09:19  11            MS. MOYE:  If I could have the next

09:20  12   slide.

       13   BY MS. MOYE:

09:20  14       Q.    How many patents does VMware hold today?

09:20  15       A.    So VMware today has almost 6,000 patents.

09:20  16       Q.    And does the company continue to file patent

09:20  17   applications?

09:20  18       A.    We do.

09:20  19       Q.    About how many patent applications are filed

09:20  20   each year?

09:20  21       A.    So our targets are around 600 patent

09:20  22   applications per year.  We could actually do much

09:20  23   higher than that, as a matter of fact.  But we throttle

09:20  24   it a bit to make sure that every patent that we file is

09:20  25   going to be a high-quality one.

635

09:20    1          Q.    When was the first patent that VMware

09:20    2    obtained?

09:20    3          A.    It issued in 2002.

09:20    4          Q.    And company was founded in 1998, first patent

09:20    5    in 2002?

09:20    6          A.    That's correct.

09:20    7          Q.    And now at least 6,000?

09:20    8          A.    Yes.

09:20    9                MS. MOYE:  Can we have the next slide,

09:21   10    please?

        11    BY MS. MOYE:

09:21   12          Q.    Has your patent portfolio received any

09:21   13    recognition?

09:21   14          A.    It has.

09:21   15          Q.    And on this slide we have the acronym IEEE.

09:21   16    What does that stand for?

09:21   17          A.    Sure.  It stands for the Institute of

09:21   18    Electrical and Electronics Engineers.

09:21   19          Q.    A organization I would never be allowed to be

09:21   20    a part of.

09:21   21                Now, it says here that that organization,

09:21   22    IEEE, has ranked VMware's portfolio.

09:21   23                Would you explain that for the jury?

09:21   24          A.    Sure.  So the IEEE is a professional

09:21   25    association of engineers.  And while it says electrical

636

09:21  1    and so forth, it includes software.  And they give out

09:21  2    various awards and recognitions, both for individuals

09:21  3    doing great accomplishments, as well as companies

09:21  4    overall.

09:21  5            And so as you can see, this one is specific to

09:21  6    us as a company, recognizing the number and the amount

09:21  7    of patents that we have in the software field.

09:22  8        Q.    And is it correct that IEEE has ranked the

09:22  9    company as having the second most powerful software

09:22  10   patent portfolio in the world?

09:22  11       A.    It is.

09:22  12       Q.    Are you proud of that accomplishment, sir?

09:22  13       A.    Very much so.

09:22  14       Q.    Now, I want to talk a little bit about the

09:22  15   geographic scope of the company.  You told us it was

09:22  16   founded in California.

09:22  17           Where does VMware have offices now?

09:22  18               MS. MOYE:  If we could have the next

09:22  19   graphic for that, please.

09:22  20       A.    Sure.  We've got offices across the U.S. and

09:22  21   all around the world.

09:22  22   BY MS. MOYE:

09:22  23       Q.    And does the light blue shading on this

09:22  24   demonstrative demonstrate where the international

09:22  25   offices are?

637

09:22   1        A.    Yes.  It does.

09:22   2        Q.    Give us some examples of where there are

09:22   3    international offices.

09:22   4        A.    Sure.  So we've got some very large

09:22   5    engineering offices in Sofia, Bulgaria; a couple in

09:22   6    India; and a couple in China as well.

09:22   7        Q.    Does the -- do the dark blue dots that we see

09:23   8    in the U.S., do they represent domestic office

09:23   9    locations for VMware?

09:23   10       A.    They do.

09:23   11       Q.    Give us some examples of where there are U.S.

09:23   12   office locations.

09:23   13       A.    Sure.  Seattle; Boston; Atlanta is another

09:23   14   very large one.  Then we actually have a fairly large

09:23   15   office here in Texas, in Austin.

09:23   16       Q.    Do you also have an office in Dallas, Texas?

09:23   17       A.    We do.

09:23   18       Q.    About how many people work at VMware today?

09:23   19       A.    Today, it's about 37,000 full-time employees.

09:23   20       Q.    So when you joined in 2003, there were a

09:23   21   couple hundred.  You've grown to 37,000?

09:23   22       A.    That's correct.

09:23   23       Q.    About how many of the VMware employees are

09:23   24   based in Texas?

09:23   25       A.    Somewhere on the order of 2,000 employees in

638

09:23  1    Texas.

09:23  2        Q.    How many customers does VMware have today?

09:23  3        A.    We have about 300,000 customers.

09:23  4        Q.    And are your customers -- are any of your

09:24  5    customers included on the Fortune 100 largest

09:24  6    companies?

09:24  7        A.    Yes.

09:24  8        Q.    And how many?

09:24  9        A.    Essentially all of them.

09:24  10        Q.    Thank you, sir.

09:24  11            Tell us a little bit more about your

09:24  12    customers.  In what industries do they operate?

09:24  13        A.    Yeah.  So as you can imagine, 300,000

09:24  14    customers.  We really have customers across all types

09:24  15    of industries.  Whether it's manufacturing or retail or

09:24  16    healthcare or finance.  It really runs the gamut.

09:24  17        Q.    Can you give us some examples of customers who

09:24  18    use your products?

09:24  19        A.    Sure.  As I said, large financial

09:24  20    institutions, the sort of JPMorgans of the world.

09:24  21    Folks like Domino's, right?  How -- you know, you think

09:24  22    about the problems that they have delivering pizza, but

09:24  23    there's a lot of technology that goes into it.  So it's

09:24  24    both very large, you know, companies as well as smaller

09:24  25    ones.

639

| | | |
|---|---|---|
| 09:24 | 1 | Q.    Can you give us an example of how your |
| 09:25 | 2 | technology is utilized in the healthcare field in |
| 09:25 | 3 | particular? |
| 09:25 | 4 | A.    Sure.  Let me give you a personal example |
| 09:25 | 5 | from, you know, my own experience.  One of the benefits |
| 09:25 | 6 | that I have is being able to go and meet with |
| 09:25 | 7 | customers.  And sometimes they take me on tours of |
| 09:25 | 8 | their facilities. |
| 09:25 | 9 | And so this one case I went -- or this one |
| 09:25 | 10 | customer I went to was a children's hospital in |
| 09:25 | 11 | Minneapolis.  And it was really, really impactful for |
| 09:25 | 12 | me personally to see the difference that our software |
| 09:25 | 13 | made there. |
| 09:25 | 14 | They were taking me through and told me before |
| 09:25 | 15 | they used our software when they had to move a child |
| 09:25 | 16 | between different departments in the hospital, those |
| 09:25 | 17 | departments weren't connected technologically.  And so |
| 09:25 | 18 | they have to, like, burn a DVD and literally, you know, |
| 09:25 | 19 | physically put it on the child, like -- sounds wild, |
| 09:25 | 20 | but that's what they did.  Then, you know, rushed them |
| 09:25 | 21 | off to their other area.  They had to load the data. |
| 09:26 | 22 | It took forever. |
| 09:26 | 23 | And, you know, you're just kind of, like, |
| 09:26 | 24 | shocked.  Like, this is modern America.  But that was |
| 09:26 | 25 | the way it was just a few years back. |

640

09:26  1              And so then they started using our technology.

09:26  2    They got everything in the data center.  All the apps,

09:26  3    all the data was there.  All the doctors, all the

09:26  4    medical professionals had iPads.  It was all available

09:26  5    at a moment's notice, at a touch.

09:26  6              And it really -- you know, I think the biggest

09:26  7    factor there was it got the technology out of the way.

09:26  8    It allowed them to focus on helping the kids.

09:26  9              So that was personally, for me, a really,

09:26  10   really impactful experience, seeing how our

09:26  11   technology's used.

09:26  12        Q.   Yeah, I'm sure it was.

09:26  13             Is the U.S. military also a customer for

09:26  14   VMware?

09:26  15        A.   They are.

09:26  16        Q.   Can you give us some examples of how the U.S.

09:26  17   military uses your products?

09:26  18        A.   Sure.  They're, you know, very large customers

09:26  19   across, I don't know, all the different branches of the

09:26  20   military.  But one example that comes to mind would be

09:26  21   the U.S. Army.

09:26  22             We worked together with them to create what we

09:26  23   call the Army Software Factory.  And the realization

09:27  24   that the Army had was that they were actually falling

09:27  25   behind some of our potential enemies.  That while you

| | | |
|---|---|---|
| 09:27 | 1 | got to be strong in battle field physically -- |
| 09:27 | 2 | (Interruption.) |
| 09:27 | 3 | BY MS. MOYE: |
| 09:27 | 4 | Q.    Sorry.  Technical glitch. |
| 09:27 | 5 | A.    All good. |
| 09:27 | 6 | While you can be strong on the battlefield |
| 09:27 | 7 | physically, the software component's becoming a bigger |
| 09:27 | 8 | and bigger aspect, things like cyber attacks, you know. |
| 09:27 | 9 | So they had to step up their game.  And that's what we |
| 09:27 | 10 | work with them to do. |
| 09:27 | 11 | And essentially, it helped them to build |
| 09:27 | 12 | applications faster, to make them better to support our |
| 09:27 | 13 | troops both on and off the battlefield.  So that was a |
| 09:27 | 14 | great collaboration. |
| 09:27 | 15 | Q.    Is VMware technology actually used on the |
| 09:27 | 16 | battlefield in some occasions? |
| 09:27 | 17 | A.    It is.  And probably can't go into too many |
| 09:27 | 18 | details there.  I think they're kind of secretive.  But |
| 09:27 | 19 | I will say that I was personally kind of surprised, |
| 09:27 | 20 | positively, to learn that some of the tanks the U.S. |
| 09:27 | 21 | Army has actually runs VMware products. |
| 09:28 | 22 | And, you know, they've kind of battle-hardened |
| 09:28 | 23 | them and used them in these, you know, pretty scary |
| 09:28 | 24 | scenarios.  But they rely on our technology in order to |
| 09:28 | 25 | operate.  And so that, you know, again, kind of hit |

642

09:28  1    home for me.

09:28  2        Q.    Has the company received any awards or

09:28  3    accolades over the years other than the IEEE award that

09:28  4    we talked about earlier?

09:28  5        A.    Oh, yeah.  Many, many, many awards.

09:28  6                MS. MOYE:  Can we have the next slide,

09:28  7    please?

09:28  8    BY MS. MOYE:

09:28  9        Q.    Does this slide, Mr. Colbert, list some of the

09:28  10   awards the company has received?

09:28  11       A.    It has -- or it does.  Excuse me.

09:28  12       Q.    I'd like you to go through and explain those

09:28  13   awards to the jury.  Let's start with the cybersecurity

09:28  14   award on the left.

09:28  15       A.    Sure.  So, yeah.  As I mentioned,

09:28  16   cybersecurity's becoming a bigger and bigger thing.  We

09:28  17   talked about it in the context of the Army, but really

09:28  18   all of our customers are worried about it.

09:28  19              And one of the benefits of our technology is

09:28  20   that it fundamentally helps customers to be more secure

09:29  21   and that just goes to some of the design elements of

09:29  22   how we build our software.

09:29  23              So this is a great recognition for our

09:29  24   contributions to the cybersecurity industry.

09:29  25       Q.    And that was an award obtained in 2022; is

643

09:29  1   that correct?

09:29  2       A.    Yes.

09:29  3       Q.    The next one I see is a Wall Street Journal

09:29  4   2009 Technology Innovation Award.  Explain what that is

09:29  5   for the jury.

09:29  6       A.    Sure.  So the Wall Street Journal recognizes,

09:29  7   pardon me, excellence in a number of areas.  When we

09:29  8   look at innovation, what they're really looking at --

09:29  9   what they were looking at is impact to the business

09:29  10  community.  And they were recognizing our flagship

09:29  11  product called vSphere for the impact that it's had and

09:29  12  how we've helped to drive a lot of that digital

09:29  13  transformation that I talked about.

09:29  14      Q.    And then, finally, we see a Fortune 100 Best

09:30  15  Companies to Work For award.  Please explain that for

09:30  16  the jury.

09:30  17      A.    Yeah.  This one, you know, is really --

09:30  18  personally, I'm really proud of this one as well.  You

09:30  19  know, as I talked about, one of the things that

09:30  20  attracted me to VMware was the culture, was the fact

09:30  21  that it's a very enjoyable place to work.  And this

09:30  22  award is great recognition of that, that our employees

09:30  23  really, really enjoy working for the company.

09:30  24      Q.    And the slide says:  92 percent of employees

09:30  25  at VMware say it's a great place to work compared to

644

09:30  1    57 percent of employees at a typical U.S.-based

09:30  2    company.

09:30  3            Do you see that?

09:30  4    A.    I do.

09:30  5    Q.    Is that a finding that Fortune made?

09:30  6    A.    From what I understand, it is.

09:30  7    Q.    And do you have an understanding of how

09:30  8    Fortune made that finding?

09:30  9    A.    I do.  My understanding was that the way this

09:30  10   works is that Fortune reaches out to the HR departments

09:30  11   of prospective companies that could be in the list.

09:31  12   The HR departments provide a list of e-mail addresses

09:31  13   to Fortune.  They then mail all of us employees and ask

09:31  14   us to fill out this survey.

09:31  15           And so the takeaway from that that I got was

09:31  16   there's no way for our executives, myself or anyone

09:31  17   else, to influence those scores because it's Fortune

09:31  18   who's actually getting them.  And so I think that just

09:31  19   reflects the authenticity of this award.

09:31  20   Q.    And has VMware obtained this Fortune 100 Best

09:31  21   Companies to Work For award more than once?

09:31  22   A.    Yes.

09:31  23   Q.    Do you know how many times?

09:31  24   A.    You know, I know -- I believe, I should say,

09:31  25   we first got it in either 2014 or 2015, and I'm pretty

645

09:31  1    sure we've gotten it every year since.

09:31  2        Q.    Congratulations on that.

09:31  3        A.    Thank you.

09:31  4        Q.    I next want to turn to VMware's activities in

09:31  5    the communities where its employees live.

09:31  6        A.    Uh-huh.

09:31  7        Q.    Does the company also give back to those

09:32  8    communities?

09:32  9        A.    Yes.  It's a core part of our culture.

09:32  10              MS. MOYE:  Let's have the next slide.

      11    BY MS. MOYE:

09:32  12       Q.    We have a reference here to the VMware

09:32  13    foundation.  Explain to the jury, what is that?

09:32  14       A.    Yeah.  So this is the charitable arm of our

09:32  15    company that we created back in, I think, 2010.

09:32  16       Q.    And I'd like you to walk through and explain

09:32  17    these entries for the jury.

09:32  18              On the left we see "Citizen Philanthropy:

09:32  19    Infinite Possibilities, All Year."

09:32  20              What does that mean?

09:32  21       A.    So I think a key -- maybe a philosophical

09:32  22    aspect is that each of us as individuals in the

09:32  23    organization can contribute.  It's not just about, you

09:32  24    know, the overall company supporting, but what each of

09:32  25    us as employees can do.

646

09:32  1          So this notion of citizen philanthropy is that

09:32  2  we can all individually give back in our own ways in

09:32  3  our local communities.

09:32  4     Q.    And leadership in community organizations,

09:32  5  what does that mean?

09:32  6     A.    So I think what we're seeing here on the

09:33  7  right-hand side is really just talking about the

09:33  8  different ways of giving back.

09:33  9          This first one is saying, you know, taking the

09:33  10  opportunity for each of us as employees to step up in

09:33  11  our local communities and organizations.

09:33  12     Q.    Pro bono services to address social sector

09:33  13  needs.

09:33  14          What does that mean?

09:33  15     A.    Again, this is about giving back, leveraging

09:33  16  the skill sets that we've developed within VMware,

09:33  17  doing whatever roles we do, back to our communities.

09:33  18     Q.    And then, finally, employee freedom.

09:33  19     A.    Yeah.  So I think what this means is that

09:33  20  there's not an overriding sort of single agenda the

09:33  21  company has.  It's not like, oh, we're going to focus

09:33  22  on this one charity.

09:33  23          Instead, what we do is we partner with, I

09:33  24  mean, literally thousands of charities, I believe.  And

09:33  25  each employee can select those charities which are most

647

09:33  1    important to them, which they're most passionate about.

09:33  2        Q.    Does the acronym EPICC, E-P-I-C-C, have a

09:34  3    particular meaning within VMware?

09:34  4        A.    It does.

09:34  5        Q.    Tell us what that means.

09:34  6        A.    Sure.  So it stands for execution, passion,

09:34  7    integrity, community and customers.

09:34  8        Q.    And how does EPICC impact the culture at the

09:34  9    company?

09:34  10       A.    So, you know, as I mentioned, even as an

09:34  11   intern, I had a very visceral sense of what the culture

09:34  12   was, right?  This very positive culture, supportive

09:34  13   culture, doing the right thing, giving back.  And as we

09:34  14   talked about, that persisted and still persists within

09:34  15   the company.

09:34  16           And so I think it was, I don't know, 2013/2014

09:34  17   time frame where we decided to try and give it a name.

09:34  18   And so what we came up with this term EPICC, EPICC 2.

09:34  19           And what it functions as now is really

09:34  20   interesting, because we do actually use it in our

09:35  21   day-to-day discussions.  We might be discussing a

09:35  22   problem or a decision we need to make and sometimes

09:35  23   people say, well, what's the EPICC thing to do here?

09:35  24   And it's usually to sort of pull us out of the, you

09:35  25   know, minutia and the details and say, okay.  Hold on.

648

09:35   1    Are we doing the right thing?  Are we really operating

09:35   2    by our values?

09:35   3            And the great thing about it is that this is

09:35   4    not something that I, as a leader, need to try and

09:35   5    enforce, right?  It's something that is organically

09:35   6    cropping up amongst our employee base.  And that, I

09:35   7    think is really the power of it.

09:35   8        Q.    Thank you, sir.

09:35   9            Now, I want to shift and talk a little bit

09:35   10   about the product that's accused of infringement in

09:35   11   this case, the VeloCloud product.

09:35   12       A.    Uh-huh.

09:35   13       Q.    Could you start by telling the jury, how did

09:35   14   VMware come to offer the VeloCloud product?

09:35   15       A.    Sure.  So, you know, we regularly, as I said,

09:36   16   look at what's coming next, look at things we're not

09:36   17   doing and things that we need to improve on.

09:36   18            And so what we recognized was that we had a

09:36   19   lot of strengths inside the data center.  We had a lot

09:36   20   of products there.

09:36   21            But as we talked to customers, a lot of them

09:36   22   needed technology, IT, outside the data center.  They

09:36   23   needed it at the retail stores, maybe at some branch

09:36   24   offices, at the manufacturing site, you know, these

09:36   25   sorts of places.

649

09:36    1                 And so what we realized was we needed some

09:36    2    system that could solve that challenge for customers,

09:36    3    and that's what got us interested in VeloCloud.

09:36    4        Q.    Did VMware actually acquire VeloCloud?

09:36    5        A.    Yes.

09:36    6        Q.    And I realize I keep going back and forth,

09:36    7    VeloCloud, VeloCloud.

09:36    8                 Is it VeloCloud?  Do I have it right?

09:36    9        A.    I've always said VeloCloud, but...

09:36   10        Q.    I'm going to try to get it right.

09:37   11                 MS. MOYE:  Let's go to the next

09:37   12    demonstrative we have.

        13    BY MS. MOYE:

09:37   14        Q.    You just told us that VMware actually acquired

09:37   15    VeloCloud?

09:37   16        A.    Uh-huh.

09:37   17        Q.    Does this demonstrative depict some of the

09:37   18    acquisitions that VMware has made over the years?

09:37   19        A.    Yes.  I believe it depicts all or almost all

09:37   20    of the acquisitions.

09:37   21        Q.    And I see the earliest entry is October 2008.

09:37   22    The last is November 2021.

09:37   23                 So is this -- does this include the principal

09:37   24    acquisitions between 2008 and 2021?

09:37   25        A.    Yes.  I believe so.

650

09:37  1      Q.    And when I look at this slide, it looks like
09:37  2   there are -- one, two, three, four, five, six, seven,
09:37  3   eight, nine -- ten columns.
09:37  4      A.    Uh-huh.
09:37  5      Q.    And -- one, two, three, four, five -- at least
09:37  6   five rows.  So there are over 50 acquisitions that the
09:37  7   company has done in that time period?
09:37  8      A.    That's correct.
09:38  9             MS. MOYE:  And could I have the next
09:38 10   slide?
      11   BY MS. MOYE:
09:38 12      Q.    VeloCloud is one of those acquisitions; is
09:38 13   that right?
09:38 14      A.    That's correct.
09:38 15      Q.    And was that in about December of 2017?
09:38 16      A.    That's correct.
09:38 17      Q.    Now, could you tell the jury, at a high level,
09:38 18   what does VeloCloud do?
09:38 19      A.    Sure.  So as I mentioned, the focus is really
09:38 20   on these remote offices, branch offices, manufacturing
09:38 21   sites, essentially places where a business doesn't
09:38 22   necessarily have IT personnel on-site.
09:38 23             And so what they really need are a few things.
09:38 24   First, they need connectivity.  How can we make it as
09:38 25   simple as possible to connect this site back up to my

651

09:38   1   data center out to the cloud, so forth?

09:38   2           But it's very important to note that it's not

09:38   3   just about connectivity.  It's also about

09:38   4   manageability.  How do you manage it?  How do you

09:38   5   ensure that users have a great experience?  That's

09:38   6   really easy, as I said.  For the Domino's pizza people,

09:39   7   to have their Internet and everything working and not

09:39   8   have to deal with the technical issues.  So that's the

09:39   9   management piece.

09:39   10          The third piece and possibly most important

09:39   11  piece is around security.  And what we find is that,

09:39   12  unfortunately, a lot of times folks -- both technical

09:39   13  and nontechnical folks can get hacked, right?  And

09:39   14  inadvertently release a lot of company secrets or data

09:39   15  or what have you.

09:39   16          And so one of the great things about VeloCloud

09:39   17  is because of its simplicity of use and security built

09:39   18  in, it's an overall much more secure solution.  So,

09:39   19  again, those three:  Connectivity, management and

09:39   20  security.

09:39   21     Q.    Thank you, sir.

09:39   22          Now, we've talked a lot about VMware's culture

09:39   23  and that culture of innovation --

09:39   24     A.    Uh-huh.

09:39   25     Q.    -- prior to taking your products.  Does the

652

09:39  1   company invest significant amounts in research and

09:39  2   development?

09:39  3        A.    Oh, we do.

09:39  4        Q.    How much would you say, as a ballpark figure,

09:40  5   VMware spends annually on research and development?

09:40  6        A.    It's on the order of billions of dollars per

09:40  7   year.

09:40  8        Q.    And how does the company support and drive

09:40  9   that innovation culture?

09:40  10       A.    So obviously a lot of innovation happens in

09:40  11  the business units, from a previous slide.

09:40  12             At the same time we, within the office of the

09:40  13  CTO, want to help foster and accelerate a lot of that

09:40  14  innovation.  So we have a number of innovation programs

09:40  15  that we run.

09:40  16             MS. MOYE:  If we could have the next

09:40  17  slide.

09:40  18  BY MS. MOYE:

09:40  19       Q.    I'd like to walk through some of those

09:40  20  innovation programs for the jury.  The first one here

09:40  21  is RADIO.  It looks like a question mark or headphones

09:40  22  at the end.  Explain, what is RADIO?

09:40  23       A.    Yeah.  I think it actually -- I think it's

09:40  24  supposed to be a light bulb, but maybe something got

09:40  25  cut off.  I don't know.

653

| | | |
|---|---|---|
| 09:40 | 1 | But anyway, RADIO stands for research and |
| 09:40 | 2 | development innovation off-site.  Like so many things |
| 09:41 | 3 | we do, it's an acronym.  We software people love |
| 09:41 | 4 | acronyms, I guess. |
| 09:41 | 5 | But what it is, is a few days out of the year, |
| 09:41 | 6 | maybe half a week, we pull together a few thousand of |
| 09:41 | 7 | our engineers from around the world to share what |
| 09:41 | 8 | they're working on, new ideas that they have.  With the |
| 09:41 | 9 | goal being to really stimulate new thoughts, new |
| 09:41 | 10 | technologies, new innovations. |
| 09:41 | 11 | MS. MOYE:  Let's have the next one, |
| 09:41 | 12 | please. |
| 09:41 | 13 | BY MS. MOYE: |
| 09:41 | 14 | Q.   TechTalks.  Explain what TechTalks are for the |
| 09:41 | 15 | jury. |
| 09:41 | 16 | A.   So TechTalks are a program that we run. |
| 09:41 | 17 | Usually have a few of these a week.  And the goal there |
| 09:41 | 18 | is for an individual or a team to share what they're |
| 09:41 | 19 | working on.  Maybe some new insights they have, some |
| 09:41 | 20 | new technologies they developed. |
| 09:41 | 21 | Again, the goal there is to get broad sharing |
| 09:41 | 22 | so we can see, hey, could we maybe use that technology |
| 09:41 | 23 | in different context?  Or hey, maybe we could do this |
| 09:41 | 24 | thing better.  That's the goal of TechTalks. |
| 09:42 | 25 | MS. MOYE:  If we could have the next |

654

09:42   1    program, please.

09:42   2    BY MS. MOYE:

09:42   3        Q.    Borathon.  What is Borathon at VMware?

09:42   4        A.    Yeah.  So this is our little take on a

09:42   5    hackathon.  So if you go to a hackathon, the basic idea

09:42   6    is you get a lot of engineers in a room and have a

09:42   7    period of time -- maybe 24 hours, in our case

09:42   8    48 hours -- where they build.  And usually it's some

09:42   9    sort of passion project.  Something they've been

09:42   10   wanting to do.  Something they want to try out.  But

09:42   11   they only have a limited amount of time to do it.

09:42   12            At the end, we judge the results and, you

09:42   13   know, declare a winner.  But the important thing is

09:42   14   that sometimes those passion projects turn out to be

09:42   15   very interesting business opportunities for us.  So

09:42   16   it's a good source of innovation.

09:42   17            And then the reason we call it Borathon and

09:42   18   not a hackathon is simply because our main source code

09:42   19   tree was named for the Bora Bora Islands.

09:42   20       Q.    It's not because that event happens in the

09:43   21   Bora Bora Islands, is it, sir?

09:43   22       A.    I think the engineers wish it was, but

09:43   23   unfortunately not.

09:43   24       Q.    Okay.

09:43   25            MS. MOYE:  Let's have the next program,

```
09:43    1    please.  The few others.

         2    BY MS. MOYE:

09:43    3        Q.    Let's walk through xLabs.  What is xLabs?

09:43    4        A.    Sure.  So xLabs is run within my org, the

09:43    5    office of the CTO.  And it's an incubation program

09:43    6    focused on technologies that we believe will be --

09:43    7    should come to market between, let's say, 18 and

09:43    8    24 months from now.

09:43    9            So, again, a bit more future facing.  We're

09:43   10    not always sure if we are doing exactly the right

09:43   11    thing.  We got to try out some different things.

09:43   12            But point there -- and, you know, by the way,

09:43   13    some of them don't work out.  And that's okay.  That's

09:43   14    why we're -- each of them are small projects.  But they

09:43   15    really seed potentially much larger businesses in the

09:43   16    future.

09:43   17        Q.    SME Connect.  What is that, sir?

09:43   18        A.    Yeah.  SME stands for subject matter expert.

09:43   19    And the goal here is to connect our engineering teams,

09:44   20    or engineers, with our technical sales folks.  These

09:44   21    technical sales folks, they spend time with customers.

09:44   22    They know what the customers' challenges are.  They see

09:44   23    them firsthand.

09:44   24            And so the goal there is really to -- is

09:44   25    really twofold.  Number one, so that our technical
```

656

09:44  1    sales folks can educate our engineers and give them the

09:44  2    real deal, like, what's going on, here are the

09:44  3    problems.  Here's what we need to improve on.

09:44  4            Simultaneously, our engineers can educate our

09:44  5    technical sales folks about all the ins and outs of our

09:44  6    products, how to help the customers get even more out

09:44  7    of them than they may already be getting.

09:44  8    Q.    And then finally there's Accelerated

09:44  9    Co-Innovation Engineering.  What is that program?

09:44  10    A.    It's another acronym.  We call it ACE.  So the

09:44  11    reality is we do have some very large customers, as we

09:44  12    talked about.  All of, essentially, the Fortune 100,

09:44  13    most of the Fortune 1,000.  These are very large

09:45  14    businesses and they have very specific requirements.

09:45  15            And so it's often the case that one of our

09:45  16    products doesn't quite meet exactly what they need.  Or

09:45  17    maybe they do something a little bit differently that

09:45  18    they need a special accomodation for.

09:45  19            And so the ACE team is a small target team

09:45  20    that we drop in there to work closely with the

09:45  21    customer, fix whatever problems they got.  So that not

09:45  22    only does it work for that customer -- we give them a

09:45  23    great experience -- but also that we take all those

09:45  24    changes and put them back into the product so all

09:45  25    customers can benefit from them.

657

09:45    1          Q.    Thank you, sir.

09:45    2                MS. MOYE:  And we can take the slides

09:45    3    down now.

09:45    4    BY MS. MOYE:

09:45    5          Q.    Now, just a few more questions.  Mr. Colbert,

09:45    6    have you studied the patent at issue in this case, the

09:45    7    '133 patent, in detail?

09:45    8          A.    Not in detail, no.

09:45    9          Q.    Are you here today, Mr. Colbert, to address

09:45    10   whether the accused VeloCloud product infringes that

09:46    11   '133 patent?

09:46    12         A.    No.

09:46    13         Q.    Do you have an understanding of whether there

09:46    14   will be witnesses for VMware who will discuss that

09:46    15   issue?

09:46    16         A.    I do.

09:46    17         Q.    And who are those witnesses, sir?

09:46    18         A.    Well, as I mentioned, Craig Connors, my

09:46    19   colleague, general manager and former CTO of VeloCloud.

09:46    20   And then we also have an expert witness as well.

09:46    21         Q.    Does VMware ever pay to use technology that

09:46    22   belongs to others?

09:46    23         A.    We do.

09:46    24         Q.    Is the VeloCloud acquisition -- VeloCloud

09:46    25   acquisition an example of that?

658

```
09:46   1        A.    Yes.  One of many.

09:46   2        Q.    Is paying to use the technology, like doing an

09:46   3   acquisition or licensing patents, is that part of

09:46   4   VMware's technological strategy?

09:46   5        A.    Absolutely.

09:46   6        Q.    Thank you, sir.

09:46   7              MS. MOYE:  I pass witness.

09:46   8                   CROSS-EXAMINATION

09:46   9   BY MR. LOVE:

09:47  10        Q.    Now, before I get started, Mr. Colbert, I just

09:47  11   want to make sure I got something right.  And I wrote

09:47  12   it down.  It was the first part of your testimony.

09:47  13              THE COURT:  You might pull the microphone

09:47  14   a little closer to you.

       15              MR. LOVE:  Is that better, Judge?

09:47  16              THE COURT:  Yes.  Thank you.

09:47  17   BY MR. LOVE:

09:47  18        Q.    I think you said in the very first part of

09:47  19   your testimony that VMware is not the kind of company

09:47  20   that would infringe others' patents.  And I wrote it

09:47  21   down word for word.  And I just want to make sure I got

09:47  22   it right.  Did you say that?

09:47  23        A.    Yeah.

09:47  24        Q.    Okay.

09:47  25        A.    I did.
```

659

| | | |
|---|---|---|
| 09:47 | 1 | Q.   Okay. |
| 09:47 | 2 | Now, as chief technology officer, you are part |
| 09:47 | 3 | of the leadership structure at VMware.  You've already |
| 09:47 | 4 | established that, haven't you? |
| 09:47 | 5 | A.   Uh-huh.  Yes. |
| 09:47 | 6 | Q.   And you report directly to the CEO? |
| 09:47 | 7 | A.   I do. |
| 09:47 | 8 | Q.   Yes. |
| 09:48 | 9 | And the CEO is the -- he's the head of the |
| 09:48 | 10 | company, right? |
| 09:48 | 11 | A.   That's correct. |
| 09:48 | 12 | Q.   And he leads this company of -- how many |
| 09:48 | 13 | employees did you say? |
| 09:48 | 14 | A.   About 37,000 full-time employees. |
| 09:48 | 15 | Q.   With your direct input? |
| 09:48 | 16 | A.   Yes. |
| 09:48 | 17 | Q.   Yes. |
| 09:48 | 18 | A.   Yeah. |
| 09:48 | 19 | Q.   And as an officer of the company -- because |
| 09:48 | 20 | you are an officer the company, correct? |
| 09:48 | 21 | A.   No.  I'm not. |
| 09:48 | 22 | Q.   You're just a leader? |
| 09:48 | 23 | A.   Yes. |
| 09:48 | 24 | Q.   Okay.  So as a leader of the company -- |
| 09:48 | 25 | A.   I'm sorry.  Can I get clarity?  You mean |

660

```
09:48    1   officer from, like, a board-perspective type thing
09:48    2   or --
09:48    3        Q.   Well, your title is chief technical officer?
09:48    4        A.   Okay.
09:48    5        Q.   And so --
09:48    6        A.   It is.
         7        Q.   Okay.
09:48    8        A.   But I was -- I interpreted your question to
09:48    9   mean, like, at a certain -- like, either being a board
09:48   10   member or -- there's certain -- there's a certain term.
09:48   11   I don't know if it's legal or not, "officer," that's
09:48   12   separate from my title.
09:48   13             I wasn't sure what you were referring to.
09:48   14        Q.   Yeah.  And that doesn't matter.
        15        A.   Okay.
09:48   16        Q.   And your title -- it's -- your title is chief
09:49   17   technical officer, right?
09:49   18        A.   Technology officer, yes.
09:49   19        Q.   Okay.
09:49   20        A.   Yeah.
09:49   21        Q.   Now, as a leader of the company, you know that
09:49   22   you have to lead by example for your employees, don't
09:49   23   you?
09:49   24        A.   Uh-huh.  I try my best.
09:49   25        Q.   And part of leading by example is being
```

661

| | | |
|---|---|---|
| 09:49 | 1 | truthful, correct? |
| 09:49 | 2 | A.    Uh-huh. |
| 09:49 | 3 | Q.    Now, you're aware that we allege VeloCloud |
| 09:49 | 4 | infringes the '133 patent, or the '133 patent, correct? |
| 09:49 | 5 | A.    Yes. |
| 09:49 | 6 | Q.    And we say that VMware has been doing this for |
| 09:49 | 7 | years, true? |
| 09:49 | 8 | A.    That's what I understand. |
| 09:49 | 9 | Q.    Okay.  And you're aware that attorneys for |
| 09:49 | 10 | VMware told the jury on Day 1 that it was very |
| 09:49 | 11 | important for VMware to clear its name. |
| 09:49 | 12 | A.    I don't know the specifics of what was said on |
| 09:49 | 13 | Day 1. |
| 09:49 | 14 | Q.    Okay.  Did you watch those proceedings, sir? |
| 09:49 | 15 | A.    No. |
| 09:49 | 16 | Q.    Have you watched any of the proceedings? |
| 09:49 | 17 | A.    No. |
| 09:49 | 18 | Q.    Did you know they were available on Zoom? |
| 09:50 | 19 | A.    Yes.  Well -- sorry.  I didn't think I was |
| 09:50 | 20 | allowed to watch any of the proceedings, actually, as a |
| 09:50 | 21 | witness. |
| 09:50 | 22 | Q.    Okay.  Well -- and we can get into that later. |
| 09:50 | 23 | A.    Okay. |
| 09:50 | 24 | Q.    But the Zoom proceedings, you didn't watch |
| 09:50 | 25 | them? |

662

09:50  1          A.    No.

09:50  2          Q.    And you are the highest-ranking official for

09:50  3   the company at this trial, right?

09:50  4          A.    So we have another one of my colleagues, Julie

09:50  5   Gonzalez, who is also a senior vice president like me.

09:50  6          Q.    Okay.  And she reports directly to the CEO?

09:50  7          A.    No.

09:50  8          Q.    No.  Okay.

09:50  9                So in terms of reporting directly to the CEO,

09:50  10  you're the only person with VMware at this trial?

09:50  11         A.    That's correct.  To the best of my knowledge,

09:50  12  that's correct.

09:50  13         Q.    Okay.  I just want to make sure -- there's

09:50  14  some things that I know we can agree on.  I want to get

09:50  15  those out of the way.

09:50  16         A.    Yeah.  All good.  Thank you.

09:50  17         Q.    You bet.  Now, as a leader of this company, as

09:51  18  you sit here today, do you know when this lawsuit was

09:51  19  filed?

09:51  20         A.    I don't.

09:51  21         Q.    And so if I told you it was in June of 2020,

09:51  22  you wouldn't know?

09:51  23         A.    No, sir.

09:51  24         Q.    Okay.  As a leader of this company, you

09:51  25  weren't even aware of this lawsuit until a few months

663

09:51  1    ago; is that right?

09:51  2        A.    That's correct.

09:51  3        Q.    Okay.  Even though this lawsuit had been going

09:51  4    on for two and a half years?

09:51  5        A.    If you say so, I'm not sure again.

09:51  6        Q.    Okay.  As a leader of the company, you didn't

09:51  7    even review the patents until a couple of months ago,

09:51  8    correct?

09:51  9        A.    That's correct.

09:51 10        Q.    And you didn't study them.  It was just a

09:51 11    cursory review, wasn't it?

09:51 12        A.    That's correct.

09:51 13        Q.    Now, as a leader of the company, it's

09:51 14    important to take reasonable steps not to take other

09:51 15    people's property.

09:51 16              You know that, don't you?

09:51 17        A.    I do.

09:51 18        Q.    And a first reasonable step not to infringe

09:51 19    other people's patents would be to actually read the

09:52 20    patent, wouldn't it, sir?

09:52 21        A.    Sure.  Sorry.  Yes.  I agree.

09:52 22        Q.    Okay.  Now, your deposition was on

09:52 23    February 9th?

09:52 24        A.    Yeah.  It was a couple of weeks ago, give or

09:52 25    take.  Yeah.

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

664

09:52    1        Q.    13 days -- well, 14 days ago exactly, wasn't
09:52    2    it?
09:52    3        A.    Yeah.  Yeah.
09:52    4        Q.    Okay.  Now, in terms of agreeing that it would
09:52    5    be a careful -- it would be a reasonable step to
09:52    6    carefully review the patents, as of 14 days ago, you
09:52    7    had not bothered to do that; isn't that correct, sir?
09:52    8        A.    Again, I'd done a cursory review of them.
09:52    9        Q.    But you hadn't carefully read them, have you?
09:52   10        A.    Not in detail.  No.
09:52   11        Q.    Okay.  Now, going back to this quote.
09:52   12              MR. LOVE:  Your Honor, can we approach
09:52   13    the bench?
09:52   14              THE COURT:  Sure.
09:52   15              (Bench conference.)
09:53   16              MR. LOVE:  Your Honor, I believe we have
09:53   17    a MIL on other proceedings, and this witness has
09:53   18    testified, and I quote, that "VMware was not the kind
09:53   19    of company that would infringe other people's patents."
09:53   20              THE COURT:  Did he testify under oath to
09:53   21    that?
09:53   22              MR. LOVE:  Yes, Your Honor.
09:53   23              THE COURT:  You can say:  Have you ever
09:53   24    said this in another proceeding?
09:53   25              Just don't say what the proceeding is.

```
09:53    1                    MR. LOVE:  Okay.
09:53    2                    THE COURT:  Well, what is it?  He said
09:53    3    something under oath at a different time?
09:53    4                    MR. LOVE:  No.  The point is, Your Honor,
09:53    5    we have a MIL on other proceedings, and there have been
09:53    6    other patent infringement cases that were filed and
09:53    7    juries have disagreed with VMware's statement under
09:53    8    oath in this courtroom today.
09:53    9                    THE COURT:  Okay.  I'm not following.
09:53   10    What is the point?  What is it that you want to get out
09:53   11    of him here?  I'm not following you.
09:53   12                    MR. LOVE:  The proposition is that VMware
09:53   13    doesn't infringe patents, other people's patents.  And
09:53   14    the --
09:53   15                    THE COURT:  Oh, I don't think he said
09:54   16    that.
09:54   17                    MS. MOYE:  He --
09:54   18                    THE COURT:  Tell me what it is you want
09:54   19    him -- what is it he said in another proceeding?
09:54   20                    MR. LOVE:  Your Honor, he said:  VMware's
09:54   21    not the kind of company that would infringe others'
09:54   22    patents.
09:54   23                    THE COURT:  Right.
09:54   24                    MR. LOVE:  Juries have disagreed with
09:54   25    that view in other cases.  I think he's opened the door
```

666

```
09:54   1    to that question about whether or not he's aware of

09:54   2    juries in other cases having disagreed with that view.

09:54   3                   THE COURT:  Yeah.  But you brought that

09:54   4    question up.

09:54   5                   MR. LOVE:  No, Your Honor.  He said that

09:54   6    in direct examination.

09:54   7                   MS. MOYE:  He said -- he had said in his

09:54   8    examination -- he said in his examination, Your Honor,

09:54   9    that they're a company with high integrity and that we

09:54   10   take steps not to infringe patents of others.

09:54   11                  What Mr. Love is proposing to do is now

09:54   12   ask this witness about jury verdicts in other lawsuits

09:54   13   and --

09:54   14                  THE COURT:  I don't think -- did you ask

09:54   15   him in some substance whether or not the company was

09:55   16   the kind of company that did not file any patents or

09:55   17   something like that?

09:55   18                  MS. MOYE:  No.  I did not, Your Honor.

09:55   19                  THE COURT:  I don't remember that either.

09:55   20                  MR. LOVE:  Your Honor, she asked him --

09:55   21   it was the first question, maybe the second question,

09:55   22   why are you here?

09:55   23                  And he testified that he's here to talk

09:55   24   about the fact that VMware's not the kind of company

09:55   25   that would infringe other people's patents.
```

667

| | | |
|---|---|---|
| 09:55 | 1 | THE COURT: Okay. How much more do you |
| 09:55 | 2 | have of this? Are you done? |
| 09:55 | 3 | MR. LOVE: Maybe two minutes. |
| 09:55 | 4 | THE COURT: Okay. Let's take a recess |
| 09:55 | 5 | and I'll see -- I'll have Kristie show me what he said |
| 09:55 | 6 | and I'll make my decision. |
| 09:55 | 7 | MR. LOVE: Thank you, Your Honor. |
| 09:55 | 8 | (Bench conference concludes.) |
| 09:55 | 9 | THE COURT: Ladies and gentlemen of the |
| 09:55 | 10 | jury, we're going to take our morning recess. I was |
| 09:55 | 11 | trying to find a good place to break there. If we -- |
| 09:55 | 12 | we'll come back in about ten minutes. |
| 09:55 | 13 | Please remember my instructions not to |
| 09:55 | 14 | discuss the case amongst yourselves. |
| 09:56 | 15 | THE BAILIFF: All rise. |
| 09:56 | 16 | (Jury exited the courtroom.) |
| 09:56 | 17 | THE COURT: Counsel, if I can have your |
| 09:57 | 18 | attention, please. I'm going to -- I have the question |
| 09:57 | 19 | and answer starting with -- the question from defense |
| 09:57 | 20 | counsel was: Why don't you start, Mr. Colbert, by |
| 09:57 | 21 | telling us why you are here today? |
| 09:57 | 22 | Well, I'm here to represent VMware. I'm |
| 09:57 | 23 | here to share what VMware's all about, our continued |
| 09:57 | 24 | focus on innovation, and also how we operate with |
| 09:57 | 25 | integrity, that we are absolutely not the type of |

668

| | | |
|---|---|---|
| 09:57 | 1 | company that would infringe another company's patents. |
| 09:57 | 2 | I'm going to find that opens the door to |
| 09:57 | 3 | the other determinations coming in. |
| 09:57 | 4 | MR. LOVE:  Thank you, Your Honor. |
| 09:57 | 5 | THE COURT:  You bet.  So we'll have a |
| 09:57 | 6 | recess for ten minutes and then we'll come back. |
| 09:57 | 7 | (Recess taken.) |
| 10:08 | 8 | THE COURT:  Thank you.  You may be |
| 10:08 | 9 | seated. |
| 10:08 | 10 | Yes, sir. |
| 10:08 | 11 | MR. ROSENTHAL:  I'm sorry to interrupt |
| 10:08 | 12 | the flow, but, Your Honor, I just wanted to make sure |
| 10:08 | 13 | that we don't overstep any bounds. |
| 10:08 | 14 | We understand that -- and Mr. Colbert is |
| 10:08 | 15 | not in the room right now.  We understand that he is |
| 10:08 | 16 | about to be asked about the one verdict that was |
| 10:08 | 17 | against VMware which was then overturned, and we are |
| 10:08 | 18 | going to bring up the fact that it was overturned. |
| 10:08 | 19 | And I just want to make sure that that's |
| 10:08 | 20 | not -- |
| 10:08 | 21 | THE COURT:  Well, I was unaware it was |
| 10:08 | 22 | overturned. |
| 10:08 | 23 | MR. ROSENTHAL:  Yeah.  There's no |
| 10:08 | 24 | judgment against us, so we just want to make sure |
| 10:08 | 25 | that -- we're about to get into a bit of a sideshow and |

669

| | |
|---|---|
| 10:08 | 1 |
| 10:08 | 2 |
| 10:08 | 3 |
| 10:08 | 4 |

10:08  1    I'm not sure if that's what --

10:08  2         MR. LOVE:  Your Honor, so, first, I

10:08  3    have -- we haven't talked about what it specifically is

10:08  4    that I'm going to ask this witness --

10:08  5         THE COURT:  Well --

10:08  6         MR. LOVE:  -- except for at the bench.

10:08  7         THE COURT:  -- if there was a -- you did

10:08  8    not tell me, when you say there was a verdict against

10:08  9    this company, that it had been overturned.

10:09  10        Now, I'm not going to let -- we're not --

10:09  11   then if that's so -- is that so?  It was overturned?

10:09  12        MR. LOVE:  Yes.

10:09  13        THE COURT:  Well, then we're not going to

10:09  14   get into it.  I mean, we're not going to get into a

10:09  15   battle over something that was -- and have him explain

10:09  16   that.

10:09  17        MR. LOVE:  And I agree with the Court

10:09  18   100 percent, because that is not my question for this

10:09  19   witness.

10:09  20        THE COURT:  Okay.

10:09  21        MR. LOVE:  My question for this witness

10:09  22   is twofold.  One, based on his statement that we

10:09  23   operate with integrity and that we are absolutely not

10:09  24   the type of company that would infringe other company's

10:09  25   patents.

670

```
10:09   1                    The twofold questions that I would like
10:09   2    to ask him, Your Honor, is one, if he's aware of other
10:09   3    juries that disagree with that view.
10:09   4                    THE COURT:  Nope.  Nope.  You're not --
10:09   5    if it's this jury, then no.
10:09   6                    MR. LOVE:  Okay.  And number two, if he's
10:09   7    aware of other patent infringement cases that have been
10:09   8    filed against VMware.
10:09   9                    THE COURT:  No.  Neither one.
10:09   10                   MR. LOVE:  Okay.
10:09   11                   THE COURT:  Okay.  We'll bring the jury
10:10   12   in.
10:10   13                   THE BAILIFF:  All rise.
10:15   14                   THE COURT:  Please remain standing for
10:15   15   the jury.
10:15   16                   (Jury entered the courtroom.)
10:15   17                   THE COURT:  Thank you.  You may be
10:15   18   seated.
10:15   19                   You may continue with your cross.
10:15   20                   MR. LOVE:  Thank you, Your Honor.
10:15   21   BY MR. LOVE:
10:15   22      Q.   Now, Mr. Colbert, have you ever testified
10:15   23   before today?
10:15   24      A.   Yes.
10:15   25      Q.   How many times?
```

671

| | | |
|---|---|---|
| 10:15 | 1 | A.    Once before. |
| 10:15 | 2 | Q.    Just once before? |
| 10:15 | 3 | A.    Uh-huh. |
| 10:15 | 4 | Q.    Okay.  In this case VMware has produced |
| 10:15 | 5 | certain documents for us to review and the jury to |
| 10:15 | 6 | review. |
| 10:15 | 7 | Are you aware of that? |
| 10:16 | 8 | A.    Yes. |
| 10:16 | 9 | Q.    Okay.  And one document I want to turn to is |
| 10:16 | 10 | PTX-125.  And I believe this has been previously |
| 10:16 | 11 | admitted in this case. |
| 10:16 | 12 | Can you see this document, Mr. Colbert? |
| 10:16 | 13 | A.    Yes. |
| 10:16 | 14 | Q.    And we can see at the upper right-hand side is |
| 10:16 | 15 | the title "White Paper." |
| 10:16 | 16 | Do you see that? |
| 10:16 | 17 | A.    I do. |
| 10:16 | 18 | Q.    What is a white paper? |
| 10:16 | 19 | A.    Well -- thank you for the zoom in. |
| 10:16 | 20 | Typically, it's a technical document going |
| 10:16 | 21 | into some depth on some specific technical area. |
| 10:16 | 22 | Q.    And when you say it's a technical document, do |
| 10:16 | 23 | you agree that it describes key functionalities? |
| 10:16 | 24 | Generally? |
| 10:16 | 25 | A.    It's hard to say.  I mean, I guess so. |

672

```
10:16   1          Q.    Okay.
10:16   2          A.    I think it varies a bit, but I think that's a
10:17   3   fine assumption to make.
10:17   4          Q.    Before these white papers are finalized, do
10:17   5   you have any input in the approval process?
10:17   6          A.    No.
10:17   7          Q.    Those are people beneath you?
10:17   8          A.    Well, or people in completely different orgs
10:17   9   than me.
10:17  10          Q.    Okay.
10:17  11                Because isn't it true you didn't have anything
10:17  12   to do with the development of SD-WAN or DMPO?  Isn't
10:17  13   that correct?
10:17  14          A.    That's correct.
10:17  15          Q.    Okay.  And you haven't reviewed the source
10:17  16   code, true?
10:17  17          A.    Correct.
10:17  18          Q.    Now, let's look at the bottom part of the
10:17  19   page.  And it says "VeloCloud Dynamic Multipath
10:17  20   Optimization," correct?
10:17  21          A.    That's what I see here, yes.
10:17  22          Q.    Yes.  And DMPO essentially stands for Dynamic
10:17  23   Multipath Optimization, true?
10:17  24          A.    Yes.
10:17  25          Q.    Now, in the blue wording it says:  This
```

673

| | | |
|---|---|---|
| 10:17 | 1 | document discusses the key functionalities... |
| 10:17 | 2 |         Did I read that correctly? |
| 10:17 | 3 | A.    Appears to be, yes. |
| 10:17 | 4 | Q.    ...and benefits, correct? |
| 10:17 | 5 | A.    Yes. |
| 10:17 | 6 | Q.    ...of VeloCloud Dynamic Multipath Optimization |
| 10:18 | 7 | that assures enterprise and cloud application |
| 10:18 | 8 | performance over Internet and hybrid WAN. |
| 10:18 | 9 |         Did I read that correctly? |
| 10:18 | 10 | A.    I believe so. |
| 10:18 | 11 | Q.    Now, this document is published by VMware to |
| 10:18 | 12 | the public, right? |
| 10:18 | 13 | A.    Well, I've never seen this document before, |
| 10:18 | 14 | but I think we can safely assume so. |
| 10:18 | 15 | Q.    And we can probably safely assume that |
| 10:18 | 16 | businesses and customers rely on the accuracy of this |
| 10:18 | 17 | information, correct? |
| 10:18 | 18 | A.    I think that's a safe assumption. |
| 10:18 | 19 | Q.    Because you don't want to mislead the people |
| 10:18 | 20 | that buy your products; isn't that true? |
| 10:18 | 21 | A.    No. |
| 10:18 | 22 | Q.    Because these products are highly profitable |
| 10:18 | 23 | for your company, right? |
| 10:18 | 24 | A.    I'm not sure, actually.  I can't comment on |
| 10:18 | 25 | the specific profitability of VeloCloud, if that's what |

674

10:18   1    you're asking.

10:18   2        Q.    Okay.

10:18   3              So you don't know that either?

10:18   4        A.    I don't know the specifics of their

10:18   5    financials, no.

10:18   6        Q.    Okay.

10:18   7              In terms of being a leader, you want to make

10:18   8    sure what your company puts out to the public is

10:19   9    truthful and accurate, correct?

10:19  10        A.    Yeah.  Absolutely.

10:19  11        Q.    Because VMware is a publicly traded company,

10:19  12    right?

10:19  13        A.    Even if we were private we'd want to do the

10:19  14    same.

10:19  15        Q.    Regardless?

10:19  16        A.    Yes.

10:19  17        Q.    That's a great response.

10:19  18        A.    Yes.

10:19  19        Q.    Okay.

10:19  20              MR. LOVE:  Pass the witness, Your Honor.

10:19  21              THE COURT:  Anything additional?

10:19  22              MS. MOYE:  Yes, Your Honor, just very

10:19  23    briefly.

10:19  24                     REDIRECT EXAMINATION

10:19  25    BY MS. MOYE:

10:19  1      Q.    Just a couple of points, Mr. Colbert.

10:19  2            Plaintiff's counsel asked you about whether

10:19  3  you had been watching the Zoom proceedings, watching

10:19  4  the testimony in this case.

10:19  5            Do you remember that?

10:19  6      A.    I do.

10:19  7      Q.    Is it correct, sir, that you have not watched

10:19  8  the proceedings because it was your understanding as a

10:19  9  fact witness that you're not allowed to watch the

10:19 10  proceedings?

10:19 11      A.    Yes.  That's correct.

10:19 12      Q.    You were also asked a lot about when you

10:19 13  learned about the lawsuit, whether you had reviewed the

10:20 14  patent.

10:20 15            Whose job is it at VMware to review these

10:20 16  kinds of allegations when they come in?

10:20 17      A.    Yeah.  So typically the way this works is that

10:20 18  our legal department, obviously, is the first one to

10:20 19  hear about any such actions.  They will typically hire

10:20 20  outside counsel.

10:20 21            And then we'll also figure out who's the right

10:20 22  experts internally, inside the company, to look into

10:20 23  this and validate and what's happening.

10:20 24      Q.    So is it correct, sir, that it is not your

10:20 25  job, part of your job function, to review these types

676

| | | |
|---|---|---|
| 10:20 | 1 | of allegations as they come in? |
| 10:20 | 2 | A.    That's correct. |
| 10:20 | 3 | Q.    And, sir, Mr. Brooks Beard is here as the |
| 10:20 | 4 | corporate representative for VMware; is that correct? |
| 10:20 | 5 | A.    Yes.  That's correct. |
| 10:20 | 6 | Q.    And Mr. Beard is a executive, a vice president |
| 10:20 | 7 | at the company; is that correct? |
| 10:20 | 8 | A.    That is correct. |
| 10:20 | 9 | Q.    And is Mr. Beard a part of the team that does |
| 10:20 | 10 | that review that you just spoke about? |
| 10:20 | 11 | A.    He is. |
| 10:20 | 12 | MS. MOYE:  Pass the witness. |
| 10:21 | 13 | MR. LOVE:  Nothing further, Your Honor. |
| 10:21 | 14 | THE COURT:  May this witness be excused? |
| 10:21 | 15 | MR. LOVE:  As far as we're concerned, |
| 10:21 | 16 | Your Honor. |
| 10:21 | 17 | MS. MOYE:  Nothing else, Your Honor. |
| 10:21 | 18 | THE COURT:  Thank you, sir. |
| 10:21 | 19 | You are -- what I mean by that is |
| 10:21 | 20 | sometimes witnesses feel insulted when I say you're |
| 10:21 | 21 | free to go.  You're free to go, you're free to stay. |
| 10:21 | 22 | You just no longer need to be with us. |
| 10:21 | 23 | THE WITNESS:  Thank you so much, Your |
| 10:21 | 24 | Honor. |
| 10:21 | 25 | THE COURT:  You're certainly welcome to |

677

```
10:21    1    stay, but you don't have to.
10:21    2                   THE WITNESS:  Appreciate it.  Thank you.
10:21    3                   THE COURT:  Who will your next witness
10:21    4    be?
10:21    5                   (Conference between counsel.)
10:21    6                   MR. LOVE:  Your Honor, plaintiff rests
10:21    7    its case-in-chief.
10:21    8                   THE COURT:  Thank you, sir.
10:21    9                   And is there an agreement we'll reserve
10:21   10    any motions until our next break?
10:21   11                   MR. LOVE:  I couldn't hear you, Your
10:21   12    Honor.
10:21   13                   THE COURT:  Is there an agreement we'll
10:21   14    reserve motions for both sides until our break?
10:21   15                   MR. LOVE:  We don't have an agreement, to
10:22   16    my understanding.
10:22   17                   MR. ROSENTHAL:  Your Honor, I'm happy to
10:22   18    wait until the break if plaintiff will agree.
10:22   19                   MR. LOVE:  That is fine with us, Your
10:22   20    Honor.
10:22   21                   THE COURT:  Okay, very good.
10:22   22                   You may call your next witness.
10:22   23                   MR. HSIN:  Your Honor, defendant's next
10:22   24    witness is Mr. Craig Connors.  This is the witness who
10:22   25    is going to be appearing by Zoom.  And it was our
```

678

| | | |
|---|---|---|
| 10:22 | 1 | understanding that the Court would take a recess to |
| 10:22 | 2 | make sure that we can set that up. |
| 10:22 | 3 | THE COURT:  Okay.  Let's do that. |
| 10:22 | 4 | About how long do you anticipate he'll |
| 10:22 | 5 | be? |
| 10:22 | 6 | MR. HSIN:  I'm sure ten minutes would be |
| 10:22 | 7 | sufficient, Your Honor. |
| 10:22 | 8 | THE COURT:  I'm sorry.  About how long do |
| 10:22 | 9 | you think his testimony will be? |
| 10:22 | 10 | MR. HSIN:  I would estimate on direct, |
| 10:22 | 11 | about 30 minutes. |
| 10:22 | 12 | THE COURT:  Okay.  He'll be finished this |
| 10:22 | 13 | morning likely? |
| 10:22 | 14 | MR. LOVE:  Yes, Your Honor. |
| 10:22 | 15 | THE COURT:  Okay.  Very good. |
| 10:22 | 16 | Ladies and gentlemen of the jury, what's |
| 10:22 | 17 | going to happen is we now -- because of COVID, we now |
| 10:23 | 18 | occasionally -- I don't think this has to do with |
| 10:23 | 19 | COVID, but prior to COVID we would never -- my court |
| 10:23 | 20 | would never have done anything other than make people |
| 10:23 | 21 | show up. |
| 10:23 | 22 | We realize occasionally there are people |
| 10:23 | 23 | who cannot attend for one reason or another.  And so we |
| 10:23 | 24 | now allow people to appear by Zoom.  Something when I |
| 10:23 | 25 | was y'all's age would never have thought possible, but |

| | | |
|---|---|---|
| 10:23 | 1 | it is now apparently. |
| 10:23 | 2 | And my only point of telling you all this |
| 10:23 | 3 | is when this witness appears, he'll be sworn just like |
| 10:23 | 4 | the other witnesses that you'll have in this case. The |
| 10:23 | 5 | fact that he is appearing remotely should not impact |
| 10:23 | 6 | your opinion about his credibility, just like the |
| 10:23 | 7 | witnesses who are here in person or who might appear by |
| 10:23 | 8 | deposition. |
| 10:23 | 9 | You are the judges. You assess the |
| 10:23 | 10 | credibility one way or the other of anything that he |
| 10:23 | 11 | says. Take it into consideration. But don't -- he is |
| 10:23 | 12 | of equal dignity appearing by Zoom as he would be here |
| 10:23 | 13 | live. |
| 10:23 | 14 | So we'll take about a ten-minute recess. |
| 10:24 | 15 | We'll get the Zoom set up and then we'll go on with |
| 10:24 | 16 | that. |
| 10:24 | 17 | THE BAILIFF: All rise. |
| 10:24 | 18 | (Jury exited the courtroom.) |
| 10:24 | 19 | THE COURT: You may be seated. |
| 10:24 | 20 | Are you able, Mr. Rosenthal, while |
| 10:24 | 21 | they're setting up, to make your motions? |
| 10:24 | 22 | MR. ROSENTHAL: Yes, Your Honor. |
| 10:24 | 23 | THE COURT: Okay. |
| 10:24 | 24 | MR. ROSENTHAL: So, Your Honor, we are |
| 10:24 | 25 | going to file, if we haven't already, but we are going |

680

```
10:24   1   to file, momentarily, a paper version of the motion.
10:24   2   The motion that we're making is a Rule 50(a) motion and
10:24   3   it will include a number of different bases.
10:24   4             But I want to focus any oral argument on
10:24   5   really one basis that I think makes this a little bit
10:24   6   of a different case than an ordinary case.  And that is
10:25   7   that the plaintiff in this case has not put on any
10:25   8   evidence with respect to several critical limitations
10:25   9   of the singular claim that is at issue in this case.
10:25  10             So as the Court is well aware, we're
10:25  11   dealing with one apparatus claim, Claim 13, and that
10:25  12   apparatus claim -- and I'm happy to put it up on the
10:25  13   screen, although I think you remember it.
10:25  14             THE COURT:  Yeah.
10:25  15             MR. ROSENTHAL:  It has two and only two
10:25  16   structural elements.  There is a processor module and
10:25  17   there is a switching module coupled to the processing
10:25  18   module.  I think it's called a processor module.  I
10:25  19   misspoke.
10:25  20             And as you know, we had a rough go of it
10:25  21   with the direct testimony, but we have very, very
10:25  22   carefully reviewed the transcript.  We have searched
10:25  23   for the word "processor module."  We have searched for
10:25  24   the word "switching module."  We have searched for the
10:25  25   word "coupled" to make sure that we're not
```

681

| | | |
|---|---|---|
| 10:25 | 1 | misunderstanding what was said. |
| 10:25 | 2 | But because Dr. McClellan did not have |
| 10:26 | 3 | certain opinions and explanations in his report, the |
| 10:26 | 4 | Court correctly excluded any testimony about certain |
| 10:26 | 5 | things that -- |
| 10:26 | 6 | THE COURT:  I remember. |
| 10:26 | 7 | MR. ROSENTHAL:  You remember.  And so -- |
| 10:26 | 8 | it's hard to forget. |
| 10:26 | 9 | So here's the things that are missing. |
| 10:26 | 10 | There was no testimony about what the processor module |
| 10:26 | 11 | is in our device.  All that was said was that we |
| 10:26 | 12 | receive traffic, and we do, you know, things with that |
| 10:26 | 13 | traffic.  There was no testimony about what the |
| 10:26 | 14 | processor module is. |
| 10:26 | 15 | There was also no testimony about what |
| 10:26 | 16 | the switching module is.  And the only thing, by the |
| 10:26 | 17 | way, in the expert report that he could have said is |
| 10:26 | 18 | that the switching module is the link scheduler. |
| 10:26 | 19 | There's one, e.g., switching module.  That's what -- he |
| 10:26 | 20 | could have said that.  He didn't.  He didn't say |
| 10:26 | 21 | anything. |
| 10:26 | 22 | And he certainly didn't say anything |
| 10:26 | 23 | about whatever he thinks the processing module is and |
| 10:26 | 24 | whatever he thinks the switching module is being |
| 10:27 | 25 | coupled together. |

10:27  1                    The only testimony that he gave that even

10:27  2    relates to those limitations was when counsel asked him

10:27  3    those leading questions and said, do you agree that

10:27  4    this limitation is met?  Yes.

10:27  5                    Do you agree that this limitation is met?

10:27  6    Yes.

10:27  7                    Did you look at source code to confirm

10:27  8    that?  Yes.

10:27  9                    Did you look at documents?  Yes.

10:27  10                    And that's not testimony on which the

10:27  11   jury can base a conclusion of infringement.

10:27  12                    So the other thing that I want to note

10:27  13   about that is these aren't just a couple of random

10:27  14   limitations.

10:27  15                    As the Court is well aware, there was a

10:27  16   ex parte reexamination on this patent.  Claim 1, which

10:27  17   is a method claim for doing the same thing, was

10:27  18   invalidated.

10:27  19                    Claim 13 is an apparatus claim for doing

10:27  20   the same thing.  It was held valid on the sole basis,

10:27  21   the examiner said, just because of these structural

10:27  22   limitations.  They're not in the prior art.

10:27  23                    So this is literally the only thing

10:27  24   holding this claim together.  And the expert and WSOU

10:28  25   put on zero evidence of the only two limitations of

10:28 1    this structural claim.

10:28 2                So this is why I think we're in the rare.

10:28 3    And we understand the Court's practice is often to

10:28 4    reserve on these sorts of things.  This is really one

10:28 5    of those cases where we ought not to be sending this

10:28 6    case to the jury.  There's nothing for them to decide.

10:28 7    There's no evidence on which they could base a

10:28 8    conclusion of infringement.

10:28 9                The last point I want to make, Your

10:28 10   Honor, is on a different element of the claim.  The

10:28 11   last element of the claim talks about processing the

10:28 12   packets such that packets that are destined for an

10:28 13   egress node that is congested or handled differently

10:28 14   with a different priority than packets that are sent to

10:28 15   a non-congested node.

10:28 16               Again, we looked really carefully at the

10:28 17   testimony last night because we have it so quickly.

10:28 18   And there was zero testimony other than, "yes.  I think

10:28 19   that element is met," that showed how priorities are

10:29 20   changed.

10:29 21               The witness testified about how he

10:29 22   thought bandwidth was changed or that it is handled

10:29 23   differently, but never did he explain how the

10:29 24   priorities are changed.  In fact, he testified that the

10:29 25   priority is set based on traffic type, which is exactly

684

| 10:29 | 1 | how the product works. |
| 10:29 | 2 | But he never -- and look.  If he had |
| 10:29 | 3 | said, but here's why I think that means changing the |
| 10:29 | 4 | priority, that's, you know, that's fine.  He didn't. |
| 10:29 | 5 | He just didn't. |
| 10:29 | 6 | He -- and I understand that he was in a |
| 10:29 | 7 | difficult position because he hadn't offered those |
| 10:29 | 8 | opinions, but it's just not in the record. |
| 10:29 | 9 | And so, Your Honor, we move for judgment |
| 10:29 | 10 | under Rule 50(a) that there is no infringement.  We |
| 10:29 | 11 | also have bases that are going to be addressed in the |
| 10:29 | 12 | papers, but I would really like just to focus on that |
| 10:29 | 13 | part. |
| 10:29 | 14 | THE COURT:  And for the record, I think |
| 10:29 | 15 | it was raised through my law clerk, the issue that you |
| 10:29 | 16 | all -- the defendant has an issue on 101. |
| 10:29 | 17 | MR. ROSENTHAL:  We do.  You're right. |
| 10:29 | 18 | THE COURT:  But on that, I'm going to |
| 10:30 | 19 | wait to decide that until -- setting aside what we're |
| 10:30 | 20 | going to do right now, I'm not going to take up the 101 |
| 10:30 | 21 | right now.  I'll take that up at the end of trial. |
| 10:30 | 22 | MR. ROSENTHAL:  I figured as much.  That |
| 10:30 | 23 | is in our papers.  We also addressed -- just so you're |
| 10:30 | 24 | not surprised, we also addressed the standing because |
| 10:30 | 25 | our appellate folks believed that we ought to put that |

685

10:30   1   in that paper.

10:30   2                  We understand you've ruled on that, but

10:30   3   we want to make sure that we do everything we need to

10:30   4   to preserve that issue.  But you have it right.  Those

10:30   5   are the other two issues that we address.

10:30   6                  Oh, and I'm sorry.  We also have a

10:30   7   damages issue, which is that we don't believe that

10:30   8   the -- any evidence has been put on that supports the

10:30   9   damages that the plaintiff is asking for in this case,

10:30   10  because the apportionment analysis is not sufficient to

10:30   11  support the damages that have been asked for.

10:30   12                 And we have more detailed reasons in the

10:30   13  paper, but I really think the thing to be concerned

10:30   14  about at the moment is the infringement issue.

10:31   15                 And that's all I have, Your Honor, unless

10:31   16  you have questions.

10:31   17                 THE COURT:  Okay.  Counsel?

10:31   18                 Yes, sir.  Good morning.

10:31   19                 MR. WALDROP:  Good morning, Your Honor.

10:31   20  Thank you very much for the opportunity to address this

10:31   21  issue.

10:31   22                 If -- before I proceed, Your Honor, do

10:31   23  you have any particular questions, Your Honor?

10:31   24                 THE COURT:  Well, counsel just made a

10:31   25  pretty declarative statement on the record that there's

686

| | | |
|---|---|---|
| 10:31 | 1 | no evidence through your expert of what the processor |
| 10:31 | 2 | module is, what the switching module is, and -- there |
| 10:31 | 3 | was one more point he made just then that was missing |
| 10:31 | 4 | as well -- oh, it had to do with the final steps with |
| 10:31 | 5 | the way it exits. |
| 10:31 | 6 | So you have the transcript? |
| 10:31 | 7 | MR. WALDROP:  Yes, Your Honor. |
| 10:31 | 8 | THE COURT:  So I invite you to tell me |
| 10:31 | 9 | where your expert disclosed for the jury what the |
| 10:32 | 10 | processor module is and what the switching module is. |
| 10:32 | 11 | MR. WALDROP:  Yes, Your Honor.  We would |
| 10:32 | 12 | like an opportunity -- I'll do that right now, Your |
| 10:32 | 13 | Honor, but we also would like the opportunity to file a |
| 10:32 | 14 | written response too, which we're prepared now.  I have |
| 10:32 | 15 | the chart, but I can point you, Your Honor, to that. |
| 10:32 | 16 | But we'd like to file a written response as well. |
| 10:32 | 17 | So with that in mind, Your Honor, as to |
| 10:32 | 18 | the switching module, Your Honor, we disagree.  There's |
| 10:32 | 19 | evidence in the record.  As you know, JMOL's an absence |
| 10:32 | 20 | of evidence. |
| 10:32 | 21 | So, Your Honor, not only is there |
| 10:32 | 22 | testimony in which Dr. McClellan was asked whether or |
| 10:32 | 23 | not the egress node associated with each of the |
| 10:32 | 24 | packets, do you have an opinion as to whether that |
| | 25 | element is met? |

687

```
              1                    (Clarification by Reporter.)
10:32         2              MR. WALDROP:  He said yes.
10:32         3              And also, Your Honor, he specifically
10:32         4    testified whether or not -- whether this element as to
10:32         5    a switching module was met and documents were
10:32         6    introduced into evidence that demonstrated that,
10:32         7    including PTX-82, Your Honor; PTX-126; PTX-625, which
10:32         8    is source code, Your Honor; and these elements,
10:33         9    PTX-625B, which were all source -- 625A, PTX-625C,
10:33        10    PTX-625D, PTX-625E, PTX-625F, PTX-625G, PTX-625H,
10:33        11    PTX-625I.
10:33        12              All of that elements, Your Honor, was
10:33        13    presented confirming and showing infringement of the
10:33        14    switching module.
10:33        15              THE COURT:  He specifically identified
10:33        16    that as being --
10:33        17              MR. WALDROP:  Yes, Your Honor.  As
10:33        18    confirming his infringement analysis, Your Honor.
10:33        19              THE COURT:  But where is the testimony
10:33        20    where he identifies that as either the processor module
10:33        21    or the switching module?
10:33        22              MR. WALDROP:  So --
10:33        23              THE COURT:  I heard him say -- I heard
10:33        24    you say:  Does it have a processing module?
10:33        25              And he said:  Yes.
```

688

| | | |
|---|---|---|
| 10:33 | 1 | I heard you say:  Is there a switching |
| 10:34 | 2 | module? |
| 10:34 | 3 | And he says:  Yes. |
| 10:34 | 4 | MR. WALDROP:  Yes, Your Honor. |
| 10:34 | 5 | THE COURT:  I saw you introduce those |
| 10:34 | 6 | documents. |
| 10:34 | 7 | MR. WALDROP:  Yes, Your Honor. |
| 10:34 | 8 | THE COURT:  Where does he -- where is |
| 10:34 | 9 | there evidence in the record that he identifies any of |
| 10:34 | 10 | what you just articulated as being -- specifically as |
| 10:34 | 11 | being the processor module or the switching module? |
| 10:34 | 12 | MR. WALDROP:  Your Honor, he says here -- |
| 10:34 | 13 | he delivers an opinion, Your Honor, that this |
| 10:34 | 14 | document -- that all of those documents satisfy the |
| 10:34 | 15 | claim elements, Your Honor. |
| 10:34 | 16 | As -- I read the claim limitation into |
| 10:34 | 17 | the record and I said, which documents, do these |
| 10:34 | 18 | support that infringement analysis? |
| 10:34 | 19 | And he said, yes, Your Honor. |
| 10:34 | 20 | THE COURT:  And did he go through any of |
| 10:34 | 21 | them and explain -- other than just shoving them in, |
| 10:34 | 22 | expecting the jury to look at them, did he explain in |
| 10:34 | 23 | any way how they served as either of the modules? |
| 10:34 | 24 | MR. WALDROP:  He said that these |
| 10:34 | 25 | confirmed -- yes, Your Honor.  He said -- |

689

| | | |
|---|---|---|
| 10:34 | 1 | THE COURT:  No, no.  I'm not saying did |
| 10:34 | 2 | you say, here are these exhibits.  Do they confirm that |
| 10:34 | 3 | it's in there? |
| 10:34 | 4 | Did he articulate for the jury how |
| 10:34 | 5 | anything that is in any of those exhibits is the |
| 10:35 | 6 | processor module or is the switching module? |
| 10:35 | 7 | MR. WALDROP:  Yes, Your Honor. |
| 10:35 | 8 | THE COURT:  And tell me -- show me where. |
| 10:35 | 9 | MR. WALDROP:  Can I pass this up to you? |
| 10:35 | 10 | Your Honor, what I would like to do -- |
| 10:35 | 11 | THE COURT:  What I'd like for you to do |
| 10:35 | 12 | is just cite to me where in the transcript, because |
| 10:35 | 13 | then -- |
| 10:35 | 14 | MR. WALDROP:  Can I give you the cites? |
| 10:35 | 15 | So there's a bunch of cites.  So, Your Honor, if I |
| 10:35 | 16 | can -- |
| 10:35 | 17 | THE COURT:  In the -- cite in the |
| 10:35 | 18 | transcript? |
| 10:35 | 19 | MR. WALDROP:  Oh, yes, Your Honor.  So I |
| 10:35 | 20 | have -- if I could, Your Honor, which may be more |
| 10:35 | 21 | helpful is I have an Exhibit A that goes through the |
| 10:35 | 22 | trial transcript with all the citations and the |
| 10:35 | 23 | exhibits that support that this was disclosed to the |
| | 24 | jury. |
| 10:35 | 25 | Can I pass that up to the jury (sic) -- |

690

```
           1                    THE COURT:  Sure.  Of course.
10:35      2                    MR. WALDROP:  -- and then you can review
10:35      3    that, Your Honor, rather than me having to cite to it
10:35      4    specifically, Your Honor?
10:35      5                    And just -- so I can pass that up, Your
10:35      6    Honor.
10:35      7                    So this is the -- and just what I have
10:35      8    here, Your Honor, is the -- I have -- there's a motion
10:35      9    that we were going to file, there's an Exhibit A
10:35     10    attached to it, and it has all the testimony and all
10:35     11    the exhibits that address this point, Your Honor.
10:36     12                    THE COURT:  Okay.  So everything I have
10:36     13    in Exhibit A is what you're citing to?
10:36     14                    MR. WALDROP:  That's for every element.
10:36     15    So we went through, Your Honor -- so we actually
10:36     16    haven't seen their motion, Your Honor.  So we have not
10:36     17    seen their motion.
10:36     18                    THE COURT:  Okay.  So what I need --
10:36     19    okay.  Exhibit A is the trial testimony?
10:36     20                    MR. WALDROP:  For every -- for every
10:36     21    element --
10:36     22                    (Simultaneous conversation.)
10:36     23                    THE COURT:  The two elements I care
10:36     24    about, tell me where in Exhibit A there's any testimony
10:36     25    where he identifies what the processor module is.
```

```
10:36   1                      MR. WALDROP:  So I -- if you give me
10:36   2   that, Your Honor, I can tab those for you because it
10:36   3   has -- as you see, it's a big document.  I will tab for
10:36   4   you and give back to you the --
10:36   5                      THE COURT:  Tab for me everywhere he
10:36   6   identifies what the processor module is or the
10:36   7   switching module is.
10:36   8                      MR. WALDROP:  Okay.  Yes, Your Honor.
10:36   9   Thank you.  The processor module is -- thank you, Your
10:36  10   Honor.
10:37  11                      We also request, Your Honor, that we see
10:37  12   their motion so we can respond to it, Your Honor.
10:37  13   Because we've not even seen their motion, Your Honor.
10:37  14                      MR. ROSENTHAL:  Oh, that's it.
10:37  15                      THE COURT:  Well, what your chief concern
10:37  16   ought to be right now, Mr. Waldrop, is counsel has said
10:37  17   categorically that there's nowhere where you -- where
10:37  18   your expert identified, in any of the exhibits that you
10:38  19   put in, where the processor module is and where the
10:38  20   switching module is.
10:38  21                      If you have evidence of that in the
10:38  22   record in the transcript, I need to see it.  And you'll
10:38  23   survive this motion.  And if you don't have it, then
10:38  24   you won't.  That's where we're at.
10:38  25                      So you have your -- whoever it is, flag
```

692

10:38   1   where it is in the transcript.  And then I'll read

10:38   2   those pages, and I'll let Mr. Rosenthal have a response

10:38   3   if he wants to have one.

10:38   4               MR. WALDROP:  Yes, Your Honor.  I just

10:38   5   only wanted to state for the record, we just got this

10:38   6   motion, Your Honor --

10:38   7               THE COURT:  But --

10:38   8               MR. WALDROP:  I'll find it.  I'll find

10:38   9   it, Your Honor.

10:38   10              THE COURT:  But it's -- you knew you had

10:38   11  to put on all the elements.  And Mr. Rosenthal has

10:38   12  articulated that there is no evidence of the processor

10:38   13  module -- again, he and I both understand that you

10:38   14  asked, is there one.  And your witness said yes.

10:38   15  That's not sufficient in my opinion to get to the jury.

10:39   16              What I want to see in the transcript

10:39   17  is -- because all he can do on cross is say, no, there

10:39   18  isn't or nuh-uh.  Or have his person say, you're wrong.

10:39   19              What I want to see in the transcript is

10:39   20  where your expert, who was on the stand for hours,

10:39   21  identified what the processor module is and where the

10:39   22  switching module is.  And whatever evidence it is the

10:39   23  jury can look at.

10:39   24              MR. WALDROP:  Okay.  Yes, Your Honor.

10:39   25  I'll give it to you right now, Your Honor.

| | | |
|---|---|---|
| 10:39 | 1 | THE COURT:  Okay. |
| 10:39 | 2 | MR. WALDROP:  Is it possible, Your Honor, |
| 10:39 | 3 | if we could take a break?  Because I want to make sure. |
| 10:39 | 4 | We put all the evidence in the exhibit, Your Honor. |
| 10:39 | 5 | Because we thought we were going to respond |
| 10:39 | 6 | substantively.  I'll find it specifically, Your Honor. |
| 10:39 | 7 | Just -- |
| 10:39 | 8 | THE COURT:  I'm happy to just sit here |
| 10:39 | 9 | and wait. |
| 10:39 | 10 | MR. WALDROP:  Thank you, Your Honor. |
| 10:41 | 11 | (Pause in proceedings.) |
| 10:53 | 12 | MR. WALDROP:  Hello, Your Honor. |
| 10:54 | 13 | THE COURT:  Sure. |
| 10:54 | 14 | MR. WALDROP:  So I was just -- make sure |
| 10:54 | 15 | we culled it down to what we thought was the most |
| 10:54 | 16 | relevant, Your Honor, for purposes of this hearing |
| 10:54 | 17 | without being able to respond in writing. |
| 10:54 | 18 | I would like to read it into the record, |
| 10:54 | 19 | if I could, Your Honor.  Or do you just want to see it? |
| 10:54 | 20 | THE COURT:  No.  If you'll tell us the |
| 10:54 | 21 | page. |
| 10:54 | 22 | MR. WALDROP:  Can I read it into the |
| 10:54 | 23 | record as well, Your Honor?  I'll give you the page |
| 10:54 | 24 | numbers, as well, Your Honor. |
| 10:54 | 25 | THE COURT:  If you'd give the page |

694

| | |
|---|---|
| 10:54 | 1 |
| 10:54 | 2 |
| 10:54 | 3 |
| 10:54 | 4 |
| 10:54 | 5 |
| 10:54 | 6 |
| 10:54 | 7 |
| 10:54 | 8 |
| 10:54 | 9 |
| 10:55 | 10 |

1  numbers so opposing counsel can hear it.  And just put

2  in whatever you think is the best evidence.

3            MR. WALDROP:  Your Honor, so 360:24 to

4  362:19.  And this exchange -- and this is on Pages

5  14 -- 13 and 14 of Exhibit A which we have not been

6  able to submit but prepared to do so.

7            And in this exchange, Dr. McClellan is

8  referring to document PTX-126 in which he identifies

9  the appliance as the processor related to the processor

10  module claim, Your Honor.  It's there.

11            Can I then move over -- so that's -- I

12  think that should end this, Your Honor.  But I'll then

13  move over to this switching module issue, Your Honor.

14  And it is --

15            THE COURT:  Well, if you would --

16            MR. WALDROP:  Oh, I was just going to

17  give you the citations.

18            THE COURT:  -- read into the record what

19  the question and answer was --

20            MR. WALDROP:  Okay.  Yes, Your Honor.

21            THE COURT:  -- so I know what the

22  evidence is, starting with the first on processor

23  module.

24            MR. WALDROP:  Processor module, Your

25  Honor.  I will say it here, and I will start at the

695

10:55   1    beginning of the question:

10:55   2                   So we'll move to the next element,

10:55   3    Dr. McClellan, and this says -- and I'll read it for

10:55   4    the record to make sure that we're clear.

10:55   5                   This says:  A processor module for

10:55   6    receiving traffic flow comprising a plurality of

10:55   7    packets; and...

10:55   8                   Do you see that, Dr. McClellan?

10:55   9                   Answer:  Yes.

10:55   10                   Question:  I want to direct you -- and

10:55   11   we're going to show you here the next slide which is

10:55   12   PTX-126 at Page 6.

10:55   13                   Do you see that, Dr. McClellan?

10:55   14                   Answer:  Yes.

10:55   15                   Question:  Do you see that, ladies and

10:56   16   gentlemen?

10:56   17                   Question:  Dr. McClellan, what does this

10:56   18   document show regarding the highlighted portion on the

10:56   19   left?  Let me be clear so we can direct everybody.

10:56   20   I'll back up.  What does PTX-126 at Page 6 say or show

10:56   21   about the elements highlighted in yellow for receiving

10:56   22   traffic flow comprising a plurality of packets?

10:56   23                   Yeah.  So the blow-up section on the

10:56   24   right corresponds to the highlighted section on the

10:56   25   left, is the answer.

696

| | |
|---|---|
| 10:56 | 1 |

10:56    1            And as you've discussed before,

10:56    2    traffic -- this is a descriptor of the packet flow,

10:56    3    sort of like a Plinko game inside the device.

10:56    4            And so traffic migrates from here through

10:56    5    here.  And when it arrives at this location, it gets

10:56    6    classified into different buckets.  And so a traffic

10:56    7    flow is received and it has to be a plurality of

10:56    8    packets to be classified into different buckets.

10:56    9            Question:  And, Dr. McClellan, before --

10:56    10    right under the -- right under the one under the

10:56    11    document here is a picture.  Do you see under the title

10:57    12    right here, right down here?

10:57    13            Answer -- question:  And what is that?

10:57    14            Answer:  That, again, the appliance.

10:57    15    That's a picture of that appliance device which has a

10:57    16    processor in it.

10:57    17            THE COURT:  Is that the only evidence you

10:57    18    have with respect to processor?

10:57    19            MR. WALDROP:  There's more evidence.  I

10:57    20    just went through and gave you the best, Your Honor.

10:57    21    So, Your Honor, that's what he says.  There's more

10:57    22    evidence.  I didn't get it all, Your Honor.  I just --

10:57    23            THE COURT:  Okay.  Let me hear a response

10:57    24    from counsel on that.

10:57    25            MR. ROSENTHAL:  Yes, Your Honor.

697

10:57   1              This is, we believe, the best evidence.
10:57   2   And this is what we thought they would point to.
10:57   3              The first question and answer that
10:57   4   counsel read simply said, let me direct you to the
10:57   5   claim element.
10:57   6              There's also -- I don't think Mr. Waldrop
10:57   7   read it.  There's also something later that says, do
10:57   8   you think the claim is met?  So we've got those.
10:57   9              Then there's a -- what's on Page 361
10:57   10  where he asks about the highlighted text.  The
10:58   11  highlighted text was the functional language for
10:58   12  receiving a traffic flow.  He specifically did not
10:58   13  highlight the processor module.  He took that
10:58   14  highlighting off when we objected to the slide because
10:58   15  it's not in the report.
10:58   16             So that doesn't do it.
10:58   17             And then the last part, which we thought
10:58   18  was the closest, was the question that said:  You see a
10:58   19  picture of the accused product?  That's -- you see what
10:58   20  this is?  This is -- that's the appliance.  That's a
10:58   21  picture of the appliance device.  That's the accused
10:58   22  product.
10:58   23             And the question was:  What is that?
10:58   24             And he said:  That's a picture of the
10:58   25  appliance device, the accused product which has a

698

```
10:58   1    processor in it.
10:58   2                We don't think that that's sufficient to
10:58   3    identify what within the accused device satisfies the
10:58   4    limitation processor module.
10:58   5                And to be completely candid --
10:58   6                THE COURT:  Because your position -- the
10:58   7    entire device is not the processor module.  Your
10:58   8    position -- I'm articulating this for opposing
10:58   9    counsel -- is, where did the expert identify where
10:59  10    within -- he said, yes, there's a processor in it, but
10:59  11    he didn't identify within the entire device what the
10:59  12    processor module was.
10:59  13                MR. ROSENTHAL:  You said that much better
10:59  14    than I did.  That's exactly the point.  Because the
10:59  15    apparatus is the claim.  And we understand the Edge is
10:59  16    the apparatus.
10:59  17                But the question is, where -- and the
10:59  18    where is important.  Because that thing, whatever they
10:59  19    point to, has to be coupled to another thing, the
10:59  20    switching module.
10:59  21                THE COURT:  Right.
10:59  22                MR. ROSENTHAL:  And that leads to the
10:59  23    next argument.
10:59  24                But anyway, that's our response, is we
10:59  25    don't think that they have any evidence of where it is.
```

699

| | | |
|---|---|---|
| 10:59 | 1 | We still don't know where it is. |
| 10:59 | 2 | THE COURT:  And I'm also saying this for |
| 10:59 | 3 | Mr. Waldrop.  Because what I try to do here in my |
| 10:59 | 4 | effort to be fair to both sides is, the only way that |
| 10:59 | 5 | your side can protect itself in terms of telling the |
| 10:59 | 6 | jury why they're wrong is for him to be able to say |
| 10:59 | 7 | what it was -- to take what was testified to the |
| 10:59 | 8 | evidence and explain to the jury why that's not right. |
| 10:59 | 9 | Which is why I'm just putting this on the |
| 10:59 | 10 | record for if it goes up.  It's insufficient to me to |
| 11:00 | 11 | have an expert say, is this claim element met?  Yes. |
| 11:00 | 12 | And that's not sufficient evidence to withstand this |
| 11:00 | 13 | motion. |
| 11:00 | 14 | Because your expert is just going to come |
| 11:00 | 15 | in and say, no.  And that's not really -- and so, did |
| 11:00 | 16 | you have anything else you wanted to add before I ask |
| 11:00 | 17 | Mr. Waldrop? |
| 11:00 | 18 | MR. ROSENTHAL:  The only thing I wanted |
| 11:00 | 19 | to add to that is that you may remember, I didn't and |
| 11:00 | 20 | couldn't, cross-examine him on processor module or |
| 11:00 | 21 | switching module.  I didn't say anything about those |
| 11:00 | 22 | things because there was nothing to cross-examine. |
| 11:00 | 23 | THE COURT:  Okay. |
| 11:00 | 24 | MR. ROSENTHAL:  Thank you. |
| 11:00 | 25 | THE COURT:  Counsel? |

700

| | | |
|---|---|---|
| 11:00 | 1 | MR. WALDROP: Your Honor, I would add |
| 11:00 | 2 | that, Your Honor, in this -- the exchange that I gave |
| 11:00 | 3 | Your Honor, Dr. McClellan is pointing to a picture in |
| 11:00 | 4 | which he says: That, again, the appliance, that's a |
| 11:00 | 5 | picture of the appliance device which has a processor |
| 11:00 | 6 | in it. |
| 11:00 | 7 | THE COURT: Right. Where does he |
| 11:00 | 8 | identify where the processor is and what it is? |
| 11:00 | 9 | That's Mr. Rosenthal's point. And that's |
| 11:00 | 10 | my point as well. Where in his testimony does he do |
| 11:00 | 11 | that? |
| 11:01 | 12 | MR. WALDROP: He's pointing to the link |
| 11:01 | 13 | scheduler, Your Honor, which is the picture here. It's |
| 11:01 | 14 | at PTX-126 that is not before you, Your Honor. This is |
| 11:01 | 15 | PTX-126, so we're talking about the transcript without |
| 11:01 | 16 | the document. |
| 11:01 | 17 | THE COURT: Do you have Exhibit 126 you |
| 11:01 | 18 | can put up and show me? |
| 11:01 | 19 | MR. WALDROP: Do you want me to give you |
| 11:01 | 20 | the document? |
| 11:01 | 21 | THE COURT: If you can just put it on the |
| 11:01 | 22 | screen so counsel can see it. And if you'll point -- |
| 11:01 | 23 | if you'll -- what I need you to do is point to me where |
| 11:01 | 24 | in the transcript it's clear that your witness was |
| 11:02 | 25 | identifying what is on -- what you're showing me. |

—701—

| | | |
|---|---|---|
| 11:02 | 1 | MR. WALDROP:  So I'm showing you -- not |
| 11:02 | 2 | yet.  I'm not showing you. |
| 11:02 | 3 | So, Your Honor, I'm showing you which is |
| 11:02 | 4 | previously marked as Exhibit PTX-126. |
| 11:02 | 5 | THE COURT:  Okay. |
| 11:02 | 6 | MR. WALDROP:  Do you see that, Your |
| | 7 | Honor? |
| 11:02 | 8 | And then this is -- I'm going to the |
| 11:02 | 9 | specific page that he was testifying about, where he -- |
| 11:02 | 10 | THE COURT:  Okay.  And tether up what he |
| 11:02 | 11 | says in his transcript to what you're showing me on the |
| 11:02 | 12 | screen.  Show me exactly what you showed the jury -- |
| 11:02 | 13 | I'm sorry -- what your witness showed the jury. |
| 11:02 | 14 | MR. WALDROP:  We're looking for the |
| 11:03 | 15 | slide, Your Honor, for the exact slide that was shown, |
| 11:03 | 16 | but I'm just showing you the PTX exhibit, Your Honor. |
| 11:03 | 17 | And I'll get the exact slide, Your Honor. |
| 11:03 | 18 | And so what you're seeing here, Your |
| 11:03 | 19 | Honor, is the document which is the network scheduler, |
| 11:03 | 20 | so this is an actual device in the company -- in the |
| 11:03 | 21 | accused product.  And he is walking through the link |
| 11:03 | 22 | selection, which are -- these are parts. |
| 11:03 | 23 | THE COURT:  Tell me -- read to me what he |
| 11:03 | 24 | says about this page from the transcript. |
| 11:03 | 25 | MR. WALDROP:  All right.  So... |

702

| | | |
|---|---|---|
| 11:03 | 1 | (Conference between counsel.) |
| 11:03 | 2 | MR. WALDROP:  I think we found the slide, |
| 11:03 | 3 | Your Honor, that we think should put up, Your Honor. |
| 11:03 | 4 | So I'll just do -- let me just do that.  That may be |
| 11:03 | 5 | better. |
| 11:03 | 6 | We have it, Your Honor.  Are you able to |
| 11:06 | 7 | see it, Your Honor? |
| 11:06 | 8 | THE COURT:  No. |
| 11:06 | 9 | MR. WALDROP:  Let me post it.  Thank you, |
| 11:06 | 10 | Your Honor. |
| 11:06 | 11 | Are you able to see it, Your Honor? |
| 11:06 | 12 | THE COURT:  I can see Slide 64 -- |
| 11:06 | 13 | MR. WALDROP:  Yes, Your Honor. |
| 11:06 | 14 | THE COURT:  -- which says:  VeloCloud |
| 11:06 | 15 | infringes Element 2. |
| 11:06 | 16 | MR. WALDROP:  I don't think this was |
| 11:06 | 17 | actually -- I think -- oh, yeah. |
| 11:06 | 18 | Go ahead, Your Honor. |
| 11:06 | 19 | THE COURT:  Okay.  Now... |
| 11:06 | 20 | MR. WALDROP:  So just to set the context, |
| 11:06 | 21 | Your Honor, this is a document which describes the |
| 11:06 | 22 | network scheduler on the left and the link scheduler at |
| 11:06 | 23 | the bottom. |
| 11:06 | 24 | These are pieces of source code, right, |
| 11:06 | 25 | that the witness entered source code in.  So he's |

—703—

| | | |
|---|---|---|
| 11:06 | 1 | describing the processing of what these pieces of code |
| 11:06 | 2 | are doing as to information. |
| 11:07 | 3 | So with that caveat, Your Honor, I'm |
| 11:07 | 4 | going to talk about -- he's talking about the |
| 11:07 | 5 | processor, how it processes information along the path. |
| 11:07 | 6 | So he has highlighted sections, and he's |
| 11:07 | 7 | walking through a document that shows how the -- how |
| 11:07 | 8 | the processor processes the flow of packets. |
| 11:07 | 9 | So with that context, I can read -- can I |
| 11:07 | 10 | now read -- you want me to read the section, Your |
| 11:07 | 11 | Honor? |
| 11:07 | 12 | THE COURT:  Yes. |
| 11:07 | 13 | MR. WALDROP:  So, Dr. McClellan -- I |
| 11:07 | 14 | can -- do you want me to reread it, or does he want to |
| 11:07 | 15 | respond? |
| 11:07 | 16 | But this is the document that he was |
| 11:07 | 17 | pointing to which talks about the network scheduler and |
| 11:07 | 18 | the link scheduler.  This is software, Your Honor, |
| 11:07 | 19 | which is why we entered the source code.  The source |
| 11:07 | 20 | code confirmed his infringement analysis as to why this |
| 11:07 | 21 | element was met. |
| 11:07 | 22 | Now, counsel, I'm sure, will jump up and |
| 11:07 | 23 | say, well, it's the highlighted section.  But he |
| 11:07 | 24 | testified specifically about the processor module. |
| 11:07 | 25 | So this is what -- the testimony was |

—704—

11:07  1   heard.  He walked through it and he presented source

11:07  2   code.

11:07  3                THE COURT:  Read to me the testimony.

11:07  4                MR. WALDROP:  Oh, read it again?

11:07  5                Okay.  I'll read it again.

11:08  6                Dr. McClellan, what does this document

11:08  7   show regarding the highlighted portion on the left?

11:08  8                Let me be clear so that we can direct

11:08  9   everybody.  I'll back up.

11:08 10                What does PTX-126 at Page 6 show about

11:08 11   the elements highlighted in yellow for receiving a

11:08 12   traffic flow comprising a plurality of packets?

11:08 13                Yeah.  So the blow-up section on the

11:08 14   right corresponds to the highlighted section on the

11:08 15   left and, as we've discussed before, traffic.  That is

11:08 16   the description of the packets flow sort of like a

11:08 17   Plinko game inside the device.  And so traffic migrates

11:08 18   through here.  And it arrives at this location.  It

11:08 19   gets classified into different buckets.

11:08 20                And so a traffic flow is received and it

11:08 21   has to be a plurality OF packets to be classified in

11:08 22   different buckets.

11:08 23                And, Dr. McClellan, before -- under the

11:08 24   one on the document here, the picture, do you see the

11:08 25   title right here?

705

| | | |
|---|---|---|
| 11:08 | 1 | Yes. |
| 11:08 | 2 | And that -- that -- that, again, the |
| 11:08 | 3 | appliance, that's a picture of the appliance device |
| 11:08 | 4 | that has the processor in it -- |
| 11:08 | 5 | THE COURT:  That's the entire appliance, |
| 11:08 | 6 | right? |
| 11:08 | 7 | MR. WALDROP:  Yes. |
| 11:08 | 8 | THE COURT:  Where does he say in his |
| 11:08 | 9 | testimony where the traffic flow is sorted into traffic |
| 11:09 | 10 | classes?  Where does he say within that -- the picture |
| 11:09 | 11 | we see?  Where inside of that entire apparatus is the |
| 11:09 | 12 | processor module?  Where does he testify to that? |
| 11:09 | 13 | MR. WALDROP:  The network scheduler and |
| 11:09 | 14 | the link scheduler, Your Honor.  This document is the |
| 11:09 | 15 | processor flow for how the documents (sic) process. |
| 11:09 | 16 | So this is the next slide, 35. |
| 11:09 | 17 | THE COURT:  So your position is it's the |
| 11:09 | 18 | entire apparatus? |
| 11:09 | 19 | MR. WALDROP:  That contains -- yes, Your |
| 11:09 | 20 | Honor. |
| 11:09 | 21 | THE COURT:  No.  The entire apparatus |
| 11:09 | 22 | contains a processor module -- |
| 11:09 | 23 | MR. WALDROP:  No.  No, Your Honor.  On |
| 11:09 | 24 | the right -- |
| 11:09 | 25 | THE COURT:  Where does he -- |

—706—

| | | |
|---|---|---|
| 11:09 | 1 | MR. WALDROP:  The network scheduler on |
| 11:09 | 2 | the right, Your Honor, is the processor. |
| 11:09 | 3 | You see that on the right?  That is the |
| 11:09 | 4 | network scheduler and the link scheduler. |
| 11:09 | 5 | Counsel just identified that -- |
| 11:09 | 6 | THE COURT:  And you say that what he just |
| 11:09 | 7 | testified to says that that's the processor module? |
| 11:09 | 8 | MR. WALDROP:  Yes, Your Honor. |
| 11:09 | 9 | THE COURT:  Counsel? |
| 11:09 | 10 | MR. ROSENTHAL:  Yes, Your Honor. |
| 11:10 | 11 | The witness never testified that that's |
| 11:10 | 12 | the processor module.  The witness never used the word |
| 11:10 | 13 | "processor module" in any of those answers.  The lawyer |
| 11:10 | 14 | never used the word "processor module" in any of the |
| 11:10 | 15 | questions. |
| 11:10 | 16 | We're not talking about the processor |
| 11:10 | 17 | module.  We're talking about the highlighted text on |
| 11:10 | 18 | the slide, which is the functional language. |
| 11:10 | 19 | Plaintiff originally had a slide that had |
| 11:10 | 20 | the word "processor module" highlighted and had a title |
| 11:10 | 21 | that said the processor module's in here.  And that's |
| 11:10 | 22 | what they wanted the witness to testify about.  We |
| 11:10 | 23 | objected to that because that is nowhere in his report. |
| 11:10 | 24 | And so they changed it, and they decided, |
| 11:10 | 25 | the way we're going to be able to get this witness to |

—707—

| | | |
|---|---|---|
| 11:10 | 1 | address this limitation is by ignoring the processor |
| 11:10 | 2 | module limitation and, instead, just focusing on the |
| 11:10 | 3 | functional language. |
| 11:10 | 4 | And they did it, and they got through |
| 11:10 | 5 | their testimony.  But in doing so, they omitted the |
| 11:10 | 6 | structural element of this apparatus claim. |
| 11:10 | 7 | And so while I appreciate Mr. Waldrop |
| 11:10 | 8 | saying that they believe that the network scheduler is |
| 11:10 | 9 | the processor module, that testimony neither appears in |
| 11:11 | 10 | the trial record nor in the expert report. |
| 11:11 | 11 | THE COURT:  Okay. |
| 11:11 | 12 | MR. WALDROP:  Your Honor.  Yes, Your |
| 11:11 | 13 | Honor. |
| 11:11 | 14 | He's pointing to -- Your Honor, he's |
| 11:11 | 15 | pointing to a picture in the figure which he's saying |
| 11:11 | 16 | that is the processor that is processing the packets. |
| 11:11 | 17 | He's specifically talking about how the processor |
| 11:11 | 18 | packet -- the process -- the packets are processed. |
| 11:11 | 19 | He's talking to the picture on the right.  That is the |
| 11:11 | 20 | network scheduler and the link scheduler. |
| 11:11 | 21 | The jury all saw that.  And, in fact, I |
| 11:11 | 22 | asked Dr. McClellan, does VeloCloud meet the element of |
| 11:11 | 23 | a processor module for receiving traffic -- directly |
| 11:11 | 24 | after this testimony:  Does VeloCloud meet the element |
| 11:11 | 25 | of a processor module for receiving a traffic flow |

—708—

| | | |
|---|---|---|
| 11:11 | 1 | comprising a plurality of packets? |
| 11:11 | 2 | Yes. |
| 11:11 | 3 | That is the next question after he walks |
| 11:11 | 4 | through this document, which the jury sees, which is a |
| 11:11 | 5 | network scheduler and the link scheduler processing the |
| 11:11 | 6 | packets through the device. |
| 11:11 | 7 | Your Honor, that is sufficient structure |
| 11:11 | 8 | and it's pointed to.  And there is source code, Your |
| 11:11 | 9 | Honor, that was entered into the record without |
| 11:11 | 10 | objection, Your Honor, that specifically addresses the |
| 11:12 | 11 | network scheduler and the link scheduler.  I don't... |
| 11:12 | 12 | (Conference between counsel.) |
| 11:12 | 13 | MR. WALDROP:  And even if you don't |
| 11:12 | 14 | believe, Your Honor, that it's direct evidence, there's |
| 11:12 | 15 | circumstantial evidence.  I don't want to get there |
| 11:12 | 16 | because I don't think that's where we are. |
| 11:12 | 17 | But if that's the world we're living in, |
| 11:12 | 18 | even if there's no direct evidence, there's |
| 11:12 | 19 | circumstantial evidence for a jury to conclude that |
| 11:12 | 20 | that was found. |
| 11:12 | 21 | But, Your Honor, it's right here through |
| 11:12 | 22 | their own documents. |
| 11:12 | 23 | THE COURT:  Okay.  Let's move on to |
| 11:12 | 24 | switching module. |
| 11:12 | 25 | MR. WALDROP:  Thank you, Your Honor. |

709

11:12   1              Switching module, I'll read it into the
11:12   2    record.  There's several sections, several highlighted
11:12   3    sections.  I'll give them all, Your Honor, so that we
11:12   4    don't have to go back and forth.
11:12   5              There's one that's probably more direct,
11:12   6    but I will just go through all of them, Your Honor,
11:12   7    under the circumstances.
11:12   8              So this is 373:1-11.  It's referring to
11:12   9    PTX-82.
11:12  10              So now, on PTX-82, you see above when we
11:13  11    talked about this document, please explain what this
11:13  12    document shows as it relates to adapted for determining
11:13  13    an egress node associated with each of the plurality of
11:13  14    packets element.
11:13  15              Well, the highlighted section in the
11:13  16    middle, which comes from the document, says:  DMPO
11:13  17    makes steering decisions based on the type of
11:13  18    application, the realtime link condition --
11:13  19    including in parentheses -- congestion, latency, jitter
11:13  20    and packet loss -- and the business policy.
11:13  21              Next section, which is 373:12-374:4.
11:13  22              Dr. McClellan -- I want to move to the
11:13  23    next slide, PTX-126.
11:13  24              Remember, we talked about that?
11:13  25              Yes.

—710—

11:13  1          Dr. McClellan, what does this document
11:13  2    show or state regarding comprising egress node
11:13  3    information adapted for determining an egress node
11:13  4    associated with each of the plurality of packets?
11:13  5          Answer:  When we talk about the fact that
11:13  6    packets are matriculating through here like a Plinko
11:13  7    game, and this is making a path selection, and the
11:13  8    paths are bound to the egress nodes.
11:13  9          And in your opinion, does this -- does
11:14  10   the VeloCloud product meet this element, which is
11:14  11   comprising egress node information adapted for
11:14  12   determining an egress node associated with each of the
11:14  13   plurality of packets?
11:14  14          Yes.
11:14  15          Next section, trial transcript 375:4-10.
11:14  16          So I want to direct you -- because this
11:14  17   is something new, I want to direct you to your binder,
11:14  18   Dr. McClellan, so we can get this in so the jury can
11:14  19   see it.  This is Tab 37.
11:14  20          And this is marked previously PTX-625,
11:14  21   which is VMware source code?
11:14  22          Answer:  Yes.
11:14  23          Dr. McClellan -- this is 375:3 -- 23
11:14  24   through 376:12.
11:14  25          Dr. McClellan, just using the words and

| | | |
|---|---|---|
| 11:14 | 1 | just the words, first of all, tell the jury what this |
| 11:14 | 2 | is, Dr. McClellan. |
| 11:14 | 3 | This is a section from my report that is |
| 11:14 | 4 | an appendix of the report.  And I used the appendix of |
| 11:14 | 5 | the report to compile a summary of the source code. |
| 11:14 | 6 | And this is one piece of the summary of the source |
| | 7 | code. |
| 11:14 | 8 | The highlighted part of the top left, |
| 11:14 | 9 | underlined in red here, talks about particular thing |
| 11:14 | 10 | that's in the software.  And it talks about the fact |
| 11:15 | 11 | that this thing contains elements describing tunnel and |
| 11:15 | 12 | configurations concluding transmit and produce |
| | 13 | statistics for latency, jitter, and bandwidth and loss |
| 11:15 | 14 | as well -- |
| 11:15 | 15 | (Clarification by reporter.) |
| 11:15 | 16 | MR. WALDROP:  I just want to do one |
| 11:15 | 17 | thing.  I just want you to show you the slide, Dr. -- |
| 11:15 | 18 | Judge Albright.  So just to orient you, Your Honor, |
| 11:15 | 19 | this is the slide that the jury is seeing.  It says |
| 11:15 | 20 | VeloCloud switching module. |
| 11:15 | 21 | The switching module is assessed to |
| 11:15 | 22 | obtain information about congestion coupled to the |
| 11:16 | 23 | processor module.  And you see on the left, you see |
| 11:16 | 24 | he's highlighting on the left the flow in this |
| 11:16 | 25 | document, PTX-126, the same way he's -- |

—712—

| | | |
|---|---|---|
| 11:16 | 1 | MR. ROSENTHAL:  I'm so sorry.  I just |
| 11:16 | 2 | want to make sure that we're very clear.  This slide |
| 11:16 | 3 | was never shown.  They removed that language before |
| 11:16 | 4 | they showed it to the jury because I objected. |
| 11:16 | 5 | THE COURT:  Counsel, was this slide |
| 11:16 | 6 | shown? |
| 11:16 | 7 | MR. WALDROP:  This slide -- but -- I |
| 11:16 | 8 | think it might be the wrong slide, but this picture was |
| 11:16 | 9 | shown.  It's just the language at the top -- |
| 11:16 | 10 | THE COURT:  Show me -- |
| 11:16 | 11 | MR. WALDROP:  I'll show you -- |
| 11:16 | 12 | THE COURT:  All I care about is what was |
| 11:16 | 13 | shown to the jury. |
| 11:16 | 14 | MR. WALDROP:  Okay. |
| 11:16 | 15 | (Conference between counsel.) |
| 11:16 | 16 | MR. WALDROP:  They're saying that was |
| 11:16 | 17 | shown, Your Honor, actually.  That actually was shown. |
| 11:16 | 18 | MR. ROSENTHAL:  I had a conversation with |
| 11:16 | 19 | both of these gentlemen.  And I said, I object to that |
| 11:16 | 20 | language that's above there because it says "switching |
| 11:16 | 21 | module."  Your expert doesn't talk about it. |
| 11:17 | 22 | So they removed that language or they |
| 11:17 | 23 | didn't show the slide.  But I know it never went up |
| 11:17 | 24 | there because I was watching very carefully.  I -- it |
| 11:17 | 25 | just never was. |

713

| | |
|---|---|
| 11:17 | 1 |
| 11:17 | 2 |
| 11:17 | 3 |
| 11:17 | 4 |
| 11:17 | 5 |
| 11:17 | 6 |
| 11:17 | 7 |
| 11:17 | 8 |
| 11:17 | 9 |
| 11:17 | 10 |
| 11:17 | 11 |
| 11:17 | 12 |
| 11:17 | 13 |
| 11:17 | 14 |
| 11:17 | 15 |
| 11:17 | 16 |
| 11:17 | 17 |
| 11:17 | 18 |
| 11:17 | 19 |
| 11:17 | 20 |
| 11:17 | 21 |
| 11:17 | 22 |
| 11:17 | 23 |
| 11:17 | 24 |
| 11:17 | 25 |

1    MR. WALDROP:  That slide is --

2    MR. ROSENTHAL:  What matters is the words

3  that are in the transcript in any event.

4    THE COURT:  Right.

5    And -- okay.  Continue.

6    MR. WALDROP:  Can I finish, Your Honor?

7  Then I'll get to -- just, Your Honor, just to get to

8  the -- I don't have to give you everything, Your Honor,

9  but I -- well, I probably should read all this in the

10  slide -- all of this into the record just for the

11  purposes.

12    But there's one citation, Your Honor,

13  which we asked him:  And do you rely on the following

14  functions in the source code related to the switching

15  module coupled to processor module?

16    Yes.

17    THE COURT:  Where are you talking about?

18    MR. WALDROP:  Oh.  I'll show it to you,

19  Your Honor.  Do you want to hear that language, Your

20  Honor?  Is that important?

21    THE COURT:  I need to know where in the

22  transcript it is so Mr. Rosenthal can respond.

23    MR. WALDROP:  So I'll give you -- I'll

24  give you all of the citations, Your Honor.

25    THE COURT:  I would like for you to read

| | | |
|---|---|---|
| 11:17 | 1 | to me and tell me the page number so Mr. Rosenthal can |
| 11:17 | 2 | respond to it. |
| 11:17 | 3 | MR. WALDROP:  So this is -- this -- this |
| 11:18 | 4 | is the document that the witness is talking about, |
| 11:18 | 5 | regardless of the slide.  But this is the document that |
| 11:18 | 6 | the -- |
| 11:18 | 7 | THE COURT:  No, no.  I want to see what |
| 11:18 | 8 | the jury saw that he's talking about. |
| 11:18 | 9 | MR. WALDROP:  Okay.  Okay, Your Honor. |
| 11:18 | 10 | So there's a -- I'm going to -- there's a |
| 11:18 | 11 | bunch of pages, Your Honor, that set this up.  Which he |
| 11:18 | 12 | talks about.  Then I'll start here because I think I've |
| 11:18 | 13 | gotten pretty far. |
| 11:19 | 14 | So starting up from where I left -- this |
| 11:19 | 15 | is 375:4 through 10:  So I want to direct you, because |
| 11:19 | 16 | this is something new, I'm going to direct you then on |
| 11:19 | 17 | your binder, Dr. McClellan, so we can get this in so |
| 11:19 | 18 | the jury can see it.  This is Tab 37.  This is |
| 11:19 | 19 | previously marked PTX-625 which is VMware's source |
| | 20 | code? |
| 11:19 | 21 | Answer:  Yes. |
| 11:19 | 22 | Dr. McClellan, just using the words and |
| 11:19 | 23 | just the words, first of all, tell -- |
| 11:19 | 24 | THE COURT:  Do you have somewhere where |
| 11:19 | 25 | he says "switching module"? |

715

```
11:19   1                      MR. WALDROP:  Yeah.  Yes, Your Honor.
11:19   2    I'm sorry.
11:19   3                      THE COURT:  Or "switching module."
11:19   4                      MR. WALDROP:  So I was just trying to
11:19   5    build credibility.  I've got to have credibility.
11:19   6                      THE COURT:  I want to see where he talks
11:19   7    about what he says the switching module is.
11:19   8                      MR. WALDROP:  Here.  He says --
11:19   9                      THE COURT:  What page are you on?
11:19  10                      MR. WALDROP:  So let me back up to the --
11:19  11    so I'm going to start first with here.  This is
11:19  12    PTX-126.  It's 378:3 through 15.  I'll start there
11:19  13    first.
11:19  14                      And then if I do that, can I read it now?
11:20  15                      THE COURT:  You can do whatever you need
11:20  16    to do.  But you need to understand, all I care about is
11:20  17    hearing where your witness put in evidence that the
11:20  18    accused products have a switching module.  Where he --
11:20  19    where your -- this is not -- you're making this way
11:20  20    tougher, if it exists.  The switching module is a term
11:20  21    that is in the patent.
11:20  22                      And I've never been through a patent
11:20  23    trial where -- it's painful, but where the plaintiff's
11:20  24    expert doesn't march through every claim element.  And
11:20  25    the lawyer says, this is an element.  Show me where it
```

| | | |
|---|---|---|
| 11:20 | 1 | is.  And the witness says, it's here.  This is what I |
| 11:20 | 2 | believe this is. |
| 11:20 | 3 | So somewhere here he needs to have said, |
| 11:20 | 4 | this is what I believe the switching module is.  In |
| 11:20 | 5 | this record. |
| 11:20 | 6 | MR. WALDROP:  393:17 to 394:13, Your |
| 11:20 | 7 | Honor. |
| 11:20 | 8 | THE COURT:  Okay. |
| 11:20 | 9 | MR. WALDROP:  And he's referring to 625A. |
| 11:21 | 10 | And he's specifically asked the question:  Did you rely |
| 11:21 | 11 | on this for the following function of latency switching |
| 11:21 | 12 | module coupled to the processing module? |
| 11:21 | 13 | (Clarification by Reporter.) |
| 11:21 | 14 | MR. WALDROP:  And here he says, |
| 11:21 | 15 | question -- I gave you the longer section, Your Honor, |
| 11:21 | 16 | but I'm just going to the read the part that has the |
| 11:21 | 17 | switching model. |
| 11:21 | 18 | And did you rely on it -- and he's |
| 11:21 | 19 | referring to 625A source code -- for the following |
| 11:21 | 20 | functions related to the switching module coupled to |
| 11:21 | 21 | the processing module? |
| 11:21 | 22 | Yes. |
| 11:21 | 23 | Answer:  Yes. |
| 11:21 | 24 | And did you rely on it for showing the |
| 11:21 | 25 | switching module comprising egress node information |

—717—

11:21  1   adapted for determining an egress node associated with

11:21  2   each of the plurality of packets?

11:21  3                    Yes.

11:21  4                    THE COURT:  Anything else?

11:21  5                    Mr. Rosenthal?

11:21  6                    MR. ROSENTHAL:  Yes, Your Honor.

11:21  7                    That testimony merely says the

11:21  8   information that he relied upon to come to the

11:21  9   conclusion that the claim is infringed.  It's not

11:22  10  sufficient for an expert to say, I think the claim

11:22  11  is -- the claim is infringed and that's it.  Nor is it

11:22  12  sufficient to say, I think this element is infringed

11:22  13  and that's it.  Nor is it sufficient to say, I think

11:22  14  this element is infringed and here's all the things I

11:22  15  looked at that allowed me to come to that conclusion.

11:22  16                    And that's the sum total of what we just

11:22  17  saw.  He never identifies anywhere in the product that

11:22  18  is the processor module, that is the switching module.

11:22  19  And he certainly doesn't ever explain how they're

11:22  20  coupled.

11:22  21                    I just did a keyword search for the word

11:22  22  "coupled" and there's nothing.  I mean, the word

11:22  23  appears three times when someone recites claim

11:22  24  language.  But nobody ever explains what these two

11:22  25  things are -- there are only two -- and how they're

—718—

11:22   1   coupled together in the device.

11:22   2              So none of the elements -- none of the

11:22   3   structural elements of the claims have been addressed,

11:22   4   other than conclusorily.

11:22   5              THE COURT:  Anything else, Mr. Waldrop?

11:22   6              MR. WALDROP:  Yes, Your Honor.

11:23   7              Going back to the section -- going back

11:23   8   to the section on -- that I talked about, 393:17 to

11:23   9   394:13.  Dr. McClellan is talking about Exhibit 625A

11:23   10  which is source code file.  It's an exemplary module.

11:23   11             And I just want to read this for the

11:23   12  record, Your Honor.

11:23   13             I said -- he's asked about the link

11:23   14  scheduler.  And he's talking about the link scheduler

11:23   15  which is a file in Exhibit 625A.  And this is the

11:23   16  evidence and the thing that is the switching module.

11:23   17             And I also, Your Honor, want to talk

11:24   18  about -- I just want to put these in the record.  There

11:24   19  are sections in which he's identifying source code,

11:24   20  which is PTX-625A, which corresponds to the picture

11:24   21  that's showed in PTX-126.

11:24   22             I can read this into the record as well,

11:24   23  Your Honor.  I was doing so earlier, but I wanted to

11:24   24  get to the core to talk about Dr. McClellan talking

11:24   25  about the link scheduler which is shown on PTX-126.

11:24  1    And also talking about the source code that represents

11:24  2    the link scheduler which is the switching module

11:24  3    coupled to the processor module in PTX-625A.

11:24  4                    Unless the Court has particular

11:24  5    questions...

11:24  6                    THE COURT:  Anything else?

11:24  7                    (Conference between counsel.)

11:24  8                    MR. WALDROP:  And that this is the same

11:24  9    link scheduler on PTX-126, Your Honor.

11:24  10                   Thank you.

11:24  11                   THE COURT:  Mr. Rosenthal?

11:24  12                   MR. ROSENTHAL:  After that -- that was a

11:24  13   little hard for me to follow, but I didn't actually see

11:24  14   anything in there where he said, this is where the

11:25  15   switching module is.  Unless I missed it.  I was trying

11:25  16   to read along, but I didn't see that.

11:25  17                   THE COURT:  Or the connection.

11:25  18                   MR. ROSENTHAL:  So I think that's the end

11:25  19   of it.

11:25  20                   THE COURT:  Or the connection.

11:25  21                   MR. ROSENTHAL:  Or the coupling of the

11:25  22   two, certainly.

11:25  23                   Thank you, Your Honor.

11:25  24                   THE COURT:  Anything else, Counsel?

11:25  25                   MR. WALDROP:  The link scheduler is a

720

```
11:25   1   piece of software, Your Honor, that he's discussing
11:25   2   specifically.
11:25   3                   THE COURT:  Okay.
11:25   4                   Anything else?
11:25   5                   MR. ROSENTHAL:  Not from me, Your Honor.
11:25   6                   MR. WALDROP:  There's one more -- there's
11:25   7   one more -- one more, Your Honor, 1149 where he
11:25   8   starts -- so it's 1149:8.  Let me make sure I have the
11:25   9   right page number, Your Honor.  It's 369.  369:8.
11:25  10                   And I said:  Thank you, Dr. McClellan.  I
11:25  11   really appreciate you and the jury having patience for
11:25  12   talking about the switching module, Dr. McClellan.  And
11:25  13   Dr. McClellan, so I have a little -- I want to go ahead
11:25  14   and talk about this document.  And I'm going to direct
11:25  15   you to a question that I have that I think is pretty
11:25  16   clear so we can move on but still understand where we
11:25  17   are.
11:26  18                   Dr. McClellan, with respect to DMPO
11:26  19   mitigating the loss, this mitigation that we talked
11:26  20   about allows DMPO for relieving -- for relieving
11:26  21   congestion.  Do you remember that?
11:26  22                   Yes.
11:26  23                   And I'm going to make a statement -- and
11:26  24   I want to make a statement if you agree, okay.
11:26  25                   This is the mitigation with the use of
```

| | | |
|---|---|---|
| 11:26 | 1 | DMPO which routes the received traffic using per-packet |
| 11:26 | 2 | basis and sends the correct flow of traffic to the |
| 11:26 | 3 | destination determining egress node associated with |
| 11:26 | 4 | each of the plurality of packets. |
| 11:26 | 5 | Do you see that, Dr. McClellan? |
| 11:26 | 6 | Yes.  I see that.  Yes. |
| 11:26 | 7 | And what does that mean to you, |
| 11:26 | 8 | Dr. McClellan? |
| 11:26 | 9 | You don't have to look at the document. |
| 11:26 | 10 | I'm making a statement to see if you agree with that. |
| 11:26 | 11 | Yes.  I agree with that. |
| 11:26 | 12 | And please explain to the jury what that |
| 11:26 | 13 | statement means as it relates to infringement of |
| 11:26 | 14 | VeloCloud. |
| 11:26 | 15 | Well, that statement is a kind of |
| 11:26 | 16 | reinterpretation of what's -- it's a different type of |
| 11:26 | 17 | interpretation of what's shown on the screen here and |
| 11:26 | 18 | what's contained in the report. |
| 11:26 | 19 | It says we've already established that |
| 11:26 | 20 | DMPO establishes tunnels between two endpoints.  So |
| 11:26 | 21 | there are tunnels between two -- every endpoint.  Every |
| 11:26 | 22 | endpoint is a load-balancing network and can be an |
| 11:26 | 23 | egress and ingress node. |
| 11:27 | 24 | It measures latency -- it measures loss, |
| 11:27 | 25 | latency and jitter on every packet on every tunnel |

722

| 11:27 | 1 | between every endpoint, so it's collecting node |

11:27  1   between every endpoint, so it's collecting node

11:27  2   information.

11:27  3              And then he struck that -- that last part

11:27  4   of that answer was stricken as an objection by

11:27  5   Mr. Rosenthal, but I wanted to make sure the Court was

11:27  6   aware of that citation in the record as well.

11:27  7              THE COURT:  Anything else, Mr. Rosenthal?

11:27  8              MR. ROSENTHAL:  No, Your Honor.

11:28  9              (Off-the-record bench conference.)

11:28  10             THE COURT:  The Court is going to grant

11:28  11  the motion for directed verdict.

11:28  12             The plaintiff will have an opportunity to

11:28  13  file a written response to the defendants' motion.  You

11:28  14  all can do whatever normal back-and-forth pleading

11:28  15  there is, and then we will -- because we'll need to get

11:28  16  a written order up for it.

11:28  17             So that takes care of the case.  I will

11:28  18  talk to the jury and let them know that we have

11:28  19  resolved the case.

11:28  20             And I thank you for being here.

11:28  21             (Hearing adjourned.)

22

23

24

25

—723—

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS     )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10             I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13             Certified to by me this 26th day of

14   February 2023.

15

16                         /s/ Kristie M. Davis
                           KRISTIE M. DAVIS
17                         Official Court Reporter
                           800 Franklin Avenue
18                         Waco, Texas 76701
                           (254) 340-6114
11:28                      kmdaviscsr@yahoo.com
19

20

21

22

23

24

25